UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PAUL VESOULIS, | * | CIVIL ACTION NO. 2:19-cv-01795 |
| | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | |
| | * | |
| RESHAPE LIFESCIENCES INCORPORATED f/k/a | * | JUDGE MARTIN L.C. FELDMAN |
| ENTEROMEDICS INCORPORATED, | * | |
| Defendant. | * | MAG. JUDGE DANA M. DOUGLAS |

************************************************

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

ReShape Lifesciences, Inc. f/k/a Enteromedics Incorporated ("ReShape"), submits this Memorandum in Support of its Motion for Summary Judgment.  As set forth below, Plaintiff Paul Vesoulis' state law claims asserted against ReShape are expressly preempted under the Medical Device Amendments of 1976, 21 U.S.C. § 360k(a) ("MDA") and impliedly preempted under Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 353 (2001).  Even to the extent this Court finds that federal preemption does not apply, Plaintiff has failed to establish the essential elements of his state law claims.  Plaintiff cannot show that ReShape's alleged noncompliance of FDA regulations caused his injuries.  Accordingly, ReShape is entitled to summary judgment dismissing Plaintiff's claims, with prejudice.

## I.     PROCEDURAL HISTORY

On January 10, 2019, Plaintiff filed his Petition for Damages in the Twenty Fourth Judicial District Court for Jefferson Parish, Louisiana, alleging that he suffered injuries and damages arising from procedures involving a medical device—specifically, the Endoscopic ReShape Integrated Dual Balloon (the "balloon").  See R. Doc. 1.2 On February 27, 2019, ReShape removed

the lawsuit to this Court under 28 U.S.C. § 1332 on federal diversity jurisdiction grounds.  See R. Doc. 1.

In his Petition, Plaintiff asserts that ReShape, as manufacturer of the balloon, is liable under the Louisiana Products Liability Act ("LPLA") because the product was allegedly unreasonably dangerous in its (1) construction or composition; (2) design; and (3) inadequate warning.  See R. Doc. 1.2, ¶7.  On December 13, 2019, Plaintiff filed a First Amended Complaint.  See R. Doc. 25. In the Amended Complaint, Plaintiff clarified his allegations, asserting that ReShape "is liable based solely upon [its] failure to comply with the PMA Approval Order and applicable FDA regulations, and thereby, is also liable under the Louisiana Products Liability Act's parallel provisions regarding failure to warn, La. R.S. 9:2800.57(A) and breach of the defendants post-sale duty to warn, La. R.S. 9:2800(C)."  See R. Doc. 25, ¶7.  In his Amended Complaint, Plaintiff makes a separate claim that ReShape is "liable for failing to comply with the Premarket Approval Order issued by the FDA and applicable FDA regulations…regarding labelling and warnings" and reporting instances of death or serious injury through the required filing of MAUDE reports with the FDA.  See R. Doc. 25, ¶8.  In support of the claims in his Amended Complaint, Plaintiff attached a report drafted by George Samaras, M.D. dated December 12, 2019. See R. Doc. 23-2. In response to Plaintiff's Petition and Amended Complaint, ReShape filed answers denying all liability claims, and asserted federal preemption under 21 U.S.C. § 360k(a) as an affirmative defense.  See R. Doc 22, aff. def. 35; R. 30, aff. Def. 35.

## II.   **FACTUAL BACKGROUND**

### A.   **The Product**

The Integrated Dual Balloon is a temporary weight-loss medical device.  See ReShape Integrated Dual Balloon System Instructions for Use, attached hereto as Exhibit "A," at ReShape-

000002.  The balloon is designed to occupy space in the stomach and produce a sensation of satiety to promote weight loss.  See id.

Treatment associated with the balloon occurs in three phases:

1) Implement phase:  A trained medical doctor delivers the balloon down the esophagus and implants the device in a patient's stomach via a delivery catheter.  See id.

2) Monitoring phase:  Once inserted, the balloon is inflated and left in the stomach for up to six months.  While the balloon is inside of a patient's stomach, the patient is under medical supervision.  See id.

3) Explantation:   A trained medical doctor removes the balloon from the patient's stomach.  See id.

The known risks associated with the implant and explant procedures include potential esophageal perforation, pancreatitis, and death. See id. at ReShape-000004-7.  The balloon's labeling and marketing materials clearly indicate these known risks. See Labeling and Marketing Materials, attached hereto as Exhibit "B," at ReShape-000039, 109, 132, 134, 136, 142, 147, 149, 202, 205. Also, the ReShape Integrated Dual Balloon System Instructions for Use, which are provided to physicians who perform the implant and explant procedures, fully and unambiguously explain all known risks associated with the balloon. See Ex. A, at ReShape-000004-23.  The Integrated Dual Balloon System Instructions for Use instruct physicians to communicate all potential risks and complications to patients. See id. at ReShape-000005, 6 ("[I]t is the responsibility of the physician to advise the patient of known risks and complications associated with the procedure and the device.").

**B.    The Subject Procedure**

On July 27, 2017, Plaintiff, an Ohio native, elected to have the balloon inserted by Dr. Thomas Lavin ("Lavin") at Surgical Specialists of Louisiana, LLC ("SSOL") in Metairie,

Louisiana.  See R. Doc. 1.2, ¶3.  Before the implant procedure, Plaintiff signed an informed consent form, provided by Dr. Lavin, informing Plaintiff of all risks associated with the procedure, specifically including "upper gastrointestinal tract or intra-abdominal organs including perforation (tearing)."  See Endoscopic Balloon Procedure Consent Form, executed 7/27/17, attached hereto as Exhibit "C," at p. 1.  Plaintiff's explant procedure occurred on January 11, 2018.  Before the explant procedure, Plaintiff signed another informed consent form, which notified him of the risks associated with the procedure, including "a risk of bleeding or perforation of the esophagus, stomach or duodenum."  See Consent for Endoscopic Removal of Intragastric Balloon, executed 1/11/18, attached hereto as Exhibit "D," at p. 1. During the balloon's removal Plaintiff purportedly suffered a 2 mm esophageal perforation.

