Case 2:19-cv-01795-MLCF-DMD Document 95-6 Filed 03/23/21 Page 1 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PAUL VESOULIS           * CIVIL ACTION
                        * NO. 19-cv-01759
                        *
VERSUS                  * JUDGE:
                          MARTIN L.C. FELDMAN
                        *
RESHAPE LIFESCIENCES,   * MAGISTRATE JUDGE:
f/k/a ENTEROMEDICS      * DANA M. DOUGLAS
INCORPORATED            *

  Videotaped Corporate Deposition of
ReShape LifeSciences f/k/a Enteromedics, Inc.,
through its representative, MARY LOU MOONEY,
taken via ZOOM Videoconference, on Wednesday,
the 27th day of January, 2021.

APPEARANCES (ZOOM):

  LEGER & SHAW
  Attorneys at Law
  (By:  Franklin G. Shaw, Esquire)
  512 East Boston Street
  Covington, Louisiana 70433

    (Attorneys for the Plaintiff,
      Paul Vesoulis)

  BLUE WILLIAMS, LLP
  Attorneys at Law
  (By:  Kelly M. Brian, Esquire)
  1060 West Causeway Approach
  Mandeville, Louisiana 70471

    (Attorneys for the Defendant,
      Dr. Thomas Lavin and Surgical
      Specialists of Louisiana, LLC)

**EXHIBIT F**

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 23

1    Q    It is entirely possible for ReShape
2 to calculate the percentage of adverse events
3 for the entire population of balloons that had
4 sold from the date of the PMA approval
5 forward, is that true?
6    A    Yes. We would have records of
7 number of devices sold, and we would have
8 records of reported complaints, so yes.
9    Q    And the PMA approval included
10 post-approval studies, did it not?
11    A    Yes, it did.
12    Q    What was the purpose of those
13 studies?
14    A    That's a typical requirement
15 following a PMA. It's basically generally
16 designed to continue to collect additional
17 safety data on the product. It's fairly
18 common for any PMA device, or any device
19 approved through a PMA, to have a
20 post-approval study assigned to it, and that
21 is under a specific protocol that's reviewed
22 and approved by the FDA.
23    Q    And what documents would be
24 received by a physician, such as Dr. Lavin, in
25 connection with any labeling or warnings that

Page 24

1  would be issued by ReShape?
2       A    The instructions for use for the
3  product contain that information.
4       Q    I'm looking at the first big batch
5  of documents that I'm going to start going
6  through, which would be a portion of the
7  various documents that were attached to the --
8  and they're not stapled, yet they should be.
9            MS. WEBRE:
10                Are you talking about the
11       Request for Admissions?
12           MR. SHAW:
13                Right.  That would be marked as
14       "Exhibit 4."
15  EXAMINATION BY MR. SHAW:
16       Q    It has been admitted in this case
17  by both ReShape and by Dr. Lavin that prior to
18  the implantation of the ReShape intragastric
19  balloons in Mr. Vesoulis, on July 27, 2017,
20  that the MAUDE reports that are attached
21  thereto were not sent to that physician.  You
22  can review those if you'd like.  Do you agree
23  with that?
24           MS. WEBRE:
25                Hold on, Frank.  You're saying

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 32

1  death can result from sepsis?
2      A    I did not consult with any
3  physicians.  The purpose of the MAUDE report
4  is to report the findings of the event.
5      Q    From March 29 of 2016 until
6  July 27, 2017, did you have any communications
7  with the FDA regarding death from sepsis
8  secondary to esophageal perforation?
9      A    Any communications would have been
10  MAUDE-reported events.  I don't recall offhand
11  whether there were any such events in that
12  time window, but if there were, those would
13  have been reported through the MAUDE database.
14      Q    Was the MAUDE database the
15  exclusive reporting that was done by ReShape
16  to the FDA regarding adverse events?
17      A    Yes, that is our regulatory
18  responsibility, to report all serious adverse
19  events.  Any that do not qualify or meet the
20  regulatory criteria of a serious adverse event
21  are captured within the complaint handling
22  system of the company and executed under
23  standard operating procedures.
24      Q    Are you aware of anyone at ReShape
25  communicating with the FDA regarding the

