# IN THE
# US DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

*in re* Paul Vesoulis,
**Plaintiff**,
*-vs-*
RESHAPE LIFESCIENCES,
F/K/A ENTEROMEDICS, INC.
a DE Corporation,
**Defendant**

## EXPERT WITNESS REPORT
of
### George Michael Samaras
Diplomate, National Academy of Forensic Engineers
Physiologist (PhD) / Industrial Engineer (DSc)
Licensed Professional Electrical Engineer (PE)
Licensed Professional Software Engineer (PE)
Board-certified Human Factors Engineer (CPE)
Board-certified Forensic Engineer (DFE)
ASQ-certified Quality Engineer (CQE)
ASQ-certified Biomedical Auditor (CBA)

### Managing Partner
### Samaras & Associates, Inc.
### Pueblo, CO   USA
www.samaras-assoc.com
(719) 485-3751

June 21, 2020

EXHIBIT

I

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# EXECUTIVE SUMMARY

This report was commissioned by Plaintiff's counsel and represents about 80 hours of research, review, auditing, analyses, and writing beginning in mid-August 2019.

I am a working biomedical scientist and interdisciplinary engineer (hardware, software, human factors, and quality) whose interest, expertise, and focus are medical device product development across the full product lifecycle – from concept to disposal.

This report is organized as follows: (a) identification of my expert witness credentials, (b) brief review of the subject matter relevant to this case; (c) detailed overview of my findings; and (d) summary of opinions that I would provide, should I be asked to testify.  I offer no opinion on medical causation, which is outside the scope of my practice; I do offer specific scientific, engineering, and regulatory opinions related to matters regarding the use of the medical device designed, manufactured, and sold by Defendant in the US prior to it being removed from the market.

The appendices in this report include: (A) a prose description of my expert witness credentials, (B) an academic-style curriculum vitae; (C) listing of recent State and Federal expert witness work; (D) a detailed exposition of human factors issues for medical devices in general, but also central to this particular case; (E) a discussion of off-label use and misguided use; and (F) a discussion of medical device complaint handling and reporting requirements.

The general conclusions from this effort are: (a) the product deployment resulted in a complex, implantable, medical device that increased the risk of patient serious injury; and (b) the flawed labeling and failures of critically important public medical device reporting, not only increased risk of this hazard to additional patients, but also delayed recognition and rectification of the root cause(s) by multiple entities to protect the public health.  The hazards associated with both these sets of Defendant's decisions were known and foreseeable to individuals skilled in medical device engineering and management.

As illustrated in Figure 6, complexity associated with the deployment of an FDA-approved medical device is mirrored in the myriad failures by Defendant to meet the standard of care.  These are organized around failures of postmarket vigilance, risk communication, labeling, and regulatory compliance.  My opinions are offered to a reasonable degree of scientific and engineering certainty in the specific disciplines identified in this report.  This report is not intended for a jury; it is a compromise between technical accuracy and accessibility by the Court and Defense. Terms of art are initially *italicized* and, after being defined or put in context, used without further elaboration.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# Table of Contents

EXECUTIVE SUMMARY ............................................................................................................ 2

SECTION 1:  EXPERT WITNESS CREDENTIALS.............................................................................. 5

SECTION 2:  BACKGROUND/SUBJECT MATTER OF TESTIMONY................................................. 6

    Section 2.1: US Medical Device Regulation ........................................................................ 6

    Section 2.2: Lifecycle Risk Management............................................................................. 7

    Section 2.3: Human Subjects Medical Experimentation .................................................. 11

    Section 2.4: Standard of Care for Defendants ................................................................. 13

SECTION 3:  REVIEW/ANALYSIS OF THE RECORD ...................................................................... 15

    Section 3.1: Plaintiff Treatment ...................................................................................... 16

    Section 3.2: Defendant Regulatory Approval Activities .................................................. 17

    Section 3.3: Defendant Post-Approval Activities ............................................................ 19

SECTION 4:  ROOT CAUSE ANALYSIS & ISHIKAWA DIAGRAM .................................................. 23

SECTION 5:  SUMMARY OF OPINIONS ..................................................................................... 25

SECTION 6:  REFERENCES ....................................................................................................... 25

APPENDIX A:  GM SAMARAS EXPERT WITNESS CREDENTIALS SUMMARY ...................................... 26

    A1: Expert Witness Credentials ....................................................................................... 27

    A2: Certifications & Licensure ......................................................................................... 29

APPENDIX B:  GM SAMARAS CURRICULUM VITAE ...................................................................... 32

APPENDIX C:  GM SAMARAS RECENT EXPERT WITNESS WORK ................................................... 45

APPENDIX D:  HUMAN FACTORS ENGINEERING MEDICAL DEVICES ............................................... 48

    D1: Historical Perspective............................................................................................... 49

    D2: HF&E in Medical Devices .......................................................................................... 53

    D3: Requirements for Medical Device Manufacturers .................................................... 56

    D4: Organizational Design and Management (Macroergonomics)................................... 58

APPENDIX E: OFF LABEL USE & MISGUIDED USE ....................................................................... 61

    E1: Off-Label Use ........................................................................................................... 62

    E2: Misguided Use ......................................................................................................... 63

    E3: Transition from Off-Label Use to Misguided Use ...................................................... 64

APPENDIX F: COMPLAINT HANDLING & MDR PROCEDURES ....................................................... 66

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## List of Figures

Figure 1:  Anatomy of the Human Stomach ..................................................................... 6
Figure 2:  FDA Regulatory Processes - PMA vs. 510(k) ................................................... 7
Figure 3:  Timeline of Salient Events ............................................................................ 15
Figure 4:  ReShape Duo Balloon ................................................................................... 16
Figure 5:  Reshape Reporting Delays >30 Days Beyond Adverse Event........................... 22
Figure 6:  Ishikawa Diagram of Increased Risk ............................................................. 24
Figure 7:  The Varying Levels of Tool Interfaces ........................................................... 50
Figure 8:  System Use Errors Ishikawa Diagram ........................................................... 53
Figure 9:  Individual User Errors Ishikawa Diagram ...................................................... 53
Figure 10:  Federal Reporting Requirements for MDRs.................................................. 69
Figure 11:  Post-Market Vigilance for Medical Device Manufacturers ............................ 70

## List of Tables

Table 1: System Use & Individual User Error Types......................................................... 8
Table 2: Elements of Lifecycle Risk Management ........................................................... 9
Table 3: Timeline of Some Rules Related to Protection of Human Subjects...................... 12
Table 4: ReShape Balloon Regulatory Submissions: 2014 – 2018................................... 18
Table 5: Labeling Analysis Table.................................................................................. 19
Table 6: Examples of Overt and Covert Interface Factors .............................................. 52
Table 7: Human Factors Standards & Guidance Documents........................................... 55

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## SECTION 1:  EXPERT WITNESS CREDENTIALS

I am a biomedical scientist and interdisciplinary engineer whose interest, expertise, and focus are medical device product development and deployment across the full product lifecycle – from concept to disposal.  My education, training, experience, and peer-reviewed publication record in this area has spanned nearly the past half-century.  A prose summary of my qualifications is in Appendix A; my full CV is in Appendix B.  A listing of my recent expert witness work is in Appendix C.

I offer opinions in this matter based upon my education, training, and experience and to a reasonable degree of scientific and engineering certainty in the specific disciplines identified:

- Biomedical opinions are offered as a doctor of physiology and former medical school professor.
- Engineering opinions are offered as a doctor of industrial engineering, a licensed professional engineer, Board-certified in both human factors engineering and forensic engineering, a former engineering graduate school professor and a former CEO of an FDA-regulated biomedical engineering product development firm.
- Opinions related to regulations, industry standards, and engineering best practices are offered as a certified quality engineer, a certified biomedical auditor, and a former FDA reviewer and manager.

This report is not intended for a jury; it is a compromise between interdisciplinary technical accuracy and accessibility by the Court and Defense. Terms of art are initially *italicized* and, after being defined or put in context, used without further elaboration.  This report is NOT exhaustive.  My objective is to provide a high-level overview of the relevant biomedical technical subject matter and my specific observations from my review of the Record to support the summary of my opinions.  Two of my objectives in preparing this report are to:

- Provide the Court with a basis to find that my opinions are relevant and reliable; and
- Provide the Defense, and their experts, with the technical basis for my opinions.

My scientific, engineering, and regulatory forensic[1] analyses and biomedical auditing, like legal reasoning, arise from a comparison of the case specifics in the Record with generally accepted knowledge, standards, and regulations in the various relevant domains; this results in an opinion regarding deviations and their implications.  The fundamental issue relevant in this case relates to the risk of an improperly distributed, improperly marketed, and improperly used implantable regulated medical device.

---

[1] See also:  Liptai L & Cecil J.  Forensic Engineering and the Scientific Method.  JNAFE, 26(1):147-155 (2009), ISSN:2379-3252

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# SECTION 2:  BACKGROUND/SUBJECT MATTER OF TESTIMONY

This case concerns the use of *bariatric*[2] medical device.  Modern day use of the term "bariatric" refers to the medical subfield associated with weight loss, weight control, and obesity treatment; the global bariatric surgery devices market was valued at nearly three quarters of a billion $US in 2016.[3]  More generally, the term refers to procedures and devices used for large or high weight individuals.  Bariatric medical procedures span the range from counseling to invasive surgery; bariatric medical devices span the range from specialized beds & lifts to implantable prosthetic medical devices.  Implantable prosthetic bariatric medical devices include such products as esophagus (see Figure 1) flow restriction devices (e.g., LAP bands[4]), stomach (see Figure 1) space-occupying devices (various inflatable gastric balloons), electronic devices that modulate afferent parasympathetic signals (e.g., vagal nerve modulator), etc. all intended to reduce caloric ingestion/consumption by various means.



Figure 1:  Anatomy of the Human Stomach[5]

In the US, the manufacturers (and the sale) of medical devices are regulated by the federal Food & Drug Administration (FDA).

## *Section 2.1: US Medical Device Regulation*

US medical device regulation is risk-based; three risk classifications are identified: Class 1 (low risk; FDA general controls), Class 2 (moderate risk; general controls + FDA premarket notification), and Class 3 (high risk; general controls + FDA premarket approval).   Risk depends primarily upon intended use and the uncertainty regarding establishing safety, effectiveness, and usability of a new medical device.

---

[2] The term bariatric is derived from contraction of the Greek terms *baros* (weight, load, burden) and *iatric* (pertaining to medicine).
[3] See: https://www.transparencymarketresearch.com/bariatric-surgical-devices.html Accessed 6/10/20.
[4] **LAP**aroscopic adjustable gastric band
[5] From: https://courses.lumenlearning.com/suny-ap2/chapter/the-stomach/  Accessed 6/11/20.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Figure 2, based on the well-known 1990 Henderson-Clark product innovation model, illustrates this in greater detail for Class 2 and 3 devices[6].  New devices that have a legally marketed predicate are required to provide premarket notification and obtain administrative[7] clearance prior to marketing in the US.  New devices that have no legally marketed predicate are required to obtain premarket approval (which is substantially different from administrative clearance) prior to marketing in the US.  An alternative is *de novo* reclassification[8].  Clinical trials are required for all premarket approval requests and for a minority of premarket notifications.



*Figure 2:  FDA Regulatory Processes - PMA vs. 510(k)*

**This is relevant as the Reshape medical device involved in this case is a Class III, high risk, medical device that was approved for marketing by the FDA under a PMA (P140012).**

## Section 2.2: Lifecycle Risk Management

Safety refers to freedom from unintentional harms; security refers to freedom from intentional harms.[9]  A product manufacturer's obligation for product safety & security extends across the whole

---

[6] Samaras, GM.  Exactly What Medical Device Innovation Are You Talking About? MD+DI Online. August 10, 2012
[7] 21 CFR 807 is the regulation for manufacturer registration, listing, and premarket notification
[8] 21 CFR 860 SubPart C
[9] Samaras, EA & Samaras, GM.  Commentary: Stakeholder Dissonance Impedes Medical Device Cyber-Risk Reduction. AAMI Biomedical Instrumentation & Technology. 52(4): 296-304, July/August 2018.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

product lifecycle – from concept to salvage/disposal.[10]  In the case of implantable/reusable medical device manufacturers, this obligation arguably extends beyond salvage/disposal to retrieval analysis, since explanted/reused devices offer rare insight into actual[11] device performance.  Medical device manufacturers are responsible for identifying and mitigating the known and foreseeable risks of system use errors and individual user errors (21 CFR 803.3c) of their products (see Table 1)[12], including expected use, unexpected use, and misuse[13], but not abuse, of their products (see also Appendix D).

*Table 1:  System Use & Individual User Error Types[14]*

| ERROR TYPE | ERROR CATEGORY | |
|---|---|---|
| | SYSTEM USE ERROR | INDIVIDUAL USER ERROR |
| EXPECTED BEHAVIOR | ACTIVE (KNOWN BUGS) | ROUTINE USE |
| UNEXPECTED Behavior | LATENT (UNKNOWN BUGS) | NOVEL USE |
| MISGUIDED Behavior | DRIFT (BEYOND DESIGN ENVELOPE) | MISUSE |
| MALICIOUS Behavior | SABOTAGE | ABUSE |
| | LOCUS OF CONTROL: DEVELOPMENT, DEPLOYMENT, & MAINTENANCE ORGANIZATIONS | LOCUS OF CONTROL: INDIVIDUAL HUMAN(S) |

Copyright © 2011-12, GM Samaras   All Rights Reserved

Risk is the uncertainty of the deviation from an expected or predicted outcome.  Most senior executives learn <u>financial</u> risk management: "*The identification, analysis, assessment, control, and avoidance, minimization, or elimination of unacceptable risks. An organization may use risk assumption, risk avoidance, risk retention, risk transfer, or any other strategy (or combination of strategies) in proper management of future events.*"[15]  But, there are two (2) general types of risk management: *financial* risk management and *product/process/service* risk management; the appropriate strategies are not identical.  For example, the well-accepted financial risk management strategy of risk transfer – in this case, from manufacturer to patient - is illogical for a regulated medical device manufacturer.  The principle of *caveat emptor*, especially in the presence of a learned intermediary, is meaningless for a consumer of implantable[16] medical devices, when neither the

---

[10] Samaras, GM. Medical Device Life Cycle Risk Management. ASQ Biomedical Division Biofeedback Newsletter, Volume 43 (2), August 2015.
[11] Absent clinical trials in humans, manufacturers rely on simulated performance studies *in vitro* that may (and have been shown historically to) vary markedly from actual device performance *in vivo*.  Simulated performance studies are typically design verifications, not design validations.
[12] Samaras, GM.  Reducing latent errors, drift errors, and stakeholder dissonance.  WORK: A Journal of Assessment, Prevention, and Rehabilitation, 41(s1):1948-1955, 2012
[13] FDA Guidance on Medical Device Patient Labeling; Final Guidance for Industry and FDA Reviewers. Document issued on: April 19, 2001
[14] Table from: Samaras, GM.  Reducing latent errors, drift errors, and stakeholder dissonance.  WORK: A Journal of Assessment, Prevention, and Rehabilitation, 41(s1):1948-1955, 2012.
[15] http://www.businessdictionary.com/definition/risk-management.html  Accessed October 5, 2017.
[16] Implanted medical devices range from temporary, like an endoscope, to permanent, like a pacemaker.

*in re Vesoulis vs. Reshape Lifesciences et al*

patient nor the physician have been granted access to detailed (typically, proprietary, technically complex, and voluminous) design information and comprehensive risk communication.  Such a risk management strategy (risk transfer) invariably fails to mitigate the risk to the patient and often fails its objective to shield the implanting physician and medical device manufacturer.

Lifecycle risk management consists of premarket (during product development) risk management and postmarket (after the product is launched) risk management.  Each has the same five (5) iteration steps, but they historically have been assigned different names before and after market launch (see Table 2).  Manufacturers marketing their medical devices in the US are obliged to apply risk management before and after launch of their products.  The prelaunch FDA regulation is 21 CFR 802.30 (Design Control); the relevant international consensus standard is ISO 14971.  The postlaunch FDA regulations are 21 CFR 820.198 (Complaints) and 21 CFR 820.100 (CAPA).  Health hazard evaluations are defined in 21 CFR 7.41.

This is not a "once and done" activity, which is why the lifecycle process consists of <u>iteration</u> steps.  An important element of postmarket risk management, corrective & preventive action (CAPA), is public reporting (part of the "P" in CAPA); the relevant FDA regulation is 21 CFR 803 (Medical Device Reporting).  It is a validated risk control and expands the risk management process beyond the manufacturer to external agencies (both government and non-government) attempting to protect the public health.  Reporting failures by the manufacturer and/or user facility undermine the risk control and increase the risk to the end user and patient.

*Table 2:  Elements of Lifecycle Risk Management[17]*

| ITERATION STEP (IS) | PREMARKET DEVELOPMENT | POSTMARKET VIGILANCE |
|---|---|---|
| 1 | Hazard Identification | Complaint Management |
| 2 | Hazard Recognition & Acceptance | Sentinel Event Recognition (Hazard Recognition) |
| 3 | Hazard Risk Evaluation (Premarket Risk Analysis) | Health Hazard Evaluation (Postmarket Risk Analysis) |
| 4 | Risk Control Application | Corrective & Preventive Action (CAPA) |
| 5 | Risk Control Verification or Validation | CAPA Verification or Validation |

There are, in general, two types of product-related risk: *design/device* risk and *process/production* risk.[18]  Design (or device) risk – the risk associated with a specific configuration of a medical device - is generally estimated by engineers using some combination[19] of the severity of harm of an identified hazard and the expected frequency of occurrence of that identified hazard.  Design risk (consumer risk)

---

[17] Table adapted from: Samaras, GM. Medical Device Life Cycle Risk Management. ASQ Biomedical Division Biofeedback Newsletter, Volume 43 (2), August 2015.
[18] In statistical analyses, these correspond to Type 1 (consumer risk or alpha) and Type 2 (producer risk or beta) events.
[19] The product of the level of severity and the probability of occurrence can be shown by dimensional analysis to be mathematically incorrect but the product is a well-regarded engineering metric for estimating risk.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

never includes detectability[20], as that underestimates the true design risk, because the device user is outside the manufacturer's control[21]; detectability (a risk control) is only included in estimating producer risk, where the manufacturer has control of trained assemblers and inspectors who can detect hazardous situations.

Identifying hazards, the first step in a risk analysis, requires understanding the context of the product use, the product user, and the product use environment. It is impractical for engineers to complete a correct risk analysis without establishing boundaries, which constrains the problem to something that is manageable and solvable. We have already identified the principal boundary used by medical device risk analysts; it is the product's Intended Use (and the basis of FDA's risk-based regulation). A complete and correct risk analysis is predicated on a clearly defined intended use; modifying the intended use (e.g., off-label use) alters the product's risk profile. Altering a medical device's intended use, after it has been cleared for market, essentially invalidates the risk analysis completed prior to market launch (and FDA submission) and requires a new or revised risk analysis, if the intended use is changed.

