UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PAUL VESOULIS, | * | CIVIL ACTION NO. 2:19-cv-01795 |
| | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | |
| | * | |
| RESHAPE LIFESCIENCES INCORPORATED f/k/a | * | JUDGE MARTIN L.C. FELDMAN |
| ENTEROMEDICS INCORPORATED, | * | |
| Defendant. | * | MAG. JUDGE DANA M. DOUGLAS |

**********************************************

## MEMORANDUM IN SUPPORT OF REURGED MOTION FOR SUMMARY JUDGMENT ON BEHALF OF RESHAPE LIFESCIENCES INCORPORATED f/k/a ENTEROMEDICS INCORPORATED

**MAY IT PLEASE THE COURT:**

ReShape Lifesciences, Inc. f/k/a Enteromedics Incorporated (hereinafter "ReShape"), submits this Memorandum in Support of its Reurged Motion for Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. ReShape seeks a dismissal of all claims brought against it by Plaintiff Paul Vesoulis. As set forth below, Plaintiff's state law claims asserted against ReShape are expressly preempted under the Medical Device Amendments of 1976, 21 U.S.C. § 360k(a) ("MDA") and impliedly preempted under Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 353 (2001). Even to the extent this Honorable Court finds that federal preemption does not apply, Plaintiff has failed to establish the essential elements of his state law claims. Further, Plaintiff cannot show a causal connection between any alleged noncompliance with FDA regulations by ReShape and his alleged injuries. Accordingly, ReShape is entitled to judgment as a matter of law dismissing Plaintiff's claims with prejudice.

## I.    PROCEDURAL HISTORY

On January 10, 2019, Plaintiff filed his Petition for Damages in the Twenty Fourth Judicial District Court in Jefferson Parish, Louisiana, alleging that he suffered injuries and damages arising from procedures involving a medical device—specifically, the Endoscopic ReShape Integrated Dual Balloon (the "balloon"). See R. Doc. 1.2 On February 27, 2019, ReShape removed the lawsuit to this Court under 28 U.S.C. § 1332 on federal diversity jurisdiction grounds.  See R. Doc. 1.

In his Petition, Plaintiff asserts that ReShape, as manufacturer of the balloon, is liable under the Louisiana Products Liability Act ("LPLA") because the product was allegedly unreasonably dangerous in its (1) construction or composition; (2) design; and (3) inadequate warning.  See R. Doc. 1.2, ¶7.  On December 13, 2019, Plaintiff filed a First Amended Complaint.  See R. Doc. 25. In the Amended Complaint, Plaintiff clarified his allegations, asserting that ReShape "is liable based solely upon [its] failure to comply with the PMA Approval Order and applicable FDA regulations, and thereby, is also liable under the Louisiana Products Liability Act's parallel provisions regarding failure to warn, La. R.S. 9:2800.57(A) and breach of the defendants post-sale duty to warn, La. R.S. 9:2800(C)." See R. Doc. 25, ¶7. In his Amended Complaint, Plaintiff makes a separate claim that ReShape is "liable for failing to comply with the Premarket Approval Order issued by the FDA and applicable FDA regulations…regarding labelling and warnings" and reporting instances of death or serious injury through the required filing of MAUDE reports with the FDA.  See R. Doc. 25, ¶8.  In support of the claims in his Amended Complaint, Plaintiff attached a report drafted by George Samaras, M.D. dated December 12, 2019. See R. Doc. 23-2.

In response to Plaintiff's Petition and Amended Complaint, ReShape filed answers denying all liability claims, and asserted federal preemption under 21 U.S.C. § 360k(a) as an affirmative defense.  See R. Doc. 22, aff. def. 35; R. Doc. 30, aff. def. 35. After adequate discovery, on August

2

21, 2020, ReShape filed its Motion for Summary Judgment ("MSJ") arguing that Plaintiff's claims are expressly preempted under the MDA, and further that Plaintiff cannot show that ReShape's alleged noncompliance with FDA regulations caused or contributed to his injuries. <u>See</u> R. Doc. 54. On September 8, 2020, Plaintiff filed his Motion in Opposition to ReShape's MSJ. <u>See</u> R. Doc. 62-19. Neither Motion was ever heard by the Court because Plaintiff and ReShape subsequently filed a Joint Motion to Continue ReShape's MSJ. <u>See</u> R. Doc. 65. In response to the Joint Motion, this Honorable Court issued an Order that ReShape's MSJ was denied without prejudice as premature. <u>See</u> R. Doc. 66. Since that time, both Plaintiff and ReShape have conducted ample discovery and ReShape seeks to reurge its argument set forth in its initial MSJ and to strengthen that argument in this Reurged Motion for Summary Judgment.

## II.   <u>FACTUAL BACKGROUND</u>

### A.   **The Product**

The Integrated Dual Balloon is a temporary weight-loss medical device.  <u>See</u> ReShape Integrated Dual Balloon System Instructions for Use, attached hereto as Exhibit "A," at ReShape-000002.  The balloon, which is inserted into the stomach and removed several months later, is designed to occupy space in the stomach and produce a sensation of satiety to promote weight loss. <u>See</u> <u>id</u>.

The known risks associated with the implant and explant procedures include potential pancreatitis, *esophageal perforation, and death.* <u>See</u> <u>id</u> at ReShape-000004-7 (emphasis added). The balloon's labeling and marketing materials clearly indicate these known risks. <u>See</u> FDA Approved Labeling and Marketing Materials, attached hereto as Exhibit "B," at ReShape-000039, 109, 132, 134, 136,142, 147, 149, 202, 205. Also, the ReShape Integrated Dual Balloon System Instructions for Use ("IFU"), which are provided to physicians who perform the procedures, fully

3

and unambiguously explain all known risks associated with the balloon, including esophageal perforation and death. See Ex. A, at ReShape-000004-23. The Integrated Dual Balloon System IFU instruct physicians to communicate all potential risks and complications to patients. See id at ReShape-000005, 6 ("it is the responsibility of the physician to advise the patient of known risks and complications associated with the procedure and the device").

### B.      The Subject Procedure

On July 27, 2017, Plaintiff, an Ohio native, *elected* to have the balloon inserted by Dr. Thomas Lavin ("Dr. Lavin") at Surgical Specialists of Louisiana, LLC ("SSOL") in Metairie, Louisiana.  See R. Doc. 1.2, ¶3.  Before the implant procedure, Plaintiff signed an informed consent form, provided by Dr. Lavin. See Endoscopic Balloon Procedure Consent Form, executed July 27, attached hereto as Exhibit "C," at p. 1. The very first paragraph of the informed consent form states:

> The purpose of this informed consent is to provide you information about endoscopic balloon procedures, which you are considering for weight reduction. Please read this informed consent *carefully* and *ask your doctor any questions you may have*. *Sign this form only after you understand* the procedure, your expected commitment, the anticipated benefits, *the risks*, the alternatives, *and all your questions have been answered to your satisfaction*.

Ex. "C," at p. 1 (emphasis added). Then just three short paragraphs below, the informed consent form lays out all of the risks associated with the procedure, specifically including "death" and "upper gastrointestinal tract or intra-abdominal organs including perforation (tearing)." See id. Additionally, after the consent form covered all risks, it provided, "These risks are rare but may require additional treatment, surgery, or hospitalization, such as in the case for dehydration, deflation, *perforation*, and/or bleeding ulceration." See id at p. 2 (emphasis included). Finally, on the last page of the informed consent form, Dr. Vesoulis signed an acknowledgement attesting that

4

he "had an opportunity to ask questions and receive answers from [his] surgeon" and that "all [his] questions ha[d] been answered to [his] satisfaction." See id at p. 4.

