## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

PAUL VESOULIS

VERSUS

RESHAPE LIFESCIENCES, f/k/a
ENTEROMEDICS INCORPORATED

CIVIL ACTION NO. 19-CV-01795-MLCF-DMD

JUDGE MARTIN L.C. FELDMAN

MAGISTRATE JUDGE DANA M. DOUGLAS

**********************************************************************

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

MAY IT PLEASE THE COURT:

This memorandum is submitted by Defendants, Thomas Lavin, M.D. ("Dr. Lavin") and Surgical Specialists of Louisiana ("SSL"), in support of their Motion for Partial Summary Judgment pursuant to the Federal Rules of Civil Procedure Rule 56.  Defendants show that there is no genuine issue of material fact and urges that summary judgment be granted as plaintiff has failed to produce evidence to rebut the presumption that Dr. Lavin and SSL obtained informed consent of Dr. Vesoulis.

## I.    FACTUAL BACKGROUND

### A.  *Introduction*

This lawsuit arises out of a claim for medical malpractice against Dr. Thomas Lavin and SSL.[1]  In his Second Amended Complaint, the Plaintiff asserted that ReShape was negligent for its alleged failure to properly comply with its duty to warn and/or duty to comply with FDA regulations regarding labelling and warnings.  Specifically, plaintiff alleged that ReShape failed to comply with applicable regulations regarding reporting of instances of death or serious injury

---

[1] Plaintiff has also made separate claims against Defendant, ReShape Lifesciences.

and failing to communicate these instances of death or serious injury to Dr. Lavin and/or Surgical Specialists of Louisiana ("SSL"). Plaintiff further alleged that the defendants failed to disclose these adverse events – events which he also argues that ReShape never disclosed to the defendants.

In mid-2017, Plaintiff, Paul Vesoulis ("Dr. Vesoulis"), contacted Dr. Lavin's office regarding the ReShape Integrated Dual Balloon System procedure, having been informed of Dr. Lavin's reputation as a skilled bariatric surgeon. Prior to Dr. Vesoulis' arrival in Louisiana, Dr. Lavin conducted a phone consult with Dr. Vesoulis, wherein he discussed the risks and benefits of the procedure; Dr. Vesoulis decided to proceed.[2] On July 27, 2017, Dr. Vesoulis underwent the balloon insertion. Prior to the procedure he reviewed and then signed an informed consent acknowledging all known risks to the procedure.[3] Of note, the consent form mentioned the following possible risks:

> Death (very rare), Cardiopulmonary arrest (heart stops beating), Cerebrovascular accident (CVA), stroke or transient ischemic attack (TIA – bleeding or blood vessel blockage in the brain), Myocardial infarction (MI; heart attack), Onset or worsening of angina (chest pain), heart failure or cardiac arrhythmia (irregular heartbeats), Pneumonia (infection in the lungs) or other intrathoracic (in the chest) infections, Pulmonary (lung) embolism (blockage), thromboembolism or deep venous thrombosis (blockage caused by a blood clot in various parts of the body), Respiratory complications including aspiration [breathing foreign substances (for example food, liquids, vomit) into the lungs or airway system], Hypoxia (low oxygen level), airway (breathing) obstruction (blockage), cough, wheezing, exacerbation (worsening) of asthma. The presence of solid food will increase the chances of aspiration and may require general anesthesia (being put to sleep) after the insertion of an airway. This is to protect the airway and the lungs against the ingestion of food.

> Nonspecific (general) symptoms including sore throat, loss of appetite, nausea, chest or abdominal pain or discomfort, disturbance of gastrointestinal function including vomiting, diarrhea, constipation, change in bowel (bathroom) habits, abdominal distension (stomach bloating), bloating, hiccoughs, belching (burping), heartburn, gastric (stomach) stasis, motility disorders (slowed emptying of stomach) or nerve damage, damages to the oropharynx (mouth-throat area), larynx (voice box), ***upper gastrointestinal tract or intra-abdominal organs including***

---

[2] See Ex. A, 68:22-25.
[3] See Ex. A, p. 31:13-32;6, 67:19-68:25; 69:18-70:17; Ex. B, 32:17-20.

**perforation (tearing),** peritonitis (inflammation of tissues in the abdominal cavity), ulceration (sores), inflammation, laceration (cuts), erosion, fistula (abnormal connection between two parts of the body), abscess (collection of pus), bleeding, hemorrhage, hematoma, dilation (enlargement) or nerve damage, gastroesophageal reflux (burping up of stomach fluids into the esophagus) or esophagitis (infection of esophagus), partial or complete obstruction (blockage) of the gastrointestinal tract by the device, pancreatitis (infection of the pancreas), cholecystitis (infection of gallbladder), cholelithiasis (formation of gallstones), abnormal liver function, and bacterial overgrowth related to device or medication.

*     *     *

These risks are very rare but may require additional treatment, surgery, or hospitalization, such as in the case for dehydration, deflation, perforation, and/or bleeding ulceration. [**Emphasis added.**]

Moreover, the informed consent signed by Dr. Vesoulis noted:

**After your procedure, you must be aware of some important information. Please read carefully:**

**_You must have the Balloon device removed per protocol_**.  If the balloon device stays in your stomach for more than recommended time frame there is a much greater risk that the balloon could deflate and cause a blockage in your intestines or develop an ulcer in the stomach.[4]  [**_Emphasis original._**]

Dr. Vesoulis tolerated the insertion procedure well and no complications were encountered. He was discharged later that day, as anticipated.  The next day he followed up with Dr. Lavin, as instructed.  He reported hiccups and reflux pain but denied nausea/vomiting and/or sore throat pain.  He was voiding and tolerating oral fluids well.  He had no significant complaints and planned on flying home to Ohio the following day.

On August 9, 2017, Dr. Lavin's office completed a phone visit with Dr. Vesoulis.  He denied any problems and/or complications.  Another follow up phone visit was completed on September 1, 2017.  Again, Dr. Vesoulis denied any problems; he reported doing well.  Moreover,

---

[4] See Ex. C.

3

since his surgery at SSL, Dr. Vesoulis had undergone knee surgery and planned to return to work the following week.

