Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


PAUL VESOULIS                CIVIL ACTION NO.
                             19-CV-01795-MLCF-DMD
VERSUS
                             JUDGE MARTIN L.C. FELDMAN
RESHAPE LIFESCIENCES,
F/K/A ENTEROMEDICS           MAGISTRATE JUDGE DANA
INCORPORATED                   M. DOUGLAS

**************************************************

            22ND JUDICIAL DISTRICT COURT
               PARISH OF ST. TAMMANY
                 STATE OF LOUISIANA

NO. 2019-11625                         DIVISION "D"

IN RE:  MEDICAL REVIEW PANEL FOR THE CLAIM OF
                   PAUL VESOULIS

**************************************************



     Deposition of THOMAS E. LAVIN, M.D., FACS,
taken in the offices of Surgical Specialists of
Louisiana, LLC, 7015 Highway 190 E. Service
Road, Suite 200, Covington, Louisiana 70433, on
Monday, the 11th day of November, 2019.


APPEARANCES:

     LEGER & SHAW
     (By:  Franklin G. Shaw, Esq.)
     512 East Boston Street
     Covington, Louisiana 70433

          ATTORNEYS FOR PLAINTIFF,
          PAUL VESOULIS

Page 31

1   will mark as Exhibit 13, specifically says, "The
2   FDA recommends health care providers," and this
3   is bullet point one, "Instruct patients
4   regarding symptoms of potentially
5   life-threatening complications such as balloon
6   deflation, gastrointestinal obstruction,
7   ulceration, and gastric and esophageal
8   perforation."
9              Did you discuss with Dr. Vesoulis
10  prior to July 27, 2017 the symptoms that he
11  might experience if there had been an esophageal
12  perforation?
13       A     On the front end of the procedure, we
14  go over all the risks of urinating, discolored
15  urine, which we fill the balloons with methylene
16  blue, so if they do leak, the patients would
17  urinate green, and so they know that's a warning
18  sign, and the reason that's important is because
19  if they do, if the balloons both leak, they can
20  pass downstream and create an intestinal
21  obstruction, so we went over the risks of
22  intestinal obstruction, and basically any
23  nausea, vomiting, fever, severe abdominal pain,
24  inability to tolerate liquids, those are warning
25  signs where they should call immediately.

Page 32

1    And I don't remember specifically
2 with Paul Vesoulis, but we discuss that with
3 everyone.
4    Q   And the results of those discussions
5 is the signing of a consent form?
6    A   Yes.
7    Q   In the February 9, 2017 letter from
8 the FDA, on the third page, it says, "The FDA
9 recommends that health care providers," and it's
10 in bullet point one, "If abnormalities are
11 found, perform any confirmatory diagnostic
12 studies."
13    Mr. Vesoulis' balloons were removed
14 on 1-11-18, and my question to you is, were you
15 ever advised by anyone at ReShape Lifesciences
16 to perform a CT scan in the event that
17 abnormalities were found?
18    A   It's basic healthcare practice that
19 CT is one of the tools we use.  When
20 Mr. Vesoulis came in later in the day -- Are you
21 talking about just performing a routine CT or a
22 CT scan for symptoms?
23    Q   Let me back up, because I don't think
24 you got the question.
25    A   Okay.

Page 37

1                Being the witness is reviewing it, I
2     will go ahead and mark it as Exhibit 14.
3         A     (Reviewing document).
4         Q     Do you recall ever seeing this
5     article?
6         A     No.  That would have been in -- What
7     month was that in '18?
8         Q     I don't know that the month is on
9     here, but I could find out.  It was Volume 16.
10    It says "2018; 16:1081-1088," but the date at
11    the bottom is copyrighted as 2018.
12               Does your office receive the Journal
13    of Clinical Gastroenterology and Hepatology?
14        A     No.  It's more of a GI type
15    publication, although we could search it and
16    find it.
17        Q     That is a retrospective study, and I
18    think we went over the Instructions for Use
19    indicated that the incidences of esophageal
20    perforations were estimated to be at .4 percent;
21    is that about right?
22        A     .4, I think, and the pre-approval I
23    believe was somewhere around .4.
24        Q     Do you recall whether or not the
25    actual incidences of esophageal perforation were

Page 38

1  greater than .4 percent?
2       A     If the actual?
3       Q     Yes.
4       A     In what study?
5       Q     In the entire world and in your
6  experience, were they greater than four-tenths
7  of a percent?
8       A     Those are two separate things:  The
9  entire world, and then my personal experience.
10      Q     Okay.  Well, let's break it down.  I
11 hate to be compound.
12            Do you know what the incidences were
13 in actuality of esophageal perforations using
14 the ReShape balloons?
15      A     Well, the world experience, I don't
16 know that.  I know that I had that one on
17 removal, and that was it for me.  So my
18 incidence would have been higher than that.
19      Q     Okay.  So you had one out of how
20 many?
21      A     We probably ended up placing maybe 60
22 to 70 ReShapes before we had stopped.  It could
23 have been closer to 100, but I don't know the
24 exact number.
25      Q     And you were obviously familiar with