### C.      The Pre-Market Approval Application Process

Before ReShape's acquisition of the balloon in October 2017, the balloon underwent a rigorous premarket approval ("PMA") evaluation process with the United States Food and Drug Administration ("FDA"). The FDA stringently regulates medical devices via the comprehensive regulatory system implemented under the authority of the Federal Food, Drug, and Cosmetic Act ("FDCA").  See 21 U.S.C. §§ 321 et. seq.  The regulatory system is designed to ensure the safety and effectiveness of medical devices through both pre-market and post-market controls.

The Medical Device Amendments ("MDA") to the FDCA, 21 U.S.C. § 360k, classifies medical devices into three categories based on the degree of risk they pose to the public.  See e.g. Martin v. Medtronic, Inc., 254 F.3d 573, 576 (5th Cir. 2001).  Class III devices,[1] such as the balloon, are the most strictly regulated and must undergo an "indisputably thorough, rigorous, and

---

[1] In general, a device is assigned to Class III if it cannot be established that a less stringent classification would provide reasonable assurance of safety and effectiveness, and the device is either "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or "presents a potential unreasonable risk of illness or injury."  See 21 U.S.C. §360c(a)(1)(C)(ii).

costly pre-market review (some 1,200 FDA man-hours at hundreds of thousands of dollars in cost) by the FDA." Id. at 576.

During the PMA application process, the manufacturer must provide the FDA with detailed information regarding the safety and efficacy of the devices, including full reports of all information that is known by the applicant (including data from clinical trials), a full statement of the device's components, ingredients, and properties, a full statement of the principle or principles of operation, samples of the proposed labeling and the device itself (or access thereto), and a full description of the methods and facilities used for designing, manufacturing and testing the device. See 21 U.S.C. § 360e(c)(1).   The FDA approves the warnings and directions for physicians contained in the User's Manual through the PMA process, specifies the labeling requirements, and approves the exact label that is issued. See Kanter v. Warner-Lambert Co., 99 Cal. App. 4th 780, 784-85 (2002).

The FDA, through the PMA process, also approves the "Patient Guide" used to provide information and warnings to patients.  See id.  A manufacturer is prohibited from producing or labeling any device in any manner inconsistent with the conditions of approval specified by the FDA. 21 C.F.R. § 814.80.  Moreover, the manufacturer must submit a supplemental application regarding certain proposed changes for FDA approval before implementing such changes.  21 C.F.R. § 814.39(d).

After pre-market approval and marketing, the manufacturer has continuing obligations: to report certain adverse events and other safety related issues to the FDA, to submit to FDA inspections, and to respond to FDA requests for information. The FDA requires additional post-market controls, including manufacturing controls and record keeping and reporting requirements. See 21 C.F.R. Parts 803, 820. The FDA has the exclusive power to inspect companies to ensure

compliance with its regulatory requirements; issue appropriate remedies, such as warnings, corrective labeling, notification to doctors or patients; and recall products if it believes a product poses a hazard. See e.g. 21 U.S.C. §§ 351, 352, 360(h), 374.

On July 1, 2014, the balloon's PMA application was received by the Center for Devices and Radiological Health of the FDA. See FDA Medical Device Database Website (www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P140012), PMA of ReShape Integrated Dual Balloon System, printed page attached hereto as Exhibit "E." The FDA approved the application and found the balloon safe for commercial sale and distribution on July 28, 2015. See ReShape Approval Order, attached as Exhibit "F." ReShape was forbidden from making changes concerning the balloon's design specifications, the manufacturing process, product labeling and warnings without FDA approval. See 21 U.S.C. §§ 360e(d)(6)(A)(i).  Importantly, neither Plaintiff in the Petition for Damages, not Plaintiff's expert in his report asserts that ReShape made any changes to the labeling.

## **LAW AND ARGUMENT**

### **III.   Summary Judgment Standard**

A summary judgment shall be granted if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; See Little v. Liquid Air Corp., 37 F.3d 1069 (5th Cir. 1994) (en banc); See also Gray v. Indus. Plant Maint., 01-1167, 2004 WL 1661209 at * 3 (E.D. La. July 23, 2004).  As to issues that the non-moving party bears the burden of proof at trial, the moving party may satisfy this summary judgment burden by demonstrating the absence of evidence supporting the non-moving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Once the movant makes such a demonstration, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue

of material fact requiring trial. See id.  The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-249 (1986); Little, 37 F.3d at 1075.  If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment as prayed for.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322.

In this instance, the material facts surrounding the Plaintiff's subject medical procedures and the regulatory history of the balloon are not in dispute.  Rather, the issues in this Motion are legal issues.  The controlling legal authority from the United States Supreme Court, the United States Fifth Circuit Court of Appeal, and this Court hold that state law tort claims involving a Class III medical device that has successfully completed the PMA process, such as the balloon, are preempted under the MDA, 21 U.S.C. § 360k(a). See e.g. Gomez v. St. Jude Med. Daig Div. Inc., 442 F.3d 919, 928 (5th Cir. 2006); Hughes v. Boston Scientific Corp., 631 F.3d 762, 768 (5th Cir. 2011); see also Bass v. Stryker Corp., 669 F.3d 501, 507 (5th Cir.2012); Parra v. Coloplast Corporation, No. CV 16-14696, 2017 WL 24794, at *3 (E.D. La. 2017); Chiasson v. Medtronic Inc, No. CV 16-3552, 2016 WL 4191837, at *2 (E.D. La. 2016); Hinkel v. St. Jude Med., S.C., 869 F. Supp. 2d 739, 744 (E.D. La. 2012). Even to the extent this Court finds that federal preemption does not apply, Plaintiff has not and cannot support his claims. Accordingly, the Court should dismiss Plaintiff's claims against ReShape, with prejudice.