Case 2:19-cv-01795-MLCF-DMD   Document 95-6   Filed 03/23/21   Page 5 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 34

1   regarding either of these two deaths that were
2   issued by ReShape?
3       A     I don't recall what specific dates
4   or communications to health care providers
5   were issued.  I think there were some.  I
6   don't believe they were for this subject, but
7   I don't have access to those records, so I
8   can't confirm that.
9       Q     To your recollection, was there any
10  communication with Dr. Lavin, Thomas Lavin, or
11  Louisiana Surgical Specialists, regarding
12  these two deaths, prior to August 10 of 2017
13  when the FDA letter came out, Dear Doctor
14  Letter, concerning the number of deaths
15  involving intragastric balloons?
16      A     The regulatory process and our
17  responsibility, as a manufacturer, was to
18  report those through the MAUDE database, and
19  there's no responsibility or regulation that
20  requires us to report it to any health care
21  provider, including Dr. Lavin, so I would not
22  have expected any of that information to be
23  communicated to him.
24      Q     Did you consider that any changes
25  to the instructions for use had to have FDA

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 36

```
 1         were just in, on Page 111 of the PDF.
 2         That's where it is.
 3              THE WITNESS:
 4                   Okay.  That's helpful, Rachel,
 5         thank you.  Okay, I've got it.
 6   EXAMINATION BY MR. SHAW:
 7         Q    This particular IFU, if you'll look
 8   at the ReShape Document No. 2, is designated
 9   as Revision G; is that correct?
10         A    That appears to be correct, yes.
11         Q    So I would assume that there had
12   been some previous revisions to this IFU, is
13   that right?
14         A    Yes.
15         Q    And if you look at Page 5 of the
16   IFU.  It's ReShape Document No. 6.
17         A    Yes.
18         Q    The third to the bottom paragraph.
19         A    Yes.
20         Q    It says, quote, "It is important to
21   discuss all possible complications and adverse
22   events with the patient," unquote.  Do you see
23   that language?
24         A    I do.
25         Q    Okay.  But the MAUDE reports were
```

Case 2:19-cv-01795-MLCF-DMD Document 95-6 Filed 03/23/21 Page 7 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 37

```
 1   not sent to the treating physicians, were
 2   they?
 3        A    No, they were not.  That's not a
 4   requirement.
 5        Q    And the notice of adverse events or
 6   the occurrence of adverse events were also not
 7   communicated to the treating physician, were
 8   they?
 9        A    The notice of adverse events or
10   occurrence?  Which document are you referring
11   to?
12        Q    Well, I'm asking, from this
13   requirement in the IFU, that adverse events be
14   discussed with the patient.
15        A    Right.  Possible types of adverse
16   events, that's correct.
17        Q    And what do you mean when you say,
18   "Possible types of adverse events"?
19        A    Known potential adverse events,
20   which are listed in the product labeling, in
21   the warning sections, and in the sections that
22   contain data from the original study.  I'm
23   looking -- let's see -- for the section I'm
24   thinking of here.  You can see that the
25   original clinical study is listed and the
```

Case 2:19-cv-01795-MLCF-DMD   Document 95-6   Filed 03/23/21   Page 8 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 41

```
 1              Yeah, as I've restated -- I'll
 2       restate, any events that are captured
 3       are reported through the MAUDE database.
 4       That is the regulatory process that we
 5       follow.
 6  EXAMINATION BY MR. SHAW:
 7       Q    Okay.  And so death is an adverse
 8  event which gets reported, is that true?
 9       A    You -- you basically report the
10  event.  So if the FDA -- the FDA typically
11  will capture the event that led to the death,
12  but the description will include the outcome
13  of that event, and if death was the outcome,
14  that would be recorded, and in the MAUDE
15  database, that would be recorded as a death.
16  You can search that database and it will be
17  listed as a death and then it will explain the
18  associated event.
19       Q    And the adverse events of death of
20  patients who received ReShape intragastric
21  balloons are not communicated to the treating
22  physicians --
23       A    All of the --
24       Q    -- after the PMA study, is that
25  true?
```