Once hazards are identified (step #1, see Table 2 above), recognized/accepted as within the defined boundaries of the intended use of the medical device (step #2), and the risk has been evaluated and prioritized (step #3), it is necessary to develop and apply risk controls to mitigate the risk (step #4). There are a variety of risk control hierarchies, the simplest of which is found in the international consensus standard on risk management for medical devices[22] and is consistent with historical practices of risk control in virtually all industrial sectors:

- First, change the design to eliminate the risk;
- Second, implement an engineering risk control to reduce risk that cannot be eliminated; and
- Finally, provide information for safety (labeling).[23]

It is well-understood in product engineering that labeling is the least effective risk control, in that the manufacturer has no control of the user, who may be inattentive, distracted, or unable/unwilling to read the labeling. In those cases, where labeling is the only technically feasible alternative[24], the manufacturer is still required to verify and validate the labeling as an effective risk control (step #5). It is also important to note that labeling of medical devices in the US[25] goes beyond what is written on labels and instructions and has been interpreted to include *false or misleading* statements[26] made by

---

[20] Samaras, GM. Use, Misuse, and Abuse of the Device Failure Modes Effects Analysis. MD+DI Online. July 29, 2013

[21] The manufacturer has no control over whether the user (a) will detect a specific risk; (b) will attend to that risk, if they detect it; (c) will remember what action to take for that specific risk, if they attend to it; and (d) will have the time or other resources necessary to implement an effective risk mitigation strategy.

[22] ISO 14971: Medical devices -- Application of risk management to medical devices.

[23] For example, if steps are determined to be a trip hazard for the user population (e.g., nursing home), the hierarchy might be envisioned as: first, build a ramp, not steps; second, include hand railing on one or both sides; and finally, if neither of those are possible, place a big sign nearby stating, "Trip Hazard – Do Not Fall". NOTE: The proposed sign is intentionally inconsistent with modern labeling guidelines and I leave it to the reader to determine which approach is consistent with a reasonable, prudent approach.

[24] "Technically feasible" alternative does not include "economically feasible" for Class 2, moderate risk, "me, too", medical devices.

[25] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/default.htm

[26] https://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM095308.pdf

*in re Vesoulis vs. Reshape Lifesciences et al*

agents of the manufacturer (21 CFR 801.4). So, false or misleading statements that alter the intended use of a medical device undermine or invalidate the risk management of that device. False or misleading statements meet the definition of a medical device being misbranded; failure to comply with good manufacturing practices (this includes essentially all premarket activities) meets the definition of a medical device being adulterated.

**Risk management does not end at market launch**; manufacturers selling medical devices in the US have postmarket risk management duties specified in various federal regulations, including good manufacturing practices (21 CFR 820), public reporting of adverse events (21 CFR 803), and corrections and removals (21 CFR 806). Complaint management and medical device reporting regulatory responsibilities for medical device manufacturers and their agents and consignees are discussed in detail in Appendix F.

The federal regulations, the relevant international industry consensus standards, and the general engineering principles cited here form the engineering standard of care for a manufacturer of medical devices in the US (see Section 2.4).

## Section 2.3: Human Subjects Medical Experimentation

We historically have had a difficult time with bioethical issues related to human subject medical experimentation,[27],[28] especially when it involves medical devices. This unfortunate situation continues to this day, due to the lack of appropriate and comprehensive training in bioethical principles[29] and practices, as well as unscrupulous practices by some individuals. Table 3 identifies some of Western society's attempts to constrain and guide bioethical behavior in both intentional and inadvertent human subject medical experimentation. Fundamental to this effort was the exposition of the importance of *informed consent*, the control of *non-significant risk* medical experimentation by Institutional Review Boards (governed by federal regulations[30]), and the control of *significant risk* medical experimentation using medical devices by FDA-granted investigational device exemptions.[31]

The 1979 Belmont Report[32] addressed the boundaries between biomedical/behavioral research and accepted/routine practice of medicine. They state[33]:

- *"the term "**practice**" refers to interventions that are designed solely to enhance the well-being of an individual patient or client and that have a reasonable expectation of success"*, and

---

[27] https://www.pcrm.org/ethical-science/human-experimentation-an-introduction-to-the-ethical-issues Accessed 6/28/19
[28] http://theconversation.com/human-experiments-the-good-the-bad-and-the-ugly-39876 Accessed 6/28/19
[29] The fundamental principles are *autonomy* (informed decision-making), *justice* (burdens & benefits equally distributed), *beneficence* (good intention, which embodies competence and current scientific knowledge), and *non-maleficence* (does not harm individual or others).
[30] 21 CFR 56 (see also 21 CFR 50 regarding the 14 elements of informed consent for protection of human subjects)
[31] 21 CFR 812
[32] Named after the conference center where the work was done in Elkridge, Maryland by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research.
[33] https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/read-the-belmont-report/index.html Accessed 7/4/19

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- *"the term **"research'** [sic] designates an activity designed to test an hypothesis, permit conclusions to be drawn, and thereby to develop or contribute to generalizable knowledge".*

One can reasonably conclude that when the FDA has either not cleared/approved (or refrained from clearing/approving) a medical device (or set of medical devices) for a specific intended use, the use of that device (or set of devices) **constitutes an attempt to test a hypothesis** rather than the accepted/routine practice of medicine (but, see discussion in Appendix E).

Table 3:  Timeline of Some Rules Related to Protection of Human Subjects[34]

| YEAR | RULE | RELEVANT GUIDANCE |
|---|---|---|
| 1947 | Nuremberg Code | Informed Consent **Required** for Experiments |
| 1949 | Int'l Code of Medical Ethics | A Physician Shall Act **Only** in The Patient's Interest When Providing Medical Care Which Might Have the Effect of Weakening the Physical and Mental Condition of The Patient. |
| 1953 | NIH Clinical Policy | Ethical Responsibility for Medical Experiments Lies with The Study's Principal Investigators. |
| 1964 | Helsinki Declaration | Human Beings Should Be **Fully** Informed And Must Freely Consent to The Research. |
| 1974 | 45 CFR 46 | IRB Procedures Established |
| 1979 | Belmont Report | Principal of Respect - Recognizes the Autonomy of Humans And Requires **Clear** Informed Consent. |

The FDA regulates medical device manufacturers and not the practice of medicine. To this end, they provide a custom device exemption that permits an individual physician or dentist to meet the specific needs of an individual patient and not burden them with premarket notification or premarket approval. The custom device definition includes:[35]

- *Not generally available to, or generally used by, other physicians or dentists;*
- *Not generally available in finished form for purchase or for dispensing upon prescription;*
- *Not offered for commercial distribution through labeling or advertising; and*
- *Is intended for use by an individual patient … made in a specific form for that patient, or is intended to meet the special needs of the physician or dentist in the course of professional practice.*

In January 2009, FDA issued a guidance regarding "Good Reprint Practices"[36] that addressed proliferation of articles that discuss unapproved new uses for approved/cleared medical devices to healthcare professionals. It specifically states, *"if these conditions were met, dissemination of such journal articles or reference publications would not be considered as evidence of the manufacturer's intent that the product be used for an unapproved new use."*

---

[34] https://history.nih.gov/about/timelines_laws_human.html Accessed 6/28/19
[35] 21 CFR 812.3(b)
[36] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/good-reprint-practices-distribution-medical-journal-articles-and-medical-or-scientific-reference Accessed 6/20/19

*in re* Vesoulis *vs.* Reshape Lifesciences et al

The regulatory codification[37] defines the following:

- *"(f) Manufacturer means a person who manufactures a drug or device or who is licensed by such person to distribute or market the drug or device. For purposes of this part, the term may also include the sponsor of the approved, licensed, or cleared drug or device."*

- *"(g) New use means a use that is not included in the approved labeling of an approved drug or device, or a use that is not included in the statement of intended use for a cleared device."*

In the US, human experimentation with a non-significant risk device requires review and approval by the local Institutional Review Board (IRB – 21 CFR 56); if the device is deemed a significant risk device, it also requires review and approval of an Investigational Device Exemption (21 CFR 812) by the FDA.

## Section 2.4: Standard of Care for Defendants

Marketing and distributing medical devices in the United States (US) obligates a medical device manufacturer to comply with certain federal regulations.  Additionally, where manufacturers choose to identify national and international industry consensus standards in their internal policies and procedures, these same regulations require that manufacturers comply with their internally chosen standards (e.g., national or international consensus standards).

It is well-understood that medical devices, like many other types of products (e.g., aviation, automotive, etc.) are not and cannot be made risk-free; they are often safety-critical or life-critical and require considerable care and expertise be exercised throughout the full product lifecycle (from concept to disposal).  Manufacturers of medical devices voluntarily chose to design, manufacturer, and distribute medical devices for profit; they are never compelled to do so and are always free to enter a different business sector.

Unlike risk in finance, risk in medical devices (and other safety-critical industrial sectors) is not transferrable from the manufacturer to consumers (e.g., patients and providers).  In accepting the risk of designing, manufacturing, and distributing medical devices for profit, manufacturers attempt to limit their risk by complying with engineering best practices, many of which are codified in federal regulations and national/international industry consensus standards.  We understand these as the expected duties of medical device manufacturers and their executive management.  They include:
- Submitting to US regulation
  - Abiding by US federal regulations related to marketed medical devices
  - Obtaining appropriate regulatory clearance or approval for medical devices intended use prior to marketing them
  - Submitting to periodic establishment inspection once products are marketed in the US
- Complying with the regulatory clearance letters or approval orders
- Establishing a complete and correct Quality Management System (QMS) that determines
  - Product document control, including
    - Effective management of the Quality System Record
    - Effective management of the Design History File

---

[37] This was codified in 21 CFR 99

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- Effective management of the Risk Management File
- Effective management of the Design Master Record and Device History Record
- Effective management of the Purchasing Control Record
- Product design control, including
  - Effective management of design and development planning across the product lifecycle
  - Effective management of design inputs (also known as product requirements[38])
  - Effective management of design outputs (also known as product specifications[38])
  - Effective management of design reviews
  - Effective management of design verifications
  - Effective management of design validation (including labeling comprehension and usability validation)
  - Effective management of engineering change orders before and after market launch
- Product premarket risk management, including
  - Identification of intended use
  - Identification of foreseeable expected use, unexpected use, misuse, and abuse
  - Identification known and foreseeable hazards
  - Risk analysis of identified hazards
  - Risk control and risk control verifications of identified hazards
  - Determination of residual risk acceptability
- Product postmarket risk management (also known as postmarket vigilance), including
  - Effective management of complaints of adverse events
  - Effective recognition of sentinel events (also known as safety signals)
  - Effective health hazard evaluations
  - Effective corrective and preventive actions
  - Public reporting of adverse events
- Ensuring the complete and correct implementation of the QMS through
  - Training of personnel,
  - Control of suppliers, contractors, and consultants (including the establishment and maintenance of purchasing control data) and
  - Internal quality audits for executive management to ensure QMS requirements are established and maintained effectively.

Both US federal regulations and national/international industry consensus standards indicate that senior management is responsible for the effective establishment and implementation of these regulations and standards. This is often a problem, as senior managers are typically trained as financial/marketing managers and do not readily recognize that, unlike financial risk, the risk associated with their products is not transferable to consumers. However, it is ultimately the duty of senior management to establish, implement, and maintain compliance with regulations and standards through their firm's quality policy and procedures.

---

[38] Samaras, GM. The Use, Misuse, and Abuse of Design Controls. IEEE Eng Med Biol Magazine 29(3):12-18, 2010

*in re Vesoulis vs. Reshape Lifesciences et al*

# SECTION 3:  REVIEW/ANALYSIS OF THE RECORD

The following (Sections 3.1-3.4) summarize some of my observations from my review of the Record provided to me to date.  Figure 3 is a timeline of some salient events relevant to my opinions.  It is worth noting that the FDA database does not include a record of Mr. Vesoulis' serious injury that *"was or may have been attributed to a medical device[39]"* that occurred on 1/11/18.



Figure 3:  Timeline of Salient Events

The three FDA HCP (Health Care Provider) Alerts shown in Figure 3 are available on the FDA website.[40] The deaths and serious injuries identified in Figure 3 were obtained from the FDA's Manufacturer and User Facility Device Experience (MAUDE) database.[41]  The detailed data were also downloaded and

---

[39] 21 CFR 803.3(c) … (6) User Error
[40] February 9, 2017: https://www.fda.gov/medical-devices/letters-health-care-providers/fda-alerts-health-care-providers-about-potential-risks-liquid-filled-intragastric-balloons; August 10, 2017: https://www.fda.gov/medical-devices/letters-health-care-providers/update-potential-risks-liquid-filled-intragastric-balloons-letter-health-care-providers; June 4, 2018: https://www.fda.gov/medical-devices/letters-health-care-providers/update-potential-risks-liquid-filled-intragastric-balloons-letter-health-care-providers-0. Accessed 6/8/2020.
[41] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/results.cfm [5/31/2020 11:29:46 AM]; *"98 records meeting your search criteria returned- Brand Name: RESHAPE INTEGRATED DUAL BALLOO Report Date From: 1/1/2015 Report Date To: 04/30/2020"*

*in re* Vesoulis *vs.* Reshape Lifesciences et al

exported to a Microsoft Excel spreadsheet for analysis (see also Section 3.3.2: Medical Device Reporting); both documents are archived on the shared DropBox folder (see Section 5).

### Section 3.1: Plaintiff Treatment

Medical records indicate that Plaintiff Paul Vesoulis, DDS (DoB: 7/22/60) of Sylvania, Ohio received a Reshape Duo Balloon (see Figure 4) endoscopically implanted on 7/27/17 by TE Lavin, MD of Surgical Specialists of Louisiana, LLC.  The bariatric implantable medical device was explanted by Dr. Lavin on 1/11/18; a distal esophageal perforation was found near the gastroesophageal junction and repaired on 1/13/18 by Dr. Lavin.

Tom Lavin, MD is a co-owner of the Crescent City Surgical Centre[42] where Paul Vesoulis, DDS received the Reshape explant procedure.  He completed training by Reshape Medical on the use of the "ReShape Integrated Duo Balloon" on 9/11/15.[43]  His curriculum vitae[44] lists him as "Principal Investigator, A Prospective, Multicenter Post Approval Study of the ReShape™ Post Approval Study (ReShape PAS), ReShape Medical".  Patient informed consent (see Section 2.3) for the 1/11/18 explant procedure, signed by both Drs. Lavin and Vesoulis, included being informed that *"serious complications include a risk of bleeding or perforation of the esophagus, stomach or duodenum occurring less that 1 of 10,000 cases."*[45,46]



**The ReShape balloons are designed to be placed in the stomach during a 15-minute outpatient procedure using deep conscious sedation.**

**Step 1**
Using an endoscope, your study doctor looks at your esophagus and stomach lining to ensure there are no ulcers, gastritis or hiatal hernia.

**Step 2**
The uninflated ReShape balloons are placed in the stomach.

**Step 3**
The ReShape balloons are then inflated with saline and the endoscope is removed leaving the inflated balloons in the stomach.  The balloons remain in place for six months and are then deflated and removed in the same fashion.

RESHAPE-214590

Figure 4:  ReShape Duo Balloon

---

[42] VesoulisP-CrescentCtySrgCtrMR-00013
[43] TE Lavin Deposition, 11/11/19, Exhibit 7
[44] TE Lavin Deposition, 11/11/19, Exhibit 6
[45] OchsnerMedCtrMR-PV- 00031
[46] Per P140012C, page 6 of 20: 1:265 risk in the <u>pre-approval</u> REDUCE Pivotal Trial of esophageal tears; this is nearly 40x greater risk than the 1:10,000 in the informed consent provided to Plaintiff.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## Section 3.2: Defendant Regulatory Approval Activities

The focus of this report is the Defendant's postmarket activities (following federal approval for marketing) beginning 7/28/15 (see Figure 3); it also include consideration of any residual pre-approval regulatory activities (e.g., standard operating procedures, risk analyses) that subsequently impacted Defendant's postmarket activities during the period relevant to this case.  Table 4 identifies Defendant's regulatory submission and approval activities related to the ReShape Integrated Duo Balloon for the period 2014 through 2018.  This include the original PMA submission and subsequent PMA Supplements, as well as the two product recalls[47].  The time of Vesoulis' implant and explant are identified on the table for the reader's convenience.  Class III, high risk, medical devices are approved for marketing in the US by the FDA, subject to an "Approval Order" listing post-approval requirements. The FDA approval of the ReShape Integrated Dual Balloon System included four official documents:

- P140012A: Official Approval Order;
- P140012B: Summary of Safety and Effectiveness Data;
- P140012C: Instructions for Use; and
- P140012D: Patient Information Guide.

The official approval letter lists a number of requirements, including:

- An Office of Surveillance & Biometrics lead Post- Approval Study[48];
- Admonition regarding medical device reporting[49] per 21 CFR 803; and
- Admonition regarding device labeling[50,51].