In addition to the informed consent, before the balloon was implanted, Plaintiff also signed an anesthesia consent form in which he agreed to receive general anesthesia for the procedure. See id at p. 5. The second page of the anesthesia consent form provided that the "[r]isks generally associated with any surgical treatment/procedure, including anesthesia, are: *death* . . ." See id at p. 6 (emphasis added). Before informing Plaintiff of the risks, the anesthesia consent form specifies:

> Listed below are those risks associated with this procedure that we believe a *reasonable person in your (the patient's) position would likely consider significant* when deciding whether to have or forego the proposed therapy. *Please ask your physician if you would like additional information regarding* the nature or consequences of these risks, *their likelihood of occurrence, or if there are other associated risks that you might consider significant but may not be listed below.*

Id (emphasis added). Under the "general anesthesia" section of the form, the risks listed include "death" and "esophageal injury." See id at p. 7. On the last page, Plaintiff signed a certification acknowledging that he had an opportunity to discuss the risks identified in the form, particularly those of importance to him, and that he asked and received answers to all his questions. Id at p. 8.

Plaintiff's explant procedure occurred on January 11, 2018. Before the explant procedure, Plaintiff signed another informed consent form for the removal of the balloon, which notified him of the risks associated with the procedure, including "a risk of bleeding or perforation of the esophagus, stomach or duodenum." See Consent for Endoscopic Removal of Intragastric Balloon, executed January 11, 2018, attached hereto as Exhibit "D," at p. 1. The explant consent form also notified the Plaintiff that the "[s]pecific risks associated to removal of the intragastric balloon are the same risks discussed upon insertion of the device . . ." See id. Furthermore, prior to the removal of the balloon, Plaintiff signed another anesthesia consent form for the explant procedure *identical*

to the one he signed for implantation of the balloon. See id at p. 3-6.  During the balloon's removal Plaintiff purportedly suffered a 2 mm esophageal perforation.

      **C.**      **The Pre-Market Approval Application Process**

Before ReShape's acquisition of the balloon in October 2017, the balloon underwent a rigorous premarket approval ("PMA") evaluation process with the United States Food and Drug Administration ("FDA"). The FDA stringently regulates medical devices via the comprehensive regulatory system implemented under the authority of the Federal Food, Drug, and Cosmetic Act ("FDCA").  See 21 U.S.C. §§ 321 et. seq. As part of the pre-market scheme, medical devices must meet certain minimum requirements in order to be marketed in the United States. For example, like other medical products, a device cannot be adulterated or misbranded, and there are registration, good manufacturing practices, and labeling requirements. See 21 U.S.C. §§ 351-52, 360; 21 C.F.R. §§ 801, 809, 820.

The Medical Device Amendments ("MDA") to the FDCA, 21 U.S.C. § 360k, classify medical devices into three categories based on the degree of control needed to provide assurance of the device's safety and effectiveness.  See e.g., Martin v. Medtronic, Inc., 254 F.3d 573, 576 (5th Cir. 2001). Class III devices, such as the ReShape balloon, are the most strictly regulated, receive the greatest amount of federal oversight, and must undergo an "indisputably thorough, rigorous, and costly pre-market review (some 1,200 FDA man-hours at hundreds of thousands of dollars in cost) by the FDA."  Id. at 576; see 21 U.S.C. § 360c(a)(1)(C)(ii).

Under the PMA application process, the manufacturer must provide the FDA with detailed information regarding the safety and efficacy of the devices. A PMA application is lengthy and must include, among other things, information regarding proposed labeling; reports of information "concerning investigations which have been made to show whether or not such device is safe and

effective"; a description of the manufacturing and processing methods; samples of the device and

its components; and information regarding the components, ingredients, and operating principles

of the device. See 21 U.S.C. § 360e(c)(1). The FDA *will deny* a PMA application if "there is a lack

of a showing of reasonable assurance that such device is safe [and effective] under the conditions

of use" in the proposed labeling; if the methods of manufacturing, processing, packing, or

installing the device do not conform to good manufacturing practices; *if the proposed labeling is*

*false or misleading*; or if the device does not meet performance standards. See 21 U.S.C. §

360e(d)(2); 21 C.F.R. § 814 (emphasis added). Additionally, in the PMA process the FDA

specifies the labeling requirements, approves the "Patient Information Guide" used to provide

information and warnings to patients, approves the warnings and directions for physicians

contained in the IFU, and approves the specific label that is issued. See id.

After a device has received PMA, "the MDA forbids the manufacturer to make, without

FDA permission, changes in design specifications, manufacturing processes, labeling, or any other

attribute, that would affect safety or effectiveness." Riegel v. Medtronic, 552 U.S. 312, 319 (2008).

Further, a manufacturer is prohibited from producing or labeling any device in any manner

inconsistent with the conditions of approval specified by the FDA. 21 C.F.R. § 814.80.  Moreover,

the manufacturer must submit a supplemental application regarding certain proposed changes for

FDA approval before implementing such changes. 21 C.F.R. § 814.39(d).

After PMA and marketing, the manufacturer has continuing obligations: to report certain

adverse events and other safety related issues to the FDA, to submit to FDA inspections, and to

respond to FDA requests for information. The FDA requires additional post-market controls,

including manufacturing, record keeping, and reporting requirements. See 21 C.F.R. §§ 803, 820.

The FDA has the exclusive power to inspect companies to ensure compliance with its regulatory

requirements; issue appropriate remedies, such as warnings, corrective labeling, notification to doctors or patients; and recall products if it believes a product poses a hazard. See e.g., 21 U.S.C. §§ 351, 352, 360(h), 374. Further, the FDCA provides that subject to an exception for certain actions that may be brought by a state, "all such proceedings for the enforcement, or to restrain violations of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a).

On June 30, 2014, the balloon's PMA application was submitted to Center for Devices and Radiological Health ("CDRH") of the FDA. See FDA Medical Device Database Website (www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P140012), PMA of ReShape Integrated Dual Balloon System, attached hereto as Exhibit "E." The FDA approved ReShape's PMA application, which included the IFU and Patients Information Guide, and found the balloon safe for commercial sale and distribution on July 28, 2015. Id. Under the PMA, ReShape was forbidden from making changes to the balloon's design, manufacturing, product labeling, and warnings without FDA approval. See 21 U.S.C. § 360e(d)(6)(A)(i). Importantly, neither Plaintiff nor his expert asserts that ReShape made any changes to the labeling without FDA approval.

## LAW AND ARGUMENT

### III.   Summary Judgment Standard

A summary judgment shall be granted if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; see Little v. Liquid Air Corp., 37 F.3d 1069 (5th Cir. 1994) (en banc); see also Gray v. Indus. Plant Maint., 01-1167, 2004 WL 1661209 at * 3 (E.D. La. July 23, 2004). As to issues that the non-moving party bears the burden of proof at trial, the moving party may satisfy this summary judgment burden by demonstrating the absence of evidence supporting the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Once the movant makes such a demonstration, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring trial. See id. The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Little, 37 F.3d at 1075. If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment as prayed for.   Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322.