Dr. Vesoulis returned to Louisiana and Dr. Lavin's office in January 2018 for a planned removal of the Balloon. Dr. Lavin discussed the risks and benefits of the endoscopic removal of the Balloon. Again, Dr. Vesoulis expressed his understanding and then reviewed and signed a consent form which was identical to the form quoted above.[5] On January 11, 2018, Dr. Vesoulis underwent the endoscopic removal of the Balloon. The endoscopy reflected normal findings within the upper gastrointestinal system, with the exception of multiple 3-4 mm polyps, of which biopsy was obtained and sent to pathology. The Balloon was removed without difficulty and/or apparent complications. Dr. Vesoulis remained stable throughout his onsite recovery. He voiced no complaints and had no signs of distress. He was able to ambulate and he left the facility with his wife.

Later that day, the Plaintiff notified Dr. Lavin's office that he was experiencing significant abdominal pain, beginning approximately two hours post-surgery. Dr. Lavin then gave orders for Dr. Vesoulis' admission to Crescent City Surgical Center. Orders included, but were not limited to, NPO, start IV of lactated ringer, obtain CT scan of the abdomen/pelvis with contrast, labs, and antibiotics and pain medications. Once Dr. Vesoulis arrived at the facility he reported to the nurse that he developed painful respirations after returning to his hotel room post-endoscopy earlier that day. Records reflect that his respirations were shallow and at a rate of 26/minute, with difficulty lying down; as such, he was allowed to sit in the bedside chair for his IV and labs. He was then assisted to his bed, at which time an EKG and portable chest x-ray were completed. The chest x-ray reflected findings consistent with atelectasis and a small left pleural effusion. Dr. Lavin arrived

---

[5] See Ex. A, p. 70:19-25; 71:5-12; Ex B, p. 37:18-38:1; 39:13-18.

and examined Dr. Vesoulis.  He diagnosed an acute abdomen, requiring emergent surgery. Consents for surgery and anesthesia were signed and preoperative preparations were completed.

On January 11, 2018, Dr. Lavin proceeded with an exploratory laparoscopy with EGD, with the assistance of his colleague, Dr. Rachel Moore.  Dr. Lavin noted that everything appeared normal, but for the presence of extreme gastric distention.  An NG tube was placed to relieve this distension.  Dr. Moore proceeded with EGD, which also revealed normal esophagus and normal stomach with a small amount of old blood in the stomach.  A thorough exploration of the entire intra-abdominal cavity, from the GE junction to the entire stomach both posterior in the lesser sac and anterior, revealed a completely normal stomach.  Dr. Vesoulis remained stable throughout the procedure.  He was then transferred to recovery where he remained stable.  He was transferred to the fourth floor of the facility.  His presumed diagnosis was extreme gastric distention from the balloon removal.  By early the following morning, Dr. Vesoulis reported feeling better.

By approximately 8:00 am on August 12, 2018, Dr. Vesoulis was stable without any problems or distress.  He was ambulating the hallways without distress and his pain was controlled with medications.  All signs that his prior complaints were caused by the extreme gastric distention, which was relieved by the placement of the NG tube.  Later that morning, Dr. Lavin evaluated Dr. Vesoulis; he ordered his NG tube discontinued and advanced his diet to clear liquids.  Dr. Vesoulis continued to increase his activities with ambulation in the hallways.  Early that evening, Dr. Vesoulis' nurse alerted Dr. Lavin of a slight swelling and crepitus to Dr. Vesoulis' jaw, anterior neck, and clavicle areas.  Dr. Lavin ordered an upper GI study for the following morning.  Later that evening, Dr. Lavin examined Dr. Vesoulis and noted that his respirations were shallow, but without distress.  Dr. Vesoulis remained stable throughout the night.

3210317 v1

In the morning of January 13, 2018, Dr. Lavin was notified that Dr. Vesoulis was having some difficulty breathing with lethargy.  Dr. Lavin ordered a STAT CT scan of the chest/neck with contrast, and STAT arterial blood gasses to be called to pulmonology.  Dr. Lavin was bedside awaiting radiology results.  Pending these results, Dr. Lavin ordered consults with pulmonology and otolaryngology.  The CT scan was obtained and reflected presence of air without obvious tear or perforation.  These findings were discussed with Dr. Lavin.  A chest x-ray, obtained that morning, reflected extensive subcutaneous air and pneumomediastinum with left lung base consolidation.  Consequently, Dr. Lavin decided to take Dr. Vesoulis back to surgery for laparoscopic exploration.  Consents were obtained and Dr. Vesoulis was prepped for surgery.

During the procedure, a very small – 2mm – tear in the esophagus was identified.  It was noted that the tear was found via opening the mediastinum and not via the abdominal cavity, which explained why laparoscopy on January 11, 2018 was negative.  The perforation was repaired, and the repair was tested.  Dr. Vesoulis remained stable throughout the procedure without any complications.  He was extubated without difficulty and transferred to recovery in stable condition.  His recovery from this procedure was uneventful.  And on January 19, 2018, Dr. Vesoulis was discharged in stable condition.

As noted above, the Plaintiff has alleged that the defendants failed to disclose the increased risks of death or serious injury, or of other recent deaths or serious injury, associated with the ReShape Balloon, as well as other unrelated intragastric balloons.  Essentially, he has asserted that Dr. Lavin, and the other defendants, should have made known to him information regarding specific incidents of death reported to ReShape by the FDA, as well as specific patient outcomes in Dr. Lavin's patients receiving the intragastric balloon.  These incidents are as follows:  On March 29, 2016, a patient (not a patient of Dr. Lavin) who received the ReShape Dual Intragastric

Balloon died from sepsis secondary to esophageal perforation.  Plaintiff admits, however, that the MDR report notes that **there was no known allegation that the death was in fact related to the device**.  [Doc. 62]  On February 9, 2017, the FDA issued a "Dear Doctor Letter" which informed physicians of the chance of "spontaneous hyperinflation of balloon after placement," as well as, "acute pancreatitis."  On May 10, 2017, a patient (not a patient of Dr. Lavin) who received the ReShape Dual Intragastric Balloon aspirated and died.  On August 10, 2017, approximately two weeks after Dr. Vesoulis' insertion procedure, the FDA issued a "Dear Doctor Letter" which informed physicians about five deaths in patients who received intragastric balloons by various manufacturers.  One of these deaths included a patient who received the ReShape Integrated Dual Balloon System and sustained an esophageal perforation.  On August 14, 2017, a patient of Dr. Lavin, in which the ReShape balloon was also placed, sustained a gastric perforation requiring emergent surgery.