Page 39

1   the hardware and the device that we're talking
2   about, having been doing this for a long time
3   and having some experience in the clinical
4   studies.
5             Was there anything in particular
6   about the ReShape system or balloons themselves
7   that you believe led to an increased incidence
8   of esophageal perforations?
9        A    I can't tell you why ReShape over any
10  other balloon would have an increased incidence
11  of esophageal perforation.
12       Q    All right.  Let's get to your medical
13  records then.  Unfortunately, I marked several
14  copies of these and not all of them have the
15  page numbers to them.  I'm interested in your
16  removal operative report specifically, and that
17  would be at Page -- No, that's the repair.  180.
18  So it would be in these at Page --
19       A    180?
20       Q    Yes.  And I guess my first question
21  to you would be what is an EGD?
22       A    Esophagogastroduodenoscopy.  It's
23  just basically an upper endoscopy, just like a
24  colonoscopy would be a lower endoscopy.
25       Q    If you read down in the middle of the

Page 67

 1     A     I don't know.
 2     Q     Okay.  I'm going to show you these,
 3   and, unfortunately, these might be the only
 4   copies that I have, so we will just have to work
 5   together here.
 6           Okay.  Here's one.  This, at the
 7   bottom it says "VesoulisDrLavin" Bates No. 40,
 8   and this is a four-page document.  Take a look
 9   at that.
10     A     (Reviewing document).
11           Yes.
12     Q     Okay.  And the last page of that has
13   the date on it that Dr. Vesoulis signed it?
14     A     Yes, 7-27-17.
15     Q     Okay.  So this would have been signed
16   on the day of the actual procedure; is that
17   right?
18     A     Correct.
19     Q     How does this work?  At what point
20   does the patient sign this prior to the
21   procedure?
22           MR. SHAW:
23               Can I see it real quick?
24           THE WITNESS:
25               (Handing).

Page 68

1              So, was the procedure on the 27th
2        or the 28th?
3    EXAMINATION BY MS. WEBRE:
4        Q     The 27th.
5        A     So it depends on whether the person
6    is coming from out of town.  I do a lot of
7    patients from all over the United States, so
8    they will either do their consent the day before
9    or sometimes, depending on their schedule, the
10   morning of the procedure.
11       Q     Okay.
12       A     So we just do it prior to the
13   procedure, prior to any sedation, of course, or
14   anything like that.
15       Q     Okay.  Did you meet Dr. Vesoulis,
16   since he came from out of town, did you meet him
17   before the procedure?
18       A     No -- Well, yes, before the
19   procedure, when we went over the informed
20   consent, of course, yes.  Always.  I never do a
21   procedure without meeting the patient, going
22   over everything.  Even before he came down, I
23   did a phone consult, discussing everything about
24   the procedure.  So we talked prior to him coming
25   to town.

1    Q    He's a doctor, right?
2    A    He's a dentist, correct.
3    Q    Was your procedure any different than
4    it would be with someone who was not a doctor?
5    A    No. We treat everyone the same.
6    Q    The language that you use, the detail
7    that you go into would have been the same with
8    Dr. Vesoulis as it would be with any patient?
9    A    Pretty much, yes. I'm not going to
10   change it for one person. Lot of times I don't
11   even know if it is a healthcare professional.
12   Q    Okay. I had asked you if you met him
13   before the procedure. The morning of the
14   procedure, did you meet him before you took him
15   in?
16   A    For sure.
17   Q    Okay.
18   A    Absolutely. Before he had any
19   sedation, before he went in for the procedure,
20   we met and went over everything.
21   Q    So the form that you're looking at
22   there, the four-page, it says "Endoscopic
23   Balloon Procedure Consent Form," is this
24   something you yourself would have gone over with
25   him or one of your staff?

Thomas E. Lavin, M.D., FACS
Paul Vesoulis v. Reshape Lifesciences, et al

Page 70

1    A    Probably both.  I don't sit and go
2  over the form in detail with everyone.  They
3  read it over and sign it, and I go over it and
4  go over the consent again.  So there's a
5  combination of me going over it and them reading
6  through things, so they get two chances to see
7  everything.
8    Q    Okay.  I want to shift focus a little
9  bit.  This is a different form, and it's a
10  two-page document, and it says "Consent for
11  Endoscopic Removal of Intragastric Balloon"; is
12  that correct?
13    A    Right.
14    Q    Can you tell us whether Dr. Vesoulis
15  signed that?
16    A    Yes, right here (indicating).
17    Q    Okay.  And what date did he sign it?
18    A    January 11th, 2018.
19    Q    Okay.  So would you have also gone
20  over this with him before you took him into this
21  procedure?
22    A    Sure.
23    Q    It would have been similar to the
24  first time, right?
25    A    Right.

Thomas E. Lavin, M.D., FACS
Paul Vesoulis v. Reshape Lifesciences, et al

Page 71

1    Q    Do you recall whether either in going
2  over this form specifically or just in talking
3  to him about the risks, you would have discussed
4  the risk of esophageal perforation?
5    A    I would have said intra-abdominal GI
6  tract perforation, which I discuss with everyone
7  on any kind of procedure, whether it's a
8  laparoscopic procedure, endoscopic procedure,
9  either way.
10    Q    Okay. And then you would have handed
11  him this form to look at and sign, correct?
12    A    Right.
13    Q    And this form specifically notes, let
14  me quote, "Serious complications include a risk
15  of bleeding or perforation of the esophagus,"
16  et cetera, "occurring in less than one of 10,000
17  cases"; is that correct?
18    A    Right.
19    Q    Okay. And then further down, the
20  next paragraph, there are risks of
21  gastroesophageal reflux, esophagitis, correct?
22    A    Yes.
23    Q    Okay. Is this form that we have
24  talked about, which is number "VesoulisDrLavin"
25  Bates No. 49, is this a form that your office