## IV.   Plaintiff's Claims are Preempted

### A.   Plaintiff's Claims are Expressly Preempted by Federal Statute, 21 U.S.C. § 360k(a)

The Supremacy Clause of the United States Constitution provides that the "Laws of the United States ... Shall be the supreme Law of the Land."  Hinkel, 869 F. Supp. 2d at 744 citing to U.S. Const. Art. VI, cl. 2. When state law conflicts with federal law, the state law is without effect

7

under the Supremacy Clause. Id., citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, (1992). However, because of the important principles of federalism in areas of public health and safety, the states' police power will not be preempted by federal law unless congressional intent to the contrary is clearly expressed. Id. citing Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985).

In this instance, the United States Supreme Court has unequivocally stated that the preemption clause enacted in the MDA bars state tort lawsuits challenging the safety or effectiveness of a Class III medical device given PMA by the FDA. See Chiasson, No. CV 16-3552, 2016 WL 4191837, at *3 citing Riegel, 552 U.S. 312 (2008); Lohr, 518 U.S. 470 (1996).

> The MDA sets forth, in pertinent part:
>
> (a) General Rule
> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
> (1) which is different from, or in addition to, any requirement under this chapter to the device, and
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). Under this authority, Plaintiff's tort claims are preempted because a finding of liability against ReShape under Louisiana law arising from requirements not imposed by the FDA during the PMA process would undermine the FDA's central oversight role for the device. Wildman v. Medtronic, Inc., 874 F.3d 862, 867 (5th Cir. 2017).

In Riegel v. Medtronic, Inc., the Supreme Court interpreted 21 U.S.C. § 360k, and established a two-prong test to determine whether the MDA preempts state tort law. Under the test, the MDA preempts state tort law (1) if "the FDA has established requirements applicable to the device at issue"; and (2) if "the state law at issue creates a requirement that is related to the device's safety or effectiveness and is '"different from or in addition to" the federal requirement.'"

552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). See also Hughes, 631 F.3d at 768; Bass, 669 F.3d at 507 ("Devices that are approved through PMA procedures automatically satisfy the 'federal requirements' prong"). As discussed in Section A(2) below, Plaintiff does seek to impose additional requirements with his state law claims. Because the balloon is (1) a PMA approved, Class III medical device subject to FDA requirements, and (2) Plaintiff's state law claims impose requirements different from and in addition to the FDA safety requirements, his LPLA claims are preempted by federal law.

### 1.     The ReShape Balloon is a Class III, Medical Device, and, Therefore, Subject to Premarket Approval

The FDA "grants premarket approval only if it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness,'" as determined by "weigh[ing] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." Id. citing 21 U.S.C. §§ 360e(d); 360c(a)(2)(C)). Therefore, even where a device presents a great health risk, it may be approved where it offers great benefits in light of available alternatives. Id. Once a device is approved, the manufacturer is forbidden to make changes in design specifications, manufacturing process, labeling or any other attribute that would affect the safety or effectiveness of the device without FDA approval. Id. citing 21 U.S.C. §§ 360e(d)(6)(A)(i). See e.g. Gomez, 442 F.3d at 928, citing 21 C.F.R. § 814.80 (prohibiting the production or labeling of any device in a manner inconsistent with any conditions of approval specified in the approval order); 21 C.F.R. § 814.3a(d) (requiring an applicant to submit a supplemental application setting forth any proposed changes for FDA approval before implementing any changes). Devices that the FDA approves through the PMA process automatically satisfy the "federal requirements" prong. Calloway v. Coloplast Corp., No. CV 18-0992, 2019 WL 2169222, at *3 (W.D. La. Feb. 5, 2019), report and recommendation adopted, No. CV 18-0992, 2019 WL 2166539 (W.D. La. May 17, 2019). This

Court has previously taken judicial notice of the FDA's website noting a medical device's MDA classification, and should do so in this case because it is undisputed that ReShape's balloon is a Class III medical device that received PMA.  See Exs. E and F; Parra, No. CV 16-14696, 2017 WL 24794, at *3; Scianneaux v. St. Jude Medical S.C., Inc., 961 F. Supp. 2d 808, 812 (E.D. La. 2013) (taking judicial notice of the FDA's website).  Accordingly, the first prong of Riegel is satisfied.

**2.     Plaintiff's State Law Claims Are Preempted Because They Seek to Impose Requirements that are Different From, or In Addition to Those Required Under Federal Law**

The salient issue before the Court is whether Plaintiff's state law claims impose different or additional requirements on the balloon; the second prong of the Riegel analysis.  See Hinkel v. St. Jude Med., S.C., 869 F. Supp. 2d 739, 745–46 (E.D. La. 2012).  In his Petition for Damages and First Amended Complaint, Plaintiff asserts the following claims under the LPLA:

1. The product in question was unreasonably dangerous in construction or composition [manufacture] pursuant to La. R.S. § 9:2800.55;
2. The product in question was unreasonably dangerous in design pursuant to La. R.S. § 9:2800.56;
3. The production in question was unreasonably dangerous because of an inadequate warning pursuant to La. R.S. § 9:2800.57. (R. Doc. 1.2, ¶7);
4. ReShape's alleged failure to comply with the PMA Approval Order and applicable FDA regulations makes it liable for breaching its duty warn under La. R.S. § 9:2800.57(A) and post-sale duty to warn under La. R.S. § 9:2800.57(C).