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 42

1    A    All of the adverse events that
2  occur are communicated through the MAUDE
3  database, as required by regulation.
4    Q    Okay.  Isn't it true that the CFR
5  also allows ReShape to directly contact
6  treating physicians for any updated labeling
7  that may be necessary?
8    A    That's -- that's an updated IFU
9  issue that would be sent to all prescribers,
10  and IFUs are updated periodically.  Yes, I
11  agree with that statement.
12    Q    In fact, this particular IFU was
13  updated to warn of the risk of acute
14  pancreatitis, was it not?
15    A    You mean subsequent to this
16  Revision G?
17    Q    No, in this Revision G.
18    A    In this Revision G?  Let me see if
19  I can find it.  Do you know which page that's
20  on?
21    Q    I will tell you in just a minute.
22    A    Okay.
23    Q    I didn't get to highlight these.
24         MS. WEBRE:
25              Mary Lou, I'll direct your

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 45

1 no deaths that had occurred as a result of the
2 use of these balloons, is that true?
3     A    Yes. The FDA requires your
4 instructions for use to have a summary of your
5 clinical study results, including the safety
6 results.
7     Q    But why wasn't the IFU updated to
8 also reflect the two deaths to which we have
9 been referring, which occurred after PMA
10 approval, after the clinical study, but before
11 the implantation of Mr. Vesoulis's balloons?
12     A    I just lost volume. I can't --
13 it's frozen to me right now.
14     Q    Did you hear the question?
15     A    No. It froze for a minute there.
16 Now I can hear you. Could you repeat that?
17     Q    Okay. Do you know why the IFU that
18 was in Dr. Lavin's possession at the time that
19 Mr. Vesoulis' balloons were placed, on
20 July 27, 2017, did not reflect or in any way
21 reference the two deaths that occurred, one
22 from aspiration, as of May of 2017, and one
23 from sepsis, secondary to esophageal
24 perforation, as of March 29, 2016?
25     A    There is not a requirement to

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 46

1  update the IFU, based upon every single,
2  individual event received.  It's reviewed in
3  terms of the types of events that can happen,
4  and when those events start to appear where
5  they were not evident before, or if they
6  appear in a distinctive increase in frequency,
7  those are the things that will typically
8  involve a review and update of an IFU.  And
9  FDA also monitors these, through the MAUDE
10 database, and they, at their discretion, can
11 reach out to manufacturers and request some of
12 those updates, as was done with the acute
13 pancreatitis and the aspiration, so there are
14 two vehicles.
15      Q    So you would agree with me that a
16 treating physician cannot warn of any adverse
17 events or discuss any adverse events with his
18 patient unless he is actually notified that
19 there had been an adverse event, isn't that
20 true?
21           MS. WEBRE:
22                Let me just put my objection on
23      the record.  First of all, I'm objecting
24      because you cut off her answer.  Please
25      don't cut her off.  Second of all, I

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 47

1          object to the suggestion, the only way
2          he can find out information about
3          adverse events or risks is to get it
4          directly from the company.  So if you
5          can answer, you can answer.
6               THE WITNESS:
7                    I think a treating physician
8          with specialty in the field can describe
9          for a patient, if he were to have any of
10         the types of events we had been speaking
11         about, that any of those can lead to
12         further sequelae, in any given
13         situation.  So our obligation is to
14         report the events that we know have been
15         seen, in the clinical study, or in
16         practice, and then it's up to the
17         physician to describe that and to
18         communicate that to the patients.
19   EXAMINATION BY MR. SHAW:
20        Q    So it's your testimony, sitting
21   here today, that the treating physician should
22   check the MAUDE database for adverse events
23   prior to him placing these balloons?
24        A    No.  The point I was trying to make
25   is the physician, because it is a prescription

Case 2:19-cv-01795-MLCF-DMD   Document 95-6   Filed 03/23/21   Page 13 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 48

1  device, uses the information we provide in the
2  IFU to provide informed consent to the patient
3  about the possible adverse events that may
4  occur with the balloons.
5      Q    Okay.  And the IFU specifically
6  states, with regard to the clinical study that
7  was used for premarket approval, that no
8  deaths had been experienced as a result of the
9  use of this device, isn't that true?
10     A    That's the data in Revision G.
11 That was the clinical study, correct.
12     Q    But, in fact, ReShape knew that
13 there had been a death, in March of 2016, and
14 a death in May of 2017, and did not advise the
15 treating physician, is that true?
16     A    We reported through the MAUDE
17 database, as required.  We did not contact any
18 individual physicians, which is not required.
19     Q    And wouldn't you agree that the IFU
20 does not specifically state that the treating
21 physician should check the MAUDE database for
22 adverse events --
23     A    The IFU --
24     Q    -- prior to speaking with a
25 patient?