As stated in the official Approval Order, *"Failure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law."* [52]

The FDA's Total Product Life Cycle database shows that devices with product code LTI (Implant, Intragastric for Morbid Obesity, device class 3) reported **2135 device problems** over the period 2015 through 2020.[53]

---

[47] Per 21 CFR 7.3(m)(2): *"Class II is a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote."*
[48] P140012A, page 2
[49] P140012A, page 4.
[50] P140012A, page 4: *"We remind you; however, that device labeling must be truthful and not misleading."*
[51] P140012A, 4-5: *"Final printed labeling that is identical to the labeling approved in draft form will not routinely be reviewed by FDA staff when accompanied by a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment."*
[52] P140012A, page 4:
[53] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=2242[6/6/2020 1:53:43 PM]

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Table 4:  ReShape Balloon Regulatory Submissions: 2014 – 2018

| SUBMISSION # | TITLE/TOPIC | SUBMIT DATE | APPROVAL DATE |
|---|---|---|---|
| P140012 | Trade/Device Name: Reshape Integrated Dual Balloon System | 07/01/14 | **07/28/15** |
| | Amended: 09/02/14, 09/11/14, 12/17/14, 03/24/15, and 04/14/15 | | |
| P140012 S001 | **Approval of the post-approval study protocol** | 08/26/16 | 01/14/16 |
| P140012 S002 | Approval for 1) a new delivery catheter gen1; 2) product packaging for the reshape integrated dual balloon system; 3) extension of the balloon and delivery catheter assembly to 24 months; and 4) a new supplier for the delivery catheter assembly (MedBio, Inc., in Grand Rapids, Michigan). | 09/28/15 | 12/21/15 |
| P140012 S003 | Approval for a dimensional change to the torque transmission wire component of the reshape removal catheter assembly | 11/18/15 | 01/22/16 |
| P140012 S004 | Addition of Vesta, Inc., as a second source supplier of the balloon shell (p/n 03-0238). | 12/01/15 | 12/31/15 |
| Z-2552-2016 | **First Product Recall (FDA Class II),** assembly error | 05/04/16 | 08/17/16 |
| | **Second Product Recall (FDA Class II),** assembly error | 05/04/16 | 01/24/17 |
| P140012 S005 | Addition of an inspection step (spin test) during commercial manufacturing and quality control activities. | 09/26/16 | 10/25/16 |
| P140012 S006 | Change Receipt inspection of packaging materials, reseal Valve Sealant packaging after inspection, and increase HEPA filtration and particulate alert and action levels. | 12/07/16 | 01/06/17 |
| P140012 S007 | Addition of a 100% visual inspection step of the flapper valve. | 12/19/16 | 01/06/17 |
| P140012 S008 | Change of lot release testing of finished catheter-balloon assemblies. | 01/23/17 | 02/21/17 |
| P140012 S009 | Approval for changes to the ReShape Integrated Dual Balloon System **Instructions for Use and Patient Information Guide** for the ReShape Procedure. | 03/22/17 | 04/20/17 |
| P140012 S0010 | **Approval of the revised protocol for the post-approval study (PAS) protocol.** | 04/28/17 | 06/27/17 |
| | ***Vesoulis Implant – 7/27/17*** | | |
| P140012 S0011 | Reduce the frequency of sterility dose auditing for the ReShape Integrated Dual Balloon System and ReShape Removal Catheter. | 09/2717 | 10/26/17 |
| | ***Vesoulis Explant – 1/11/18*** | | |
| P140012 S0012 | **Approval of the revised protocol of the post-approval study protocol** | 02/26/18 | 05/30/18 |
| P140012 S0013 | **Approval for labeling updates to inform users about current risks associated with device use and adverse event information.** | 05/02/18 | 05/31/18 |

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## Section 3.3: Defendant Post-Approval Activities

Three of the requirements of P140012 approval were previously identified: (a) execution of a post-approval study; (b) truthful labeling; and (c) compliant medical device reporting. Referring to Table 4, it is evident that the post-approval study was not finally approved until 5/30/2018, nearly a year AFTER plaintiff was implanted with the device and almost 5 months AFTER his device was explanted. In the following two subsections, evidence related to truthful labeling and medical device reporting are analyzed. Failures to comply with the FDA's labeling regulation and/or medical device reporting meets the definition of a misbranded[54] medical device; previously, failure of medical device reporting has resulted in a judicial conclusion of criminal misbranding[55].

## Section 3.3.1: Medical Device Labeling

The Approval Order (P140012A, page 4) states the following requirement: *"device labeling must be truthful and not misleading."* The federal regulation for medical device labeling is 21 CFR 801;[56] §801.109 specifies certain exemptions for adequate directions for use by practitioners licensed by law to use the Rx-only device; this does not apply to patients. Table 7 in Appendix D lists the extensive guidance human factors standards and guidance for industry beginning in 1991 and continuing through 2016. Labeling and risk communication were well understood prior to the approval of P140012.[57]

Table 5: Labeling Analysis Table

| DOCUMENT ID | LABEL PARAMETER | TARGET | MEASURED | PASS/FAIL |
|---|---|---|---|---|
| RESHAPE-00026 (© 2017) | Font Size for Patient/Consumer | ≥ 10 pt. | ~2 pt | Fail |
| | Flesch Reading Ease | ≥ 70% | 8% | Fail |
| | Flesch – Kincaid Reading Grade Level | ≤ 8th | 18th | Fail |
| RESHAPE-000039 (© 2018) | Font Size for Patient/Consumer | ≥ 10 pt. | ~4 pt | Fail |
| | Flesch Reading Ease | ≥ 70% | 29% | Fail |
| | Flesch – Kincaid Reading Grade Level | ≤ 8th | 12th | Fail |
| RESHAPE-000109 (© 2016) | Font Size for Patient/Consumer | ≥ 10 pt. | ~5 pt | Fail |
| | Flesch Reading Ease | ≥ 70% | 16% | Fail |
| | Flesch – Kincaid Reading Grade Level | ≤ 8th | 17th | Fail |
| RESHAPE-000134, RESHAPE-000149 (© 2018) | Font Size for Patient/Consumer | ≥ 10 pt. | ~2 pt | Fail |
| | Flesch Reading Ease | ≥ 70% | 9% | Fail |
| | Flesch – Kincaid Reading Grade Level | ≤ 8th | 18th | Fail |
| RESHAPE-000205 (© 2016) | Font Size for Patient/Consumer | ≥ 10 pt. | ~2 pt | Fail |
| | Flesch Reading Ease | ≥ 70% | 11% | Fail |
| | Flesch – Kincaid Reading Grade Level | ≤ 8th | 18th | Fail |
| NB: 1 inch ≈ 72 pts; F RE & F-K RGL computed using MS Word | | | | |

---

[54] Within the meaning of Section 502(a) of the Act, in that the labeling is false or misleading in any particular.
[55] https://www.justice.gov/opa/pr/olympus-medical-systems-corporation-former-senior-executive-plead-guilty-distributing. Accessed 6/21/19
[56] Title 21: Food and Drugs, Part 801 – Labeling; Original Source: 41 FR 6896, 2/13/1976
[57] In fact, the FDA advised ReShape of serious deficiencies in labeling on 7/10/15 (see RESHAPE-089825).

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Analysis of the **system safety information** in six (6) patient-facing labeling documents (see Table 5) in the Record indicates a clear lack of understanding of the basics of medical device labeling and risk communication by the Defendant.  Presumably, this labeling was issued after compliance with internal procedures for usability engineering[58] and labeling content & format approval[59].  The usability engineering procedure claims *"a process to provide for the safety of the patient, user and others related to the usability of the Medical Device"*.  The labeling approval procedure assigns to *"Regulatory Affairs"* responsibility for *"checking the adequacy of labeling content for its intended use and assuring compliance with law and regulations"* and to *"Quality Assurance"* responsibility for *"the requirements with respect to legibility, content and that precautions and warning have been included."*

Examination of the labeling analysis shown in Table 5 clearly demonstrates that these internal procedures were violated, if not ignored.  I found no evidence in the Record that any human factors testing of patient labeling was conducted for label comprehension, risk communication, and usability.  The portion of the patient-facing labeling in these six documents is illegible, incomprehensible, and fails to communicate the risks of this medical device; it appears on its face to hide the risks from the intended user, the device recipient.  It is, therefore, misleading and not truthful, thus violating the FDA's P140012A Approval Order.

## Section 3.3.2: Medical Device Reporting

The Approval Order (P140012A, page 4) states the following requirement:

> *"Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:*
> *1. May have caused or contributed to a death or serious injury; or*
> *2. Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."*

Furthermore, the Medical Device Reporting regulation (21 CFR 803) was promulgated in 1984[60] and is well-understood by industry.  The requisite (see Appendix F) complaint handling regulation (21 CFR 820.198) was promulgated in 1978[61], decades prior to approval of P140012 in the summer of 2015.

Capture of the FDA's **Manufacturer and User Facility Device Experience** (MAUDE) database search for "RESHAPE INTEGRATED DUAL BALLOON" from 1/1/2015 through 04/30/2020 conducted on 5/31/2020[62] yielded 98 records.  These were downloaded to an MS Excel spreadsheet for analysis.[63]

There is no evidence in the MAUDE database of Mr. Vesoulis' serious injury on 1/11/18; it is unknown how many other serious injuries associated with the use of Defendant's product were not reported to

---

[58] ReShape Medical Standard Operating Procedure SOP0051, Revision B (RESHAPE-162708 -> 162716)
[59] ReShape Medical Standard Operating Procedure SOP0068, Revision E (RESHAPE-151004 -> 151011)
[60] 49 FR 36348, September 14, 1984
[61] 43 FR 31508, July 21, 1978
[62] Saved for the Record as "DropBox/Paul Vesoulis/Samaras/MAUDE - 2015 - 2020.pdf"
[63] After formatting, saved for the Record as "DropBox/Paul Vesoulis/Samaras/MAUDE 2015 – 2020.xls"

*in re* Vesoulis *vs.* Reshape Lifesciences et al

the FDA.  The events, in the public domain and continuously available to Defendant, were analyzed to determine how many were reported within a 30-day window from the actual time of the event[64] (see Appendix F for complaint and medical device reporting procedures); the majority of reported events were not reported to the FDA within that timeframe.

Figure 5 is evidence of a defective and violative postmarket vigilance effort on the part of Defendant. It demonstrates incomplete and untimely reporting of deaths, serious injuries, and device malfunctions in violation of Defendant's internal procedures, US federal regulations, and engineering best practices. These data also demonstrate Defendant's failures in post-market risk management, requisite internal quality audits, and corrective & preventive actions to avoid exposing patients and providers to unsafe and/or ineffective medical devices.

---

[64] 21 CFR 803 requires reporting from the time an employee learns of an event (see Appendix F); the repeated inability of an employee learn, in a timely manner, of a death, serious injury, or device malfunction is diagnostic for a defective complaint handling system.

*in re* Vesoulis vs. Reshape Lifesciences et al



Figure 5:   Reshape Reporting Delays >30 Days Beyond Adverse Event

Page **22 of 71**

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## SECTION 4:  ROOT CAUSE ANALYSIS & ISHIKAWA DIAGRAM

Multiple failures of the Defendant and agents lead to the implantation and explantation of a medical device at increased risk of serious injury to the Plaintiff.  Figure 6 is an example of a standard[65] analytical tool for diagramming cause & effect relationships.  It identifies some of these failures, which are a breach of duties of medical device manufacturers and were (or should have been) under control of Defendant's senior management.

These failures are organized in four categories, implying a major failure category and a failure providing a clear indication of a high risk of serious injury:

- Regulatory Compliance
- Postmarket Vigilance
- Risk Communication
- Product Labeling

Within each of these four primary categories are summarized secondary and tertiary categories of failures that increase risk of implant failure by users (healthcare providers and user facilities) to recipients (patients) implanted with the Defendant's medical device.  Secondary categories are a warning signal and caution should be exercised to avoid possible failure during use.  Tertiary and quaternary categories indicate that these failures each individually increase the risk of serious injury associated with the use of the medical device.  As the number of individual failures increase, the overall failure of risk (serious injury or death) also increases.[66]

---

[65] Kaoru **Ishikawa** was an engineering professor at the University of Tokyo and an organizational theorist.  He is known for his contributions to quality management and best-known for his famous cause & effect graphical analysis method (also known as a "fishbone" diagram), used nearly universally for analysis of industrial processes.

[66] It is worth noting that failure aggregation may be summative, multiplicative, or in some unique cases, even self-cancelling.

*in re Vesoulis vs. Reshape Lifesciences et al*



Figure 6: Ishikawa Diagram of Increased Risk

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## SECTION 5:  SUMMARY OF OPINIONS

I have formulated the following opinions after my review of the Record that I have been provided to date (see Section 6).  I offer these opinions in this matter based upon my education, training, and experience and to a reasonable degree of scientific and engineering certainty in the specific disciplines identified.

Defendant Reshape Lifesciences (a) engaged in the manufacture and marketing of a complex, implantable, medical device that increased the risk of patient serious injury in violation of the federal approval order; and (b) the flawed labeling and failures of critically important public medical device reporting, not only increased risk of hazards to additional patients, but also delayed recognition and rectification of the root cause(s) by multiple entities to protect the public health.  The hazards associated with both these sets of Defendant's decisions (to issue flawed labeling and to engage in defective medical device reporting) were known and foreseeable to individuals skilled in medical device engineering and management.

## SECTION 6:  REFERENCES

In addition to the specific documents cited in this report, I have been provided with a set of records and documents by Plaintiffs' Counsel on a shared folder "Paul Vesoulis" on DropBox; the content of that shared folder may be obtained from them.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

APPENDIX A:  GM SAMARAS EXPERT WITNESS CREDENTIALS SUMMARY

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## A1: Expert Witness Credentials

I am a biomedical scientist/engineer and have been in private practice since 1996.  My offices are in Southern Colorado; my firm has a national and international clientele.  I have no conflict of interest known to me with the Defendant; I do not own any stock in their businesses, I do not work, and have not worked, for them, and I do not, to my knowledge, have family or friends that have been treated by them or with their products.  My education, training, skills, and experience are documented in my curriculum vitae; the most current version is posted on my firm's website: www.samaras-assoc.com. They are summarized here for the reader's convenience.

My undergraduate education and training is in Electrical Engineering (BSEE) and I have an earned doctorate (DSc) in Industrial Engineering; my area of emphasis was engineering management and my doctoral dissertation focused on organizational effectiveness.  I am a licensed professional engineer (PE) and one of a very few US engineers licensed both as an electrical engineer and a software engineer.  I have an internationally recognized board certification (CPE) in Human Factors Engineering (one of four sub-disciplines of Industrial Engineering).  I am certified by the American Society for Quality both as a Quality Engineer (CQE) and a Biomedical Auditor (CBA).   I am board-certified as a Forensic Engineer, a senior member of the National Academy of Forensic Engineers and a Professional member of the American Society of Safety Engineers.

Also, I am trained as a biomedical scientist and have an earned master's degree (MS) and doctorate (PhD) in physiology; my area of study was mammalian physiology & pharmacology; my master's emphasis was protein reuptake mechanisms and my doctoral dissertation focused on neuronal transcellular reuptake mechanisms.

In both my doctoral programs, I minored in psychology: first, biopsychology (also known as physiological psychology) as part of my PhD and then industrial & organizational psychology (also called industrial psychology) as part of my DSc.

I have worked as a medical school professor, an engineering graduate school professor, and an entrepreneur (having started three different science- & engineering-based companies).  I have been the CEO of a medical device product development firm (a FDA-regulated firm), a FDA medical device regulator, and for over the past two decades I have been in engineering private practice; my engineering practice has been limited to medical devices (all types, from low risk Class 1 devices to high risk Class 3 devices), including health information systems and pharmaceutical container closure systems for combination medical devices.

In my current engineering practice, I have designed, developed, analyzed, and audited quality management systems for industry clients.  I have assisted them with the premarket hardware, software, human factors, and quality engineering of their devices.  I have assisted them in obtaining premarket clearances (510k) and premarket approvals (PMA) from the FDA as well as in a variety of postmarket activities, with an emphasis on postmarket risk management.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

I am skilled in experimental physiology; as an experimental physiologist, I personally have performed well over a thousand surgical procedures on mammals, as well as having participated in many experimental surgical procedures on humans, where medical devices I designed were being tested. As a medical school professor, I not only taught undergraduate medical students and graduate residents, but also developed experimental medical devices and collaborated in the design and analysis of human experimental (clinical) trials of these devices. Subsequently, I have assisted medical device clients with the development, review and analysis of both medical and human factors studies using human subjects in clinical trials.

I am skilled in the interdisciplinary (hardware, software, human factors, and quality) engineering design, development, testing, and evaluation of medical devices and systems, including control of designs and pre- & post-market risk management. I am further skilled in the design, implementation, and analysis of bench & human study protocols, especially for design verifications and validation of medical devices, which I routinely review/revise for clients. I have developed and applied these skills throughout my nearly half-century professional career to the development of medical devices for industry and the federal government (US military and the National Institutes of Health), as well as my own research. These devices have included both surgically implantable[67] and non-implantable medical devices. The scientific and engineering work that was not confidential or classified was published by me in the open scientific literature. I published my first peer-reviewed article in the open biomedical science and engineering literature in 1971, while still in college; I have continued to publish to this date[68]. Those publications include three US patents on biomedical devices and nearly 100 peer-reviewed articles on biomedical devices, design controls, risk analysis, human factors engineering, quality engineering, medical device regulatory issues and medical device cybersecurity. I have served as a peer-reviewer for science and engineering organizations and journals; I continue to do so to this date.

I have extensive experience (nearly four decades) working with regulated organizations. In addition to my broad technical domain knowledge in biomedical engineering and biomedical science, I am qualified (and nationally-certified) to both analyze (CQE) and audit (CBA) the quality systems and compliance of medical device manufacturers. I do this type of work routinely for my industry clients and have done similar work in prior legal cases.

---

[67] I have extensive biomedical engineering and regulatory expertise with implantable medical devices. I developed the first sympathetic neural prosthesis, which I published in 1983 in the British medical journal Lancet with two colleagues from the NIH (the Lancet is recognized globally as one of the two top medical journals). I did extensive practical work with implantable devices for treating brain and esophageal tumors, while I was a medical school professor. I have advised a variety of clients with implantable medical devices on engineering and regulatory matters during my years in private practice.

[68] 3 biomedical US patents, 1 book chapter, 56 peer-reviewed by academic standards, plus an additional 38 peer-reviewed by industry standards.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## A2: Certifications & Licensure

### Board-certified Forensic Engineer

- A Forensic Engineer is qualified to apply the art and science of engineering in matters which are in, or may possibly relate to, the jurisprudence system, inclusive of alternative dispute resolution, and <u>explain the significance</u> of the findings in the context of protection of public health and welfare.
- I am a Senior Member & Diplomate of the National Academy of Forensic Engineering
- (http://www.nafe.org/faqs): "*Forensic engineers generally are seasoned and experienced professional engineers licensed under state law who have worked in private practice, industry, construction, education or in other settings who have developed expertise in one or more technical areas (e.g., civil, mechanical, electrical, chemical engineering, etc.). They are often retained by attorneys, public agencies, business entities and others to analyze the causes of accidents, failures (e.g., product failures, structural failures) perform accident reconstruction, evaluations, prepare reports and studies and are called upon by their clients to serve as expert witnesses and testify during the litigation process, arbitration or other dispute resolution procedures.*"
- QUESTION?  What kind of forensic engineering do you do?
  ANSWER:  My area of practice is medical device engineering.  My demonstrable areas of expertise are hardware, software, human factors, and quality engineering, including engineering management, as well as relevant national & international standards and US regulations related to the medical device lifecycle.

### ASQ-Certified Biomedical Auditor (CBA)

- A CBA is qualified to analyze and opine on the degree to which a biomedical organization has met their requirements (both their internally adopted and documented procedures and the externally imposed standards & regulations) and <u>explain the significance</u> of failures to meet these requirements.
- (https://asq.org/cert/catalog): "*The Certified Biomedical Auditor is a professional who understands the principles of standards, regulations, directives and guidance for auditing a biomedical system while using various tools and techniques to examine, question, evaluate and report on that system's adequacy and deficiencies. A biomedical auditor analyzes all elements of the system and reports on how well it adheres to the criteria for management and control of process safety.*"
- QUESTION?  What types of biomedical organizations do you audit?
  ANSWER:  My practice is limited to medical devices and pharmaceutical container closure systems.

### ASQ-Certified Quality Engineer (CQE)

- A CQE is qualified to analyze and opine on the degree to which an organization has adopted, implemented, and properly managed a Quality Management System required to ensure safe

*in re* Vesoulis *vs.* Reshape Lifesciences et al

and effective products and services and <u>explain the significance</u> of deviations from generally-accepted best practices.