In this instance, the material facts surrounding the Plaintiff's subject medical procedures and the regulatory history of the balloon are not in dispute. Rather, the issues in this Motion are legal issues. The controlling legal authority from the United States Supreme Court, the United States Fifth Circuit Court of Appeal, and this Court hold that state law tort claims involving a Class III medical device that has successfully completed the PMA process, such as the balloon, are preempted under the MDA, 21 U.S.C. § 360k(a). See e.g., Gomez v. St. Jude Med. Daig Div. Inc., 442 F.3d 919 (5th Cir. 2006); Parra v. Coloplast Corporation, No. CV 16-14696, 2017 WL 24794 (E.D. La. 2017); Chiasson v. Medtronic Inc, No. CV 16-3552, 2016 WL 4191837 (E.D. La. 2016); Hinkel v. St. Jude Med., S.C., 869 F. Supp. 2d 739 (E.D. La. 2012). Even to the extent this Court finds that federal preemption does not apply, Plaintiff has not and cannot support his claims. Accordingly, the Court should dismiss Plaintiff's claims against ReShape, with prejudice.

## IV.   Plaintiff's Claims are Preempted

### A.   Plaintiff's Claims are Expressly Preempted by Federal Statute, 21 U.S.C. § 360k(a)

The Supremacy Clause of the United States Constitution provides that the "Laws of the United States ... Shall be the supreme Law of the Land." Hinkel, 869 F. Supp. 2d at 744 (citing U.S. CONST. Art. VI, cl. 2). When state law conflicts with federal law, the state law is without

9

effect under the Supremacy Clause.  Id. (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, (1992)).  However, because of the important principles of federalism in areas of public health and safety, the states' police power will not be preempted by federal law unless congressional intent to the contrary is clearly expressed.  Id. (internal citations omitted).

In this instance, the United States Supreme Court has unequivocally stated that the preemption clause enacted in the MDA bars state tort lawsuits challenging the safety or effectiveness of a Class III medical device given PMA by the FDA.  See Chiasson, 2016 WL 4191837, at *3 (citing Riegel, 552 U.S. at 312).

The MDA sets forth, in pertinent part:

(a) General Rule
Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
(1) which is different from, or in addition to, any requirement under this chapter to the device, and
(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a) (emphasis added).  Under this authority, Plaintiff's tort claims are preempted because a finding of liability against ReShape under Louisiana law arising from requirements not imposed by the FDA during the PMA process would undermine the FDA's central oversight role for the device.  See Wildman v. Medtronic, Inc., 874 F.3d 862, 867 (5th Cir. 2017).

In Riegel v. Medtronic, Inc., the Supreme Court interpreted 21 U.S.C. § 360k, and established a two-prong test to determine whether the MDA preempts state tort law. Under the test, the MDA preempts state tort law (1) if "the FDA has established requirements applicable to the device at issue"; and (2) if "the state law at issue creates a requirement that is related to the device's safety or effectiveness and is 'different from or in addition to' the federal requirement." Riegel, 552 U.S. at 312; see also Hughes v. Boston Scientific Corp., 631 F.3d 762, 768 (5th Cir.

2011); Bass, 669 F.3d at 507 ("Devices that are approved through PMA procedures automatically satisfy the 'federal requirements' prong").  As discussed in Section A(2) below, Plaintiff does seek to impose additional requirements with his state law claims that are different from the allegedly violated federal requirements. Because (1) the balloon is a PMA approved, Class III medical device subject to FDA requirements, and (2) Plaintiff's state law claims impose requirements different from and in addition to the FDA safety requirements, his LPLA claims are expressly preempted.

**1.     The ReShape Balloon is a Class III Medical Device, and,
       Therefore, Subject to Premarket Approval**

As discussed above, the medical devices that receive the most federal oversight are those designated as Class III.  In general, a device is assigned to Class III if it cannot be established that a less stringent classification would provide reasonable assurance of safety and effectiveness, and the device is either "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or "presents a potential unreasonable risk of illness or injury."  Id. at 1003 (internal citations omitted) (citing, with regard to Class III medical devices, 21 U.S.C. §360c(a)(1)(C)(ii)). As a result, the FDA requires that all Class III medical devices undergo a meticulous PMA period. See Chiasson, 2016 WL 4191837, at *2 (citing Riegel, 552 U.S. at 317–18).

Devices that the FDA approves through the PMA process automatically satisfy the "federal requirements" prong.  Calloway v. Coloplast Corp., No. CV 18-0992, 2019 WL 2169222, at *3 (W.D. La. Feb. 5, 2019), report and recommendation adopted, No. CV 18-0992, 2019 WL 2166539 (W.D. La. May 17, 2019).  This Court has previously taken judicial notice of the FDA's website noting a medical device's MDA classification, and should do so in this case because it is undisputed that ReShape's balloon is a Class III medical device that received PMA.  See Ex. E;

Parra, 2017 WL 24794, at *3; Scianneaux v. St. Jude Medical S.C., Inc., 961 F. Supp. 2d 808, 812

(E.D. La. 2013). Accordingly, the first prong of Riegel is satisfied.

> **2.      Plaintiff's State Law Claims Are Preempted Because They Seek to Impose Requirements that are Different From, or In Addition to, Those Required Under Federal Law**

The second prong of the Riegel analysis and the salient issue before the Court is whether

Plaintiff's state law claims impose different or additional requirements on the balloon than the

allegedly violated federal requirements. See Hinkel, 869 F. Supp. 2d at 745–46. In his Petition for

Damages and First Amended Complaint, Plaintiff asserts the following claims under the LPLA:

1. The production in question was unreasonably dangerous because of an inadequate warning pursuant to La. R.S. § 9:2800.57. (R. Doc. 1.2, ¶7);
2. ReShape's alleged failure to comply with the PMA Approval Order and applicable FDA regulations makes it liable for breaching its duty to warn under La. R.S. § 9:2800.57(A) and post-sale duty to warn under La. R.S. § 9:2800.57(C).

See R. Doc. 1.2, ¶7; See R. Doc. 25, ¶7.

Respecting whether requirements are "different from" or "in addition to" federal MDA

requirements, any standards that a jury could impose upon a manufacturer under the LPLA would

certainly be "in addition" to and/or "different from" the standards imposed by the federal

government when the federal standards have been met by the manufacturer. See Riegel, 128 S. Ct.

at 999. Moreover, state tort law cannot "question the sufficiency of the FDA-approved labeling,

warnings, and instructions or require the manufacturer to have included different warnings, labels,

or instructions with the device."  Hughes, 631 F.3d at 769.

> **a.      Plaintiff's Claims that ReShape had a Post-PMA Approval Duty to Warn Doctors and Patients of Adverse Events Imposes Rigid and Additional Measures that FDA Regulations do Not Require**

Plaintiff broadly alleges that ReShape failed to warn him and his treating physician, Dr.

Lavin, as required by federal law and the FDA. See R. Doc. 62-19, at p. 15. In support, Plaintiff

12

cites comprehensive FDA regulations that ReShape allegedly violated. Notably, none of them require that a medical device manufacturer notify the public and physicians directly when it learns that its device was linked to an adverse event. Plaintiff was unable to provide a law or regulation because there is no federal requirement to report adverse events directly to doctors or patients. See Cenac v. Hubbell, CIV.A. 09-3686, 2010 WL 4174573, at *5–6 (E.D. La. Oct. 21, 2010).