However, there are several problems with Plaintiff's allegations as they apply to Dr. Lavin and SSL.

First, Dr. Lavin cannot disclose risks of which he is unaware.  In his Response to Statement of Uncontested Facts, the Plaintiff argues that the "risk of death from esophageal perforation was known to ReShape.  The risk of death from aspiration was known to ReShape."  However, he further states that "[t]hese risks were not made known to Dr. Lavin, SSL, or the plaintiff."  [Doc. 62 Response to Statement of Alleged Uncontested Fact 8.][6]  Further, Plaintiff asserts that while ReShape Instructions for Use call for treating physicians to discuss all "adverse events" with

---

[6] Plaintiff further alleges in his response to no. 8 that ReShape's Instructions for Use warned physicians that "here is risk of 0.4% esophageal tears, which was not disclosed to plaintiff…" However, this number was specific to a study of 326 patients with ReShape balloons, not all endoscopic procedures as noted in the consent signed by Dr. Vesoulis; moreover, the reason for the esophageal tear was not disclosed in the Instructions for Use.

patient, the "treating physician cannot, and in this case did not, discuss adverse events with the plaintiff because ReShape did not make them known to him." [Doc. 62 Response to Statement of Alleged Uncontested Fact 11.] The Plaintiff has explicitly admitted that "MDR report of the death from esophageal perforation on March 29, 2016 and from aspiration of May 10, 2017 were not provided by ReShape to Dr. Lavin or LSS [sic]." [Doc. 62 Contested Issue of Fact 7] By Plaintiff's own admission, **Dr. Lavin cannot disclose a risk for which he is not aware**. Of course, plaintiff's claims totally ignore the fact that **every** consent form that he signed advised him of the risks of death and/or perforation.[7]

Furthermore, the one incident of which Dr. Lavin was aware – the patient sustaining a gastric perforation - occurred after Dr. Vesoulis' July 27, 2017 surgery. This could not possibly have influenced a reasonable person not to proceed as it occurred *after* Dr. Vesoulis' insertion procedure had taken place. Dr. Vesoulis' claim has always been that he would not have elected to undergo the Balloon procedure had he known of specific adverse events. He has never claimed that such alleged failure to disclose would have changed his decision to have the balloon removed. What's more is that there is no alternative to removal of the balloon. It is a required procedure as is clearly stated in the consent form.[8] Dr. Vesoulis acknowledged that he clearly understood that once it was inserted, the balloon was required to be removed within six months.[9] As such, using the reasonable person standard disclosure of an adverse event in a patient which occurred **AFTER** plaintiff's insertion surgery could not have influenced him.

Next, none of the above specific "adverse events" warranted disclosure by Dr. Lavin or any of the defendants. As noted in detail below, the informed consent law does not require

---

[7] See Ex. B, p. 45:20-25; 97:20-98:3; Ex. C.
[8] See Ex. C.
[9] See Ex. B, p. 88:18-25.

disclosure of specific incidents or specific rates/percentages.   As discussed below, informed consent law requires only that a physician disclose **known material risks**.  The mechanism and technicalities of those risks need not be disclosed.  As such, Dr. Lavin was under no duty to disclose specific adverse events as alleged by the Plaintiff.  All of the "adverse events" that the Plaintiff has complained of are included as **material risks** in the informed consent forms acknowledged and signed by Dr. Vesoulis.

And finally, assuming that Dr. Lavin had a duty to disclose each adverse event, Plaintiff would still be unable to prevail at trial as he would not be able to meet his burden of proof regarding causation.  Plaintiff did not sustain any of the "adverse events" referenced in his Complaint or that he has asserted throughout this litigation.  He did not die, either of an esophageal perforation or aspiration.  He did not develop acute pancreatitis.  He did not experience a spontaneous inflation of his balloon.  Dr. Vesoulis sustained an esophageal perforation – a risk which *was* disclosed to him prior to surgery.  Furthermore, he has provided no evidence to prove that a reasonable person would have elected not to proceed had they been provided technical details regarding these adverse events as opposed to the potential for each material risk.

Dr. Vesoulis unfortunately experienced a very small, 2mm tear, in his esophagus that was timely and appropriately treated by Dr. Lavin.  Esophageal perforation is a ***known risk*** of ***all*** endoscopic procedures and that risk ***was identified in the informed consents*** that Dr. Vesoulis acknowledged and signed.  Plaintiff's allegations regarding informed consent hinge upon his belief that Dr. Lavin was under a duty to report to him all "adverse events."  This is simply not what the law requires.  Dr. Lavin is presumed to have obtained informed consent and Dr. Vesoulis will be unable to rebut that presumption at trial, warranting summary judgment and dismissal of the claims regarding informed consent in this matter.

9

## II.    LAW AND ARGUMENT

### A.    Rule 56: Summary Judgment Standard

Rule 56 (c) mandates the entry of summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party's burden may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex*., 477.U.S. at 321-322; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). Once the moving party demonstrates the absence of a genuine dispute as to facts material to a determinative element, the non-movant must then provide competent evidence that sets forth specific facts in support of his claim and which shows the existence of a genuine issue on the challenged essential elements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986); *see also Taita Chem. Co. v. Westlake Tyrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1995) (*en banc*).

Because a genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, the non-movant cannot defeat summary judgment with conclusive allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Ware*, 2009 WL 1011109, at *2 (citing *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999). The "mere argued existence of a factual dispute does not defeat an otherwise properly supported motion." Tegrity Contractors, Inc. v. Spectra Group, Inc., 2013 WL 6669769 (EDLA 12/18/13). Where critical evidence is "so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant, then summary judgment should be granted." *Dutcher v.*

*Ingalls Shipbuilding*, 53 F.3d 723, 725 (5th Cir. 1995).  In other words, if "the evidence is merely colorable, or is not significantly probative" summary judgment is warranted.  *Tegrity* at p. 1. Therefore, if the non-movant fails to produce sufficient evidence, such as affidavits or depositions, on even one of the essential elements of the claims to which he would bear the burden of proof at trial, he cannot prevail and summary judgment must be granted.  "Although the Court must 'resolve factual controversies in favor of the nonmoving party,' it must do so 'only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.'" *First NBC Bank v. Kirsch*, 16-04352 (ED La. 10/17/18), 2018 WL 5024074.