Under Louisiana law, a plaintiff may not recover under any theory of liability against a product manufacturer that is not set forth in the LPLA.  See Parra, No. CV 16-14696, 2017 WL 24794, at *2; see also, Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 261 (5th Cir. 2002) (claims for negligence, strict liability, and breach of express warranty are not available as theories of recovery against a manufacturer, independent from the LPLA); Jefferson v. Lead Indus. Ass'n, 106 F.3d 1245, 1250 (5th Cir. 1997).

With respect to whether requirements are "different from" or "in addition to" federal MDA requirements, any standards that a jury could impose upon a manufacturer under the LPLA would certainly be "in addition" to and/or "different from" the standards imposed by the federal government when the federal standards have been met by the manufacturer. See Riegel, 128 S. Ct. at 999. Specifically, Plaintiff's design defect claim is preempted because the FDA has already assessed the risk and utility of the design of the balloon. Id. at 1004 (quoting 21 U.S.C. § 360e(c)(1)) (noting that a PMA application must include a "full statement" of a Class III device's "components, ingredients, and properties and of the principle or principles of operation"). Plaintiff's manufacturing claim is preempted because ReShape followed the federally-approved manufacturing process for the balloon. Id. at 1006 (quoting 21 U.S.C. § 360e(c)(1)) (noting that a PMA application includes "a full description of the methods used in, and the facilities and controls used for, the manufacture" of a medical device). Plaintiff's warning claim is preempted because it challenges the sufficiency of the FDA-approved labeling and warnings for the balloon. Id. at 1011; see also, 21 U.S.C. § 360c(a)(2)(B); 21 U.S.C. § 360e(d)(1)(A). Plaintiff's labeling claim is preempted because the FDA has already evaluated the safety and effectiveness under the conditions of use set forth on the label and has determined that the label is neither false nor misleading. Id. at 1004 (quoting 21 U.S.C. § 360c(a)(2)(B) and 21 U.S.C. § 360e(d)(1)(A)).

Further, in order to prevail on his state law claims, Plaintiff must prove that the balloon was unreasonably dangerous.  See La.Rev.Stat. § 9:2800.54.  He cannot succeed without directly contradicting the FDA's PMA finding that the balloon is "safe and effective" when designed, manufactured, marketed, and used in accordance with its labels.  Riegel, 128 S.Ct. at 1007, citing Medronic, Inc. v. Lohr, 518 U.S. 470, 512 (1996).

This Court has routinely held that claims brought under the LPLA are preempted by the MDA.  See Parra v. Coloplast Corporation, No. CV 16-14696, 2017 WL 24794, at *3 (E.D. La. 2017); Chiasson v. Medtronic Inc, No. CV 16-3552, 2016 WL 4191837, at *2 (E.D. La. 2016); Hinkel v. St. Jude Med., S.C., 869 F. Supp. 2d 739, 744 (E.D. La. 2012). See also Calloway, No. CV 18-0992, 2019 WL 2169222, at *4; and Poole v. Hologic, Inc., No. 10–314, 2010 WL 3021528 (W.D. La. Jul. 29, 2010) (the manufacturer moved for judgment on the pleadings, and the court granted the motion, finding that each of the plaintiff's claims would necessarily impose requirements that are "different from, or in addition to" the requirements approved by the FDA and would directly contravene the FDA's determination that the device was both "safe and effective").  Indeed, even before the Supreme Court's decision in Riegel, the Fifth Circuit reached the same conclusion.  Gomez v. St. Jude Medical Daig Div. Inc., 442 F.3d 919 (5th Cir.2006).

In Gomez the plaintiff sued the manufacturer of a Class III medical device called the Angio–Seal, asserting that the product was defective under the LPLA due to its unreasonably dangerous design, for its failure to include an adequate warning, and for its failure to conform to an express warranty.  Id. at 930-32.  Essentially adopting the same two-prong test that the Supreme Court subsequently adopted in Riegel, the Fifth Circuit reasoned that the plaintiff's LPLA claims amounted to a "state-law challenge" to the federally countenanced requirements for the device, and thus found them completely preempted by Section 360k(a).  Id.  Indeed, "State tort law that requires a manufacturer's [devices] to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect."  Id.  Moreover, state tort law cannot "question the sufficiency of the FDA-approved labeling, warnings, and instructions or require the manufacturer to have included different warnings, labels, or instructions with the device."  Hughes, 631 F.3d at 769.

12

In keeping with the foregoing legal authority, Plaintiff's LPLA claims asserted against ReShape are expressly preempted by the MDA, and are due to be dismissed as a matter of law.

> **B.      Plaintiff's Parallel State Law Claims Fail Because He Has Not and Cannot Establish that a Violation of the FDA Regulations and Premarket Approval Order Caused his Injuries**

In his Amended Complaint, Plaintiff alleges that his state law claims are parallel claims arising from ReShape's failure to comply with the Premarket Approval and FDA regulations and, therefore, are not preempted by 21 U.S.C. §360k of the MDA.  .  See R. Doc. 25, ¶¶7, 8.  In support of his position, Plaintiff cites two cases that are distinguishable from the current case: Hughes v. Boston Scientific Corp., 631 F.3d 762 (5th Cir. 2011) and Bush v. Thoratec Corp., 2012 WL 2513669 (E.D. La. 6/28/12).