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 76

1  is that true?
2      A    Correct.
3      Q    And the treating physicians were
4  not advised of that particular death and the
5  instructions for use prior to July 27, 2017,
6  is that true?
7      A    Yes, the instructions were not
8  updated, and there is no provision for a
9  requirement to send MAUDE reports to
10 physicians.
11           MR. SHAW:
12                Let's go off the record real
13      quick, Ms. Mooney, and let me look at
14      the Notice of Deposition of what I
15      wanted to ask you about, and odds are, a
16      lot of it has already been covered.
17           THE WITNESS:
18                Okay.
19           MR. SHAW:
20                And I can fill in any gaps that
21      might exist.
22           THE VIDEOGRAPHER:
23                We're off the record.
24                (Whereupon, a break was taken).
25           THE VIDEOGRAPHER:

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 83

1  hadn't already met with and decided to have
2  the balloon procedure done.  That was the base
3  line.  So for those that had already chosen to
4  have the procedure and made that decision,
5  they were then subsequently informed about the
6  study and given the option to participate in
7  it.
8       Q    And so as far as persons that were
9  not involved in the study, did you consider
10 it -- what did you consider ReShape's
11 obligations were with regard to disclosing any
12 aspects or any risks of the use of its
13 product, the intragastric balloons?
14      A    That falls within IFU
15 communications.  That's the standard
16 communication, the vehicle to patients and the
17 health care providers, for commercially
18 available or distributed products.
19      Q    And the IFU would be the sole
20 vehicle through which information would be
21 transmitted to the treating physician, in
22 your --
23      A    As it relates to the product, yes,
24 that's correct.
25      Q    And that would also include any

Case 2:19-cv-01795-MLCF-DMD   Document 95-6   Filed 03/23/21   Page 16 of 17

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 84

1  risks that may have come to the attention of
2  ReShape, but that had not been yet approved by
3  the FDA, for inclusion in the IFU?
4     A    Right.  The information of this --
5  participating in this protocol related to any
6  information that would change their opinion to
7  stay in the study.
8          One example I might give, is if we
9  had elected to revise the protocol and require
10 all study participants to undergo a diagnostic
11 endoscopy.  We would be obliged to let them
12 know that's a new requirement of the study, so
13 that they could decide whether they were
14 willing to continue to participate in the
15 study.
16    Q    Do you believe that treating
17 physicians should be notified of other
18 instances involving death, of intragastric
19 balloons?
20    A    Our obligation is to provide
21 updated information through the instructions
22 for use about all potential adverse events,
23 and our obligation is to update those if event
24 incidents change, as what happened with some
25 of the updates we've already talked about

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 85

```
 1   earlier, with pancreatitis.  So that's the
 2   vehicle for updating.  There's not an
 3   obligation to notify treating physicians of
 4   every, every event reported.
 5        Q    But in order to accurately explain
 6   and discuss a risk of something with a
 7   patient, a treating physician needs to know
 8   what the actual experience has been, of a
 9   product, with regard to those particular
10   risks, does he not?
11        A    And risks of perforation have been
12   included in the instructions for use, so
13   physicians were aware of the risk of
14   esophageal perforation.
15        Q    The instructions for use
16   specifically noted that the actual instances
17   of death were nonexistent, did it not?
18        A    That was specific to the clinical
19   study.
20        Q    And there was no information added,
21   once two post-PMA deaths occurred, prior to
22   the implantation of Mr. Vesoulis' balloons,
23   did it?
24        A    No, because those were associated
25   with risks that had already -- those deaths
```