- (https://asq.org/cert/catalog): *"The Certified Quality Engineer is a professional who understands the principles of product and service quality evaluation and control. This body of knowledge and applied technologies include, but are not limited to, development and operation of quality control systems, application and analysis of testing and inspection procedures, the ability to use metrology and statistical methods to diagnose and correct improper quality control practices, an understanding of human factors and motivation, facility with quality cost concepts and techniques, and the knowledge and ability to develop and administer management information systems and to audit quality systems for deficiency identification and correction."*

- QUESTION:  Are you a Six Sigma Black Belt?
  Answer:  The ASQ CQE Body of Knowledge is broader in scope that of the ASQ CSSBB.

## Board-certified Professional Ergonomist (CPE)

- A CPE is qualified to analyze and opine on the degree to which an organization has implemented the established principles and practices of human factors engineering, at both the micro-ergonomic and macro-ergonomic levels, and <u>explain the significance</u> about the safety, effectiveness, and usability of products and services.

- (http://www.bcpe.org/): *"Wherever people interact with jobs, tasks, organizations and environments, HFE makes a contribution to ensure human compatibility.  HFE professionals contribute to the design of all kinds of systems, such as work systems and product/service systems. Using knowledge of people's cognitive and physical capabilities, needs and limitations, HFE professionals take a systems approach to design for people. The goal is optimal human well-being and performance with overall system effectiveness.  Our non-profit organization provides the gold standard of HFE certification, recognized nationally and internationally. We provide one professional certification. However, practitioners work in many different domains and the term for HFE varies by domain. No matter what the area of focus, the underlying knowledge and systems approach remain the same.  BCPE certificants obtain professional level of certification through one application process and exam. The certificant chooses the designation that fits their work world."*

- QUESTION:  Why do you call yourself a Human Factors Engineer?
  ANSWER: I am a "Human Factors Engineer", not just some engineer trained in human factors and ergonomics (HFE), because:
  o  I am degreed and licensed as an engineer (non-engineer psychologists, etc. are HFE PROFESSIONALS, not HFE Engineers)
  o  I have a doctorate in Industrial Engineering – HFE engineering is a sub-discipline of industrial engineering (the four IE sub-disciplines are: engineering management, engineering economics, engineering ergonomics, and work science)
  o  I am trained at the doctoral level in Psychology (minored in biopsychology in PhD and Industrial/Organizational psychology in DSc)
  o  I am Board-certified in HFE by the internationally-recognized US Board of Certification of Professional Ergonomists (www.bcpe.org), with a CPE, the highest level of certification possible

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- o I provide HFE engineering services to the public
- o I have peer-reviewed HFE publications, and
- o I have taught HFE engineering both at the graduate level (at CSU) and in workshops at national and international scientific conferences (see my CV).

## Licensed Professional Engineer (PE) – 2x

- A PE is qualified to analyze and opine on the degree to which engineering documents and practices are complete, correct, and compliant with engineering best practices, national and international consensus standards, and government regulations and <u>explain their significance</u> in the context of protection of public health and welfare.
- I am licensed as both an electrical engineer and a software engineer
- (https://www.nspe.org/resources/licensure/why-get-licensed): "*Licensure is the mark of a professional. It's a standard recognized by employers and their clients, by governments and by the public as an assurance of dedication, skill and quality. ... Only a licensed engineer, for instance, may prepare, sign, seal and submit engineering plans and drawings to a public authority for approval, or to seal engineering work for public and private clients. For consulting engineers and private practitioners, licensure is a virtual necessity. In fact, it is a legal requirement for those who are in responsible charge of work, be they principals or employees. More and more with each passing day, government agencies, educational institutions and private industries are requiring that they hire and contract only with licensed professional engineers. ... Just as the CPA defines the accountant, and a law license defines the lawyer, the PE license tells the public that you have mastered the critical elements of your profession. It demonstrates your commitment to the highest standards of engineering practice. It's also proof of your ability to offer engineering services directly to the public - something only a licensed PE can do.*"
- QUESTION?  Are you a biomedical engineer?
  ANSWER:  A person with a doctorate in biomedical engineering has received a fraction of the formal training I received completing both my doctorate in physiology and my doctorate in engineering.  Most individuals trained in biomedical engineering are not licensed and not legally permitted to present themselves to the public as Professional Engineers.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

APPENDIX B:  GM SAMARAS CURRICULUM VITAE

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# CURRICULUM VITAE

### George Michael Samaras
**National Society of Professional Engineers®**
*Signatory, NSPE Licensed Member*

## EDUCATION

**Doctor of Science**[69] The George Washington University 1992
Engineering Management & I/O Psychology
**Doctor of Philosophy** University of Maryland 1976
Physiology/Pharmacology & Biopsychology[70]
**Master of Science** University of Maryland 1974 General
Physiology
**Bachelor of Science** University of Maryland 1972 Electrical
Engineering (biomedical emphasis)

## LICENSURE AND CERTIFICATION
**Certified Forensic Engineer**
National Academy Forensic Engineers (#966S, 2017)
**Certified Biomedical Auditor**
American Society for Quality, (#1389; 2015)
**Professional Engineer**[71] **(Software Engineering)**
State of Maryland & Colorado eligible (#13004; 2014)
**Certified Quality Engineer**[72]
American Society for Quality, (#47957; 2005)
**Certified Professional Ergonomist**[73]
Board of Certification in Professional Ergonomics (#950; 1998)
**Professional Engineer (Electrical/Electronics)**
State of Maryland & Colorado eligible (#13004; 1980)



*www.samaras-assoc.com*

---

[69] **Engineering Management** is a subdiscipline of Industrial Engineering; the other three subdisciplines of IE are: Engineering **Ergonomics**, Engineering Economics, and Work Science.

[70] Also called Physiological Psychology or Psychobiology

[71] The term **Professional Engineer** and the actual practice of professional engineering is legally defined and protected by a government body. In some jurisdictions, only registered or licensed Professional Engineers are permitted to use the title, or to practice Professional Engineering. The earmark that distinguishes a licensed/registered Professional Engineer is the authority to sign and seal or "stamp" engineering documents (reports, drawings, and calculations) for a study, estimate, **design or analysis**, thus taking legal responsibility for it

[72] The **Certified Quality Engineer** is a professional who understands the principles of product and service quality evaluation and control. This body of knowledge and applied technologies include, but are not limited to, development and operation of quality control systems, application and analysis of testing and inspection procedures, the ability to use metrology and statistical methods to diagnose and correct improper quality control practices, an understanding of human factors and motivation, facility with quality cost concepts and techniques, and the knowledge and ability to develop and administer management information systems and **to audit quality systems for deficiency identification and correction.** CQE requires EIGHT years of higher education and/or work experience including THREE years in a decision-making position.

[73] The **Certified Professional Ergonomist** is a practitioner of human factors/ergonomics. A practitioner is defined as an individual who has (1) a mastery of ergonomics knowledge; (2) a command of the methodologies used by ergonomists in applying that knowledge to the design of a product, process, or environment; and (3) has applied his or her knowledge **to the analysis, design, test, and evaluation of products**, processes, and environments.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# EMPLOYMENT RECORD

**CEO Samaras & Associates, Inc.** 1996-present
Engineering private practice involved in software engineering, human factors engineering, computer systems validation, quality engineering, technical management consulting, expert testimony, and occupational & environmental health & safety research.  Corporate clients range from new start-ups to Fortune 500 multinational firms; also consulted with universities, government agencies, and labor unions.  *Most of our consulting contracts are bound by strict confidentiality agreements and are not reflected in this document.*

**Visiting Research Professor**, College of Education, Engineering and Professional Studies, CSU-Pueblo (formerly, USC), Fall 2010-2013.  **Adjunct Professor, University of Southern Colorado** Fall 1997-Spring 98 Graduate Program in Systems Engineering (graduate courses in Project Management and Ergonomics–with lab).

**Associate Director US Food and Drug Administration** 12/95-6/96 Division of Electronics and Computer Science, Center for Devices and Radiological Health, FDA (this is the same entity, renamed, where I worked from 1968 – 1972). Managed, with the Division Director, a staff of 40, consisting largely of scientists and engineers with advanced degrees and an annual operating budget (excluding salaries and facilities) of about 750K$. Primarily responsible for electronics & software activities, while the Director (a medical physicist) was primarily responsible for medical imaging & ionizing radiation activities. Involved in initiating process of a software validation guidance document for industry.

**Interdisciplinary Scientist US Food and Drug Administration** 6/94 -11/95 Interdisciplinary scientist and primary software engineering reviewer in the Division of Ophthalmic Devices, Center for Devices and Radiological Health, FDA; primary duties included the engineering review of ophthalmic medical devices utilizing software. Team led development of industry guidance for ophthalmic lasers systems that was approved by outside advisory committee.  Appointed one of Center's experts on electromagnetics. Numerous FDA individual and group recognition awards for FDA regulatory work on ophthalmic laser systems and computer software.

**Visiting Senior Scholar, The George Washington University** 9/93 – 12/94 **Visiting Professor The George Washington University** 1/93 – 9/93 Dept. Engineering Management and Systems Engineering, Graduate School of Engineering and Applied Sciences. Taught graduate management courses (including marketing management and entrepreneurial management). Conducted theoretical (mathematical) research in Industrial Engineering (organizational theory and measures of organizational efficiency and effectiveness).

**Dissertation Research, The George Washington University** Washington, DC 1992

**CEO GMS Engineering Corporation** Columbia, MD 1981-1991 Began and managed a contract biomedical engineering firm providing development work for federal (DoD and NIH) and private clients. Federal projects included: (a) prototype mechanical, electrical, electronic, and software development of an NBC-hardened vital signs monitor and an NBC-hardened flash reflectance oximeter for the US Army; (b) R&D on an algorithm and hardware implementation for electroencephalography artifact reduction for the US Army and the NINCDS; (c) theoretical work and mathematical modeling on workload leveling and other ergonomics issues for Army AH-64 helicopter pilots; and (d) prototype development of an airworthy biomedical data acquisition system for the USAF. Developed first human sympathetic neural prosthesis (Lancet, 1983). The firm's engineers and scientists were also involved in other consulting jobs in the areas of biomedical engineering, software development, and system test & evaluation with larger commercial organizations. Annual budgets ranged from 700K$ to 1100K$, after the first year.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

**Associate Professor University of Maryland School of Medicine** 1980–82;p/t 83-86**Assistant Professor University of Maryland School of Medicine** 1976 – 1980Department of Radiation Oncology. Managed a medical school-based academic research and teaching laboratory (cancer research funded by ACS, NIH/NINCDS, and the Whittaker Foundation) conducting research in biomedical engineering related to brain tumor and esophageal cancer therapy. Taught graduate physicians & and doctoral students physiology, biophysics and biomedical aspects of microwave engineering.

**Graduate Teaching Asst. University of Maryland College Park** 1974-1976 Department of Zoology, undergraduate physiology laboratory and graduate seminar in neuropharmacology

**Biomedical Engineer** U.S. Environmental Protection Agency. 1971-1972
**Computer Technician** U.S.D.H.E.W., Bureau of Radiological Health 1970-1971
**Biochemistry Lab. Tech.** U.S.D.H.E.W., Bureau of Radiological Health 1968-1970
**Technician** St. Savvas Anticancer Hospital Athens, Greece 1965-1967

# LANGUAGE FLUENCY

**Computer languages and Application Software:**
Fluent in Intel assembly language, proficient in C/C++, SQL, HTML, and various other computer languages. Proficient with a variety of software development CASE tools (MS DevStudio, MS VisualSourceSafe, ER/Studio, MSFrontPage, Rational's RequisitePro, Rational's Rose, etc.), electrical engineering tools (MultiSIM, MPLAB, FilterLab), human factors engineering tools (MannequinPRO, MS Visio), statistical software (NCSS/PASS), and mathematical software (MathCAD). Proficient with MS Office (with MSProject).

**Modern European Languages:**
Fluent in Modern Greek

# INTERESTS
## RESEARCH
Systems Engineering, Man-Machine Systems, Human Organizational Structures, and Engineering Ethics
## PERSONAL INTERESTS
Snow skiing, Dressage, Hiking/Backpacking, Scuba diving, and Soaring.
## PERSONAL DATA
Born: January 6, 1948, Ottawa, Ontario, Canada; US Citizen
Family: Married to Elizabeth Averill; one child, Demetrios
Contact Information: 7755 Soda Creek Road, Red Creek Ranch, Pueblo, CO 81005
Telephone: (719) 485-3751 E-mail: george@samaras-assoc.com

# TITLE OF SECOND DOCTORAL DISSERTATION
**D.Sc. -** directed by Prof. R.C. Waters
Organizational Effectiveness: Towards a Unifying Theoretical Perspective.
# TITLE OF FIRST DOCTORAL DISSERTATION
**Ph.D. -** directed by Prof. J.F. Contrera
*In vivo* Demonstration of Sodium-dependent High-affinity Hippocampal Choline Uptake.
# TITLE OF MASTER'S THESIS
**M.S. -** directed by Prof. J.F. Contrera
A Biochemical Approach for Elucidating Protein Uptake in Mammalian Tissue.

# ADDITIONAL TRAINING
**Woods Hole Marine Biological Laboratory**, Woods Hole, MA, Summer course, laboratory and field research in Invertebrate Zoology (1974).

*in re* Vesoulis *vs.* Reshape Lifesciences et al

**National Geographic Society Expedition**, Isla Mujeres, Mexico, Scuba diving study of sharks and their physical environment with Dr. Eugene Clark (1973). Designed, built, and used all the submersible electronics equipment required for the study as part of my graduate course in marine biology.
**Flight Training** (FAA #2169558)
**Scuba Training** (NASDS #8454/SSI #657622, various DAN & PADI certifications).

## RECENT COURSE WORK

MITx Professional Education:
- Cybersecurity: Technology, Application & Policy – 2016
- Internet of Things: Roadmap to a Connected World - 2016
- Data Science: Data to Insights - 2017

RITx Professional Education:
- Cyber 501x: Cybersecurity Fundamentals - 2017
- Cyber 502x: Computer Forensics - 2017
- Cyber 503x: Cybersecurity Risk Management - 2017

## PROFESSIONAL ASSOCIATIONS (past and present)

Aerospace Medical Association
American Association for Advancement of Science
American Management Association
American Society for Cybernetics
American Society of Safety Engineers (Professional Member)
American Society for Quality (ASQ Senior Member)
Association for Computing Machinery (ACM Senior Member)
Association for the Advancement of Medical Instrumentation (AAMI)
Human Factors and Ergonomics Society
International Council on Systems Engineering (INCOSE)
Institute of Electrical and Electronics Engineers (IEEE Senior Member)
Institute of Industrial Engineering (IIE Senior Member)
Institute of Validation Technology
International Society of Pharmaceutical Engineers
Maryland Society of Professional Engineers
National Academy of Forensic Engineers (NAFE Senior Member)
National Society of Professional Engineers (NSPE Licensed Member)
New York Academy of Sciences
Society for Neuroscience
Society for Psychophysiological Research

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## ACADEMIC RESEARCH AWARDS

### University of Maryland School of Medicine
Principal Investigator, NIH/NINCDS Research Grant "Focal Microwave Radiation Therapy: Preclinical Evaluation" (10/79-9/82; $332,873) & (4/83-3/85; $218,198). Principal Investigator, Whitaker Foundation Research Grant "Computer- Controlled Multiple-Beam Microwave Thermotherapy" (11/78-10/81) ($106,414).
Principal Investigator, American Cancer Society Research Grant, "Hyperthermal Radiotherapy for Brain Tumors Using Focused Microwaves" (1/1978-12/1980) ($100,000).
Principal Investigator, University of Maryland Hospital Radiology Department
Faculty Research Award (1976-1978) ($5,000).
Co-Investigator, on numerous other grants and contracts (1977 – 1984).

### University of Maryland College Park
Co-Principal Investigator, Huntington's Chorea Foundation Research Grant, (1973-1977; $25,000). I wrote this grant proposal as a graduate student and submitted it with my dissertation advisor to fund my MS/PhD research.

## INDUSTRIAL CONTRACTS (non-confidential or non-classified only)

### Samaras & Associates, Inc.
*Most of our FDA-related industrial contracts are bound by strict confidentiality agreements and are not listed here.*
Consultant, Ergonomics Training for Vocational Rehabilitation Counselors, IAMAW, 2001
Consultant, University of Maryland School of Nursing, "EnvirRN", 2000
Consultant, University of Maryland School of Medicine, USDOE Task Ordering Contract, 1998 – 2000
Consultant, USDOE/NIOSH Former Worker Medical Surveillance Program Phase I Grant, 1998
Consultant, Consortium for Risk Evaluation with Stakeholder Participation, USDOE funding to the University of Medicine and Dentistry of New Jersey and the University of Washington (6/96 -3/99))
Consultant, MEDCO Foundation Grant (1994 -1996)

### GMS Engineering Corporation
Principal Investigator, Development of an EEG Artifact Correction Device, US Army Medical R&D Command, DAMD17-89-C-9045, 2/89-11/89
Principal Investigator, Development of an Advanced Life Detector, US Army Medical R&D Command, DAMD17-88-C-8143, 7/88-9/89
Principal Investigator, Development of a Prototype Sympathetic Neural Prosthesis, National Institute of Neurological and Communicative Disorders and Stroke, 9/87-10/89
Principal Investigator, Conceptual Design of a Biocybernetic Link for Workload Leveling via Dynamic Task Partitioning, US Army Medical R&D Command, DAMD17-86-C-6027, 10/85-6/86 (see NASA CP 2504, pgs. 43-55, 1988).
Principal Investigator, Advanced Development of an NBC-Hardened Portable Vital Signs Monitor, US Army Medical R&D Command, DAMD17-86-C-6067, 10/85-10/87.
Principal Investigator, Exploratory Development of Chemically Hardened Vital Signs Monitor, US Army Medical R&D Command, DAMD17-83-C-3064, 2/83- 6/85.
Principal Investigator, Development of a Prototype Computerized Microwave Thermotherapy System, CompuMed Corp., 3/82-6/83.
Co-Investigator, Numerous other biomedical R&D projects awarded to GMS Engineering Corporation, including various SBIRs and commercial product development/testing contracts, 1981 - 1991.