In Cenac v. Hubbell, the plaintiff asserted claims against the medical device manufacturer for failing to warn the plaintiff and the plaintiff's doctor of the alleged problems with the medical device. Id.  In support of his claims, plaintiff cited 21 C.F.R. 814 et seq., sec. 814.80 and 21 C.F.R. sec. 814.3a(d). Id. The Cenac court reiterated that the Fifth Circuit has determined, "To permit a jury to decide [a plaintiff's] claims that the information, warning, and training material the FDA required and approved through the PMA process were inadequate under state law would displace the FDA's exclusive role and expertise in this area and risk imposing inconsistent obligations on [medical device manufacturers.]" Id (quoting Gomez, 442 F.3d at 931). Ultimately this Honorable Court held that because plaintiff had identified no specific federal requirement mandating that the device manufacturer warn the plaintiff and the plaintiff's doctor of the alleged problems in the device's manufacturing process, permitting the plaintiff to go forward with the failure to warn claims would risk imposing obligations on a medical device manufacturer that are inconsistent from those imposed by the FDA, and as additional, different requirements, the claims were preempted. See Cenac, 2010 WL 4174573, at *5–6; see also Gavin v. Medtronic, Inc., 2013 WL 3791612, slip op. (E.D. La. July 19, 2013); Sons v. Medtronic Inc., 915 F. Supp. 2d 776, 783 (W.D. La. 2013).

Additionally, persuasive authority from other courts also indicates that there is no federal requirement that a medical device manufacturer notify doctors and patients of adverse events

directly, without FDA involvement; rather, the manufacturer's obligation is to report adverse events to the FDA. Multiple courts have held that claims for a manufacturer's alleged failure to warn patients and physicians about adverse events are preempted and such warnings are not required by the FDCA. See McClelland v. Medtronic, Inc., 944 F. Supp. 2d 1193 (M.D. Fla. May 16, 2013); Gale v. Smith & Nephew, Inc., 12 CV 3614 VB, 2013 WL 9874422, at *5 (S.D.N.Y. Sept. 13, 2013); Bertini v. Smith & Nephew, Inc., 8 F. Supp. 3d 246, 256 (E.D.N.Y. 2014); Stokes v. I-Flow Corp., 2013 WL 1715427 (M.D. Fla. April 8, 2013); Pinsonneault v. St. Jude Medical, Inc., 953 F. Supp. 2d 1006 (D. Minn. June 18, 2013).

Mary Lou Mooney was ReShape's Vice President of Regulatory, Clinical, and Quality at the time Plaintiff's injury occurred and is very well-versed in the FDA requirements for medical devices. Ms. Mooney testified on behalf of ReShape in this matter and discussed adverse events and reporting requirements at length. See Deposition Testimony of Mary Lou Mooney, attached hereto as Exhibit "F," at p. 34. In connection with any labeling or warnings that would be issued by ReShape, Ms. Mooney clarified that doctors are sent the Instructions for Use ("IFU") which contain the product information. See id at p. 42. The IFU document is the standard communication to health care providers and patients regarding any warnings, risks, use, or aspect of the product. See id at p. 83. Ms. Mooney testified that if any changes to labeling are made, they are done so through an updated IFU, which has to be submitted to the FDA for approval. See id at p. 42. Once approved, the updated IFU is sent to all prescribers. See id at p. 23-24, 42.

Further, Ms. Mooney explained that the required mechanism of reporting adverse events to the FDA is by filing a Medical Device Report ("MDR") of the event in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database. See id at p. 32. Ms. Mooney stated that ReShape's "regulatory responsibility, [is] to report all serious adverse events. Any that do not

qualify or meet the regulatory criteria of a serious adverse event are captured within the complaint handling system of the company and executed under standard operating procedures." See id. Ms. Mooney clarified that death is not an adverse event. See id at p. 41. Rather, the MAUDE report captures the adverse event with an accompanying description that includes the outcome of the event; thus, if death were the outcome of the adverse event, it would be reported as such in the MAUDE database. See id at p. 41. The purpose of creating a MAUDE report is to report the findings of the event to the FDA. See id at p. 32. The FDA does not require the medical device manufacturer to send the MAUDE reports to physicians. See id at p. 36-37.

When asked if there was any communication with Dr. Lavin or his clinic, SSOL, regarding two deaths, prior to August 10, 2017, when the FDA issued a Dear Health Care Provider ("HCP") letter to providers, Ms. Mooney again explained:

> The regulatory process and [ReShape's] responsibility, as a manufacturer, was to report those through the MAUDE database, and there's no responsibility or regulation that requires [ReShape] to report it to any health care provider, including Dr. Lavin, so I would not have expected any of that information to be communicated to him.

Id at p. 34; see also id at p. 48 ("We reported through the MAUDE database, as required. We did not contact any individual physicians, which is not required."); see also id at p. 76 ("there is no provision for a requirement to send MAUDE reports to physicians."); see also id at p. 84-85 ("There is not an obligation to notify treating physicians of every, every event reported"). ReShape's IFU does state that "it is important to discuss all possible complications and adverse events with the patient," which Ms. Mooney explained means "possible types of adverse events," i.e., the "known potential adverse events, which are listed in the product labeling, in the warning sections, and in the sections that contain data from the original [clinical] study." See id at p. 37.

Additionally, Defendant's expert, Sally Maher, past employee of the FDA and industry representative for the FDA's medical device panel that reviews PMAs, provided extensive information regarding a medical device manufacture's obligations as it pertains to adverse events. See Deposition of Sally L. Maher, JD, RAC, attached hereto as Exhibit "G," at p. 11-12. When questioned by Plaintiff's counsel respecting the same two deaths Ms. Mooney was examined on, Ms. Maher likewise stated that ReShape "complied with the regulations by notifying the FDA of the deaths. There is no continued obligation to notify all your customers of every MDR that occurs." See id at p. 59.

In sum, ReShape did not owe a duty to Plaintiff or Dr. Lavin to inform them directly of each specific adverse event that occurred. Rather, ReShape's duty was to the FDA via filing a MDR in the MAUDE database. Because Plaintiff fails to identify any source of a federal requirement that a medical device manufacturer, such as ReShape, warn patients and health care professionals directly that an adverse event occurred in connection with its device, Plaintiff's LPLA post-sale duty to warn claims impose rigid and additional measures that FDA regulations do not require. As such, Plaintiff's claims are expressly preempted, and should be dismissed.

>   **b.    There is no FDA Requirement to Submit a PMA Supplement to Change a Product's Labeling Immediately After Learning of an Adverse Event—Especially One that was Already Included as a Risk in the IFU**

Plaintiff claims that the "federal law violated is the [FDCA], 21 U.S.C. § 352 entitled Misbranded Drugs and Devices" that states, in relevant part, "A drug shall be deemed misbranded . . . [i]f it's labeling is false or misleading in any particular way." See R. Doc. 62-19, at p. 4.  The FDA determines whether the proposed labeling is false or misleading. Bencomo v. Guidant Corp., CIV.A. 06-2473, 2009 WL 1951821, at *3 (E.D. La. June 30, 2009) (citing Riegel, 128 S. Ct. at 1003). Jurisprudence uniformly instructs that failure to warn claims regarding Class III PMA

devices are preempted by the MDA because, by their very nature, they ask the fact finder to conclude that the warnings approved by the FDA were insufficient. McBride, 2013 WL 3491085, at *4–5. Plaintiff's labeling claim regarding allegedly insufficient or misleading warnings is preempted because the FDA has already evaluated the safety and effectiveness under the conditions of use set forth on the label and has determined that ReShape's label is neither false nor misleading, which is why the FDA approved it. See Riegel, 128 S. Ct. at 1004 (quoting 21 U.S.C. §§ 360c(a)(2)(B), 360e(d)(1)(A)); see also Cenac, 2010 WL 4174573, at *6.