**B. Plaintiff cannot meet his burden of proof regarding his informed consent claim**

"The law regarding informed consent in medical malpractice claims is well settled in Louisiana." *Deykin, et al. v. Ochsner Clinic Foundation, et al.*, 16-488, p. 11 (La.App. 5 Cir. 4/26/17), 219 So.3d 1234, 1242, *citing Griffitt v. Binder*, 12-744 (La.App. 5 Cir. 5/30/12), 119 So.3d 794, 797.  "A physician is required to provide his patient with sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment." *Id. citing Suarez v. Mando*, 10-853 (La.App. 5 Cir. 3/29/10), 62 So.3d 131, 135.  Louisiana Revised Statute 40:1157.1 outlines the requirements for consent to medical treatment.  It reads in pertinent part:

> …written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:116.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damages, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. **Such consent shall be**

> *presumed to be valid and effective*, *in the absence of proof that execution of the consent was induced by misrepresentation of material facts*.  [**Emphasis added.**]

Furthermore, pursuant to La. R.S. 40:1157.1 (D) to prevail in a lawsuit against a physician for failure to obtain informed consent, "the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent."  Stated otherwise, "the sole cause of action relating to informed consent sounds in negligence." *Roberts v. Marx*, 47,658, p. 7 (La.App. 2 Cir. 1/16/13), 109 So.3d 462, 466.

To prevail in a claim for lack of informed consent, the plaintiff has the burden of proof to show that: (1) the ***adverse results of* HIS *surgery*** were known, significant, and material risks which should have been disclosed; (2) those risks were not disclosed to him; (3) he was unaware of those risks; and (4) a reasonable person would have refused the surgery because of the risks. *Hondroulis v. Schuhmacher*, 553 So.2d 398, 404 (La. 1988).  [**Emphasis added.**]  The defendants submit that there is no dispute that the plaintiff sustained an esophageal perforation during his procedure.  There is also no dispute that the defendants disclosed the fact that an esophageal perforation was a known risk of the procedure and that Dr. Vesoulis acknowledged his understanding of same.

As noted above, the consent law "establishes a presumption of informed consent." *Id*. at 405.  See also, *Larche v. Rodriguez, et al.*, 2000-0881, p. 2 (La.App. 4 Cir. 5/17/00), 765 So.2d 388, 389 *citing Cox v. Board of Administrators of Tulane Educational Fund*, 97-2350 (La.App. 4 Cir. 7/1/98), 716 So.2d 441, 445.  Moreover, a plaintiff cannot rest on mere allegations in his petition or a self-serving statement to rebut that presumption.  *Id*.  In fact, a plaintiff "cannot introduce evidence to rebut that presumption, unless he proves that his 'consent was induced by misrepresentation of material facts.'" *Soileau v. Med-Express Ambulance Service, Inc., et al.*,

12

2003-351, p. 8 (La.App. 3 Cir. 10/1/03), 856 So.2d 92, 98.  Dr. Vesoulis has offered nothing to rebut his own admitted, uncoerced consent form at issue herein.

An adverse result is not tantamount to a "material risk."  *Id*.  A plaintiff must prove that a material risk – a risk that would have "influenced a reasonable person" – occurred.  *Id*.  at 403-404.  If that is established, then the plaintiff must prove that his physician failed to disclose that risk.  *Id*.  "Because of the likelihood that a patient who suffers adverse results after a medical treatment or procedure will believe, in hindsight, that those results were caused by inadequate disclosure of the risks, courts have adopted an objective standard of causation:  whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed*."  Sappington v. Southern Pain and Anesthesia Consultant, LLC, et al*., 19-80, p. 6 (La.App. 5 Cir. 10/23/19), 280 So.3d 343, 348 [Internal citations omitted.]  *See also*, *Soileau,* 2003-351 at p. 10, 856 So.2d at 99, *quoting Hondroulis, supra*.

If a plaintiff can prove that a physician failed to disclose a material risk, he still must provide evidence that "there was a causal relationship between the doctor's failure and the damages claimed by the patient."  *Lugenbuhl, et al. v. Dowling, et al*., 96-1575, p. 12 (La. 10/10/97), 701 So.2d 447, 454, *rehearing denied* (11/21/97), *citing LaCaze*, 434 So.2d at 1048.  "Otherwise, the doctor's conduct, however wrongful, is legally inconsequential."  *Id.  See also, Richard v. Colomb*, 2004-1145, p. 6 (La.App. 1 Cir. 6/29/05), 916 So.3d 1122, 1128.  To establish proof of causation, the plaintiff must provide evidence to prove two elements.  First, the plaintiff must prove that the alleged breach of duty was a cause-in-fact of the damages claimed.  In other words, the plaintiff must prove that "the defendant's proper performance of his or her duty ***would have prevented the damages***."  *Id*. [***Emphasis added***.]  Next, the plaintiff must show that a reasonable person would

13

not have consented to the treatment had the material risks been disclosed.  "Although the patient has the absolute right, for whatever reason, to prevent unauthorized intrusions and treatment, he or she can only recover damages for those intrusions in which consent would have been reasonably withheld if the patient had been adequately informed."  *Id.* citing *LaCaze*, 434 So.2d at 1049.

First, in the instant matter, the adverse results of Dr. Vesoulis' treatment is that he sustained an esophageal perforation.  Next, Dr. Lavin concedes that an esophageal perforation is a material risk.  That is why the risk of esophageal perforation is explicitly listed on the consent form that Dr. Vesoulis acknowledged and signed.  Third, Dr. Vesoulis was aware of the risk of esophageal perforation.  And, finally, Dr. Vesoulis cannot show that a reasonable person would not have undergone the procedure knowing of the risk of perforation as Dr. Vesoulis knew, and he still proceeded with the surgery.  Dr. Vesoulis' assertions that he should have been told of specific incidents of death, perforation, or other unrelated adverse events are red herrings.  Dr. Lavin obtained proper informed consent for the procedure.