In Hughes, the plaintiff claimed that a medical device manufacturer substantively violated the FDA's reporting requirements by under-reporting deaths or serious injuries caused by the device.  See Hughes, 631 F.3d at 765-66.  The Hughes plaintiff argued that the failure to comply with federal warning guidelines violated a parallel duty to warn under Mississippi state law. The Fifth Circuit found that the plaintiff's claims were not expressly preempted because they fell under the Riegel parallel claims exception.  Hughes is factually distinguishable from the present case because (1) it pertains to Mississippi state law; (2) the manufacturer breached substantive, not administrative, FDA regulations in failing to report a large number of significant adverse events based on an algorithm that the FDA directed the manufacturer to abandon; and (3) the FDA directed the manufacturer to change its reporting.

In Bush, this Court denied a manufacturer's motion to dismiss a plaintiff's claim that the manufacturer violated federal law by failing to include suggested content in an Urgent Medical Device Correction letter, which also allegedly violated the manufacturer's duty to warn under Louisiana law.  Bush, WL 2513669, at p*2.  Bush is not persuasive in the present matter as the

manufacturer raised the issues in a motion to dismiss and, therefore, the Court considered the plaintiff's allegations as true.

Even to the extent that Plaintiff has successfully made parallel claims that fall under the express preemption exception in <u>Riegel</u>, he cannot establish that a violation of FDA regulations caused his alleged injuries.

In support of his claims, Plaintiff attaches an expert report drafted by George Samaras, dated December 12, 2019. <u>See</u> R. Doc. 25-2. In discovery, Plaintiff produced an updated Samaras report dated June 21, 2020. <u>See</u> Samaras Report, dated 6/21/20, attached hereto as Exhibit "G" In his reports, Samaras summarizes his opinions as follows:

> "Defendant, ReShape Lifesciences (a) engaged in the manufacturer and marketing of a complex, implantable, medical device that increased the risk of patient serious injury in violation of the federal approval order; and (b) flawed labeling and failures of critically important public medical device reporting, not only increased risk to additional patients, but also delayed recognition and rectification of the root cause(s) by multiple entities to protect the public health."

<u>See</u> Ex. G at p. 25.  As an initial matter, Samaras' reports are replete with errors, misleading statements, irrelevant data, and incomplete information. [2]  Compounding this problem is that in his reports, Samaras invents support for his unfounded conclusions that are, ironically, based on a fundamental misunderstanding of his purported area of expertise.

Ultimately, the Samaras reports fail to support that ReShape violated FDA Regulations and Premarket Approval Order regarding labeling.  Further, Plaintiff cannot establish that ReShape's alleged minimal late reporting of adverse events or alleged mislabeling caused Plaintiff's damages.

---

[2] For example, Samaras uses statistics of all implant intragastric Class III devices, not just the balloon, to conclude that the purported risks associated with the balloon are higher than reported and, therefore, ReShape failed to appropriately warn medical providers. <u>See</u> Ex. I, p. 3. Samaras also discusses an improperly relies upon irrelevant FDA Class II recalls associated with the balloon that occurred nearly one year before Plaintiff's implant procedure.

### 1. ReShape Did Not Violate FDA Labeling Requirements

In his reports, Samaras does not dispute that the labeling meets the FDA regulatory requirements under 21 CFR 801.5(A); 801.109(D). <u>See</u> Expert Report of Sally L. Maher, JD, RAC, dated 7/10/20, attached hereto as Exhibit "H," at p. 4. On Page 19, Section 3.3.1 of his report, Samaras states in a footnote that the FDA advised Reshape of labeling deficiencies in 2015 and he references Bates ReShape-089828. <u>See</u> Ex. G, p. 19. This is a mischaracterization of the referenced document, which is an email question from the FDA reviewer to ReShape, **during the review process of the PMA**, asking them to simplify the language in their labeling and advertising documents. See Ex. H, p. 4.  In fact, ReShape responded to the FDA's inquiry and simplified the language, and the FDA ultimately approved the PMA including the revised language.  <u>See</u> <u>id.</u>

Although the Samaras reports raise issues associated with font size, the FDA does not mandate specific font sizes for documents. <u>See</u> 21 CFR §§801.5(A), 801(D), 801.105, 801.109; <u>see</u> <u>also</u> Ex. H, at p. 4-5. But moreover and more importantly, the FDA has already approved all of ReShape's labeling. Dr. Samaras appears to be arguing that the patient brochures do not meet **his interpretation** of the human factors standards.  <u>See</u> Ex. G, p. 5.  However, as this is a PMA device, the content of all advertising and labeling is reviewed and approved by the FDA. Accordingly, Dr. Samaras' opinion on this topic is irrelevant for purposes of Plaintiff's claim.

In addition, as discussed above and in Dr. Samaras' report, before both procedures, the patient signed the informed consent forms, which included a discussion of the associated risks, one of which was esophageal perforation. As such, *even if* ReShape breached the FDA's guidelines on labeling, and *even if* the FDA had not specifically approved the labeling, the breach could not have proximately caused Plaintiff's alleged injuries because he ultimately was aware of all risks associated with the procedures.

2.      **Plaintiff Misrepresents ReShape's Alleged Failure to Comply With Reporting Requirements and Fails to Establish a Causal Link Between Any Failure and His Alleged Injuries.**

Plaintiff claims that, had he known of the risks associated with the balloon, he would not have undergone the procedures.  This claim is attenuated, completely speculative, and ignores the fact that Plaintiff—**who is a medical doctor**—signed multiple informed consent forms acknowledging the known risks associated with the balloon procedures.  Specifically, Plaintiff asserts that ReShape failed to timely report adverse events associated with the balloon to the FDA.  Had ReShape timely provided this information to the FDA, according to Plaintiff's purported theory, the FDA would have taken some action to provide him with the information before the implant procedure, and he would have foregone the elective procedures that ultimately caused his injury.  Plaintiff, however, is unable to meet his burden of proving that ReShape's alleged failure to timely report adverse events associated with the balloon caused his alleged injury.