### Cheung, Samaras & Stuchly, Consultants
Consultants to various commercial organizations on the (non-telecomm) applications of ISM-band radiation, 1978 – 1980

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# SELECTED PROFESSIONAL ACTIVITIES

**Peer Review Panel Member,** USAISR Combat Casualty Research Program (6/9-10/2009); DoD/USA: FSECSTS (3/7/2012), FSERC (6/13/2012)
**Proctor,** BCPE and ASQ certification examinations, (2003 - present)
**Publicity Chair,** IEEE Pike's Peak Section (7/97 - 7/01)
**Member**, various software engineering standards development committees for the FDA and IEEE (1994-1996)
**External Reviewer**, Veterans Administration (1981-1985)
**Reviewer,** (for numerous technical journals) (1981-1985)
**Technical Reviewer**, National Institutes of Health (NCI & NINCDS) (1981-1985)
**Guest Editor,** J Microwave Power, Special issue on Microwave and Radiofrequency Hyperthermia in Cancer Therapy, Vol. 16(2), 1981
**Member**, W.H.O. Scientific Review Committee (Radiofrequency and Microwave Bioeffects) (November, 1978)
**External Reviewer**, National Science Foundation (1978-1985)
**Moderator**, Methods of Heating Session, Symposium on Hyperthermia as an Antineoplastic Agent, Norfolk, VA (January, 1978)
**Member**, High Frequency Therapeutic Device National Standards Committee, Association for the Advancement of Medical Instrumentation (1977 – 1985)
**Consultant**, University of Maryland, Department of Psychology, Computer Systems Hardware/Software Interfacing (Summer, 1975)
**Chief Editor,** Forum, a journal of the American Society for Cybernetics (1973-1974)
**Consultant**, U.S. Environmental Protection Agency, Computer (Cybernetic) Systems (1972-1973)

# NON-RESEARCH AWARDS & HONORS

Numerous FDA individual and group recognition awards for FDA regulatory work on ophthalmic laser systems and computer software (1994/1995)
Who's Who in Frontier Science and Technology (biographee, 1984/85).
Full IEEE membership as undergrad after 1971 IEEE/MTT peer-reviewed publication

# PATENTS

**Samaras**, G.M., Falk, S.M., and Blaumanis, O.R., Flash Reflectance Oximeter, U.S. Patent Number: 5,069,214; December 3, 1991
**Samaras**, G.M. and Falk, S.M., Blood Pressure Measurement System for Filtering Low- Frequency, High-Amplitude Noise, U.S. Patent Number:4,858616; August 22, 1989
**Samaras**, G.M., Blaumanis, O.R., and Van Horn, H.Wm., Noise-Immune Blood Pressure Measurement Technique and System, U.S. Patent Number:4,649,928; March 17, 1987.

# BOOK CHAPTERS

**Samaras,** G.M. Human-Centered Systems Engineering: Managing Dissonance in Healthcare Delivery, in Management Engineering for Effective Healthcare Delivery: Principles and Practices, Kolker, A. & Story, P. (Eds). Philadelphia:IGI Global  pg. 148-171. 2011

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# PUBLICATIONS I (recent article preprints: http://www.samaras-assoc.com/eLibrary.htm)
*(Peer-Reviewed Journal & Conference Publications; see next section for Technical Reports, Invited Presentations, and Peer-Reviewed Workshops)*

**Samaras, GM**. Ergonomics & Forensic Engineering. Presented at NAFE 2019 Summer Conference (Denver CO). JNAFE, *in press*

Samaras, EA & **Samaras, GM**. Commentary: Stakeholder Dissonance Impedes Medical Device Cyber-Risk Reduction. AAMI Biomedical Instrumentation & Technology. 52(4): 296-304, July/August 2018

Samaras, EA & **Samaras, GM**. Commentary: Confronting systemic challenges in interoperable medical device safety, security & usability. Journal of Biomedical Informatics 63(2016) 226-234.

**Samaras**, GM. What IS my failure rate? ASQ Biomedical Division Biofeedback Newsletter, 44(2), 2016

**Samaras**, GM. Medical Device Life Cycle Risk Management. ASQ Biomedical Division Biofeedback Newsletter, Volume 43 (2), August 2015.

**Samaras**, GM. Use, Misuse, and Abuse of the Device Failure Modes Effects Analysis. MD+DI Online (and later print Magazine August 2013).

**Samaras**, GM. US Medical Device Innovation: Moving from the Bench to Market. IEEE Healthcare Innovation Conference: Translational Engineering in Health and Medicine. Houston, TX. November 7-9, 2012.

**Samaras**, GM. Exactly What Medical Device Innovation Are You Talking About? MD+DI Online (and later print Magazine October 2012)
**Samaras**, GM. Medical Device Mechatronics Maturity. Medical Electronics Design Online (and later print Magazine January 2013).
Samaras, E. and **Samaras**, G. (February 2012). Stakeholder Dissonance as a Critical Determinant of an E-health Initiative: A Case Study. Online Journal of Nursing Informatics (OJNI), 16 (1), Available at http://ojni.org/issues/?p=1268

**Samaras**, GM. "A Perspective on Invention, Innovation, and Regulation of Medical Devices". MDDI Online (and later print Magazine April 2012).

**Samaras**, GM. Reducing latent errors, drift errors, and stakeholder dissonance. WORK: A Journal of Assessment, Prevention, and Rehabilitation, 41(s1):1948-1955 (2012)

**Samaras**, GM. Human-Centered Systems Engineering: A Unified Approach to Product Safety Engineering. Proc. IEEE PSES 2011 Conference, San Diego, CA. 10/11-13/2011.

Samaras, EA & **Samaras,** GM. Using Human-Centered Systems Engineering to Reduce Nurse Stakeholder Dissonance. Biomed Instrum & Technol 44(s1):25-32 (2010)

**Samaras**, GM. The Use, Misuse, and Abuse of Design Controls. IEEE Eng Med Biol Magazine 29(3):12-18, 2010

**Samaras**, G.M. Human-Centered Systems Engineering: Building Products, Processes, and Services. Proc. 2010 SHS/ASQ Conference, February 25-27, 2010 on CD-ROM (6 pages)

**Samaras**, G.M. & Samaras, E.A. Feasibility of an e-Health Initiative: Information NWDs of Cancer Survivor Stakeholders, Proc. 17th World Congress on Ergonomics, August 9-14, 2009, Beijing, China, on CD-ROM (10 pages).

**Samaras**, G. M., "Systems Engineering for the Human Factors Engineer: A Workshop", a 4-hour workshop, Proc. 16th World Congress on Ergonomics (IEA 2006), Maastricht, Netherlands, July 13, 2006, on CD-ROM (6 pages).

*in re* Vesoulis *vs.* Reshape Lifesciences et al

**Samaras**, G. M., "An Approach to Human Factors Validation", J. Validation Technology, 12(3):190-201, 2006.

**Samaras**, G. M. "Engineering Complex Systems: Validating the Human Factors", Proc. 7th Annual Symposium on Human Interactions with Complex Systems, Greenbelt, MD, November 17-18, 2005, on CD-ROM (8 pages).

**Samaras**, G. M., Horst, R. L., "A systems engineering perspective of the human centered design of health information systems", J. Biomedical Informatics, 38(1):61-74, 2005.

Horst R.L., **Samaras**, G. M., "Validation Engineering in the Ergonomics of Medical Systems: Application Perspectives", Proc. 47th Annual HFES Meeting, pgs 1458 -1462, Denver, CO, October 13-17, 2003.

**Samaras**, G. M., "Validation Engineering in Ergonomics: Theoretical Perspectives", Proc. 47th Annual HFES Meeting, pgs 1453 -1457, Denver, CO, October 13-17, 2003.

**Samaras**, G.M., "Towards a Mathematical Formalism of Performance, Task Difficulty, and Activation" (invited paper), Proc. 1987 NASA Workshop on Mental State Estimation, Williamburg, VA, June 3-4, NASA CP 2504, pgs. 43-55, 1988

Almenas, K., Moore, R., **Samaras**, G.M., and Blaumanis, O.R., "Temperature distribution calculation in tissues with assymetic geometry and temperature dependent sources and blood perfusion rates", J Am Soc Mech Eng, 61:55-64, 1986

Salazar, O.M., **Samaras**, G.M., Eddy, H.A., Amin, P.P., Sewchand, W., Drzymala, R.E., and Bajaj, K.G., "Henschke memorial oration, Neurobrachytherapy: a new frontier", Endocur/Hyperth Oncol, 2:S-3-S-15, 1986.

**Samaras**, G.M., Eddy, H.A., Better, W.E., and Carlyle, J.R., "The use of swine in brain interstitial radiation studies", Lab Animal Science, 36:381-385, 1986

Sewchand, W., Amin, P.O., Drzymala, R.E., Salazar, O.M., Salcman, M., **Samaras**, G.M., and Batero, E., "Removable high-intensity iridium-192 brain implants", J Neurooncology, 2:177-186, 1984

**Samaras**, G.M., "Intercranial microwave hyperthermia", IEEE Trans Biomed Engin, (invited paper) BME-31(1):63-69, 1984.

Salcman, M. and **Samaras**, G.M., "Interstitial microwave hyperthermia for brain tumors: Results of a phase I clinical trial", J Neurooncology, 1:225-236, 1983

Polinsky, J.R., **Samaras**, G.M., and Kopin, I.J., "A sympathetic neural prosthesis for managing orthostatic hypotension", Lancet, April 23, pp. 901-904, 1983

**Samaras**, G.M., Rosenbloom, S., and Cheung, A.Y., "Correction of microwave-induced thermistor sensor errors", Med Phys, 10(3):326-332, 1983.

Harrison, G.H., Robinson, J.E., and **Samaras**, G.M., "Temperature uniformity in hyperthermal tumor therapy", Proc Symp Hyperthermia Antineoplastic Treatment Modality, NASA Publ. 2051, pp. 27-31, 1978

Salcman, M. Kaplan, R.S., **Samaras**, G.M., Ducker, T.B., and Broadwell, R.D., "Aggressive multimodality therapy based on a multicompartmental model of glioblastoma", Surgery, 92:250-253, 1982

**Samaras**, G.M., Salcman, M., Cheung, A.Y., Abdo, H.S., and Schepp, R.S., "Microwave-induced hyperthermia: an experimental adjunct to brain tumor therapy", J Natl Cancer Inst, 61:477-482, 1982

Scott, R.M., Cheung, A.Y., and **Samaras**, G.M., "Clinical local heating – microwaves (invited paper)", 3rd Int Symp Cancer Therapy Hyperthermia, Drugs & Radiation, J Natl Cancer Inst, 61:351-355, 1982

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Robinson, J.E., Cheung, A.Y., Harrison, G.H., and **Samaras**, G.M., "The response of mouse mammary tumors to microwave heating at 2.45 GHz", Radio Science, 17(2), 1982

Taylor, L.S., **Samaras**, G.M., Cheung, A.Y., Salcman, M., and Scott, R.M., "Implantable microwave antennas for clinical hyperthermia", Radio Science, 17(2):1255-1335, 1982

**Samaras**, G.M. and Cheung, A.Y., "Microwave hyperthermia in cancer therapy (invited tutorial review)", CRC Crit Rev Bioengineering, 5(2):123-184, 1981

Cheung, A.Y., Golding, W.M., and **Samaras**, G.M., "Direct contact applications for microwave hyperthermia", J Microwave Power, 16(2):151-159, 1981

**Samaras**, G.M., Van Horn, H.W., King, V.F., Slawson, E.L., and Cheung, A.Y., "Clinical hyperthermia systems engineering", J Microwave Power, 16(2):161-169, 1981

Salcman, M. and **Samaras**, G.M., "Hyperthermia for brain tumors: biophysical rationale", Neurosurgery, 9(3):327-335, 1981

Stuchly, M.A., Athey, T.W., Stuchly, S.S., **Samaras**, G.M., and Taylor, G.E., "Dielectric properties of animal tissues *in vivo* at frequencies 10MHz - 1GHz", Bioelectromagnetics J, 2(2):93-103, 1981

Stuchly, M.A., Athey, T.W., **Samaras**, G.M., and Taylor, G.E., "Measurement of radio frequency permittivity of biological tissues with an open-ended coaxial line: part II. Experimental results", IEEE Trans Microwave Theory & Techniques, 30(1):87-92, 1981

Salcman, M., **Samaras**, G.M., and Kaplan, R., "Experimental adjuncts in the combined modality treatment of glioblastoma multiforme", Proc 1st Sandie Altman Conf, pp. 73-76, Univ of Penna Med School, Philadelphia, PA, 1980

Salcman, M., **Samaras**, G.M., Mena, H., Monteiro, P., and Garcia, J., "Whole body hyperthermia: potential hazards in its application to glioblastoma", in Multidisciplinary Aspects of Brain Tumor Therapy, P. Paoletti, M.D. Walker, G. Butti, and R. Knerich (eds.), pp. 351-356, Elsevier/North-Holland Biomedical Press, 1979

**Samaras**, G.M., Robinson, J.E., Cheung, A.Y., and Weinmann, S.F., "Focussed microwave radiation therapy for deep tumors", Proc Symp Hyperthermia Antineoplastic Treatment Modality, NASA Publ. 2051, pp. 67-68, 1978

Robinson, J.E., Harrison, G.H., McCready, W.A., and **Samaras**, G.M., "Good thermal dosimetry is essential to good hyperthermal research", Br J Radiol, 51:532-534, 1978.

Salcman, M. and **Samaras**, G.M., "Neurosurgery and clinical engineering (invited paper)", J Clin Engineering, 3(3):251-256, 1978

Robinson, J.E., Cheung, A.Y., **Samaras**, G.M., and McCulloch, D., "Techniques for uniform and replicable microwave hyperthermia of a model mouse carcinoma (invited paper)", IEEE Trans Microwave Theory & Techniques, 26(8):546-549, 1978

Cheung, A.Y., Robinson, J.E., McCulloch, D., and **Samaras**, G.M., "Simultaneous free field irradiation of multiple tumors for microwave hyperthermia (Proc. 2nd Int. Symp.)", in Cancer Therapy by Hyperthermia and Radiation, C. Streffer (ed.), pp. 128-130, Urban and Schwarzenberg, Baltimore-Munich, 1978

**Samaras**, G.M., Robinson, J.E., Cheung, A.Y., Prempree, T., and Slawson, R.G., "Production of controlled hyperthermial fields for cancer therapy (Proc. 2nd Int. Symp.)", in Cancer Therapy by Hyperthermia and Radiation, C. Streffer (ed.), pp. 131-133, Urban and Schwarzenberg, Baltimore-Munich, 1978

**Samaras**, G.M. and Contrera, J.F., "Choline: high affinity uptake *in vivo* by rat hippocampus", J Neurochem., 28:1373-1376, 1977

*in re* Vesoulis *vs.* Reshape Lifesciences et al

**Samaras**, G.M., "Scientific research and social responsibility: self regulation or external controls", Amer Soc Cyber Forum, 6(2):1-2, 1974

**Samaras**, G.M., Anderson, G.E., and Rolofson, J.R., "An automated biological stress research facility", Proc 1972 IEEE-ASC Inter Conf Cyber & Soc, 1972

**Samaras**, G.M., Muroff, L.R., and Anderson, G.E., "Prolongation of life during high intensity microwave exposures", IEEE Trans Microwave Theory & Techniques, 19(2):245-247, 1971.

**Samaras,** G.M., Anderson, G.E., and Rolofson, J.R., "A controlled environmental facility", Radiation Bioeffects, BRH/DBE 70(7):72-74, 1970

**Samaras**, G.M., Muroff, L.R., and Anderson, G.E., "Prolongation of life in a microwave field by means of an environmental chamber", Radiation Bioeffects, BRH/DBE 70(1):59-61, 1969

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## PUBLICATIONS II (Technical Reports, Invited Presentations, and Peer-Reviewed Workshops)

**Samaras, GM** Participant and invited moderator, FDA Public Workshop - Cybersecurity of Medical Devices: A Regulatory Science Gap Analysis, May 18-19, 2017

**Samaras, GM** and Samaras EA, Risk Management Workshop for HF/E Practitioners, HFES 2016, Washington, DC. September 18, 2016.

Horst, RH, Caplan, SH, Karn, KS, Mauro, CL, & **Samaras, GM.** Challenges in Supporting the Design of Products for Health Care:  The Human Factors Consultant's Perspective.  Human Factors and Ergonomics Society International Annual Conference (HFES 2015). Los Angeles.  October 26-30, 2015

**Samaras**, GM. Premarket vs. Postmarket: Applying Risk Management to Your Device's Entire Lifecycle  QMED MedTechPulse, May 20, 2015.

**Samaras**, GM. US Medical Device Innovation: Moving from the Bench to Market presented at IEEE Healthcare Innovation Conference: Translational Engineering in Health & Medicine, Houston, TX  November 7-9, 2012

**Samaras**, GM.  Human-Centered Systems Engineering - Human Factors from Lust to Dust. Workshop at IEEE EMBS 2012 34th Annual International Conference of the IEEE Engineering in Medicine and Biology Society.  San Diego, CA. August 28, 2012.

**Samaras**, GM.  Human-Centered Systems Engineering - Human Factors Engineering and Reliability. Workshop at 2012 IEEE International Conference on Prognostics and Health Management (IEEE PHM 2012). Denver, CO June 18, 2012

**Samaras**, GM.  Letter to the Editor: Risky Tool?  ASQ Quality Progress. June 2012. pg. 7

**Samaras**, GM.  Human-Centered Systems Engineering: Managing Complex Systems. Workshop at IEEE SysCon 2012 International Systems Conference, Vancouver BC, March 19, 2012.

**Samaras**, GM.  Human-Centered Systems Engineering: Human Factors Engineering from Lust to Dust. Workshop at IEA 2012 World Congress on Ergonomics, Recife, Brazil.  February 15, 2012.

**Samaras**, GM. "Reducing Latent Errors, Drift Errors, and Stakeholder Dissonance: Discriminating NWDs, Requirements, and Specifications" Presentation at IEA 2012 World Congress on Ergonomics, Recife, Brazil. February 12-16, 2012.

**Samaras**, GM.  Letter to the Editor: Software Engineering Is Engineering. Communications of the ACM, 55(1): 6 (2012)

**Samaras**, GM. Human-Centered Systems Engineering: A Unified Approach to Product Safety Engineering. Workshop at IEEE PSES 2011 Conference, San Diego, CA. October 13, 2011.

**Samaras**, GM. Presenter & panelist, FDA Workshop on Medical Device Interoperability. FDA White Oak Campus, Silver Spring, MD.  January 25-27, 2010

**Samaras, GM.** Letter to the Editor: Mathematical Knowledge and Practice.  IEEE Computer. 42(12):7 (2009)

**Samaras**, GM. Integrative Approach to Medical Device Safety: Human-Centered Systems Engineering. Presented at 2009 IEEE PSES Symposium on Product Compliance Engineering, Toronto, Ontario, Canada. October 26-28, 2009.

**Samaras, GM.** Letter to the Editor: Verification and Validation.  IEEE EMBM.  28(4):6 (2009)

**Samaras**, GM. "Human-Centered Systems Engineering", *formerly "Systems Engineering for the Human Factors Engineer (see below)"*, an all day workshop presented at the 17th World Congress on Ergonomics, August 9-14, 2009, Beijing, China and HFES 2009, San Antonio, Texas, October 19-23, 2009.