Next, Plaintiff argues that ReShape failed to comply with the "provisions of the PMA Order and applicable FDA regulations." See R. Doc. 62-19, at p. 7. Specifically, Plaintiff cites that the PMA provides: "CDRH does not evaluate information related to contract liability warranties. We remind you; however, that device labeling must be truthful and not misleading." See id at p. 9. However, Plaintiff leaves out the very next sentence which states, "CDRH will notify the public of its decision to approve your PMA by making available, among other information, a summary of the safety and effectiveness data upon which the approval is based." See Ex. E, at p. 4. Further, the PMA Order states, "You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form." See id. ReShape was required to submit the FDA *approved* labeling in final printed form before the device could be distributed. Plaintiff misconstrues that the CDRH did not evaluate ReShape's label for truthfulness. The FDA's CDRH did determine that the balloon's labeling was truthful and not misleading because it was approved.

"Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." Bencomo, 2009 WL

1951821, at *3 (citing <u>Riegel</u>, 128 S. Ct. at 1005). Section 814.39, entitled "PMA Supplements" states, "After FDA's approval of a PMA, an applicant shall submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA . . . changes for which an applicant shall submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device: (1) New indications for use of the device. (2) Labeling changes." <u>See</u> 21 C.F.R. § 814.39(a).  The PMA Order expressly states "*before making any change affecting the safety or effectiveness of the device, you must submit a PMA supplement . . . in accordance with 21 CFR 814.39.*" <u>See</u> Ex. E, at p. 3 (emphasis added).  Despite federal regulations, jurisprudence, and the PMA Order, Plaintiff claims, "This statement is simply not true." <u>See</u> Plaintiff's Opposition to ReShape's MSJ, R. Doc. 62-19, at p. 10. In support, Plaintiff cites to Section 814.39(d), Changes Being Effected ("CBE"), which provides after the FDA approves a PMA, labeling changes that (1) add or strengthen a contraindication, warning, precaution, or information about an adverse reaction; or (2) strengthen an instruction that enhances the safe use of the device; or (3) deletes misleading, false, or unsupported indications **may** be placed into effect by the applicant prior to the receipt of a written FDA order approving the PMA supplement. <u>See</u> 21 C.F.R. § 814.39(d). The word "may" does not indicate a requirement, as suggested by plaintiff.

Plaintiff fails to acknowledge that implementing a CBE order prior to FDA approval is **voluntary**. The regulation specifically says the applicant **may** place the change into effect before FDA approval. It does not say the applicant "shall" or "must" place the change into effect before FDA approval. As such, Plaintiff's claims that ReShape was required to do so, are additional requirements not imposed by the FDA. Additionally, Plaintiff fails to recognize that a voluntary CBE can only be implemented *after the applicant receives specific acknowledgment that the*

*application qualifies for review*. See 21 C.F.R. § 814.39(d). Thus, despite what Plaintiff argues, had ReShape *voluntarily* decided to change the labeling before submitting the PMA supplement, it would still have needed the FDA's acknowledgement.

Specifically, Plaintiff claims that labeling changes should have been made to delete "misleading, false, or unsupported indications." See R. Doc. 62-19, at p. 11. Plaintiff argues that not including the risk of death in the IFU, "except from device migration causing a bowel obstruction, when you are aware of a death from esophageal perforation and a death from aspiration is false" and not stating in the Patient Information Guide that "there is a risk of death when the manufacturer knows about two (2) prior deaths is false." See id.

The risk of death was included in the initial IFU that the FDA approved. Specifically, the IFU warnings state "[d]eath due to intestinal obstruction is possible and has been reported with other intragastric balloons." See Ex. A. Also included was, "Potential risks associated with an endoscopic procedure and sedation include adverse reaction to sedation (headache, muscle pain, nausea), anaphylaxis, cardiac arrest, death, hypoxia, myocardial infarction, perforation . . ." See id. Similarly, in the Patient's Information Guide, it states that death is a possible serious side effect of the ReShape procedure, but that it was not reported in the clinical trial. See Ex. B.

The IFU and Patient's Information Guide make it clear from the beginning that death is a possibility and a risk of ReShape's procedure. Nothing about those statements is false or misleading like Plaintiff alleges. Furthermore, the Plaintiff did not die. So whether death is included, for all intents and purposes of this suit, is immaterial. Death was identified as a risk and a possibility, but the Plaintiff failed to realize such because, as he freely admitted, he did not review or receive any information regarding the procedure. See Deposition Testimony of Plaintiff, attached hereto as Exhibit "H," at p. 71-72.  He does not recall going to ReShape's website or

19

conducting any internet research on the balloon or procedure and says he didn't receive any marketing materials. See id at p. 71-72, 67-68, 16. In fact, Dr. Vesoulis testified that he believed that the procedure was virtually risk free:

> I was told by Dr. Lavin that it was such an easy procedure that it's like weight loss 101 for dummies and that it's so noninvasive and so nonriskful that nothing bad happens.

Id at p. 71. This was his testimony despite the fact that Dr. Lavin provided him with four consent forms listing a host of risks related to the procedure and general anesthesia, and he signed all four forms.

Finally, regarding labeling, Plaintiff cites an excerpt from ReShape's PMA Order, which states that "the results from any post approval study should be included in the labeling as these data become available. Any updated labeling must be submitted to FDA in the form of a PMA Supplement." See R. Doc. 62-19, at p. 8; see Ex. E, at p. 3. Plaintiff attempts to use this provision of the PMA Order to support the proposition that the two deaths that occurred in conjunction with ReShape's balloon should have been added to the IFU. Unsurprisingly, Plaintiff misconstrues the meaning of that PMA requirement. However, it was clarified by Ms. Mooney in her sworn deposition. She explained that ReShape's "obligation is to provide updated information through the instructions for use about all potential adverse events, and [ReShape's] obligation is to update those if event incidents change." See Ex. F, at p. 84. Ms. Mooney specifically testified:

> There is not a requirement to update the IFU, based upon every single, individual event received. It's reviewed in terms of the types of events that can happen, and when those events start to appear where they were not evident before, or if they appear in a distinctive increase in frequency, those are the things that will typically involve a review and update of an IFU. And FDA also monitors these, through the MAUDE database, and they, at their discretion, can reach out to manufacturers and request some of those updates, as was done with the acute pancreatitis and the aspiration, so there are two vehicles.

Id at p. 46-47. In keeping with the foregoing legal authority, Plaintiff's LPLA claims against ReShape are expressly preempted by the MDA, and are due to be dismissed as a matter of law.

c.      <b>Plaintiff's State Law Claims do Not Parallel Federal Requirements</b>

Plaintiff seeks to escape preemption by recasting his claims as what have often been referred to as "parallel" claims. Courts have recognized that a "lawsuit that simply parallels or enforces the federal regulatory requirements without 'threatening' or interfering with them is not preempted" under Section 360k. See Hinkel, 869 F. Supp. 2d at 747 (citing Gomez, 442 F.3d at 932). Plaintiff alleges that his LPLA claims are parallel claims arising from ReShape's failure to comply with the PMA and FDA regulations and, therefore, are not preempted by § 360k of the MDA. See R. Doc. 25, ¶¶7, 8. In support, Plaintiff refers to two cases that are distinguishable from the current case: Hughes v. Boston Scientific Corp., and Bush v. Thoratec Corp..