In *Soileau*, the plaintiff had a history of allergies and asthma.  She also had a history of early cataracts and age-related macular degeneration.  It was suspected that she was developing glaucoma.  When she presented to the defendant ophthalmologist, Dr. Casanova, her asthma was well controlled.  When she continued to have vision problems despite three surgeries, she elected to undergo a diagnostic fluorescein angiogram which involved the administration of fluorescein dye.  Prior to the procedure, Mrs. Soileau signed an informed consent.  After signing the form, but prior to beginning the procedure, Dr. Casanova's nurse went over the form "word for word" and then explained additional known, but rare risks, that were not included on the standard consent form; such risks included severe allergic reaction and death.  *Id.* at p. 2-3, 856 So.2d at 95.  Mrs.

14

Soileau voiced her understanding.  Finally, before beginning the procedure, Dr. Casanova met with Mrs. Soileau to ask if she had any additional questions regarding the procedure.

After the nurse injected the dye, Mrs. Soileau began coughing.  The nurse told her to sit back in her chair.  Mrs. Soileau asked for her asthma inhaler, which the nurse quickly provided. However, the inhaler did not help.  Dr. Casanova immediately began administering oxygen.  Mrs. Soileau stopped breathing.  Despite the resuscitation efforts of Dr. Casanova and, later the EMS, Mrs. Soileau died of an anaphylactic reaction to the fluorescein dye.  *Id*.

At trial, both the plaintiffs' and the defendant's expert physician testified that the possibility of an anaphylactic reaction to fluorescein dye is very, very rare.  The court noted that Mrs. Soileau was informed that severe allergic reaction, including death, was a risk of the procedure; she was not informed that respiratory distress or anaphylactic reaction are also risks. However, as was discussed at the trial "an anaphylactic reaction is a systemic allergic reaction." *Id*. at p. 12, 100.  Consequently, the appellate court held that it was not manifest error for the jury to either believe that disclosure of "respiratory distress or anaphylactic reaction" as additional risks was not necessary, especially in light of the fact that there was testimony that anaphylactic reaction was a type of allergic reaction, a risk that was proven to be disclosed to the patient prior to the procedure.

In *Boudreaux v. Parnell*, the plaintiff sustained radial nerve palsy in his right arm following shoulder surgery by Dr. Parnell.  *Boudreaux v. Parnell*, 11-631 (La.App. 5 Cir. 4/10/12), 96 So.3d 1181.  The plaintiff alleged that such adverse reaction was caused or made worse by Dr. Parnell's failure to obtain an x-ray of the surgery site.  Moreover, plaintiff alleged that Dr. Parnell failed to provide her sufficient information for her to give her informed consent as required by law.  Ms. Boudreaux elected to undergo a shoulder replacement surgery, or hemiarthroplasty, of the right

shoulder due to her severe rheumatoid arthritis.  During the procedure, the plaintiff's humerus was fractured and a large amount of surgical cement leaked through the fracture.  Dr. Parnell did not inform the patient of this incident and it appeared that he was not aware that it had occurred.

Following the surgery, Ms. Boudreaux began experiencing difficulty extending her fingers. This difficulty was noted in the records by Dr. Parnell.  However, Dr. Parnell never ordered any x-rays following the surgery, despite the fact that Ms. Boudreaux's inability to move her hand and fingers progressively worsened over the next several months.  Approximately eight months after her surgery at an emergency room visit for sudden pain in her right arm and shoulder, x-rays confirmed there was a substantial amount of cement surrounding her right humerus.  Further, she was informed that her radial nerve damage was permanent.

Ms. Boudreaux's complaints were first presented to a Medical Review Panel who concluded that "the evidence does not support the conclusion that Dr. Parnell failed to meet the applicable standard of care as charged in the complaint.  The panel found that the conduct complained of was not a factor in the resultant damages to plaintiff."  *Id*. at p. 4, 96 So.3d at 1183. At the bench trial, the court agreed with the Medical Review Panel and ruled that Dr. Parnell did not breach the applicable standard of care.  It found that "bone fractures and cement extrusions are known complications of shoulder replacement surgery."  *Id*. at p. 5, 96 So.3d at 1184.  Further the court noted that the plaintiff's expert "had no criticisms of Dr. Parnell's surgery.  The only criticism that [plaintiff's expert] raised was the failure to take an x-ray within 24 hours after surgery." However, the court went on to note that defendant's experts testified that the standard of care does not required such an x-ray and, more importantly, a post-operative x-ray would not have changed the course of events as the nerve damage had already occurred.

In addition to her claims for medical negligence, plaintiff made a claim of lack of informed consent, the trial court remarked that office notes prior to the surgery indicated that Dr. Parnell discussed the procedure with Ms. Boudreaux in detail.  Further, she signed an informed consent form prior to surgery.  And, "[w]hile the form did not specifically refer to cement extrusion, it explained that neurological injuries and bones fractures were a possible complication of the surgery."  *Id*. at p. 6, 96 So.3d at 1184.   The appellate court concurred and affirmed the lower court's ruling.

Similarly, in the instant matter, the plaintiff has argued that the defendants breached the standard of care for failing to disclose information regarding a patient who died of sepsis secondary to an esophageal perforation.  However, the mechanism of death is not the information required to be disclosed.  The law only requires the material risk, in this case, death, be disclosed.  It is undisputed that the consent signed by Dr. Vesoulis included the risk of death.  Yet, again it is important to note that the specific incident referenced by Dr. Vesoulis was not disclosed to Dr. Lavin or SSL.

In *Deykin*, the plaintiffs alleged that the defendant doctors failed to inform Mr. Deykin of all of the material risks associated with the bilateral knee replacement surgery.  Specifically, they alleged that the doctors failed to disclose all risks of injury and/or death due to his multiple pre-existing health conditions.  However, at the trial court, the jury found that the written consent forms signed by Mr. Deykin conformed with La. R.S. 40:1299.40(A)(1).  Specifically, the informed consent forms in the *Deykin* matter identified the patient's condition, the treatment, the material risks of the treatment, alternative treatments, and the material risks of refusing any treatment.   The appellate court affirmed that decision.