Again, Plaintiff offers the Samaras reports in support of his failure to report claim; and again, Samaras provides intentionally misleading evidence. In section 3.3.2 of his report, Samaras claims that ReShape violated the FDA's Approval Order, which provides:

> Manufacturers of medical devices…are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:
> 1. May have caused or contributed to a death or serious injury; or
> 2. Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to occur.

Ex. F, p. 4. Information regarding all reported issues associated with a medical device are on the Manufacturer and User Facility Device Experience ("MAUDE") database. Manufacturers, practitioners, and/or patients report issues—referred to as "events"—with medical devices on the MAUDE database, which is in the public domain and easily accessible online.   See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm.

In his report, Dr. Samaras explains that he searched the MAUDE database for the reported events associated with the balloon from December 30, 2015 through April 30, 2020, and he found ninety-eight events, which he analyzed to determine how many were reported within thirty days from the actual event as required under the FDA's Approval Order. In Figure 5 of the Report, Samaras includes a chart plotting the difference between the FDA reported event date and the date that the FDA received the report as to each of the ninety-eight events. He concludes that nearly half of the events were reported more than thirty days after they occurred and, therefore, Figure 5 and the data therein is evidence of "a defective and violative (*sic.*) postmarket (*sic.*) vigilance effort on the part of [ReShape]… [and] demonstrates incomplete and untimely reporting of deaths, serious injuries, and device malfunctions in violation of [ReShape's] internal procedures, US federal regulations, and engineering best practices." See Ex. G, p. 21-22. In several ways, Samaras improperly reaches and overstates this conclusion as it relates to the issues and claims in the present lawsuit:

i.   Samaras' Conclusions Rely on an Incorrect Timeframe.

In his report, Samaras examines data from the MAUDE database regarding events that occurred from December 30, 2015 to April 30, 2020. However, the relevant reported events for purposes of Plaintiff's claims are those that occurred on or before June 27, 2017—thirty days *before* the July 27, 2017 implant procedure. Under the FDA Approval Order, any events that occurred after June 27, 2017 would not be reported late until after Plaintiff's balloon implementation procedure. Accordingly, even if ReShape failed to timely report events after Plaintiff's implementation procedure, that information could not have affected Plaintiff's decision to use the balloon.

According to the MAUDE database, searching with the proper date range of December 30, 2015 to June 27, 2017, forty-two events involving the balloon were reported.

ii.   Samaras' Conclusions Misstate Manufacturers' Legal Duties Under the FDA Approval
      Order to Report Events.

Samaras misstates ReShape's duty under the FDA Approval Order, which requires "Manufacturers of medical devices… to report to FDA no later than 30 calendar days **after the day they receive or otherwise become aware of information**, from any source, that reasonably suggests" issues associated with a manufacturer's marketed device. See Ex. F, p. 4. Samaras presents a diagram that represents only the time between the event date and the date of the report to the FDA, and **he completely ignores the date that the manufacturer became aware of the event**. See Ex. G, p. 22. It is the manufacturer's knowledge of an event that triggers the duty to report it to the FDA, not the date that the actual event occurs.  Without notice, it is impossible for the manufacturer to report an event to the FDA. What makes Samaras' deception worse is that, as with all event related data, the date that the manufacturer became aware of the event is readily available on the MAUDE database.

Samaras' flawed Figure 5 purports to show that, based on the event date and date that the FDA received notice, twenty of the forty-two relevant events were reported late. When using the actual correct trigger of **the date that the manufacturer became aware of the event**, the MAUDE database shows that Reshape reported exactly **three** events—all of which involved either minor or known risks—more than thirty days after receiving information regarding those events. This critical error in Samaras' understanding of the FDA Approval Order reporting requirement extinguishes any evidence that ReShape's dilatory reporting caused Plaintiff's injuries.

iii.   The FDA Received Reports of Relevant Events Well Ahead of the Implant Procedure.

According to the MAUDE database, of the forty-two potentially relevant events, only three were actually reported late.  The following table summarizes the late reported events:

18

| Date of Event | Date ReShape Informed | Date Reported | Reporting Delay | Issue |
|---|---|---|---|---|
| 12/30/15 | 12/30/15 | 2/18/16 | 20 | Nausea, vomiting, dehydration while balloon implanted |
| 4/2/16 | 4/2/16 | 10/19/16 | 170 | Pancreatitis while implanted |
| 6/3/16 | 6/6/16 | 7/11/16 | 5 | Nausea and vomiting while balloon implanted |

Two conclusions can be drawn from this table. First, the FDA had a significant amount of time between receiving notice of the late reported events and Plaintiff's implant procedure on July 27, 2017.  Second, the issues raised in the late reported events were all known risks that Plaintiff acknowledged in the consent form that he signed before the implant procedure. Moreover, Plaintiff did not experience any of the issues listed in the above table. Therefore, the fact that ReShape failed to comply with the administrative reporting requirements under the FDA Approval Order could not have caused Plaintiff's alleged injuries.