**Samaras**, EA & GM.  "Information Needs, Wants, & Desires of Cancer Survivors", Annual Colorado Cancer Summit, Grand Junction, CO.  October 6, 2008

**Samaras**, EA & GM.  "Colorado Comprehensive Cancer Program - Creating a Comprehensive, Statewide Cancer Resource Directory: A Feasibility Study".  Final report.  Order # PPG07000175. June 30, 2007

**Samaras**, G.M., "Human-Centered Systems Engineering", Workshop at IASTED Telehealth 2007, Montreal, Quebec, Canada. May 31, 2007

**Samaras**, G. M., Horst, R. L., "Systems Engineering for the Human Factors Engineer", a 4-hour workshop, presented at the 49th Annual Meeting of the Human Factors and Ergonomics Society (HFES 2005), Orlando, Florida, September 26, 2005.  A full day version presented at the 50th Annual Meeting (HFES2006), San Francisco, CA, October 16, 2006 and at the 51st Annual Meeting (HFES2007), Baltimore, MD. October 1, 2007.

**Samaras**, G. M., Horst, R. L., "A systems engineering perspective of the human-centered design of health information systems", presented at the 8th International Symposium on Human Factors in Organizational Design and Management (ODAM 2005), Maui, HI, June 22-25, 2005.

Horst, R. L. and **Samaras**, G. M., "Validation Engineering in Ergonomics, Part II: Applications", presented at the 2003 IIE Applied Ergonomics Conference, Dallas, TX, March 10-13, 2003

*in re* Vesoulis *vs.* Reshape Lifesciences et al

**Samaras**, G. M., "Validation Engineering in Ergonomics, Part I: Theory", presented at the 2003 IIE Applied Ergonomics Conference, Dallas, TX, March 10-13, 2003

**Samaras**, G. M., "Re-certification Refuted", The Professional Ergonomist: The Newsletter of the BCPE, 8(2):4-5, 2000

Averill Samaras, E. and **Samaras**, G.M., "HAZTRAX™, An Internet-based Worker-Maintained Workplace Hazards Countermeasures Program"(invited), 1st Annual University of Washington Conference on the Ecological, Community, and Occupational Health Issues at Hanford, Richland, WA, December 3 & 4, 1997.

Averill Samaras, E. and **Samaras**, G.M., "Remediation: Worker-based Health and Hazard Surveillance", CRESP - OH Task Group,UMDNJ/U.Wash. Pack Forest, Washington, June 24- 27, 1997.

Falk, S.F. and **Samaras**, G.M., "Removal of EOG from EEG via direct interrogation", NINCDS Grant Tech. Report #86-NS-23673, GMS Eng. Corp., Columbia, Md., 126 pp., 1987.

**Samaras**, G.M. and Horst, R.L., "Conceptual design of a biocybernetic link for workload leveling via dynamic task partitioning", USAMRDC Contract Tech. Report #86-C-6027, GMS Eng. Corp., Columbia, Md., 215 pp., 1986.

NASA Presentation

**Samaras**, G.M., Blaumanis, O.R., Falk, S.M., and Konodi, M.A., "Statometric blood pressure measurement", Proc 39th ACEMB, p.375, 1986.

Salazar, O.M., **Samaras**, G.M., Eddy, H.A., Amin, P.P., Sewchand, W., Drzymala, R., and Bajaj, K., "Models and methodology to assess normal brain damage after interstitial hyperthermia and interstitial radiation and their combination", presented at the ASTRO meeting, Miami, FL, Sept. 29 -Oct. 4, 1985.

Eddy, H.A., **Samaras**, G.M., Salazar, O.M., "Temporal histopathologic changes in canine brain following interstitial radiation and hyperthermia", presented at the ASTRO meeting, Miami, FL, Sept. 29 - Oct. 4, 1985.

**Samaras** G.M., Salcman, M., and Cheung, A.Y., "Interstitial microwave hyperthermia in mammalian brain: engineering, biophysics, physiology and clinical application", 1981 Microwave Power Symposium Session on Medical and Biological Applications, June 9-12, 1981, Toronto, Ontario, Canada.

Salcman, M., **Samaras**, G.M., and Abdo, H.S., "A miniature microwave antenna for thermotherapy of glioblastoma: first clinical trials", 50th Anniversary Meeting of the American Association of Neurological Surgeons, April 1981, Boston MA.

Cheung, A.Y., **Samaras**, G.M., and Taylor, L.S., "Devices for localized microwave hyperthermia", ASME 1979 Adv Bioengin, pp. 143-144, 1979.

**Samaras**, G.M., Blaumanis, O.R., and Harrison, G.H., "*In vivo* temperature/heat flow sensing in microwave fields", XIV Symp Intl Appl Energet Micro, pp. 192-193, 1979.

**Samaras** G.M. and Cheung, A.Y., "Computer controlled multiple beam microwave thermotherapy", XIV Symp Intl Appl Energet Micro, pp. 250-251, 1979.

Cheung, A.Y., McCulloch, D., Robinson, J.E., and **Samaras**, G.M., "An encapsulation technique for uniform and replicable microwave heating of mass tumors", IEEE Intl Microwave Symp Dig, 357-359, 1977.

Robinson, J.E., McCulloch, D., Cheung, A.Y., and **Samaras**, G.M., "Microwave bolusing: a technique for improving heating uniformity for microwave hyperthermia", J Med Phys, (Abstract) 4(4):336, 1977.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

APPENDIX C:  GM SAMARAS RECENT EXPERT WITNESS WORK

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Expert Witness consulting time (work in the office and travel) for Dr. Samaras is $350/hr; $500/hr is charged for deposition and trial testimony and any other work outside the office.  A minimum of eight (8) hours per day is charged when outside the Pueblo, Colorado office.  Time and a half are charged for rush jobs requiring work during evenings, weekends, and holidays.

ATTESTATION

The foregoing report was prepared by me for the purpose of the above-referenced litigation.  I certify that all of the opinions expressed herein are to a reasonable degree of scientific and engineering certainty in the disciplines discussed.  Prior litigation consulting in the last few years in which I was disclosed by issuing a report and/or deposed, and/or testified at trial:

1.      2009 – 2010 R26 Expert Report and Deposition Testimony
in re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation, MDL No. 2004
2.      2009 - 2010 R26 Expert Report and Deposition Testimony
in re Kiley Wolfe v McNeil-PPC, Inc.
3.      2009-2011 Expert Opinions and Deposition Testimony
in re Newlife Sciences, LLC v. Ronald J. Weinstock
4.      2012 – 2013 Deposition and Trial Testimony
in re Kransky et al. v. DePuy Orthopedics et al.
5.      2013 R26 Expert Report and Deposition Testimony
in re Madgitz v. DePuy
6.      2013 Deposition Testimony
in re Kauthen v. DePuy
7.      2013 Expert Report, Deposition and Trial Testimony
in re Anderson v. Central Washington Health Services, et al
8.      2014 R26 Expert Report, Deposition, and Trial Testimony
in re Zimmer DUROM® Hip Cup Products Liability Litigation, MDL No. 2158
in re Pugliese v. Zimmer
9.      2014 R26 Expert Report and Deposition Testimony
in re ZIMMER NEXGEN® Knee Implant Products Liability Litigation, MDL No.  2272
10.     2014 Expert Report and Deposition Testimony
in re Smith v. Zhuge
11.     2015 Trial Testimony
in re Smith v. DePuy
in re Kline v. Zimmer
in re Mullin v. Zimmer
12.     2015 Expert Report and Deposition Testimony
in re Fresenius Granuflo/Naturalyte Dialysate Products Liability Litigation, MA & MDL 2428
13.     2016 Expert Report
in re Chiodo v TFS
14.     2017 Trial Testimony
in re Dial v Fresenius
15.     2017 Expert Report & Deposition
in re White v DaVita

*in re* Vesoulis *vs.* Reshape Lifesciences et al

16.     2017 Expert Report
in re Kirby v Smith & Nephew
17.     2018 Expert Report & Evidentiary Hearing & Trial Testimony
in re Hardin v DaVita
18.     2018 Expert Report
in re Gladen v J&J Services
19.     2018 Expert Report
in re Gmeiner v Pacific Medical, Inc.
20.     2018 Expert Report & 2019 Deposition
in re Emmons v. Zimmer Biomet, et al
21.     2018 Deposition & Trial Testimony
in re Meyers v. J&J Services
22.     2018 Deposition
in re Pool v. J&J Services
23.     2019 (disclosure)
in re Olympus America et al
24.     2019 Declaration
in re Fetherston v. ThermoTek et al
25.     2019 Expert Report & Deposition
in re Ziglar v. Pride Mobility, et al
26.     2019 Expert Report (2x) & Deposition
in re Fleming v. Childress, Schubert, et al
27.     2019 Expert Report & Deposition
in re JCCP #4885, Olympus American Duodenoscope Cases
28.     2020 Expert Report
in re Kemp v. Smith & Nephew et al
29.     2020 Expert Report
in re Bradshaw v. WMT

I reserve the right to expand or amend this report as additional information on this matter, or time to work on this matter, becomes available to me.

_____          _____
George M. Samaras                                              Date

*in re* Vesoulis *vs.* Reshape Lifesciences et al

APPENDIX D:  HUMAN FACTORS ENGINEERING MEDICAL DEVICES

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## D1: *Historical Perspective*

Although the science of ergonomics and human factors (HF&E) did not formally emerge until the 20th century, ergonomic principles were recognized and employed more than two thousand years ago by the ancient Greeks in many of their designs ranging from daily utensils to amphitheaters. Hippocrates (460-370 BC), the great ancient Greek physician considered to be the father of western medicine, also described the layout for surgical instruments and optimal surgeon's workplace, consistent with modern ergonomic methods[74].  The term *ergonomics* is rooted in two Greek words "ergo" (meaning work) and "nomos" (natural law).  It was first used in modern lexicon in 1857 by B.W. Jastrezebowski.

Frederick Winslow Taylor, one of the fathers of Industrial Engineering, was also an early forerunner of modern human factors and ergonomics thought with his late 19th century innovation called "Scientific Management".  Contemporary ergonomics as an applied science was introduced by Murrell in 1949, the same year that Ergonomics Research Society was founded by British scientists.  Human Factors, a predominantly North American term, with a relatively contemporaneous history, is rooted in WWII aviation and was initially used to distinguish the use of similar principles and methods as those employed in ergonomics, but in non-work contexts.  The first US textbook on human factors was published in 1949[75]; the first book on systems engineering and human factors was in published in 1975[76].  At present, the terms ergonomics and human factors are most often employed interchangeably, or as Human Factors & Ergonomics (HF&E).

HF&E further began to be recognized as an international discipline in 1955 when the Organization for European Economic Development initiated a Human Factors project within its European Productivity Agency. The late 1950's saw further expansion of HF&E influence internationally with numerous technical and committee meetings held in the United States and Europe culminating in the founding of the International Ergonomics Association (IEA) at a 1959 meeting in Oxford, England.  In 1961, the IEA bylaws and statutes were approved during the first International Congress of Ergonomics held in Stockholm, Sweden.  Subsequent decades have witnessed a proliferation of HF&E practice, with the most cited specializations in physical, cognitive and organizational ergonomics.[77]  More recently, this has been expanded[78] to model a structured, systematic progression of system complexity applicable to all human systems (please refer to next section entitled "HF&E in Medical Devices").

---

[74] Marmaras N, Poulakakis G, and Papakostopoulos, V (1999). *Ergonomic design in ancient Greece*.  Applied Ergonomics 30:4, pp. 361–368. doi:10.1016/S0003-6870(98)00050-7.
[75] Applied experimental psychology: Human factors in engineering design. Chapanis, Alphonse; Garner, Wendell R.; Morgan, Clifford T. Hoboken, NJ, US: John Wiley & Sons Inc. (1949)..http://dx.doi.org/10.1037/11152-000
[76] Chapanis A.  Human Factors in Systems Engineering. Wiley. 1996
[77] Karwowski, W. The discipline of human Factors and ergonomics in Salvendy Ed. (2012).
[78] Expanded to include cultural ergonomics, dealing not only with differences within the great human cultures (Eastern, Middle Eastern, and Western), but also within specific subcultures (e.g., engineers, healthcare providers, managers, etc.)

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Figure 7 models the range of interfaces from individuals and their tools to groups of individuals operating towards putatively common goals. [79] There are both overt and covert aspects to these human-system interfaces. Simple examples relevant to biomedical engineering are shown in Table 6.



Figure 7: The Varying Levels of Tool Interfaces

It is these overt and covert human interfaces that are the basis for stakeholder Needs, Wants, and Desires (NWDs[80]) in any system and the source of *emergent*[81] properties in complex systems. Unmitigated conflicting NWDs among system stakeholders lead to stakeholder dissonance, defective design inputs, and often result in the opportunities for system use errors. Complex systems have emergent properties; they are the result of component interactions at the interfaces that are not readily predictable without appreciation of the system as a whole. Emergent properties may be useful, benign, annoying, or dangerous, but in all instances, they arise at *system interfaces*, especially the

---

[79] Samaras, GM. "Reducing latent errors, drift errors, and stakeholder dissonance" WORK: A Journal of Assessment, Prevention, and Rehabilitation, 41(s1):1948-1955 (2012)

[80] NWDs are the foundational elements of product development requirements (also known as design inputs).

[81] Emergent (as opposed to resultant) behaviors or properties are sequelae of nonlinear, inhomogeneous, and non-commensurable interactions of system components. They are, by definition, unpredictable and nonobvious; their existence forms the theoretical basis for complete and correct system design validations.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

*human-system interfaces*.  Not fully appreciating human-centered system complexity has been an important obstacle in the development and deployment of essential systems.  We recognize that development-induced and deployment-induced errors are a serious problem, may become critical safety issues, and are an important source of reduced quality.  They are rarely eliminated merely with labeling or user training.

Errors are epiphenomena of complex system interfaces.  They are <u>symptoms</u>, not root causes.  Table 1 shows a taxonomy of human errors organized by error category versus error type, which is particularly relevant to product development engineering.  In the category of system use errors, Reason[82] has distinguished active errors (the result of known development/deployment "bugs") and latent errors (the result of unknown development/deployment "bugs").  Dekker[83] identifies drift errors – a misguided, usually slow, incremental progression of systems operations taking the tool beyond the designed safety envelope.  Finally, we have malicious corruption of the tool by, typically, non-end-users (sabotage).

Human errors in the system use and individual user categories are not mutually exclusive; very often failures occur when multiple contributors err – *each necessary, but only jointly sufficient*[84] - resulting in failure.  Figure 8 is an Ishikawa diagram identifying causal factors associated with system design resulting in system use errors.  Figure 9  is an Ishikawa diagram identifying causal factors associated with individual user errors.  It is important to note that Figure 9 not only pertains to individual user operational and maintenance errors (e.g., operator errors, of omission or commission, with the reprocessing), but also pertains to individual user errors in the design and development of the product (e.g., engineering errors, of omission or commission, in design verifications, design validation, or risk analysis).

---

[82] J. Reason, Human Error, Cambridge: Cambridge University Press, 1990.
[83] S.W.A. Dekker, Ten Questions about Human Error: A New View of Human Factors and System Safety, New Jersey: Lawrence Erlbaum Associates, 2005.
[84] D.D. Woods and E. Hollnagel, Prologue: Resilience Engineering Concepts in Resilience Engineering, Hollnagel, Woods, & Leveson, eds, Hampshire, England: Ashgate, 2006, pg 3.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Table 6:  Examples of Overt and Covert Interface Factors[85]

| | | |
|---|---|---|
| INDIVIDUALS | PHYSICAL (Micro-) | **Overt factors** – the static size and fit of an individual (e.g., the range of adjustment of an operating table for the comfort of individual surgeons of different heights and reach) |
| | | **Covert factors** – biomechanical factors (e.g., the weight and balance of an individual surgeon's tools) and sensory factors (e.g., multiple audible alarms in the operating theater interfering with recognition of a high priority alarm) |
| | INFORMATION MANAGEMENT (Meso-) | **Overt factors** – verbal and non-verbal information management behaviors (e.g., verbalization and mouse/trackball operation while using a computerized provider order entry system) |
| | | **Covert factors** – affective (e.g., a surgeon's frustration with multiple simultaneous alarms), cognitive (e.g., difficulties comprehending which alarm has the highest priority), and physiological behaviors (e.g., increased heart and respiration rate due to time pressures and frustration with discrimination of the alarms) |
| GROUPS | SOCIAL (Macro-) | **Overt factors** – communication and coordination (e.g., a physician putting medication orders or other directives in an inappropriate location of the computerized provider order entry system) |
| | | **Covert factors** – conventions and expectations (e.g., the buyer routinely selects the diagnostic radiology device based upon the radiologist's desire for high image quality, erroneously expecting that the technicians and nurses – the actual users, not the readers – will deliver high productivity and profitability, regardless of the choice of device) |
| | CULTURAL (Mega-) | **Overt factors** – language and artifacts (e.g., clinical users and clinical engineers do not speak exactly the same language and patient safety problems often arise when there are gaps in communication due to language difficulties; what may be obvious to the engineer may not be obvious to the clinician and omission leads to miscommunication) |
| | | **Covert factors** – shared values, such as shared beliefs[86], customs, ethics, and morals (e.g., the classical example of covert cultural factors is the discrepancy between clinical professionals and business professionals, both of whom are well-meaning but neither of whom recognize that they are starting with different assumptions and value systems) |

---

[85] See Table 2 in Samaras, G.M. Human-Centered Systems Engineering: Managing Dissonance in Healthcare Delivery, in Management Engineering for Effective Healthcare Delivery: Principles and Practices, Kolker, A. & Story, P. (Eds). Philadelphia: IGI Global  pg. 148-171. 2011
[86] It is important to note that the term shared belief (see Group : Cultural : Covert Factors) is a behaviorally-based, ethnographically-derived concept, involving objective observations, and does not require any precognitive (mind-reading) skills.

*in re* Vesoulis *vs.* Reshape Lifesciences et al



Figure 8:  System Use Errors Ishikawa Diagram



Figure 9:  Individual User Errors Ishikawa Diagram

## D2:  HF&E in Medical Devices

For nearly forty years, HF&E analyses have been increasingly recognized as important early, integral, and iterative contributions to medical device development during the design phase, and again at critical junctures (i.e., during product or process changes, in root cause analyses (RCAs) of adverse events, etc.) throughout the product life cycle.  Labeling and risk communication also benefit from

*in re* Vesoulis *vs.* Reshape Lifesciences et al

HF&E activities and the FDA has issued numerous guidance documents (see Table 7 below) over the years to inform manufacturers of the agencies' HF&E expectations for device design and labeling.

The history is clear that the issues of reduction of errors (for system use and individual users) has been a prominent concern within the FDA's Center for Devices and Radiological Health (CDRH), as well as its predecessor organization, the Bureau of Medical Devices, since at least the late 1970's. In 1978, the Bureau of Medical Devices established the Anesthesia Gas Standard, which substantively addressed the problem of use error; this led to the establishment of a Human Engineering Committee within the Association for the Advancement of Medical Instrumentation (AAMI).