Plaintiff cites Hughes v. Boston Scientific Corp., for the proposition that that "a manufacturer is not protected from state tort liability when a claim is based on the manufacturer's violation of applicable federal requirements . . . provided that such claims are premised entirely on violation of the applicable federal requirements." Hughes v. Boston Scientific Corp., 631 F.3d 762, 767 (5th Cir. 2011). Accordingly, Plaintiff has alleged here that his claims "are premised entirely" upon the violation of the PMA Order and federal regulations therein. See R. Doc. 62-19, at p. 12.

Both Hughes and Bush are factually distinguishable and do not lend support to Plaintiff's claims. In Hughes, during the plaintiff's medical procedure the device malfunctioned and leaked hot water onto her skin, causing her second-degree burns. See Hughes, 631 F.3d at 766. The plaintiff alleged that the defendant manufacturer developed and was using an algorithm to determine reportable events, which failed to report certain first and second-degree burns caused by leakage from the device. See id. The plaintiff produced a former FDA official who opined that

21

the manufacturer's failure to report the burns, pursuant to the algorithm, violated the MDR regulations. See id at p. 767. Additionally, the plaintiff asserted that the FDA disapproved of the manufacturer's reporting requirements, relying on the deposition of the manufacturer's representative who testified that in 2008 the FDA directed the manufacturer to abandon the algorithm and begin reporting more burns caused by the device. See id.

The Hughes court evaluated the plaintiff's claims under Riegel, found the first-prong easily met, and focused on the second-prong— whether the plaintiff's claims imposed requirements that differed from or were in addition to the federal requirements. See id at p. 768. The Fifth Circuit found that traditional state products liability claims are expressly preempted, which included the plaintiff's products liability claim for failure to provide adequate warnings or instructions communicating dangers associated with the device. However, to the extent that the claim was predicated on the manufacturer's failure to report "serious injuries" and "malfunctions" of the device as required by the applicable FDA regulations, the court allowed the plaintiff's claim to go forward.  See id. The court noted that Mississippi state law required "reasonable warnings of risks" and assuming plaintiff's failure to warn claim may be pursued under such law, it is clear that such a claim is preempted to the extent that it purports to impose liability despite the manufacturer's compliance with FDA regulations. See id at p. 779.

The court held that the plaintiff's claim that the manufacturer violated the state duty to warn **by failing to file MDR reports**, as required by FDA regulations, was not expressly preempted. The court reasoned that a factfinder could infer that a manufacturer's **failure to report this information to the FDA** as required by MDR regulations is a parallel violation of the state duty to provide reasonable and adequate information about a device's risk.

Hughes is factually distinguishable from the present case because (1) the manufacturer breached substantive FDA regulations in **failing to report** a large number of significant adverse events, which prevented the FDA from being fully informed on the safety and effectives of the device and hindered the FDA from disseminating such information to the public; (2) the FDA directed the manufacturer to abandon its algorithm and change its reporting; and (3) the adverse events that the manufacturer failed to report concerned the same type of injury the plaintiff sustained. Unlike the manufacturer in Hughes, ReShape complied with FDA regulations. Plaintiff makes no allegations that ReShape failed to file adverse event reports with the FDA like the defendant in Hughes. In fact, Plaintiff admits that ReShape appropriately filed MDR's to the FDA. See R. Doc. 62-19, at p. 10. Plaintiff's claims are preempted as they purport to impose liability on ReShape **despite** ReShape's compliance with the FDA's MDR regulations.

In Bush, this Court denied a manufacturer's motion to dismiss a plaintiff's claim that the manufacturer violated federal law by failing to include suggested content in a recall letter, which this Court found also violated the manufacturer's duty to warn under Louisiana law. Bush v. Thoratec Corp., 2012 WL 2513669 (E.D. La. June 28, 2012). Unlike the present case, Bush involved a federal recall, which has specific governing laws. The federal law governing recalls requires the manufacturer to contact each of its user accounts directly and inform of the recall. Id at p *2. This Court likened the federal recall law to LPLA's post-sale duty to provide "adequate warning" of potentially dangerous product characteristics to product users. Id at p *6; See La. Rev. Stat. § 9:2800.57(C). Bush is not persuasive in the present matter because there is no federal recall, which means there is no federal recall law that requires manufactures to contact users directly. The duty to contact users directly that existed under federal recall law in Bush does not exist in this case. Here, ReShape's "duty" was exclusively owed to the FDA, in the form of submitting adverse

event reports through the MAUDE database. LPLA's post-sale duty to warn product users is not the same as a duty to report adverse events to the FDA.

To properly assert that a medical device is defective due to inadequate warnings, the plaintiff must prove that the representations regarding the device were untrue. Hinkel, 869 F. Supp. 2d at 747–48 (citing Gomez, 442 F.3d at 932). In Hinkel, this Court reasoned that allowing a jury to hear a claim that a device was defective because of an inadequate warning would require the jury to determine whether the manufacturer's representations regarding its device—including the FDA-approved label, warnings, and instructions for use—were false, which would clearly undermine the federal regulatory scheme. Hinkel, 869 F. Supp. 2d at 747–48. This court noted that the same would be true of a failure to warn theory because the FDA approved the product's warnings based on its evaluation of the results of the extensive clinical trials and safety studies required during the PMA process. See id. This Court reasoned that "to permit a jury to decide that these warnings are inadequate under Louisiana law would effectively 'displace the FDA's exclusive role and expertise in this area and risk imposing inconsistent obligations' on manufacturers of PMA-approved devices." See id (citing Gomez, 442 F.3d at 930). As such, this Court held that neither LPLA theory simply enforces federal requirements. Hinkel, 869 F. Supp. 2d at 747–48; see also Bencomo, 2009 WL 1951821, at *1 (granting summary judgment on preemption against claims involving medical device and holding alleged contradictions between patient material and product labeling could not support a claim where the language in both sets of material were FDA approved; a claim dependent upon the falsity of FDA approved language cannot be a parallel claim); see also McBride, 2013 WL 3491085.

Plaintiff's state-law claims are not "parallel claims," are entirely preempted under Section 360k of the MDA, and should be dismissed as a matter of law. However, to the extent this Court

24

finds that Plaintiff has successfully made parallel claims that fall under the express preemption exception in <u>Riegel</u>, he cannot establish that a violation of FDA regulations caused his injuries.

**B.    Plaintiff's Alleged Parallel State Law Claims Fail Because He Has Not and Cannot Establish that a Violation of the FDA Regulations and Premarket Approval Order Caused his Injuries**

**1.    No Violation of FDA Labeling Requirements Caused Damages to Plaintiff**

In support of Plaintiff's claims that ReShape violated labeling requirements, he attaches an expert report drafted by George Samaras, dated December 12, 2019. <u>See</u> R. Doc. 25-2. In later discovery responses, Plaintiff produced an updated Samaras report. <u>See</u> Samaras Report, dated 6/21/20, attached hereto as Exhibit "I" In his reports, Samaras summarizes his opinions as follows:

> "Defendant, ReShape Lifesciences (a) engaged in the manufacture and marketing of a complex, implantable, medical device *that increased the risk of patient serious injury in violation of the federal approval order*; and (b) flawed labeling and failures of critically important public medical device reporting, not only increased risk to additional patients, but also delayed recognition and rectification of the root cause(s) by multiple entities to protect the public health."