In *Roberts v. Marx*, the plaintiff alleged that the defendant doctor failed to obtain informed consent as required by law.  Of note, the plaintiff alleged that Dr. Marx failed to disclose a material risk, namely that he, Dr. Marx, had undergone retinal detachment repair surgery prior to Mr. Roberts' vasectomy.  Evidence showed that prior to the surgery, Dr. Marx discussed the possible risks and complications of the procedure, including bleeding, hematoma, and inflammation of the epididymis.  The surgery was uneventful; however, Mr. Roberts experienced swelling and tenderness in his scrotum in the days following the procedure.  An ultrasound revealed a possible hematoma.  Dr. Marx offered Mr. Roberts exploratory surgery to address the issue.  However, Mr. Roberts declined; as such, Dr. Marx prescribed antibiotics and anti-inflammatory medications.

When Mr. Roberts presented to Dr. Marx approximately three weeks post-op with a 102 degree temperature, Dr. Marx immediately admitted him to the hospital.  A follow-up surgery was performed wherein Dr. Marx discovered a staph infection which was drained, packed, and left open.   Mr. Roberts remained in the hospital for antibiotics and wound care treatment for approximately one month.

The plaintiffs alleged that Dr. Marx's recent eye surgery and slightly diminished vision were material risks that he failed to disclose as required by the informed consent law.  The matter was first presented to a Medical Review Panel that concluded that "Dr. Marx had no obligation to disclose to Roberts the prior eye surgery…"  *Id*. at p. 3, 464.  Mr. Roberts then filed suit in district court.  Dr. Marx moved for summary judgment.  The plaintiff opposed the summary judgment by asserting that Dr. Marx was required to disclose his vision problems prior to surgery.  In its analysis the appellate court noted that first, plaintiff was required to produce evidence to show that the known hematoma risk was more probably caused by Dr. Marx's alleged negligence in not

disclosing his prior eye surgery. The court found that he failed to do so. *Id*. at p. 9, 467. As such, summary judgment was warranted.

In the instant matter, Plaintiff has not and cannot prove the failure to disclose the unrelated adverse events more probably than not caused Dr. Vesoulis' esophageal perforation. Moreover, it should be noted that Plaintiff's own expert does **not** believe that the perforation was a breach in the standard of care.[10] *It is a known risk that can happen in the absence of negligence*.

In *Packard v. Razza*, the plaintiffs filed a lawsuit for medical malpractice against Dr. Razza and Elmwood Medical Center regarding the care and treatment Mrs. Packard received during a spinal fusion performed by Dr. Razza. 05-863 (La.App. 5 Cir. 3/28/06), 927 So.2d 529. Plaintiffs alleged that Dr. Razza deviated from the applicable standard of care by failing to inform Mrs. Packard that spinal fixation plate system utilizing pedicle screws used in the procedure was not approved by the FDA. They further alleged that the device was defective and that breaches resulted in two unsuccessful surgeries, as well as another surgery to remove the device. Finally, in an amended petition the plaintiffs alleged that in the removal surgery, Mrs. Packard contracted an infection which required hospitalization on several occasions.

The court noted that the evidence provided by the defendants showed that Mrs. Packard signed at least two consent forms prior to her implantation surgery. These forms outlined and fully explained the use of metallic surgical implants and the specific risks, including infection. Additionally, the defendants introduced the testimony of Dr. Razza who confirmed that he discussed the procedure, alternative options, and the risks associated with the procedure. He specifically discussed that this was an "elective internal fixation device, not specifically approved by the FDA, but it can be used in bone." Mrs. Packard testified that she did not discuss with Dr.

---

[10] See Ex. H, p. 61:9-20.

Razza the use of hardware to promote her fusion.  She also testified that, although she knew the screws were implanted, she did not know until much later that they were not FDA approved.  After this discovery, she elected to have the device removed by a different physician.  Unfortunately, she contracted an infection as a result of that surgery which persisted for two years and required additional hospitalizations.  Mrs. Packard maintained that had she known the screws were not FDA approved, she would never have consented to their implantation.

In its analysis the court held that, the evidence showed that Mrs. Packard signed consent forms that were explicit as to the devices to be used, as well as the risks associated with the procedure.  Moreover, it held that the injury sustained by Mrs. Packard did not result from the implantation of the device.  Finally, the court held that, "the only fact at issue, whether Mrs. Packard was informed that the device used to stabilize her back was not yet approved by the FDA, is not a material fact sufficient to preclude the grant of a summary judgment in favor of Dr. Razza." *Id*. at p. 9, 534.

In *Kennedy v. St. Charles General Hospital Auxiliary*, the plaintiff filed a medical malpractice action against the defendant doctors and hospitals regarding the performance of a three vessel angiogram.  630 So.2d 888 (La.App. 4 Cir. 12/30/93), writ denied (3/18/94).  Plaintiff alleged that the defendants negligently performed the procedure which resulted in "severe medical and physical injuries, more specifically plaintiff suffered a severe stroke, paralysis and other injuries."  *Id*. at 890.  Among his many allegations was a lack of informed consent for the procedure.

The appellate court noted that the record was clear that the defendant doctor disclosed "that there was a risk of stroke, that the risk was material, and that the risk materialized." *Id*. at 891. One of plaintiff's main arguments that the informed consent was improper was that the doctor

failed to present to him exact percentages of the risk of stroke occurring. *Id.* In making his argument, the plaintiff directed the court to the holding in *Hondroulis. Supra.* However, the *Kennedy* court noted that nowhere in the *Hondroulis* opinion did the "court specifically state that percentages must be given to the patient in order to support a finding of informed consent." *Id.* at 892. The court went on to explain that "our courts have traditionally recognized that medicine is an inexact science." *Id.* [Internal citations omitted.] In fact, it reasoned that

> …the notion that the physician can give accurate percentages for a risk being realized in a surgical procedure is foreign to the field of medicine. The fallacy of establishing a rule requiring physicians to give patients percentages of risks in the procedure at issue is poignantly underscored by the testimony of the various expert witnesses in this case. Dr. Botts, the plaintiff's expert testified that the risk of causing a stroke in a carotid angiogram was "highly variable and depends on the center and the radiologist doing it." He further stated "You can see figures like one in five thousand, but more typically half of one percent or one in two hundred people have a stroke from the procedure." He also testified that he did not know what the average was but it was somewhere between one in a hundred and one in several hundred. Dr. Errol Genet testified that he had performed hundreds of three vessel angiograms. Of the 2500 angiograms that he estimated he had performed in his 20 years of practice, he knew of only one angiogram patient who suffered a stroke. Having reviewed the testimony and other documents in the record, we find that the plaintiff failed to prove that it was possible for Dr. Schwartz to give him definite percentages of the risks of a stroke occurring while undergoing a three vessel angiogram. Rather, since the figures undoubtedly vary, Dr. Schwartz could very well have been faced with a charge of misrepresentation had he given a percentage later determined to be inaccurate. *Id.* at 892-893.