### C.   Even if not Expressly Preempted, the Implied Preemption Doctrine Bars Plaintiff's Claims.

Even if a claim is not expressly preempted by § 360k(a), it may be impliedly preempted under Buckman v. Plaintiffs' Legal Comm. Riley, 625 F. Supp. 2d at 776. Plaintiff's LPLA claims are the type of claim that is impliedly preempted by the MDA under Buckman. 531 U.S. at 341. Any claim arising out of ReShape's alleged misrepresentations to the FDA in obtaining or maintaining approval for the balloon is precluded by Buckman. In Buckman, the plaintiff sued the manufacturer of allegedly defective orthopedic bone screws under state tort law for making fraudulent representations to the FDA. Buckman, 531 U.S. at 343-44. Under the Buckman plaintiff's theory, the manufacturer made intentional misrepresentations to the FDA in the course of obtaining pre-market approval. Id. at 341. Ultimately, the plaintiffs argued that absent these misrepresentations, the FDA would not have approved the screws, and the plaintiff would not have

been injured. Id. at 343. The Court held that plaintiff's state law fraud/misrepresentation claim was impliedly preempted by the FDCA. Id. at 348. The Buckman Court reasoned that policing a manufacturer's alleged omissions and/or misrepresentations to a federal agency was not a traditional state role, and noted that the FDA's authority to punish such conduct was used "to achieve a somewhat delicate balance of statutory objectives." Id. "The relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." Id. at 347.

The Court determined that if courts applying state law were permitted to find disclosures to the FDA to "be judged insufficient," the FDA's ability to protect the public would be frustrated. Id. at 351. Additionally, potential applicants would be forced into the burdensome dilemma of trying to comply with the FDA's detailed rules while "in the shadow of 50 states' tort regimes." Id. at 350. The product of this dual regulatory scheme is both a deterrence to potential applicants and a flood of gratuitous information being submitted to the FDA. Id. at 351.

The vast majority of courts have specifically rejected claims like that being asserted by Plaintiff here, finding them to be unequivocally preempted by Buckman. For example, in Webster v. Pacesetter, Inc., the court stated: "what was told to the FDA cannot support a tort claim." 259 F. Supp. 2d 27, 37 (D.C. Cir. 2003). The plaintiff in Webster argued that if the defendant manufacturer had adhered to MDA requirements regarding record-keeping, adverse incident reporting, investigation, monitoring and complaint file maintenance, the medical device would have been recalled or placed on alert notice and the plaintiff would not have been injured. Id. at 39. The court held, "This is precisely the type of claim barred by the Supreme Court [in Buckman]." Id.

Additionally, similar to the instant case, the plaintiff's in In re Medtronic, Inc. Sprint Fidelis Leads alleged that the device manufacturer delayed filing over 120 adverse event reports in violation of FDA regulations and the FDCA. 592 F. Supp.2d 1147, 1153. The court noted:

> "Plaintiffs are really alleging that Medtronic violated the FDCA by failing to inform the FDA in a timely fashion of adverse lead events. Such a claim necessarily fails, because no private right of action exists under the FDCA. Plaintiff cannot make an end run around this rule by recasting violations of the FDCA as violations of state… law."

Id. at 1160-1161. The court concluded that their claims were barred under an analysis of both Riegel and Buckman.

Furthermore, even in the minority of jurisdictions that have allowed claims based on violations of federal regulations, they have only been allowed in cases of substantive violations, not administrative violations. See King v. Danek Medical, Inc., 37 S.W.3d 429 (Tenn. App. 2000). In King, the court held that the administrative requirement that a device be approved by the FDA before being marketed, as opposed to the substantive requirement that the device be safe and effective, was merely a tool to facilitate administration of the underlying regulatory scheme. Id. at 457 (citing to regulations contained in the MDA). The court explained that since such administrative requirements lack independent substantive content, they do not impose a standard of care, the breach of which could form the basis of a state law claim. Id.

Ultimately, a "private litigant cannot bring a state-law claim against a defendant when the state-law claim is in substance (even if not in form) a claim for violating the FDCA—that is, when the state claim would not exist if the FDCA did not exist." Buckman, 531 U.S. at 352-353. Where federal enactments are a critical element of a plaintiff's case, the claims cannot be said to stand alone and thus are preempted. See Desiano v. Warner-Lambert & Co., 467 F.3d 85 (2nd Cir. 2007) (the source and "vintage" of the duty in the claims asserted in Buckman were different from the

source and "vintage" of the duty that pertains in traditional tort claims); <u>Caraker v. Sandoz Pharms. Corp.</u>, 172 F. Supp. 2d 1018, 1039 (S.D.Ill. 2001) (a claim will be preempted where the federal enactments predate the state tort law). Thus, there is only a narrow gap into which a plaintiff's claims must fit if he is to escape both express and implied preemption. <u>Riley</u>, 625 F. Supp. 2d at 777. "The plaintiff must be suing for conduct that violates the FDCA (or else his claim is expressly preempted by §360k(a)), but the plaintiff must also not be suing because the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman")". <u>Id.</u> Here, Plaintiff claims under the LPLA rely on the violation of the FDCA and, therefore, do not fit into this discrete gap. <u>See</u> R. Doc. 25, ¶7 ("Plaintiff herein alleges that defendant is liable **solely upon defendant's failure to comply with the PMA Approval Order and applicable FDA regulations**, and thereby, is also liable under the Louisiana Products Liability Act's parallel provisions").