Another early milestone occurred in 1995 when AAMI and FDA sponsored a joint HF&E conference[87]. This conference included an array of human factors medical device related papers/presentations, including one entitled: "The Premarket Review Process: New Requirements for Manufacturers" by Susan Alpert, MD PhD, then Director, Office of Device Evaluation, CDRH[88]. In that paper, Dr. Alpert asserted that FDA had undergone a shift from an "ad hoc" approach regarding human factors, to the current (meaning 1995) FDA position, which is illustrated by the following excerpts from her paper:

- *We consider premarket, manufacturing, postmarket, our guidance development, and our staff's understanding of what factors contribute to both the good use and the risky use of products... It is important, when we make an assessment, that a device has been established to be safe and effective for use. Safe does not mean it won't shock you when you put your hand on it; it means users can actually use the device safely, both for themselves and for the patients on the other end...*
- *510(k) submissions, verification of paying attention to design controls and GMPs are important for Class II products and for some Class I products. Again, we recognize there are no preapproval [sic] device-specific inspections. In this area, you need to establish that your human factors issues have been paid attention to...*
- *In the end we all share the same goal: No preventable injuries and deaths. We should not have deaths and serious injuries that could have been prevented. It is unacceptable, and we have to do the best we can in each of our roles in the production of safe medical devices to prevent it. This is what ODE sees, what we expect to see, and what we expect from you in terms of helping us get there.[89]*

In 2000, the landmark and highly influential IOM Report[90] entitled: *To Err is Human: Building a Safer Health System,* was published. It focused on the human and societal costs of human error and was instrumental in shifting the national dialogue to focus on patient safety through human error reduction within the US healthcare delivery system, including those errors associated with device/equipment

---

[87]For a description of the conference topics see:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HumanFactors/ucm126018.htm  Accessed 2/14/2015.
[88] A copy of Dr. Albert's paper, may be found on the FDA website at:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HumanFactors/ucm126028.htm  Accessed 2/14/2015.
[89] See section entitled 510K submission at:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HumanFactors/ucm126028.htm  Accessed 2/4/2015.
[90] Institute of Medicine (IOM), 2000. To Err is Human: Building a Safer Health System. Available from the National Academies Press at: http://www.nap.edu/download.php?record_id=9728#. Accessed 2/26/2019.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

failures and poor design. The IOM report is peppered with lessons learned from the discipline of human factors and indeed it has an entire section dedicated to human factors research and its importance in error reduction and safety. The CDRH also released an HF&E guidance document in 2000, where "use error" was implicated as a necessary consideration within risk analysis and HF&E techniques were recommended to reduce use error risk.[91]

Table 7:  Human Factors Standards & Guidance Documents

| YEAR | AGENCY & TITLE |
|------|----------------|
| 1991 | FDA Device Labeling Guidance |
| 1993 | FDA Guidance: Write it Right |
| 1993 | FDA Guidance: Human Factors Principles for Device Labeling |
| 1996 | FDA Guidance: Do it by Design - Intro to HF for Medical Devices |
| 1999 | IOM's : To Err is Human |
| 2000 | ISO 9001:2000 (Customer focus) |
| **2000** | FDA Guidance: Incorporating Human Factors Engineering into Risk Management |
| 2001 | ANSI/AAMI HE74 – Human Factors Design Process for Medical Devices |
| 2001 | FDA Guidance on Medical Device Labeling |
| 2006 | IEC 60601-1-6, Collateral Standards: Usability of Medical Electrical Devices |
| 2007 | IOM: Preventing Medication Errors: Quality Chasm Series |
| 2007 | ANSI/AAMI/IEC 62366: Application of usability engineering to medical devices |
| 2007 | ISO 14971:2007 (User focus) |
| 2009 | FDA Guidance: Presenting Risk Info in Rx Drug and Medical Device Promotion |
| 2009 | FDA Guidance: Label Comprehension Studies for Nonprescription Drug Products |
| **2009** | ANSI/AAMI HE75, 2009 Human factors engineering — Design of medical devices |
| **2010** | ANSI/AAMI/ISO 14971:2007/(R)2010 Medical Devices – Application of risk management to medical devices |
| 2011 | FDA Guidance: Applying Human Factors and Usability Engineering to Optimize Medical Device Design |
| 2012 | FDA Guidance: Safety Considerations for Product Design to Minimize Medication Errors |
| 2013 | FDA Guidance: Safety Considerations for Container Labels and Carton Labeling Design to Minimize Medication Errors |
| 2015 | ANSI/AAMI/IEC 62366-1:2015 Medical devices – Part 1: Application of usability engineering to medical devices |
| 2016 | FDA Guidance: Applying Human Factors and Usability Engineering to Medical Devices |

Consistent with this trend, for more than twenty years, numerous relevant national and international standard setting bodies produced HF&E guidance documents in recognition of HF&E's importance in the design and development of medical devices and their labeling (see Table 7).  Many of these documents, as well as articles published in trade magazines, workshops, webinars, etc. have been readily available resources for medical device manufacturers during the period under consideration in this case.

---

[91] Kaye, R. (2011) Human Factors/Usability for Medical Devices: An Historical Perspective retrieved from the FDA website at : http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/HumanFactors/UCM260576.pdf Accessed 2/26/2019.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## D3:  Requirements for Medical Device Manufacturers

A medical device manufacturer's product is defined as the hardware (including packaging) and the software (including labeling); the safety and effectiveness (which includes usability) of the medical device depend on both.  Medical device manufacturers that market safety-critical medical devices have always been obliged to ensure that use and users of their products are as safe as reasonably possible.  In Section 2.7.5, the basis for this obligation is delineated in detail.  Ensuring that use hazards are mitigated requires the practice of human factors engineering and risk management strategies, which includes anticipation of known and foreseeable use and user errors risks, assessment of the associated risks, analytical and empirical testing and evaluation, and verifying and validating risk controls (see Table 1, Figure 8, and Figure 9 to discriminate *system* use errors from *individual* user errors).  **This is neither a new concept nor a new obligation for medical device manufacturers.**

Use-related hazards for medical devices may occur for one or more reasons, including the device:[92]

- Used in unanticipated ways;
- Used in anticipated ways, but inadequately controlled for;
- Requires physical, perceptual, or cognitive abilities that exceed those of particular users;
- Inconsistent with user expectations or intuitions;
- Environment affects operation and effect is not recognized or understood by the user; and
- User's physical, perceptual, or cognitive capacities are exceeded, when in a particular environment and in a particular operational mode.

It is important to remember that very often failures only occur when multiple contributors err – *each necessary, but only jointly sufficient*[93] - resulting in failure that, unfortunately, in the medical device domain may result in serious injury or death.

Mitigating use-related hazards is the responsibility of every medical device manufacturer.  The user cannot be responsible for product design-induced hazards;[94] once the medical device is shipped, **the manufacturer has no control over the devices or the users** and cannot have any expectation that the user will detect a hazardous situation or, even if the user does detect the hazard, the manufacturer can have no expectation that the user will remember how to control the specific risk or, even if the user does remember, the manufacturer can have no expectation that the user will have the time or inclination to implement the specific risk control.

The types of HF&E evaluations that are expected of medical device manufacturers include the following:

---

[92] Samaras GM, Horst RL. "A systems engineering perspective of the human centered design of health information systems", J. Biomedical Informatics, 38(1):61-74, 2005.
[93] See footnote 84.
[94] Samaras GM. Use, Misuse, and Abuse of the Device Failure Modes Effects Analysis. MD+DI Online (and later print Magazine August 2013).

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- stakeholder identification and needs analyses,[95]
  - questionnaires & surveys
  - focus groups
  - ethnographic methods (participatory and non-participatory)
- formative evaluations (design <u>verification</u>), including:
  - physical ergonomic analyses,
  - function-task analyses,
  - heuristic analyses & expert reviews,
  - cognitive walkthroughs,
  - HF&E risk analyses & risk controls, and
  - labeling analyses (including readability and typography), and
- summative evaluation (design <u>validation</u>) of the device itself (in actual or correctly simulated intended use environment by actual or correctly simulated intended users) including:
  - labeling comprehension & access validation
  - usability validation

These HF&E evaluation practices apply during product development and after product marketing (e.g., postmarket design changes; when use or user error may be involved in death or serious injuries).

For FDA-regulated medical devices, labeling encompasses all statements, written or spoken, by the manufacturer, distributor, or their agents regarding the safety, effectiveness, and intended use of the device.[96] While devices sold in the US as *prescription-only* are exempt from <u>certain</u> requirements related to adequate directions for use,  they are <u>only</u> exempt from adequate warnings, if those *"hazards, warnings, and other information are commonly known to practitioners."*[97]  The design of labels and warnings, training, and instructions for use are no longer haphazard affairs relegated to whoever is available to write up the words, instead of doing something more interesting.  Warnings, risk perception, and risk communications are grounded in well-established social science and reliable HF&E engineering principles have been developed to guide their correct construction. For example, it is well-established[98] that a properly constructed warning must possess four critical elements:

- a signal word/symbol,

---

[95] There are multiple techniques for assessing stakeholder needs, wants and desires for, as well as identifying use & user errors of, a medical device; they include: focus groups, questionnaires, expert heuristic reviews, walk-throughs, function & task analyses, and ethnography.

[96] See: 21 CFR 801.4; http://www.fda.gov/RegulatoryInformation/Guidances/ucm081368.htm (Accessed 2/10/2015); http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070782.htm (Accessed 2/10/2015) ;
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/ucm2005422.htm (Accessed 2/10/2015).

[97] 21 CFR 801.109(c), which provides a floor, but not a ceiling, for labeling construction.  Device companies are also obligated by other standards that are either required or that they have chosen for themselves.

[98] Laughery KR and Wogalter MS.  Warnings and Risk Perceptions. Chapter 36 in Handbook of Human Factors and Ergonomics, G. Salvendy (Ed) 1997 pgs 1174-97.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- hazard identification,
- hazard consequence(s), and
- hazard avoidance instruction(s).

Even with properly constructed warnings, it remains incumbent upon the medical device manufacturer to validate label comprehension and usability for all intended user groups.

## D4:  *Organizational Design and Management (Macroergonomics)*

Macroergonomics, historically called *Organizational Design And Management*, is one of the four main branches of HF&E (see Figure 7): physical ergonomics, information management ergonomics, social ergonomics, and cultural ergonomics.  Macroergonomics focuses on the overt and covert[99] social factors in organizations with the purpose of minimizing human error and undesirable organizational behavior(s).  Overt social factors are *communication* and *coordination*; covert social factors are *conventions* and *expectations*.  Macroergonomics is about harmonizing work of the individual and of the organization.  To fully appreciate this, one needs to first understand the structure of human work and the relevant characteristics of the "organizational (hu)man".

Work is about achieving someone's objectives – be it the worker's, the manager's, or the organization's objective.  The quality and quantity of individual work are dependent upon the internal environment (e.g., fatigue, boredom, affect, etc.), the immediate environment (e.g., ambient temperature, illumination, noise, etc.), and the external environment (e.g., economic, political, cultural, etc.).  It is also dependent upon the existence of enablers & barriers (e.g., job design, tools, work structure, etc.) for accomplishing the requisite functions and tasks.  How the workload and the work proceed moderates the rate at which the objective is achieved.  Organizations permit the structure of work to be varied in such ways as to improve both efficiency and effectiveness.  However, organizational design can also undermine work.  Performance is affected by attributes of the organizational structure that include dimensions of complexity, formalization, and centralization – known as structural contingency theory[100].  In this theoretical structure, complexity consists of various types of differentiation (segmentation of the organization into subsystems[101]) and integration (achieving unity of effort among these subsystems[102]).

Workers in organizations are confronted with a very different set of considerations than the lone craftsman or professional working essentially in isolation.  Organizational (hu)man ostensibly works in teams – cooperative groups of individuals with a similar putative goal.  But this is not universally true

---

[99] In this context, overt means something that is directly detectable with one or more of the five human senses; covert means it cannot be directly detected and requires instrumentalities to transduce the phenomenon.

[100] For an overview, please refer to: Donaldson L. The Contingency Theory of Organizations. http://knowledge.sagepub.com/view/the-contingency-theory-of-organizations/SAGE.xml Accessed 2/17/2015.  The classic study was by Lawrence & Lorsch in 1967: https://www2.bc.edu/~jonescq/mb851/Jan29/LawrenceLorsch_ASQ_1967.pdf Accessed 2/21/15

[101] e.g., "silos"

[102] e.g., "concurrent engineering"

*in re* Vesoulis vs. Reshape Lifesciences et al

and individual interests often prevail – usually to the long-term detriment of the group and the organization.  Group processes, extensions of individual and interpersonal processes, profoundly impact the quality and quantity of work accomplished.  Critical elements include social norms & roles, social facilitation, form & uses of social power, group dynamics, polarization & leadership, conformity & consensus, and the impact of minority opinions on both productivity and group cohesion.

Unlike industrial & organizational psychology, whose objective is to fit people to the system, the goal of macroergonomics is to adjust the fit of the sociotechnical system to the participants.  The sociotechnical system consists of the technological subsystem and the personnel subsystem encapsulated by the external environment.  A central tenet of macroergonomics is that joint optimization – optimization so that both subsystems are fairly considered and constrained – yields a humane result that is most effective for the organization. A very powerful tool in macroergonomics is the participatory method; it is well grounded in both economic and behavioral theory and supported by extensive empirical research.  It is a means of motivating the individual workers – the subject matter experts for their particular jobs – to become highly involved in the analysis of the work and any subsequent job redesign.  Macro-Ergonomic Analysis and Design (MEAD)[103] is a basic macroergonomic method for assessing work system processes; its 10-step process can be shown to be essentially identical to the classical systems engineering paradigm.  As such, it benefits directly from the existing wealth of information on systems engineering and management.

From a lifecycle perspective,[104] organizational design begins with the determination and analysis of the organization's needs and wants (i.e., its objectives and goals for the work system).  This puts the consideration of ergonomic criteria as early as possible.[105]  These are transformed into appropriate requirements and the requirements (and constraints) are verified to conform to the organizational needs and wants that have been specifically selected for implementation.  These requirements are translated into organizational design specifications (managerial, operational, human resource, and financial specifications).  Once these specifications have been verified against the requirements, the iterative process of implementing the requisite work structures and processes begins.  Carayon[106] highlights the issue of work implementation in a high-pace, high-pressure environment.  It is crucial to recognize that implementation of new or revised work structures must carefully consider the criticality and complexity of the processes[107] within the organization; of necessity, this must include evaluation of organizational maturity and organizational readiness for change.  Once the implementation is verified against the specifications and validated against the requirements, the new work structures and processes are released.  Post-deployment corrective or preventive action studies, in terms of

---

[103] Kleiner BM.  Macroergonomics: Analysis and design of work systems.  Applied Ergonomics.  37:81-898 (2006).
[104] See footnote 92.
[105] Carayon, P., Macroergonomics in Quality Care and Patient Safety, in Human Factors in Organizational Design and Management – VII, H. Luzak and K. J. Zink, (Eds), 2003, pg.27
[106] Ibid. pg 29.
[107] See, for example, discussion in Footnote 92.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

managerial, operational, personnel, and financial issues, drive the next organizational design iteration. The timescale and approach are fundamentally the same as for development of any other system. Salvage and disposal of particular processes and work breakdown structures, as the needs of the organization change, are no different conceptually than salvage or disposal of tangible assets.

In the case of sociotechnical organizations like a modern hospital, where mortality and morbidity are predictable sequelae of inappropriate organizational behavior, macroergonomic considerations are critically important.  Communication and coordination among organizational components (e.g., manufacturer, patient care, diagnostic laboratory, and regulators), organization personnel (e.g., sales & marketing, physicians, direct patient care workers, product developers, diagnostic laboratory managers, and regulatory affairs personnel), and information channels were (and remain to this day) essential to minimize human error and the emergence of undesirable organizational behaviors at the various interfaces that jeopardize patient safety.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

# APPENDIX E: OFF LABEL USE & MISGUIDED USE

*in re* Vesoulis *vs.* Reshape Lifesciences et al

The question often arises: when does off-label use actually constitute misuse? From a human factor's perspective, there is a more general question: when does it constitute misguided use; *misuse* is a subset of *misguided use* and only focuses on individual human (operator) error, when we should also be attending to the associated organizational error(s) given our modern understanding of safety. In the following discussion, off-label use and misguided use are described and the transition from legitimate off-label use to misguided use is discussed.

## E1:  Off-Label Use

In the United States (US), prescription medical drugs and devices are regulated by the US Food and Drug Administration (FDA) based upon their risk, which is established by their intended use. For prescription drugs, the Physicians' Desk Reference (PDR) is a commercially published compendium of manufacturer's prescribing/use information (basically, the package inserts[108]) updated annually; it is well-known and regularly utilized by medical practitioners. For prescription medical devices, there is no such readily available compendium of prescribing/use information; practitioners must rely on the individual package insert[109] provided for each and every medical device and often, in very large devices (e.g., radiology equipment, robotic surgery equipment, etc.) or implantable devices (e.g., cardiac and orthopedic prosthetics, etc.), the package inserts and associated labeling are not readily available, may be voluminous & highly technical, and practitioners often rely on 3rd parties[110] for the relevant prescribing information.

The federal FDA regulates manufacturers, not State-licensed practitioners. Approval for drugs and devices generally implies that the available evidence presented to the FDA indicates a reasonable assurance of safety and effectiveness for the specified indication of use; clearance for devices implies that the manufacturer has provided the FDA information supporting the claim that the new device is substantially equivalent to the claimed legally marketed predicate. While it is not legal for practitioners to prescribe drugs or devices that have not been approved or cleared for marketing in the US, it is legitimate for practitioners to deviate from the intended use or indications for use, so-called "off-label" use. Off-label use is considered acceptable, unless it violates ethical guidelines or safety regulations;[111] in fact, in many circumstances it is the standard of care.[112] For certain populations (e.g., children, pregnant women, cancer patients, and patients with rare diseases),[113] it is <u>absolutely essential</u>, as systematic data obtained in these populations is not cost-effective for manufacturers and these

---

[108] 21 CFR 201
[109] 21 CFR 801
[110] These 3rd parties often represent themselves, and are generally viewed by practitioners, as product experts.
[111] This was clarified for Institutional Review Boards and clinical investigators in a 1998 FDA guidance:
http://www.fda.gov/regulatory-information/search-fda-guidance-documents/label-and-investigational-use-marketed-drugs-biologics-and-medical-devices Accessed 1/30/20
[112] https://www.lexology.com/library/detail.aspx?g=84019ee9-11f8-4c73-a503-b44922e1c3e0 Accessed 1/30/20
[113] https://www.medicaldevice-network.com/comment/commentoff-label-use-of-medical-devices-5820363/ Accessed 1/30/20

*in re* Vesoulis *vs.* Reshape Lifesciences et al

populations, otherwise, would be deprived of significant potential benefits. The practice is considered fully justified when scientific evidence suggests the safety and effectiveness for a use not included in the FDA clearance or approval <u>and</u> when it is supported by expert consensus and/or medical practice guidelines.[114]

This special privilege afforded State-licensed practitioners comes with a concomitant professional responsibility; they must not use drugs or devices in an arbitrary or capricious manner. **Off-label use should always be in the patient's best interest and it is the practitioner's responsibility to make sure the treatment plan is satisfactorily supported by evidence of safety and potential effectiveness.**[115,116] In order to understand the putative hazards of off-label use and to conduct a rational safety assessment prior to use, a risk assessment is essential.[117,118] The Alliance of Specialty Medicine, which includes the American Gastroenterological Association, updated in March 2017 their position statement on "Physician-Directed Applications", stating:

> "... a specialty physician may prescribe or administer any legally marketed product for an off-label use within the authorized practice of medicine where the physician exercises appropriate medical judgment and it is in the best interests of the patient. If specialty physicians use a product for an indication not in the approved or cleared labeling, they have the responsibility: **(1) to be well informed about the product; (2) to base its use on a firm scientific rationale and sound medical evidence; and (3) to maintain awareness of the product's use and effects. Specialty physicians should appropriately counsel patients about the benefits and risks of the proposed treatment,** ..."[119]

With regard to adverse event reporting by clinicians, please see the discussion in Appendix F regarding clinical staff at device user facilities.