<u>See</u> Ex. I, at p. 25 (emphasis added).  As an initial matter, Samaras' reports are replete with errors, misleading statements, irrelevant data, and incomplete information. [1] Compounding this problem is that in his reports, Samaras invents support for his unfounded conclusions, which are, ironically, based on a fundamental misunderstanding of his purported area of expertise. Ultimately, Samaras' reports fail to prove that ReShape violated the PMA and FDA labeling regulations, and even if Plaintiff proved a violation, Plaintiff cannot establish that ReShape's alleged mislabeling caused his damages.

---

[1] For example, Samaras uses statistics of all implantable intragastric class III devices, not just the balloon, to conclude that the purported risks associated with the balloon are higher than reported and, therefore, ReShape failed to appropriately warn medical providers. Samaras also discusses irrelevant FDA Class II recalls associated with the balloon that occurred nearly one year before Plaintiff's implant procedure.

In his reports, Samaras does not dispute that the labeling meets the FDA regulatory requirements under 21 CFR § 801.5(A) and 801.109(D).  See Expert Report of Sally L. Maher, JD, RAC, dated 7/10/20, attached hereto as Exhibit "J," at p. 4. Rather, in a footnote on Page 19, Section 3.3.1 of Samaras' report, he states that the FDA advised ReShape of labeling deficiencies in 2015 and references Bates ReShape-089828.  See Ex. I, p. 19. This is a mischaracterization of the referenced document, which is an email from the FDA reviewer to ReShape *during the PMA review process*. See Ex. J, p. 4. Prior to receiving PMA approval, ReShape was required to submit all proposed labeling to the FDA, which had to comply will all CFR labeling requirements. The FDA reviewed the labeling to determine if any changes needed to be made. These FDA requested labeling changes can include requests for font changes, for prominent display of risks and warnings, or to simplify the language in the IFU and advertising documents, which is specifically what the above referenced email requested.  See id.  In response, ReShape simplified the language and made labeling changes "exactly as directed" by the FDA. The FDA ultimately approved the PMA including the revised language.  See id. Furthermore, ReShape was required to submit the FDA *approved* labeling in final printed form before the balloon could be marketed. Obviously, ReShape did not violate any labeling requirements, as required by the CFR or the PMA because the FDA approved its labeling, which included the IFU and Patient Information Guide.

Moreover, as discussed above and in Dr. Samaras' report, the patient signed the informed consent forms before the procedures, which included a discussion of the risks associated with the procedure, including esophageal perforation and death. As such, *even if* ReShape breached the FDA's guidelines on labeling, and *even if* the FDA had not specifically approved the labeling, the breach could not have proximately caused Plaintiff's alleged injuries because he ultimately was aware of the risks associated with the procedures. Furthermore, Dr. Lavin testified that he was

26

aware of the risk of esophageal perforation and disclosed such to Plaintiff. See Deposition Testimony of Dr. Thomas Lavin, attached hereto as Exhibit "K," at p. 23. Finally, concerning Plaintiff's critiques of ReShape's labeling in the Patient Information Guide, Plaintiff admitted that he did not read it nor any of ReShape's marketing material at all. See Ex. H, at p. 71-72.  Thus, no alleged labeling error, no matter how big or small, could have contributed to or proximately caused Plaintiff's injuries.

### 2. Plaintiff Fails to Allege a Causal Link Between Any Alleged Failure to Comply and His Injuries

In order to plead a violation of federal law that is "parallel" to a state law claim, a plaintiff must assert claims for personal injury arising from the violation of such federal law, but must also show that such violation is causally related to an actionable injury under a parallel state law. See McBride, 2013 WL 3491085, at *4–5.  Plaintiff is required to allege a specific federal requirement, how it was violated, and how the violation caused his injury, which Plaintiff cannot possibly do. General violation claims do not provide a causal nexus between the violation and the alleged injury. See Williamston v. Medtronic, Inc., 2014 WL 2042004 (W.D. La. May 15, 2014) (holding plaintiff's alleged parallel claims in case involving implantable cardiac defibrillator were not plead where causation was not alleged).

The vast majority of courts have held that for a plaintiff to successfully plead a parallel state law claim, the alleged federal violations must be casually connected to the plaintiff's injuries. See e.g., Horowitz v. Stryker Corp., 613 F. Supp. 2d 271 (E.D.N.Y. Feb. 20, 2009); see Gelber v. Stryker Corp., 788 F. Supp. 2d 145 (S.D.N.Y. April 18, 2011) (holding failure to warn and failure to report claims were preempted in hip implant device case; noting that information dating from after the plaintiff's surgery could have no plausible causal effect); see Viserta v. St. Jude Medical, 2012 WL 667814 (D.S.C. Feb. 29, 2012) (holding plaintiff's parallel violation claim failed for lack

of any specificity as to what standards were violated and how they pertained to plaintiff's injuries; noting that adverse event reports that were not related to plaintiff's injuries were irrelevant).

Plaintiff claims that had he been advised of the two prior deaths known to ReShape, one involving esophageal perforation, he would have withheld his consent from the purely elective procedure and declined the balloon placement on July 27, 2017. See R. Doc. 53-9. The first instance of death the Plaintiff refers to occurred in connection with a patient who suffered esophageal perforation and died on March 29, 2016, forty-one days after his balloon was implanted. ReShape filed a MDR in the MAUDE database seven days later informing the FDA of the adverse event and resulting death. See R. Doc. 53-3, at p. 1. The second instance of death the Plaintiff refers to occurred in connection with a balloon that was implanted in a patient on May 9, 2017. The very next day, on May 10, 2017, that patient aspirated and died. ReShape filed the MDR for that patient twelve days later on May 22, 2017. See R. Doc. 53-5. Notably, only one of the deaths involved the same type of injury Plaintiff sustained.

Plaintiff admits that ReShape appropriately filed MDRs for the adverse events that led to said deaths. See R. Doc. 62-19, at p. 10. He does not allege that those MDRs were filed late. Rather, Plaintiff ambiguously says ReShape reported "some" adverse events late, but makes no correlation to any allegedly late reported adverse events and his specific sustained injury.

Moreover, on February 9, 2017, the FDA issued a Dear HCP letter, in which the FDA alerted doctors about additional potential risks associated with the balloons. Specifically, the letter focused on spontaneous hyperinflation and the development of acute pancreatitis. Importantly, it made no mention of any deaths that had been reported to the FDA. Plaintiff's procedure was performed five months after the FDA released this letter to HCPs.

Thus, at the time the FDA sent the February 2017 letter to HCPs, it knew and was aware of the esophageal perforation that resulted in death on March 29, 2016. In fact, the FDA had known about that death for almost a year prior to sending its HCP letter. For reasons only the FDA knows, it apparently did not see the need to mention that death to HCPs at that time, which further disproves Plaintiff's theory that had ReShape timely reported *unrelated* adverse events, the FDA surely would have informed Plaintiff of the death related to esophageal perforation prior to his procedure.

### C.    Implied Preemption Doctrine Bars Plaintiff's Claims

Even if this Court were not to accept ReShape's position that the claims against it are expressly preempted, Plaintiff's LPLA claims are still impliedly preempted by the MDA under Buckman. See Buckman, 531 U.S. at 341. Any claim arising out of ReShape's alleged misrepresentations to the FDA in obtaining or maintaining approval for the balloon is precluded by Buckman. In Buckman Co. v. Plaintiffs' Legal Committee, the plaintiff sued the manufacturer of allegedly defective orthopedic bone screws under state tort law for making fraudulent representations to the FDA. See id at 343-44. Ultimately, the plaintiffs argued that absent these misrepresentations, the FDA would not have approved the screws, and the plaintiff would not have been injured. Id. at 343. The Court held that plaintiff's state law fraud/misrepresentation claim was impliedly preempted by the FDCA. Id. at 348. The Buckman Court reasoned that policing a manufacturer's alleged omissions and/or misrepresentations to a federal agency was not a traditional state role, and noted that the FDA's authority to punish such conduct was used "to achieve a somewhat delicate balance of statutory objectives." Id.