The court dismissed the plaintiff's argument finding that for informed consent to be considered valid, ***a physician is not required to disclose percentages of a specific risk***. The defendants obtained proper informed consent which was presumed by the signed consent form. And, the plaintiff failed to rebut that presumption.

Likewise, in the instant matter, although the plaintiff argues that the percentages of death were not accurate, pursuant to Louisiana law, ***Dr. Lavin was not required to disclose a percentage of death***. Furthermore, while Dr. Vesoulis did sustain a known material risk, it was not death. As

such, his argument that the disclosure an inaccurate percentage constituted lack of informed consent is not only unsupported by law, it is nonsensical.

In *Little v. Boston Scientific Corp*., the plaintiff was diagnosed with a brain aneurysm. 08-271 (La.App. 5 Cir. 1/13/09), 8 So.3d 591. She was offered three options by her treating physician, Dr. Dawson: craniotomy, endovascular coiling procedure, and to have no treatment. She elected the coiling procedure. That procedure was completed on July 24, 2001. During the procedure, it was determined that she actually had two aneurisms. Dr. Dawson successfully placed the first coil and moved on to the next. However, while placing the second coil, the first coil dislodged and Dr. Dawson had difficulty removing it. As such, he placed an emergency consultation with Dr. Frank Culicchia. Dr. Culicchia performed a craniotomy to remove the coil. The following day, when it was discovered that Mrs. Little had suffered a stroke, a second craniotomy was completed. As a result of the complications, Mrs. Little sustained brain damage.

The plaintiffs filed suit against Dr. Dawson and other defendants. Micrus (the coil manufacturer) was also sued for defective design and failure to warn of the risk that coils could dislodge and spoliation of evidence. The matter against Dr. Dawson proceeded before a Medical Review Panel. That panel concluded that proper consent was obtained by Dr. Dawson. Specifically, it found that "The complication that occurred was listed as a risk prior to the surgery." *Id*. at p. 5, 8 So.3d at 594. Plaintiffs argued that Dr. Dawson failed to disclose the risk of coil migration. However, Dr. Dawson testified that he disclosed the risks of "perforation and stopping up a blood vessel." He further clarified that: "I told her we could stop up a blood vessel. I did not tell her the mechanism that this was because the effect on the brain is the same. If you stop up a blood vessel, it's a stroke. We're talking about harm, not mechanism." *Id*. at p. 7-8, 8 So.3d at 595. Dr. Dawson noted that "[o]nly the risks of harm, not the technical aspects of a procedure, are

listed on a consent form for surgery." *Id*.  Expert testimony presented at trial further supported the assertion that potential complications, *and not the technical problems causing those complications*, should be disclosed to the patient.  *Id*. at p. 9, 8 So.3d at 596.  According to one expert, the "list of technical problems that could occur would be nearly infinite."  *Id*.

In its analysis, the court remarked that the duty of the physician is to disclose to the patient material risks "in such terms as a reasonable doctor would believe a reasonable patient in the plaintiff's position would understand."  *Id*. at p. 12, 8 So.3d at 298.  Technical language is not required and is often inappropriate and will not suffice when disclosing material risks to a patient. Instead, a physician should use ordinary language regarding the "nature and severity of the risk and the likelihood of its occurrence."  *Id*.

Mrs. Little argued that Dr. Dawson did not disclose all material risks as he withheld specific information provided by the manufacturer which essentially stated that the coil system should be used in those patients who are at very high risk for traditional operative techniques or whose aneurysm is inoperable.  *Id*. at p. 12-13, 8 So.3d at 598-599.  The court disagreed finding that, as Mrs. Little refused the craniotomy, her aneurysm was inoperable; as such, the court failed to understand how such disclosure would have changed the outcome of her case.  Moreover, with regard to the issue of disclosing the risk of coil migration, the court ruled that "Mrs. Little failed to prove that she would have attached particular significance to the fact that a stroke could be caused by coil migration rather than by another means inherent in an invasive brain procedure.  In other words, Mrs. Little was aware that a stroke was a possible complication of such a procedure…Even if coil migration were defined as a material risk, the resulting harm, a stroke, was satisfactorily disclosed in the consent form."  *Id*. at p. 13, 8 So.3d at 599.

23

Again, in the instant matter death was disclosed as a material risk.  The law does not require that the technical aspects of the risk be disclosed.  However, further discrediting the plaintiff's claim is the fact that he did not die.  He experienced an esophageal perforation which was disclosed as a material risk of the procedure.  The plaintiff can only assert a claim for lack of informed consent for an adverse result that he actually sustained as a result of the procedure.  *Hondroulis, supra.*

Prior to the addition of Dr. Lavin and SSL to the instant lawsuit, the claims against those defendants were presented to a Medical Review Panel in PCF No. 2019-00044.  After reviewing the claims and the evidence presented, the panel unanimously found that neither Dr. Lavin, nor SSL breached the applicable standard of care.  Specifically, with regard to the issue of consent, the panel found that:

> Dr. Lavin provided patient with an informed consent that was signed by patient at the time of the placement of the Reshape Due Gastric Balloon which did reference risks to the "upper gastrointestinal tract or intra-abdominal organs including perforation (tearing),…"

> Dr. Lavin provided patient with an informed consent for [sic] that was signed by patient at the time of the removal of the Reshape Duo Gastric Balloon which did reference "a risk of bleeding or perforation of the esophagus, stomach or duodenum…"