The court in <u>In re Medtronic, Inc. Implantable Defibrillators Litig.</u> gave examples of typical duties directly owed to a patient arising under state tort law, including 1) a manufacturer's duty to discontinue the sale of a device with a possible defect; 2) a manufacturer's duty to advise patients and physicians directly about potential defects; and 3) a manufacturer's duty to inform the public if a safer model was available. 465 F. Supp. 2d 886, 899 (D. Minn. 2006). Plaintiff in the instant case points to no such similar duties, but only cites to the specific reporting requirements and labeling contained in the FDCA and PMA Approval Order as a basis for his claims. <u>See</u> R. Doc. 25, ¶¶7, 8. Plaintiff's claims do not exist without the FDA regulations; the federal enactments are a critical element of his case such that his claims do not stand alone. He is not relying on traditional state tort law which predated the federal enactments in question. He is not relying on a general duty to warn, but is specifically relying on ReShape's reporting obligations pursuant to its PMA as set forth in 21 C.F.R. § 803, et seq. The "source and vintage" of his claims are the FDA

regulations. He unsuccessfully attempts to invent a separate state requirement that is conveniently almost identical to the federal requirement. As such, he cannot fit his claims in the narrow gap left after Riegel and Buckman.

Further, the reporting regulations contained in the MDA, which Plaintiff maintains were not properly met in this case, are just the type of administrative tools used by the FDA to facilitate the administration of its underlying regulatory scheme. Here, Plaintiff has alleged only that ReShape violated administrative, and not substantive, federal regulations. This will not support a claim under the rationale of King, 37 S.W.3d at 429.

Claims alleging violations of the FDCA are not preempted because they run afoul of Section 360k(a), which is the type of preemption addressed in Riegel. Rather, such claims are impliedly preempted by 21 U.S.C. § 337(a), which states

> "All proceedings for the enforcement or to restrain violations of the FDCA 'shall be by and in the name of the United States.' Hence, 'the FDCA leaves no doubt that it is the Federal Government rather than private litigants [which is] authorized to file suit for noncompliance with the medical device provisions' in the FDCA.... As a result, when Sections 337(a) and 360k(a) - as construed in Buckman and Riegel, respectively - are read together, nearly all types of claims concerning FDA-approved medical devices are preempted. . . ."

Id. at 26 (citing Buckman, 531 U.S. at 349, n. 4). For these reasons, Plaintiff's claims arising out of violations of FDA regulations must be rejected.

## V.  Plaintiff Failed to Establish the Essential Elements of His LPLA Claims

If this Honorable Court should find that any of Plaintiff's LPLA claims are not preempted by federal law, ReShape is nonetheless entitled to summary judgment as a matter of law because Plaintiff has not and cannot establish the essential elements of his claims under the LPLA. The Louisiana Products Liability Act establishes the exclusive theories of liability for manufacturers for damage caused by their products. La. Rev. Stat. § 9:2800.52.  The claimant has the burden of proving his/her claims under the LPLA.  La. Rev. Stat. § 9:2800.54(D). According to Part (A) of

Louisiana Revised Statutes § 9:2800.54, "The manufacturer of a product shall be liable to a claimant for damages proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." The characteristic of the product that renders it unreasonably dangerous must have existed at the time the product left the control of its manufacturer. La. Rev. Stat. § 9:2800.54(C).

Essential to every claim for liability under the LPLA is a showing that a defect in the product rendered it unreasonably dangerous. First, Plaintiff has not established that the balloon was defective in any way. Indeed, the balloon performed as designed: after implementation; it assisted in Plaintiff's weight loss. Deposition of Dr. Lavin, attached hereto as Exhibit "I," 76:1-76:11. Plaintiff claims that he suffered a small esophageal tear when Dr. Lavin removed the device. Notably, Plaintiff does not identify any alleged defect or suggest that a defect in the balloon actually caused the tear. Plaintiff filed an unsuccessful medical malpractice claim before a medical review panel against Dr. Lavin, asserting that it was Dr. Lavon's breach of the medical standard of care that caused the esophageal tear. Further, Plaintiff has not tested or otherwise evaluated the subject device for defects and, therefore, cannot genuinely represent that a defect exists.

Second, Plaintiff has not and cannot establish that some defect in the balloon rendered the device unreasonably dangerous. In fact, the FDA's PMA found that the balloon is "safe and effective," not unreasonably dangerous, when designed, manufactured, marketed, and used in accordance with its labels. Riegel, 128 S.Ct. at 1007, citing Medronic, Inc. v. Lohr, 518 U.S. 470, 512 (1996). Finally, Plaintiff's LPLA claim that ReShape failed to provide an adequate warning is unsupported. Under the LPLA, "Adequate warning" is defined as "a warning or instruction that

would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made." La. R.S. § 9:2800.53(9). ReShape clearly and unambiguously warned of the known risks associated with the balloon in its marketing materials and Instructions for Use. See Ex. A. Further, ReShape instructed the operating physicians to communicate all potential risks and complications to patients. See id. Before both the implant and explant procedures, Dr. Lavin required Plaintiff to sign informed consent forms that clearly explained the risks and complications associated with the balloon, including the possibility of an esophageal tear. See Exs. C and D. Therefore, adequate warning is exactly what Plaintiff received before the implant and explant procedures.

## CONCLUSION

For the foregoing reasons, Plaintiff's state law tort claims are expressly or impliedly preempted under federal law. Further, Plaintiff has not and cannot establish the remaining essential elements of his claim. Therefore, ReShape Lifesciences, Inc. f/k/a Enteromedics Incorporated is entitled to a complete dismissal of plaintiff's claims with prejudice.

Respectfully submitted,

   /s/ Rachel G. Webre
RACHEL G. WEBRE (No. 26907)
TUCKER T. BOHREN (No. 37039)
Email:        rwebre@glllaw.com
                  tbohren@glllaw.com
GIEGER, LABORDE & LAPEROUSE, L.L.C
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone:     (504) 561-0400
Facsimile:     (504) 561-1011
Counsel for Defendant, ReShape Lifesciences
Incorporated f/k/a Enteromedics Incorporated