## E2: Misguided Use

In order to discriminate off-label use from misguided use, we must first understand the concepts of misguided use. Table 1 shows a taxonomy of human error types by category (i.e., system use[120] and individual user).[121] *System Use* is a Safety II concept that rejects the Safety I notion that all tools (e.g.,

---

[114] https://journalofethics.ama-assn.org/article/prescribing-label-what-should-physician-disclose/2016-06 Accessed 1/30/20
[115] See footnote 111
[116] https://www.healio.com/orthopedics/business-of-orthopedics/news/print/orthopedics-today/%7B92b5edbf-e81d-494f-8bbe-71caf1fc67f5%7D/off-label-medical-device-use-should-always-be-in-the-patients-best-interest Accessed 1/30/20
[117] https://www.ncbi.nlm.nih.gov/pubmed/18002765 Accessed 1/30/20
[118] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4165130/ "If a device is then used for a purpose for which it has not been tested, the risk to the patient and user cannot be quantified, and the liability for the safety and the performance of the device could then be transferred to the user."
[119] Emphasis added
[120] https://www.mddionline.com/issue-use-not-user-error Accessed 2/3/20
[121] **Samaras**, GM. Medical Device Mechatronics Maturity. Medical Electronics Design Online Magazine. May 23, 2012. See also: **Samaras**, GM. Human-Centered Systems Engineering: A Unified Approach to Product Safety Engineering. Proc. IEEE

*in re Vesoulis vs. Reshape Lifesciences et al*

systems, devices, system components, etc.) are inherently safe and all failures are attributable to individual human (operator) errors; system use recognizes the human contributions in the developing, distributing, and deploying organizations to the occurrence of an undesirable event.  Examples of behaviors contributing to system use and individual user errors are shown in Figure 8 and Figure 9 (respectively, see Appendix E).

One error type (see Table 1) is **misguided** behavior and includes both a system use error (*drift*) and an individual user error (*misuse*). In the case of misguided error, Dekker's drift[122] addresses the use by organizations of a tool beyond its design envelope, whereas misuse is the misguided behavior emitted by a particular individual operator.

## E3:  Transition from Off-Label Use to Misguided Use

How can legitimate off-label use transition to misguided use for the individual practitioner and the associated developing, distributing, and deploying organizations?

Referring to Figure 9 for the individual practitioner, the transition to misuse occurs:
- with a failure to apply training, such as:
  - exceeding scope of practice;
  - not basing professional decisions on sound scientific & medical evidence;
  - not conducting and documenting a risk assessment of the safety hazards and potential effectiveness;
- with lack of training comprehension, such as:
  - violating bioethical guidelines, including failure to provide informed consent;
  - violating reporting guidelines, including failure to report revisions;
- with suggestibility of the legitimacy of the off-label use by 3rd parties; and
- by omission of well-established professional responsibilities in subsequent patients.

These are but a few examples of the transition to misuse for the individual human operator.

Referring to Figure 8 for the developing, distributing, and deploying organizations, the drift into failure occurs:
- with failures of design control, such as:
  - producing incompatible product in compatible sizes;
  - not quarantining incompatible products;
- with failures of use/user risk management, such as:
  - ignoring foreseeable hazards, such as practitioner misuse;

---

PSES 2011 Conference, San Diego, CA. 10/11-13/2011; **Samaras**, GM. Reducing latent errors, drift errors, and stakeholder dissonance. WORK: A Journal of Assessment, Prevention, and Rehabilitation, 41(s1):1948-1955, 2012

[122] Dekker, S. Drift into Failure. Ashgate. 2011 Drift into Failure. Ashgate. 2011, page 121: "Drifting into failure is not so much about breakdowns or malfunctioning of components, as it is about an organization not adapting effectively to cope with the complexity of its own structure and environment."

*in re* Vesoulis *vs.* Reshape Lifesciences et al

- o defective risk analyses and risk controls, such as unvalidated or misleading user labeling & training;
- with failures of personnel selection & training, such as:
  - o no or incomplete training comprehension, such as online courseware without adequate objective testing and gatekeeping;
  - o defective SOPs, such as defective complaint management;
- With failures of user focus, such as:
  - o incomplete/incorrect labeling comprehension validation, such as incomprehensible or unattended warnings and contraindications;
  - o incomplete/incorrect usability validation, such as misleading product sizing leading to a false impression of interoperability.

There are many other examples of organizational behaviors leading to drift into failure, the salient features of which are dependent upon the specific case at hand.

*in re* Vesoulis *vs.* Reshape Lifesciences et al

## APPENDIX F: COMPLAINT HANDLING & MDR PROCEDURES

*in re* Vesoulis *vs.* Reshape Lifesciences et al

In the United States (US), regulated medical devices consist of (a) the tangible device and any required internal/external software, (b) the packaging, and (c) the labeling (consisting of labels, instructions, advertisements, and pronouncement made the medical device manufacturer and/or agents regarding the safety or effectiveness of the device). As stated earlier (see Section 2.2), part of the manufacturer's lifecycle risk management responsibility includes public reporting. It is well-known by the medical device industry.[123] It is a validated risk control and expands the risk management process beyond the manufacturer to external agencies (both government and non-government) attempting to protect the public health. There is no bar to public reporting imposed by HIPAA compliance.[124] Failures by "device user facilities, manufacturers, importers, and distributors"[125] and their agents[126] to promptly and reliably report adverse events related to medical devices:

- undermines post-market risk management,
- impedes implant retrieval & analysis,
- interferes with requisite corrective & preventive actions (CAPA), and
- sabotages the ability of the FDA and non- governmental entities to protect the public health.

Public reporting of adverse events is a **critical** public health risk mitigation strategy; it is also a critical threat to sales and revenue. Medical device reporting of serious injury (such as revision surgery) is mandated in the US[127] and this is (or should be) well known to those operating in this business sector. Revisions are a mandatory report to the FDA by the manufacturer; in fact, they are defined as serious injuries (since they require surgical intervention) and a mandatory report that must be submitted no later than 30 calendar days from when they are reasonably known.[128]

Figure 11 depicts the postmarket vigilance activities required of manufacturers selling medical devices in the US. Medical device reporting[129] and CAPA[130], including medical device recalls[131], are dependent upon careful, complete, and correct complaint management,[132] without which there can be no reliable and timely medical device reporting to protect the public health.

---

[123] 21 CFR 803 first promulgated in 1984 (49 FR 36348) for manufacturers and importers; it was expanded in 1996 to include user facilities.
[124] https://www.fda.gov/Safety/MedWatch/HowToReport/ucm085589.htm Accessed 11/1/17.
[125] 21 CFR 803.1(a)
[126] 21 CFR 801.109(a)(1)(i) – Sales representatives and distributors are agents of the manufacturer; hospital staff are either agents of the practitioner or of the manufacturer depending upon the arrangements made for handling the medical device prior to delivery to the prescribing State-licensed practitioner.
[127] 21 CFR 803.3(w)(3): *Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.*
[128] 21 CFR 803.50(b)(ii): *Any information in your possession*
[129] 21 CFR 803
[130] 21 CFR 820.100
[131] 21 CFR 806
[132] 21 CFR 820.198

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Complaint management (as well as all other regulatory activities, such as medical device reporting and CAPA) are defined by periodically audited,[133] documented,[134] Standard Operating Procedures (SOPs) forming the quality management system.[135]  Defective SOPs will result in defective complaint handling, defective medical device reporting, and defective and untimely CAPA. As the expert in the particular business sector, it is each business entity's responsibility (manufacturer, distributor, device user facility involved in the federally-regulated production, distribution, and use of medical devices) to ensure a complete and correct SOP[136] and appropriate training of their personnel and agents. Neglecting to do so may result in failures of federal and State regulatory compliance, as well as failures in patient care.

I have previously stated (Section 3) that I could not find a contemporaneous report of Mr. Vesoulis's serious injury (1/11/18) in the FDA's public database; a revision surgery (1/13/18) should have been (see Figure 10):

- reported by the device user facility to the manufacturer within 10 workdays, once staff become aware[137];
- documented[138] and maintained[139], but not reported to the FDA, by the distributor[140];
- reported by an importer to the FDA and the manufacturer within 30 calendar days, once any employee becomes aware; and
- reported by the manufacturer within 30 calendar days, once any employee becomes aware[141].

This pattern of failures in medical device reporting must be traceable to complaint handling, since the source of all medical device reports are associated with product *failure, malfunction, improper or inadequate design, manufacture, labeling, or user error.*[142]  And, the failure of medical device reporting of a series of serious injuries are associated with the failure of the manufacturer to take corrective or preventive action (e.g., revised training of personnel & agents) to avoid repetition of the failure to report the serious injury.

---

[133] 21 CFR 820.22
[134] 21 CFR 820.40
[135] 21 CFR 820.5
[136] 21 CFR 803.17
[137] 21 CFR 803.3(b)(1): The facility becomes aware once medical personnel who are employed OR formally affiliated (e.g., have privileges) with the facility become aware.
[138] 21 CFR 803.18(d)(1)
[139] 21 CFR 803.18(d)(2): for a period of time equal to the expected life of the device
[140] 21 CFR 803.1(a)
[141] 21 CFR 803.3(b)(2): The manufacturer becomes aware once any of the employees become aware.
[142] 21 CFR 803.3(c)

*in re* Vesoulis *vs.* Reshape Lifesciences et al



*Figure 10:  Federal Reporting Requirements for MDRs[143]*

---

[143] The "??" time periods shown in Figure 10 are dependent upon the individual SOPs set by the user facility for their personnel or the manufacturer for their qualified distributors and agents.

*in re* Vesoulis *vs.* Reshape Lifesciences et al



*Figure 11:  Post-Market Vigilance for Medical Device Manufacturers*

*in re* Vesoulis *vs.* Reshape Lifesciences et al

This Page Intentionally Blank

*in re* Vesoulis *vs.* Reshape Lifesciences et al

Consultations for FDA

Task IDs:  #1: Technology Review; #2: Regulatory Strategy Assessment
#3: Experimental Data Review; #4: Risk Assessment & Mgmt; #5: Quality
#A: admin or alt; NC: No Charge/Prof. Courtesy

Client Name: LegelShaw- in re Vesudis

(Time billed in 0.25 hr increments)
Cumulative Time Total and by Task

| | All Tasks | Task #1 | Task #2 | Task #3 | Task #4 | Task #5 | Admin/Alt | NC/PC | Office Time (OT) | Out-Of-Office Time (OOO) |
|---|---|---|---|---|---|---|---|---|---|---|
| | 45:00:00 | $5,460 | 1-Jun-20 | | | | 45:00:00 | | 45:00:00 | |
| | | $17,500 | 3-Jun-20 | | | | | | 45.00 | |
| | | | | | | | | | $15,750.00 | |

MAX TIME
15.6 hours
65.6 hours

Remaining Time   20.60   $7,210.00

| Date | Start | Stop | Task ID | Work Description | OT/OOO (Y/N/W) | Time (hrs:mins) |
|---|---|---|---|---|---|---|
| 5/20/2020 | 10:55 | 13:09 | A | continue review - report deadline 6/22/20 | | 2:14:00 |
| 5/27/2020 | 13:11 | 13:39 | A | continue | | 0:28:00 |
| 5/28/2020 | 16:06 | 18:00 | A | continue | | 1:54:00 |
| 5/30/2020 | 12:06 | 14:29 | A | continue | | 2:23:00 |
| 5/31/2020 | 10:56 | 13:18 | A | continue | | 2:22:00 |
| 6/1/2020 | 10:27 | 11:44 | A | continue | | 1:17:00 |
| | 15:41 | 17:42 | A | continue | | 2:01:00 |
| 6/3/2020 | 17:12 | 17:25 | A | continue | | 0:13:00 |
| 6/5/2020 | 11:39 | 12:58 | A | continue | | 1:19:00 |
| | 13:40 | 14:04 | A | continue | | 0:24:00 |
| 6/8/2020 | 11:06 | 13:28 | A | continue | | 2:22:00 |
| | 15:30 | 17:23 | A | continue | | 1:53:00 |
| 6/9/2020 | 13:28 | 16:15 | A | continue | | 2:47:00 |
| | 16:34 | 17:40 | A | continue | | 1:06:00 |
| 6/10/2020 | 13:35 | 17:31 | A | continue | | 3:56:00 |
| 6/11/2020 | 12:04 | 14:01 | A | continue | | 1:57:00 |
| 6/12/2020 | 12:50 | 15:26 | A | continue | | 2:36:00 |
| 6/16/2020 | 10:11 | 12:14 | A | continue | | 2:03:00 |
| | 15:02 | 17:20 | A | continue | | 2:18:00 |
| 8/17/2020 | 11:25 | 13:09 | A | continue | | 1:44:00 |
| 8/18/2020 | 10:18 | 13:35 | A | continue | | 3:17:00 |
| 8/20/2020 | 14:29 | 15:45 | A | continue | W | 1:16:00 |
| 8/21/2020 | 11:00 | 14:10 | A | continue | W | 3:10:00 |

Vesoulis-Leger/Shaw_GMSTimesheet 2019-20.xlsx

**Consultations for FDA**

Task IDs:
#1: Technology Review; #2: Regulatory Strategy Assessment
#3: Experimental Data Review; #4: Risk Assessment & Mgmt; #5: Quality
#A: admin or all; NC: No Charge/Prof. Courtesy

Client Name: Leger/Shaw - in re Vesoulis

| | | | | | | | (Time billed in 0.25 hr increments) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Cumulative Time Total and by Task | | | | | | | | |
| | | | | | | | MAX TIME | Task #1 | Task #2 | Task #3 | Task #4 | Task #5 | Admn/All | NC/PC | Office Time (OT) | |
| | | | | | | | 50 hours | $15,000 | 6-Aug-19 | | | | 31:48:00 | | 31:48:00 | 31.60 | $9,540.00 |
| | | | | | | | | All tasks | | | | | 31:48:00 | | | |
| | | | | | | | | | | | | | | | Out-Of-Office Time (OOO) | |
| | | | | | | | | | | | | | | | Remaining Time 18.20 | 18.20 | $5,460.00 |

| Date | Start | Stop | Task ID | Work Description | DT/OO (Y/N/W) | Time (hrs:mins) | Task #1 | Task #2 | Task #3 | Task #4 | Task #5 | Admn/All | NC/PC | Office Time (OT) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/10/2019 | 11:45 | 12:03 | A | setup & begin review | W | 0:18:00 | | | | | | 0:18:00 | | | | |
| 8/13/2019 | 9:21 | 10:16 | A | continue | | 0:55:00 | | | | | | 0:55:00 | | | | |
| 10/8/2019 | 11:25 | 14:30 | A | begin review of new docs in DropBox | | 3:05:00 | | | | | | 3:05:00 | | | | |
| 10/14/2019 | 11:40 | 13:11 | A | continue | | 1:31:00 | | | | | | 1:31:00 | | | | |
| 10/15/2019 | 9:44 | 11:04 | A | continue | | 1:20:00 | | | | | | 1:20:00 | | | | |
| | 11:36 | 12:41 | A | continue | | 1:05:00 | | | | | | 1:05:00 | | | | |
| 10/28/2019 | 16:00 | 16:58 | A | continue | | 0:58:00 | | | | | | 0:58:00 | | | | |
| 10/30/2019 | 13:47 | 16:23 | A | continue | | 2:36:00 | | | | | | 2:36:00 | | | | |
| 11/4/2019 | 11:47 | 12:29 | A | prep for TC; TC | | 0:42:00 | | | | | | 0:42:00 | | | | |
| 11/14/2019 | 10:40 | 11:59 | A | begin Lewin docs | | 1:19:00 | | | | | | 1:19:00 | | | | |
| | 14:55 | 15:10 | A | find exhibits, upload and review | | 0:15:00 | | | | | | 0:15:00 | | | | |
| 11/18/2019 | 12:00 | 12:15 | A | email re Lewin depo review | | 0:15:00 | | | | | | 0:15:00 | | | | |
| 12/4/2019 | 8:03 | 10:54 | A | continue review; TC with FS | | 2:51:00 | | | | | | 2:51:00 | | | | |
| | 14:48 | 16:07 | A | continue | | 1:19:00 | | | | | | 1:19:00 | | | | |
| 12/5/2019 | 6:33 | 9:01 | A | continue | | 2:28:00 | | | | | | 2:28:00 | | | | |
| | 11:32 | 13:41 | A | continue | | 2:00:00 | | | | | | 2:00:00 | | | | |
| | 14:31 | 15:52 | A | continue; TC with FS | | 1:21:00 | | | | | | 1:21:00 | | | | |
| 12/9/2019 | 12:08 | 12:21 | A | r&r FS email | | 0:13:00 | | | | | | 0:13:00 | | | | |
| 12/10/2019 | 11:28 | 11:39 | A | r&r FS email | | 0:11:00 | | | | | | 0:11:00 | | | | |
| | 14:45 | 15:15 | A | access new docs, index, and begin review | | 0:30:00 | | | | | | 0:30:00 | | | | |
| | 15:37 | 16:53 | A | continue | | 1:16:00 | | | | | | 1:16:00 | | | | |
| 12/11/2019 | 15:50 | 16:45 | A | prep for TC; TC with FS, no connection | | 0:55:00 | | | | | | 0:55:00 | | | | |
| 12/12/2019 | 7:44 | 8:48 | A | TC with FS; send revised Letter Report | | 1:04:00 | | | | | | 1:04:00 | | | | |
| | 11:37 | 12:03 | A | continue | | 0:26:00 | | | | | | 0:26:00 | | | | |
| | 16:42 | 18:58 | A | continue | | 2:16:00 | | | | | | 2:16:00 | | | | |
| 12/13/2019 | 10:13 | 10:43 | A | continue | | 0:30:00 | | | | | | 0:30:00 | | | | |