The vast majority of courts have specifically rejected claims like that being asserted by Plaintiff here, finding them to be unequivocally preempted by Buckman. For example, in Webster

v. Pacesetter, Inc., the court stated: "what was told to the FDA cannot support a tort claim." 259

F. Supp. 2d 27, 37 (D.C. Cir. 2003). The Webster plaintiff argued that had the defendant

manufacturer adhered to MDA requirements regarding record-keeping, adverse incident reporting,

investigation, monitoring and complaint file maintenance, the medical device would have been

recalled or placed on alert notice and the plaintiff would not have been injured. Id. at p. 39. The

court held "This is precisely the type of claim barred by the Supreme Court [in Buckman]" Id.

Ultimately, a "private litigant cannot bring a state-law claim against a defendant when the

state-law claim is in substance (even if not in form) a claim for violating the FDCA—that is, when

the state claim would not exist if the FDCA did not exist." Buckman, 531 U.S. at 352-353. Thus,

there is a narrow gap that plaintiffs' claims must fit to escape both express and implied preemption.

Riley, 625 F. Supp. 2d at 777. "The plaintiff must be suing for conduct that violates the FDCA (or

else his claim is expressly preempted by § 360k(a)), but the plaintiff must also not be suing because

the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)." Id.

Here, Plaintiff's claims under the LPLA rely on the violation of the FDCA and, therefore,

do not fit into this discrete gap. See R. Doc. 25, ¶7 ("Plaintiff herein alleges that defendant is liable

**solely upon defendant's failure to comply with the PMA Approval Order and applicable**

**FDA regulations**, and thereby, is also liable under the Louisiana Products Liability Act's parallel

provisions"). For these reasons, Plaintiff's claims arising out of FDA violations must be rejected.

## V.      Plaintiff Has Failed to Establish the Essential Elements of His LPLA Claims

If this Honorable Court should find that any of Plaintiff's LPLA claims are not preempted

by federal law, ReShape is nonetheless entitled to summary judgment as a matter of law because

Plaintiff has not and cannot establish the essential elements of his claims under the LPLA. In order

to prevail on his state law claims, Plaintiff must prove that the balloon was unreasonably

dangerous.  <u>See</u> La. Rev. Stat. § 9:2800.54.  He cannot succeed without directly contradicting the FDA's PMA finding that the balloon is "safe and effective" when designed, manufactured, marketed, and used in accordance with its labels.  <u>Riegel</u>, 128 S. Ct. at 1007.

The LPLA provides, in relevant part: "A product is unreasonably dangerous if and only if . . . [t]he product is unreasonably dangerous because an adequate warning about the product has not been provided as required under R.S. 9:2800.57." <u>See</u> La. Rev. Stat. § 9:2800.54. Further, the characteristic of the product that renders it unreasonably dangerous must exist at the time the product left the control of its manufacturer. <u>Id.</u> The only violation of the LPLA asserted by Plaintiff is a failure to warn under Louisiana Revised Statutes § 9:2800.57(A) and a breach of the post-sale duty to warn under Louisiana Revised Statutes §9:2800.57(C). <u>See</u> R. Doc. 25, ¶7.

Under the LPLA, "adequate warning" is defined as "a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made."  La. Rev. Stat. § 9:2800.53(9). Further, Section 9:2800.57 provides the criteria for when a product is unreasonably dangerous because of inadequate warning, it states:

> A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
> B. A manufacturer is not required to provide an adequate warning about his product when:
> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

La. Rev. Stat. § 9:2800.57.

ReShape clearly and unambiguously warned of the known risks associated with the balloon on its marketing materials and Instructions for Use. See Ex. A, at p. 3-5. Further, ReShape instructed the operating physicians, including Dr. Lavin, to communicate all potential risks and complications to patients.  See id at p. 4 ("it is the responsibility of the physician to advise the patient of known risks and complications associated with the procedure and the device"). Dr. Lavin knew the risk of esophageal perforation was associated with this device. He testified that "any endoscopy, whether you place a balloon or not, has a risk of perforation . . . [which] would have been explained [to Plaintiff] and would have been on the informed consent form." See Ex. K, at p. 23. Dr. Lavin followed ReShape's directions and before the implant and explant procedures, he explained the risks and required Plaintiff to sign informed consent forms that clearly explained the risks and complications, including the possibility of esophageal tear and death.  See Ex. C; Ex. D. Therefore, adequate warning is exactly what Plaintiff received before the implant and explant procedures.

 Plaintiff alleges that the "characteristic" that ReShape's balloon possessed that made it unreasonably dangerous was the "risk of esophageal perforation."  See R. Doc 62-19, p. 13 Dr. Lavin, who is a bariatric surgeon is the "ordinary user or handler" of the balloon, and has testified that perforation is a known risk of any endoscopy, regardless of whether a balloon is implanted or not. See Ex. K, at p. 23. Additionally, Dr. Lavin, the learned intermediary who understands the device, the risks, the benefits, and educates the patients, explained that "any time you instrument

32

the GI tract, particularly removing polyps or anything like that, there's a risk of perforation from esophagus to stomach to colon to anything." <u>See</u> <u>id</u> at p. 29. Dr. Lavin opined that ReShape's balloon was no more dangerous, nor did it carry a higher risk of esophageal perforation than any other balloon. <u>See</u> <u>id</u> at p. 29, 39. Rather, it was the type of procedure Plaintiff underwent—an endoscopy—that made the risk of esophageal perforation high. <u>See</u> <u>id.</u> Clearly, ReShape's balloon was not dangerous to an extent beyond that which would be contemplated by the ordinary user of the balloon because Dr. Lavin testified that esophageal perforation is a common known risk.

Finally, under the LPLA, specifically Section 9:2800.57(C), a product manufacturer has a duty to warn users of unreasonably dangerous characteristics when the manufactures learns of those characteristics **after the product has left the manufacturer's control**. ReShape was aware that the balloon presented a risk of esophageal perforation, as it occurred during the pre-approval clinical trial. The risk of esophageal perforation was not a new risk that was learned after the balloon left ReShape's control—it was a known risk and was included as such in the FDA approved Patient Information Guide, which Plaintiff did not look at or read prior to his procedure, and in the IFU issued to all customers, including Dr. Lavin.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's state law tort claims are expressly or impliedly preempted under federal law. Further, Plaintiff has not and cannot establish the essential elements of his claim. Thus, ReShape is entitled to a complete dismissal of Plaintiff's claims with prejudice.

Respectfully submitted,

  _/s/ Rachel G. Webre_____
RACHEL G. WEBRE (No. 26907)
TUCKER T. BOHREN (No. 37039)
Email: rwebre@glllaw.com
Email: tbohren@glllaw.com
GIEGER, LABORDE & LAPEROUSE, L.L.C

33

701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone:     (504) 561-0400
Facsimile:     (504) 561-1011
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing notice of removal has been served upon all

counsel of record, via the Court's CM/ECF system and U.S. mail, this 23rd day of March, 2021.

_*/s/ Rachel G. Webre*_____
RACHEL G. WEBRE

34