> We suspect there was a perforation during the removal of the Balloon but such a perforation is a known complication and risk of this type of surgery.  These risks were explained to the patient in the mentioned consent forms.[11]

The plaintiff has offered the expert report and testimony of Dr. Eric Bour to support his claims against Dr. Lavin and SSL.  In his report, Dr. Bour's **one** criticism regarding consent was that "there is no indication that specific mention was made of the then-issued FDA warnings of severe complications and death in several patients who underwent fluid-filled intragastric balloon

---

[11] See Ex. F.

procedures." First, pursuant to Louisiana law as discussed in detail above, the standard of care does not require the defendants to notify a patient of specific incidents or technical aspects of adverse events. Moreover, Dr. Vesoulis did not sustain the type of adverse event of which he claims he never received warning. To the contrary, as confirmed by the panel, Dr. Vesoulis sustained a known complication for which he provided informed consent. Finally, and most importantly, even if the standard of care required the disclosure of each and every instance of a complication, from each and every fluid-filled intragastric balloon on the market – a position that the defendants maintain is not only incorrect, but likely unfeasible – the defendants in this matter were not informed about the aforementioned incidents. Dr. Vesoulis admits so much in his various pleadings in this matter. The defendants could not warn Dr. Vesoulis about information which they were not provided. As such, Dr. Bour's single criticism is without merit in fact or law.

Further, despite this unsupported criticism, Dr. Bour does not go so far as to claim that the alleged breach in any way caused Dr. Vesoulis' damages. During his deposition, Dr. Bour was questioned regarding what harm Dr. Vesoulis suffered as a result of this alleged breach; he could not identify any direct damages. Instead, he reiterated his opinion that physicians have a duty to obtain informed consent from their patients – an opinion the defendants agree with and followed.[12] Consequently, the plaintiff will be unable to meet his burden of proof at trial on the issue of informed consent.

In further support of their position, the defendants produced the expert opinion of Dr. George Woodman. According to Dr. Woodman, the defendants did not breach the standard of care with regard to informed consent for two main reasons.

- Dr. Lavin performed informed consent which included, but was not limited to, complications such as those that can occur during balloon retrieval. The plaintiff, who is a doctor, voiced understanding of these potential complications

---

[12] See Ex. H, p. 47:15-48:6

and his informed consent by signing his consent forms. The plaintiff, who is a doctor, sought out Dr. Lavin undoubtedly by researching Dr. Lavin either by word of mouth or through the Internet and traveled a long distance to be treated by an expert. The plaintiff, who is a doctor, should have a greater understanding of his informed consent, as well as his research findings that even the average patient.

- The plaintiff's expert mentions that there is no discussion of FDA warnings made on the potential complications of this device. These warnings had nothing to do at all with complications associated with the removal of the device…Even so, there is no standard that would indicate that Dr. Lavin would be required to discuss these findings with the plaintiff.[13]

The basis of the plaintiff's claim for lack of informed consent was that the defendants failed to "disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent pursuant to La. R.S. 40:1299.40…" However, the plaintiff cannot say how such failure could have caused his injury (esophageal perforation); and, his expert has likewise been unable to say how any alleged failure in obtaining informed consent for complications he did not sustain, could have caused the injury.

Regardless of plaintiff's assertion that the defendants had a duty to inform the plaintiff of each and every instance of a potential risk and/or complication from each and every intragastric balloon on the market, the fact remains that the adverse events that Dr. Lavin did not discuss with the patient were the ones that Dr. Lavin and SSL was never informed of.

## C. Dr. Lavin obtained proper informed consent by the Plaintiff prior to the balloon removal

In short, Dr. Vesoulis sustained a *known risk* – esophageal perforation – which was identified in the informed consent form that he acknowledged and signed prior to the procedure. His claims that he should have been informed regarding certain specific "adverse events" for deaths and aspiration – *adverse reactions which did not occur in his case* – are completely unsupported by the applicable law. Moreover, the evidence is clear, and the plaintiff admits in his

---

[13] See Expert report of Dr. George Woodman, attached hereto as Exhibit I.

26

own pleadings, that Dr. Lavin had not been informed of these adverse reactions when Dr. Vesoulis underwent the procedure.  Therefore, he was unable to disclose the adverse risks which he did not know about.

Finally, the law contemplates disclosure of risks that could have influenced a "reasonable person."  Dr. Vesoulis has an undergraduate degree in Biology with a minor in Chemistry and a Doctorate in Dental Sciences degree.  He's been performing dentistry for approximately thirty-five (35) years and he concedes that he "consents" patients virtually daily.[14]  It evident that Dr. Vesoulis is better versed in medical protocol, including obtaining informed consent, than an "ordinary, reasonable" person.  His claims to that he did not give his informed consent are disingenuous and are not supported by evidence or law.

## III.   CONCLUSION

There is no factual basis to impose liability on Dr. Lavin or on SSL in this action for the claims of lack of informed consent.  Consequently, those claims should be dismissed with prejudice.

**WHEREFORE**, Defendants, Dr. Lavin and Surgical Specialists of Louisiana, pray that this Court grant their Motion for Summary Judgment and that the Plaintiff's claims for lack of informed consent be dismissed, with prejudice, at the cost of plaintiff, and for general and equitable relief.

---

[14] See Ex. B, 28:3-5, and generally 28:6-29:22.

Respectfully submitted,

**BLUE WILLIAMS, L.L.P.**

*/s/ Kelly M. Brian*
**ALDRIC C. POIRIER, JR. (21824)**
*apoirier@bluewilliams.com*
**KELLY M. BRIAN (31064)**
*kbrian@bluewilliams.com*
1060 West Causeway Approach
Mandeville, Louisiana 70471
Telephone:  (985) 626-0058
Facsimile:  (504) 846-9746
*Attorneys for Dr. Thomas Lavin and Louisiana Surgical Specialists*

## CERTIFICATE OF SERVICE

I hereby certified that a copy of the above and foregoing pleading has been served upon all counsel of record by using the CM/ECF filing system, this 29th day of March 2021.

*/s/ Kelly M. Brian*
Kelly M. Brian

3210317 v1