UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PAUL VESOULIS

CIVIL ACTION NO. 19-CV-01795-MLCF-DMD

JUDGE MARTIN L.C. FELDMAN

VERSUS

RESHAPE LIFESCIENCES,
f/k/a  ENTEROMEDICS
INCORPORATED, ET AL

MAGISTRATE JUDGE DANA M. DOUGLAS

**************************************************************************

## PLAINTIFF'S RESPONSE TO STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF MOTIONFOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes plaintiff, Paul Vesoulis, who responds to the Statement of Uncontested Facts set forth by defendant, ReShape Lifesciences, Inc. f/k/a Enteromedics, Inc., (hereinafter "ReShape"), and sets forth plaintiff's Statement of Contested Facts which present issues for trial.

## RESPONSE TO STATEMENT OF UNCONTESTED FACTS

Pursuant to LR 56.2 plaintiff responds to the Statement of Uncontested Facts set forth by defendant, ReShape, and sets forth a Statement of Contested Facts which require resolution by the factfinder:

## STATEMENT OF UNCONSTESTED FACT 1:

1. In Plaintiff's Petition, filed January 10, 2019, Plaintiff asserts that ReShape, as manufacturer of the balloon, is liable under the Louisiana Products Liability Act ("LPLA") because the product was allegedly unreasonably dangerous in its (1)

construction or composition; (2) design; and (3) inadequate warning. See R. Doc.

1-2, ¶7.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 1:

It is uncontested that plaintiff filed his original Petition in state court on January 10, 2019 which action was removed to this Court by ReShape. It is also uncontested that this Petition was replaced in its entirety, with no referral to or adoption of the Petition filed in state court, by an Amended Complaint (Rec. Doc. 25) and a Second Amended Complaint (Rec. Doc. 40) which alleged failure to comply with the Food and Drug Administration's (FDA) Premarket Approval Order of this Class III medical device, federal regulations and the parallel provisions of La. R.S. 9:2800.57(A) and (C) which claims are not preempted. Specifically plaintiff alleges failure "to comply with FDA regulations regarding communicating instances of death or serious injuries" and "failure to communicate instances of death or serious injuries to Dr. Thomas Lavin and/or Surgical Specialists of Louisiana, LLC". (Rec. Doc. 40, p. 3-4, pgh. 8 and 9). It is further uncontested that the Second Amended Complaint (Rec. Doc. 40) should be read as a whole.

## STATEMENT OF UNCONSTESTED FACT 2:

2. In Plaintiff's Amended Complaint, filed December 13, 2019, Plaintiff, asserts that ReShape "is liable based solely upon [its] failure to comply with the PMA Approval Order and applicable FDA regulations, and thereby, is also liable under the Louisiana Products Liability Act's parallel provisions regarding failure to warn,

La. R.S. 9:2800.57(A) and breach of the defendants post-sale duty to warn, La. R.S. 9:2800(C)." See R. Doc. 25, ¶7.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 2:**

It is uncontested that plaintiff filed his original Petition in state court on January 10, 2019 which action was removed to this Court by ReShape.  It is also uncontested that this Petition was replaced in its entirety, with no referral to or adoption of the Petition filed in state court, by an Amended Complaint (Rec. Doc. 25) and a Second Amended Complaint (Rec. Doc. 40) which alleged failure to comply with the Food and Drug Administration's (FDA) Premarket Approval Order of this Class III medical device, federal regulations and the parallel provisions of La. R.S. 9:2800.57(A) and (C) which claims are not preempted.  Specifically plaintiff alleges failure "to comply with FDA regulations regarding communicating instances of death or serious injuries" and "failure to communicate instances of death or serious injuries to Dr. Thomas Lavin and/or Surgical Specialists of Louisiana, LLC". (Rec. Doc. 40, p. 3-4, pgh. 8 and 9).  It is further uncontested that the Second Amended Complaint (Rec. Doc. 40) makes assertions and allegations that should be read as a whole.

**STATEMENT OF UNCONSTESTED FACT 3:**

3. In his Amended Complaint, Plaintiff makes a separate claim that ReShape is "liable for failing to comply with the Premarket Approval Order issued by the FDA and applicable FDA regulations…regarding labeling and warnings" and reporting

instances of death or serious injury through the required filing of MAUDE reports

with the FDA. See R. Doc. 25, ¶8.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 3:**

It is uncontested that plaintiff filed his original Petition in state court on January 10, 2019 which action was removed to this Court by ReShape. It is also uncontested that this Petition was replaced in its entirety, with no referral to or adoption of the Petition filed in state court, by an Amended Complaint (Rec. Doc. 25) and Second Amended Complaint (Rec. Doc. 40) which alleged failure to comply with the Food and Drug Administration's (FDA) Premarket Approval Order of this Class III medical device, federal regulations and the parallel provisions of La. R.S. 9:2800.57(A) and (C) which claims are not preempted. It is further uncontested that the Second Amended Complaint (Rec. Doc. 40) makes assertions and allegations that should be read as a whole.

This is not a separate claim. In pgh. 8 of the Second Amended Complaint (Rec. Doc. 40 p.3) plaintiff alleged a breach of the duty imposed by the FDA in the PMA Order and FDA regulations that ReShape "failed to comply with FDA regulations regarding communicating instances of death or serious injuries ... and failed to communicate instances of death or serious injuries to Dr. Thomas Lavin and/or Surgical Specialists of Louisiana L.L.C." (emphasis added). (Rec. Doc. 40, p. 3-4, pghs. 8 & 9).

4

## STATEMENT OF UNCONSTESTED FACT 4:

4. In response to Plaintiff's Petition and Amended Complaint, ReShape filed answers denying all liability claims, and asserted federal preemption under 21 U.S.C. § 360k(a) as an affirmative defense. See R. Doc 22, aff. def. 35; R. 30, aff. Def. 35.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 4:

Denied. ReShape's Answer to the First Amended Complaint is found at Doc 30, (not Doc. 22), but the Thirty Fifth Affirmative defense is the same and reads as follows:

"Plaintiff's state law tort claims brought pursuant to the Louisiana Products Liability Act, 9:2800, *et. seq.,* are preempted by the Medical Device Amendments of 1976, 21 U.S.C. § 360k(a), as the Integrated Dual Balloon is a Class III medical device and has received premarket approval by the United States Food and Drug Administration".

This defense was again raised in ReShape's Answer to the Second Amended Complaint (Rec. Doc. 45) which added defendants Dr. Thomas Lavin and Surgical Specialists of Louisiana, L.L.C.

Paragraph 7-9 of the Plaintiff's Second Amended Complaint (Rec.Doc. 40) adding Dr. Thomas Lavin and Surgical Specialists of Louisiana, L.L.C. reads as follows:

7.
"The ReShape Duo Gastric Balloon is a Class III Medical Device which received Premarket Approval by the United States Food and Drug Administration. Plaintiff herein alleges that defendant is liable based solely upon defendant's failure to comply with the PMA Approval Order and applicable FDA regulations, and

5

thereby, is also liable under the Louisiana Products Liability Act's parallel provisions regarding failure to warn, La. R.S. 9:2800.57(A) and breach of the defendant's post-sale duty to warn, La. R.S. 9:2800(C), which claims are not preempted by the preemption provisions of 21 U.S.C. §360k of the Medical Device Amendments. See, e.g. *Hughes v. Boston Scientific Corp.,* 631 F.3d 762 (5th Cir. 2011), *Busch v. Thoratec Corp.,* 2012 WL 2513669 (E.D. La. 6/28/2012).

8.

Plaintiff alleges that the defendant, Reshape Life Science Inc., is liable for failing to comply with the Premarket Approval Order issued by the FDA and applicable FDA regulations, including but not limited to those contained in 21 C.F.R. §801, 21 C.F.R.§120 and 21 C.F.R. §803. Defendant Reshape failed to comply with FDA regulations regarding labelling and warnings, failed to comply with FDA regulations regarding communicating instances of death or serious injury, failed to comply with FDA regulations regarding the reporting of instances of death or serious injury through the required filing of reports with the FDA and failed to communicate instances of death or serious incidents to Dr. Thomas Lavin and/or Surgical Specialists of Louisiana, LLC.

9.

Dr. Lavin served as Reshape's Principal Investigator in the Post Approval Study as directed by the FDA's PMA Order and as reflected in his Curriculum Vitae and sworn deposition testimony. Plaintiff was never warned at any time by either defendant or Dr. Lavin of the increased risks of death or serious injury, or of other recent deaths or serious injury. Upon information and belief, plaintiff would not have proceeded with this elective procedure had he been advised of the true risks of death or serious injury.

9(a).

The injuries to Paul Vesoulis were also caused by the medical negligence of Dr. Thomas Lavin and his employer, Surgical Specialists of Louisiana, LLC , their agents, servants and employees in failing to render proper and professional health care to petitioner; in failing to exercise the degree of skill and care employed under similar circumstances by physicians and health care professionals in good standing licensed to practice in the State of Louisiana in a local community or within their specialty; in failing to properly diagnose Paul Vesoulis' condition and promptly treat same; in negligence in the removal of the device from Paul Vesoulis causing the esophageal perforation; in failing to use reasonable care and diligence

when rendering medical services to Paul Vesoulis, including negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent pursuant to La. R.S. 40:1299.40, as well as all other acts of neglect, fault, omission or commission which may become apparent through the discovery process.

**STATEMENT OF UNCONTESTED FACT 5:**

5. The Integrated Dual Balloon is a temporary weight-loss medical device. See, ReShape Integrated Dual Balloon System Instructions for Use, attached hereto as Ex. "A," at ReShape-000002.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 5:**

Uncontested.  This is a purely elective procedure.  (Ex. A to MSJ, Rec. Doc 5-1, p. 1, ReShape 000002, "...it must be removed...").

**STATEMENT OF UNCONTESTED FACT 6:**

6. The balloon is designed to occupy space in the stomach and produce a sensation of satiety to promote weight loss. See id.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 6:**

Denied as written.  While this was ReSahpe's claim to the FDA, the PMA required ReShape to file Annual Reports and conduct Post Approval Studies (PAS) to further verify their claims.  (Ex. "A", PMA Order, Ex. "B", Deposition of Dr. Eric Bour, p. 20-21).  Dr. Bour's practice ceased placing balloons because "...the balloon was just not a viable treatment.").  Dr. Lavin stopped placing the balloons for the same reason. In essence, both practices ceased placing

7

intra-gastric balloons for weight loss because the risk associated with balloon placement was greater than those associated with a simple endoscopy, which risks Dr. Lavin noted in the consent form dated January 11, 2018 before balloon removal.  Dr. Lavin failed to obtain informed consent upon placement of the balloons on July 27, 2017for the greater risk of perforation <u>with the device</u> is as set forth in ReShape's Instruction for Use (IFU) as "device related risks".  (Ex. A to MSJ, Rec. Doc 95-1, p. 5, ReShape 000006).

<u>**STATEMENT OF UNCONSTESTED FACT 7:**</u>

7. Treatment associated with the balloon occurs in three phases:

1) Implement phase: A trained medical doctor delivers the balloon down the esophagus and implants the device in a patient's stomach via a delivery catheter. See id.

2) Monitoring phase: Once inserted, the balloon is inflated and left in the stomach for up to six months. While the balloon is inside of a patient's stomach, the patient is under medical supervision. See id.

3) Explanation: A trained medical doctor removes the balloon from the patient's stomach. See id.

<u>**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 7:**</u>

This set of statements are generally uncontested with the qualifications noted in No's 5 and 6 <u>infra</u>.

**STATEMENT OF UNCONTESTED FACT 8:**

8. The known risks associated with the implant and explant procedures include potential esophageal perforation, pancreatitis, and death. See id. at ReShape-000004-7.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 8:**

Denied. The IFU states: "It is important to discuss all possible complications and underline adverse events with the patients". Further, the IFU states: "There were no deaths." (Ex. A to MSJ, Rec. Doc. 95-1, p.5, 7, ReShape 000006 and 000008). How is a treating physician to discuss adverse events not made known to him by ReShape? The risk of death from sepsis secondary to esophageal perforation was known to ReShape. The risk of death from aspiration was known to ReShape. These risks were not made known to Dr. Lavin, SSL or the plaintiff.

Further, this statement is incomplete and misleading. The ReShape Instructions for Use, Ex. A to the MSJ, (Rec. Doc. 95-1) is only provided to physicians. (Ex. A to MSJ, Rec. Doc. 95-1, p. 1). It only warns of possible death "due to intestinal obstruction" reported in other balloons and "possibly" related to the ReShape device. Ex. A to the MSJ, (Rec, Doc. 95-1), p. 3 ReShape 000004). The warning states that "Death due to intestinal obstruction is possible and has been reported in other intragastric balloons." Ex. A to the MSJ, (Doc. 95-1), p. 3 ReShape 000004). It does not warn that the ReShape device was associated with two deaths post PMA, one from esophageal perforation and one from aspiration both prior to plaintiff's implant. Once the balloons

are placed in a patient's stomach, they must be taken out.  There is no choice as to an explant procedure.  Consequently, informed consent must be secured upon the initial implant.  The Instructions for Use do warn the physician that there is risk of 0.4%  of esophageal tears with the balloon implant, which was <u>not</u> disclosed to plaintiff at the time the balloons were implanted and which is greater than that in an endoscopy procedure which <u>were</u> disclosed to plaintiff on January 11, 2018, prior to his implant removal as "occurring in less than 1 of 10,000 cases" (or .01%). Ex. A to the MSJ, (Rec. Doc. 95-1, p. 7 ReShape 000008). In the IFU ReShape states:  "There were no deaths." This is simply not true when plaintiff's balloons were implanted on July 27, 2017.

## STATEMENT OF UNCONSTESTED FACT 9:

9. The balloon's labeling and marketing materials clearly indicate these known

risks. See ReShape Labeling and Marketing Materials, attached hereto as Exhibit

"B," at ReShape-000039, 109, 132, 134, 136,142, 147, 149, 202, 205.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 9:

Denied.  The statement "labeling and marketing materials clearly indicate these known risks" is untrue and misleading.  As shown in the Patient Information, Exhibit B attached to the MSJ, (Rec. Doc. 95-2):

a.      Patient-facing "labeling and warnings" are illegible and inappropriate under applicable FDA regulations, and while their specific content may fairly represent what may have been disclosed to the FDA prior to marketing, ReShape never disclosed (to the federal agency highly concerned about human factors and risk communication for lay persons) that their "labeling

10

and warnings" would violate FDA regulation 21 CFR 801, Appendix. D, regarding the fundamental principles of human factors, making same illegible and not useful for their intended users (patients).

b.      As shown in Exhibit B, in the Patient Information, there is no warning to the patient of possible death and there is certainly no warning of possible death by esophageal perforation or aspiration.  As to the Instructions for Use given only to the treating physician the only warning regarding the possibility of death is due to device migration causing bowel obstruction.  The risks that <u>are</u> disclosed to the patient, which do <u>not</u> mention the possibility of death at all, are in an illegible microscopic form that no reasonable person would attend.

<b><u>STATEMENT OF UNCONSTESTED FACT 10:</u></b>

10. The ReShape Integrated Dual Balloon System Instructions for Use, which are provided to physicians who perform the implant and explant procedures, fully and unambiguously explains all known risks associated with the balloon. See Exhibit A, at ReShape-000004-23.

<b><u>RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 10:</u></b>

Denied.  The statement, "fully and unambiguously explains all known risks associated with the balloon" is patently false.  The Instructions for Use, Exhibit A to the MSJ, clearly instructs the physician:  "There were no deaths, no device migrations out of the stomach and no intestinal obstructions".  Ex. A to MSJ,(Rec. Doc. 95-1, p.7, ReShape 000008.  Yet Exhibit I to the MSJ (Rec. Doc 95-9), Figure 3 p. 15 clearly shows three deaths associated with the medical device two

11

before plaintiff was implanted and the third before he was explanted and received his esophageal perforation during balloon removal.  Furthermore, ReShape knew, or should have known, that other competing medical devices also were associated with patient deaths. Ex. A to MSJ, (Rec. Doc. 95-1, p.3, ReShape 000004).

## STATEMENT OF UNCONSTESTED FACT 11:

11. The Integrated Dual Balloon System Instructions for Use instruct physicians to communicate all potential risks and complications to patients. See id. at ReShape-000005, 6 ("[I]t is the responsibility of the physician to advise the patient of known risks and complications associated with the procedure and the device.").

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 11:

Denied.  The Reshape Instructions for Use do not state all of the known risks.  The statement that it is "the responsibility of the physician to advise the patient of known risks and complications associated with the procedure and the device" is misleading and is an attempt to shift the burden of "labeling and warnings" away from ReShape and to the treating physician. While it is well understood that physicians have a bioethical duty to warn their patients of KNOWN risks, the key term here is "known".  That knowledge flows from the manufacturer. If the manufacturer fails to warn, or hides salient information, that undermines the ability of the treating physician to completely and correctly provide fundamental information required for informed patient consent.  In fact, the ReShape Instructions for Use approved in the PMA Order by the FDA calls for the treating physician to discuss all "adverse events" with the patient.  Instruction for Use.

12

Exhibit A to MSJ, (Rec. Doc. 95-1, p. 4, ReShape 000006).  The treating physician cannot, and in this case did not, discuss adverse events with the plaintiff because ReShape did not make them known to him.

**STATEMENT OF UNCONTESTED FACT 12:**

12. On July 27, 2017, Plaintiff, an Ohio native, elected to have the balloon inserted by Dr. Thomas Lavin at Surgical Specialists of Louisiana, LLC in Metairie, Louisiana. See R. Doc. 1.2, ¶3.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 12:**

Denied as written.  On July 27, 2017 based on the information and risks communicated to him by his treating physician plaintiff underwent the elective procedure of balloon placement.

**STATEMENT OF UNCONTESTED FACT 13:**

13. Prior to traveling to SSL, Dr. Lavin held a phone consultation with Plaintiff and "discuss[ed] everything about the procedure." See Deposition Testimony of Dr. Lavin, attached hereto as Exhibit "K," at p. 68.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 13:**

Denied as written.  In the initial phone consultation, Dr. Lavin certainly did not advise Dr. Vesoulis of the risk of death from this procedure.  This is hardly surprising being that Dr. Lavin did not know of the deaths known to ReShape.  Dr. Lavin explained the procedure, (apparently equating it with an endoscopy), which Dr. Lavin characterized as "a very easy, noninvasive procedure", i.e. nonsurgical which corresponded with ReShape's

declaration that the procedure was "Nonsurgical".  (See, Ex. "C", Deposition of Paul

Vesoulis, p. 8-14, Ex. B to MSJ, Doc. 95-2, p.5, ReShape 000136, "Life-changing Weight

Loss, No Surgery Required").  Dr. Lavin did not warn plaintiff that the risk of esophageal

perforation from endoscopic balloon placement was much greater than a simple endoscopy

Ex. A to MSJ, (Rec. Doc. 95-1 p. 7, ReShape 000008).  Dr. Vesoulis' testimony about the

initial phone conversation is as follows:

"Q.   In that initial conversation what, as far as you can recall, did you discuss with Dr. Lavin?
A.   Just what the procedure was.  That it was nothing like the more invasive gastric procedures, you know, bypass and sleeves and other ones that -- other procedures that were out there that were more surgical.  That this was a pretty this was a pretty benign procedure that was very noninvasive and showed really good results.
Q.   When you say what the procedure was, what do you mean?
A.   It was nothing that was irreversible, and that it was not an invasive surgical procedure.
Q.   I guess what I'm trying to get at is you've told me that Dr. Lavin told you what the procedure was.  What was that?
A.   That they would insert some balloons into my stomach.  They would stay in there for a certain amount of time and then they would pull the balloons out.
                              **********
Q.   When you talked to Dr. Lavin the initial time and you discussed the balloon placement procedure, did you discuss any other procedures?
A.   If I did I really don't remember. I just remember that I was particularly interested in this one because it was noninvasive and nonsurgical. And I have known people that have had the gastric bypass and the sleeves and so forth and that was a pretty more involved surgery.
Q.   If I understood you, you don't remember specifically if Dr. Lavin called you initially or you called him initially; is that right?
A.       Right.  I don't remember.
Q.   Irrespective --
A.   I know phone numbers were transferred, and I don't know who reached out to who first.

14

Q.   I understand.   Irrespective of who first made contact, did the conversation start with you asking Dr. Lavin tell me about the balloon placement?

A.   I had asked him to explain the procedure to me and he explained it to me, that it was basically a very easy, noninvasive procedure that I could fly in and fly out.   And that's basically what I did, I flew in and flew out and had it put in.

Q.   I didn't quite understand your answer or hear you completely.   Did you say an ED procedure?

A.   An easy.

A.   An easy procedure.

Q.   So when you say -- and you've used the term "noninvasive" a couple of times in your responses.   Did you understand that the balloons would be placed inside your stomach through an EGD procedure?

A.   Yes.   He told me it was through an upper endoscopy.

Q.   In your mind that's noninvasive?

A.   I was told that upper GIs are very noninvasive and very simple and very, very, very rare side effects to them.   Simple.   Basically he had said simply sedate you, drop it in, inflate them and you go home.

Q.   But my question is very specifically does an endoscopy procedure, in your mind, equate with noninvasive?

A.   Yes.

Q.   Does Dr. Lavin use the term "noninvasive" when describing the procedure?

A.   I believe so."

(Ex. "C", Deposition of Paul Vesoulis, p. 9-19, 11-13).

A question of fact is presented from the differing versions of that initial consultation.

## **STATEMENT OF UNCONSTESTED FACT 14**

14. Before the implant procedure, Dr. Lavin "went over the informed consent" with

Plaintiff and explained that "any endoscopy, whether you place a balloon or not,

has a risk of perforation," as is his "routine" with every patient. See id, at p. 23, 68,

70, 75.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 14:**

Denied.  Dr. Lavin testified:

Q     Let me ask you, first, is there a different consent process for the placement of the ReShape balloon versus the removal of theReShape balloon?

A     I don't believe so.  I think it's the same process, because the risks are no different for either procedure.

********************

Q     Okay.  Did you meet Dr. Vesoulis, since he came from out of town, did you meet him before the procedure?

A     No -- Well, yes, before the procedure, when we went over the informed consent, of course, yes.  Always.  I never do a procedure without meeting the patient, going over everything.  Even before he came down, I did a phone consult, discussing everything about the procedure.  So we talked prior to him coming to town.

********************

Q     Okay. Here's one.  This, at the bottom it says "VesoulisDrLavin" Bates No. 40, and this is a four-page document.  Take a look at that.

A     (Reviewing document).  Yes.

Q     Okay.  And the last page of that has the date on it that Dr. Vesoulis signed it?

A     Yes, 7-27-17.

Q     Okay.  So this would have been signed on the day of the actual procedure; is that right?

A     Correct.

Q     How does this work?  At what point does the patient sign this prior to the procedure?

A     So it depends on whether the person is coming from out of town.  I do a lot of patients from all over the United States, so they will either do their consent the day before or sometimes, depending on their schedule, the morning of the procedure.

Q     Okay.

A     So we just do it prior to the procedure, prior to any sedation, of course, or anything like that.

Q     He's a doctor, right?

A     He's a dentist, correct.

Q     Was your procedure any different than it would be with someone who was not a doctor?

A   No.  We treat everyone the same.

Q   The language that you use, the detail that you go into would have been the same with Dr. Vesoulis as it would be with any patient?

A   Pretty much, yes.  I'm not going to change it for one person.  Lot of times I don't even know if it is a healthcare professional.

Q   Okay.  I had asked you if you met him before the procedure.  The morning of the procedure, did you meet him before you took him in?

A   For sure.

Q   Okay.

A   Absolutely.  Before he had any sedation, before he went in for the procedure, we met and went over everything.

Q   So the form that you're looking at there, the four-page, it says "Endoscopic Balloon Procedure Consent Form," is this something you yourself would have gone over with him or one of your staff?

A   Probably both.  I don't sit and go over the form in detail with everyone.  They read it over and sign it, and I go over it and go over the consent again.  So there's a combination of me going over it and them reading through things, so they get two chances to see everything.

Q   Okay.  I want to shift focus a little bit.  This is a different form, and it's a two-page document, and it says "Consent for Endoscopic Removal of Intragastric Balloon"; is that correct?

A   Right.

Q   Can you tell us whether Dr. Vesoulis signed that?

A   Yes, right here (indicating).

Q   Okay.  And what date did he sign it?

A   January 11th, 2018.

Q   Okay.  So would you have also gone over this with him before you took him into this procedure?

A   Sure.

Q   It would have been similar to the first time, right?

A   Right.

Q   Do you recall whether either in going over this form specifically or just in talking to him about the risks, you would have discussed the risk of esophageal perforation?

A   I would have said intra-abdominal GI tract perforation, which I discuss with everyone on any kind of procedure, whether it's a laparoscopic procedure, endoscopic procedure, either way.

Q   Okay.  And then you would have handed him this form to look at and sign, correct?

17

    A   Right.

    Q   And this form specifically notes, let me quote, "Serious complications include a risk of bleeding or perforation of the esophagus," et cetera, "occurring in less than one of 10,000 cases"; is that correct?

    A   Right.

    Q   Okay.  And then further down, the next paragraph, there are risks of gastroesophageal reflux, esophagitis, correct?

    A   Yes.

    Q   Okay.  Is this form that we have talked about, which is number "Vesoulis Dr. Lavin" Bates No. 49, is this a form that your office would have authored, that you would have authored, or do you know?

    A   We would have got it from some – I can get the source, because the girl that runs my clinical side is a nurse practitioner and she was president of the Allied Health side of ASMBS, so she had good access to documents.  And so we wouldn't have authored it ourselves.  It would have been a collaborative work amongst people doing the procedure.

    Q   Okay.  So you don't know specifically as we sit here right now where it came from?

    A   I don't, but I can find out.

    Q   So it's something if I followed up with you, you could let me know?

    A   For sure.

    Q   Okay.  Other than these two consent forms, would you have given Dr. Vesoulis any other written materials that specifically addressed risks?

    A   I don't believe so.

    Q   Okay.  Do you share the Instructions for Use with your patients?

    A   The doctors' Instructions for Use?

    Q   Correct.

    A   No.

    Q   Let me ask you this.  As we sit here today, do you remember going through this particular consent process with Dr. Vesoulis for the removal of the balloon?

    A   I don't remember with any particular patient.  I just know my routine of how I do it with every patient.clinical study agreement

    (Ex. "D", Deposition of Dr. Thomas Lavin p. 66-75).

But there is a difference between an endoscopy and a balloon placement and removal.  The risk of esophageal perforation is much higher with a ReShape balloon than 1 in 10,000 which is

the risk in a simple endoscopy.  That is why ReShape states each risk separately in the IFU.  (Ex. A to MSJ, Rec. Doc. 95-1, P. 5-6).  By all indications, Dr. Lavin was under the impression that the risks were those of a simple endoscopic procedure, which they were not.  Further, Dr. Lavin's testimony says nothing of him warning of a risk of death secondary to sepsis from esophageal perforation or that a patient had died on March 29, 2016 from this condition after receiving the ReShape balloons.

### STATEMENT OF UNCONTESTED FACT 15

15. Before the implant procedure, Plaintiff signed an informed consent form, provided by Dr. Lavin that informed Plaintiff of all risks associated with the procedure, specifically including "upper gastrointestinal tract or intra-abdominal organs including perforation (tearing)." See Endoscopic Balloon Procedure Consent Form, executed 7/27/17, attached hereto as Exhibit "C," at p. 1.

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 15:

Denied.  This statement is misleading. The Informed Consent Form states "Death (very rare)" (see Exhibit C, page 1), which is false since two (2) deaths associated with the use of the ReShape device had already occurred in the past 16 months and the IFU from ReShape says nothing about a risk of death. It also states (Exhibit C, page 2), referring to perforation that "these risks are rare". They are clearly not 1 in 10,000 (see #8 above) because ReShape documented that the risk was much greater. This is both a bioethical failure of ReShape and a failure to obtain valid informed consent from the patient by Dr. Lavin.

## STATEMENT OF UNCONSTESTED FACT 16:

16. Plaintiff's explant procedure occurred on January 11, 2018.

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 16:

This statement is uncontested although there is no operative report of that procedure nor of any inspection of the gastro-esophageal junction (GEJ) by endoscopy.

## STATEMENT OF UNCONSTESTED FACT 17:

17. Before the explant procedure, Plaintiff signed another informed consent form, which notified him of the risks associated with the procedure, including "a risk of bleeding or perforation of the esophagus, stomach or duodenum." See Consent for Endoscopic Removal of Intragastric Balloon, executed 1/11/18, attached hereto as Exhibit "D," at p. 1.

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 17:

Denied.  This statement is false and misleading.  As stated in #8 above, plaintiff was asked on January 11, 2018 to sign a "form" claiming that the risk of perforation was 1in10,000, lower than the actual risk rate known to ReShape and disclosed in Ex. A to the MSJ to Dr. Lavin but not disclosed to the plaintiff when the balloons were placed on July 27, 2017.  Plaintiff, therefore, did not provide informed consent for the explant procedure when he signed Ex. D to the MSJ on January 11, 2018.  Additionally, the explant Informed Consent under "Alternatives" states:  "There are currently no alternatives to removal of the intragastric balloon". (emphasis added).   Plaintiff

was misinformed and mislead about the risks of esophageal perforation and death associated the

ReShape procedure when the balloons were implanted on July 27, 2017.

## STATEMENT OF UNCONSTESTED FACT 18:

18. "The risks are no different for either procedure." See Ex. C, Ex. D.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 18:

Denied.  ReShape admits in its IFU that the risks <u>are</u> different between an endoscopy

(EGD) procedure and one placing, and subsequently removing, a ReShape intragastric balloon.

Ex. A to MSJ, Rec. Doc. 95-1.  The procedure described by Dr. Lavin was "an easy procedure",

i.e. an EGD.  The actual procedure was of much greater risk of which the plaintiff was never

advised.

## STATEMENT OF UNCONSTESTED FACT 19:

19. Plaintiff executed the informed consent form in Dr. Lavin's presence and knew

that "there was risk of death" associated with the procedure.   See Deposition

Testimony of Dr. Paul Vesoulis, attached hereto as Exhibit "H," at p. 26, 82

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 19:

Denied.  Plaintiff testified:

Q.   Doctor, tell me about your first conversation with Dr. Lavin?
A.   Hi, how do you do, are you ready to do this, let's do It was real quick.
Q.   How long was the conversation?
A.   Not very long.
Q.   Did Dr. Lavin discuss with you again the process to be undergone in
the procedure?

A.   Real quickly, yes.  Going to sedate you, NG tube, put the balloons in, inflate them, and then you go on from there and then we take them out in six months.

Q.   Did you execute an informed consent form in front Dr. Lavin?

A.  Yes.

Q.  Did you discuss the form with him?

A.   Discuss it, probably not.  I skimmed over it.

Q.   Did you have any questions for Dr. Lavin regarding any of the risks of the procedure?

A.   Yes.

Q.   What was it?

A.   I specifically asked him, I said this is a pretty benign, safe procedure. Yes.  It's a simple scope, insert the balloons, inflate them and pull the tube out and you're good to go.

Q.   Doctor, the third point of your affidavit states, and I quote, Dr. Lavin never advised Paul Vesoulis of the deaths, or death, by esophageal tear as reported by the FDA, end quote. Do you know anybody that died from this procedure?

A.   Do I know anybody that died, no.  But I have found out subsequently that there were deaths associated with it.

Q.   Do you know when those deaths occurred?

A. I'm sure that I read it, but I couldn't tell you when.  But I was never advised that there were any deaths that had occurred.

Q.   When you say you were never advised that any deaths had occurred, when do you mean?

A.   When?  In the conversation before we put the balloons in.  Have there been any adverse occurrences, is this something safe, are you sure. Piece of cake. Never a problem.  If there is a problem, we take the balloons out.  Death was never even mentioned that it was a possibility.

Q.   Let me move on, Dr. Vesoulis.  Your testimony is that you did not know that there was a risk of death with this epigastric dual balloon procedure, correct?

BY THE WITNESS:

My understanding was that it was a very, very, very, very rare risk of death. And that was one of the -- that was probably the determining factor of me going through it, is that the risk was pretty much nonexistent.

Q.   Okay.  Thank you, Doctor. Now, let's take a look at the consent form.

A.   But if I can interrupt.  Some consent forms or some products that I've seen talk about percentages of death and risk of death.  And some being more than

22

others. So like everything else, there's gauges and there's amounts of risk and so
forth. So I think that's a clear point that should also be made.

    Q.  Sure.

    A.  And the way that you're putting it is any risk.  I could walk out and trip
on the front sidewalk, and so are we going to go after everybody that puts a step on
a sidewalk?

    Q.  Okay.  So at this point we don't know if it's -- you don't know if it's a
higher percentage or a lower percentage, correct?

    A.  That's correct.  Except my consent form said there was a very, very,
very rare chance.  On the first one.  And on the second one, on the second one
they gave a number that they didn't give on the first one.

    (Ex. "C" Deposition of Paul Vesoulis).

## STATEMENT OF UNCONSTESTED FACT 20:

20. Prior to Plaintiff's procedure, he did not do any internet research on the procedure,

did not research the ReShape balloon, did not get on ReShape's website, did not

contact ReShape, and did not look at or review any ReShape marketing materials.  See

id at p. 16, 71-72, 67-68, 94.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 20:

    Denied as irrelevant.  First, any "patient facing information" was never approved, and

would not have been approved, by the FDA as this was a prescription device.  See, PMA Order

(Ex. "A", p. 1) and Ex. A to MSJ, IFU, (Rec. Doc.95-1, p.1) Consequently, the learned

intermediary doctrine dictates that treating physician must be warned under the LPLA, not the

patient.  *Stahl v. Novartis Pharmaceutical Corp.* 283 F.3d 254, 263-266 (5th Cir. 2002).  Secondly,

these materials say nothing whatever about the possibility of death and are microscopic in size.

Plaintiff cannot be faulted for failing to read defective warnings or instructions that violate FDA

regulations.  Thirdly, Dr. Lavin testified that he did not provide the plaintiff with any information (Ex. "D", p.72-73).

## STATEMENT OF UNCONSTESTED FACT 21:

21. On June 30, 2014, the balloon's PMA application was submitted to Center for Devices and Radiological Health of the FDA. See FDA Medical Device Database Website (www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P140012), PMA of ReShape Integrated Dual Balloon System, printed page attached hereto as Exhibit "E."

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 21:

Uncontested.

## STATEMENT OF UNCONSTESTED FACT 22:

17. The FDA approved the application and found the balloon safe for commercial sale and distribution on July 28, 2015. See id.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 22:

It is uncontested that the FDA approved the PMA, however, the approval was subject to the filing of Annual Reports, the conduct of a PAS with the proviso that "the results from any Post Approval Study should be included in the labeling as those results become available", compliance with reporting adverse events and that all "device labeling must be truthful and not misleading". As the PMA Order and ReShape's failure to comply with it form the basis of plaintiff's claims, it

is attached as (Ex. "A").  The IFU approved by the FDA in conjunction with the PMA approval is

Ex. A to the MSJ, (Rec. Doc. 95-1).

<strong><u>STATEMENT OF UNCONSTESTED FACT 23:</u></strong>

18. The balloon is classified as a Class III medical device. See id.

<strong><u>RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 23:</u></strong>

Uncontested.

<strong><u>STATEMENT OF CONTESTED FACTS</u></strong>

The following facts are contested:

<strong><u>CONTESTED ISSUE OF FACT 1:</u></strong>

Whether Paul Vesoulis D.D.S. (not M.D.) would have undergone this procedure at all had

he been properly warned of the risks by Reshape, Dr. Lavin and/or LSS.  Had plaintiff been warned

of these deaths and the true risks involving this purely elective procedure he would have withheld

his consent and declined the balloon placement on July 27, 2017.  See, Deposition of Paul Vesoulis,

(Ex. "C", p. 70-71, 97).  This presents an issue of fact that can be resolved only by the factfinder.

The degree of fault to be allocated among the parties also presents issues enshrouded in fact.

<strong><u>CONTESTED ISSUE OF FACT 2:</u></strong>

Whether the labeling in the Patient Information was false and misleading and, therefore,

failed to comply with 21 U.S.C. §352 (A)(1), with the PMA Order and with FDA regulation 21

CFR § 801 regarding size and placement of warnings and with 21 CFR 814.84 because the prior

deaths were not transmitted or made known to the treating physicians.  See, Report of Dr. George

25

Samaras, Ex. G to Reshape MSJ, p. 19, and whether Reshape breached its federal duties to warn

or whether the FDA actually approved the use of this microscopic print, present questions of fact.

The PMA Order requires compliance with 21 C.F.R. 814.39 which does <u>not</u> require submission to

the FDA of "newly acquired information that enhances the safety of the device or the safety in the

use of the device". 21 C.F.R. 814.39(d)(1) including "Labeling changes that add or strengthen a

warning, precaution, or information about an adverse reaction for which there is reasonable

evidence of a casual association" and "Labeling changes that delete misleading, false, or

unsupported indications." 21 C.F.R. 814(d)(2)(i) and (iii).

<u>**CONTESTED ISSUE OF FACT 3:**</u>

It is admitted by both Reshape, Dr. Lavin and LSS that ReShape did <u>not</u> transmit the MDR

reports from the March 29, 2016 death secondary to esophageal perforation and May 10, 2017

death from aspiration to Dr. Lavin or SSL. Ex. E. ReShape failed to comply with 21 CFR §

814.39(d)(2) which does <u>not</u> require PMA supplements to be approved by the FDA prior to a

labeling change. Reshape's degree of fault must be weighed by the factfinder in assigning degrees

of fault. Compliance with 21 CFR 814.39 is called for in the PMA Order.

The corporate deposition of ReShape is attached as (Ex. "E"). This deposition was resisted

by ReShape and taken last and only after being ordered by the U.S. Magistrate. In that deposition

Ms. Mary Lou Mooney as corporate representative states that she worked for ReShape as Vice

President, Clinical and Quality until September, 2017, (Ex. "E", p. 15) at which time she was

replaced by Ms. Deborah Schmalz. (Ex. "E", p. 16). Only at that time after Ms. Mooney had left

26

ReShape, were the deaths associated with the ReShape balloons sold added as a "risk" to the IFU. (Ex. "F")  Ms. Mooney candidly admitted that post PMA approval it was entirely possible for ReShape to have calculated adverse events using the number of balloons actually sold and include in the IFU or a Letter to Healthcare Providers actual adverse events, including deaths.  (Ex. "E", p. 23), that the IFU stated that there were "No Deaths", (Ex. "E", p.40), and that the FDA's regulations specifically allow updating an IFU and communicating same to physicians without FDA approval.  (Ex. "E", p.42).  Ms. Mooney admitted that ReShape's "... obligation is to report the events we know have been seen, in the clinical study, or in practice...", (Ex. "E", p.47), yet ReShape reported adverse events only through MAUDE reports and only to the FDA, and did not communicate them to the treating physician.  (Ex. "E", p.22, 34, 36-37, 38-40, ("The FDA doesn't tell manufactures what they, you know, can and can't send", p.45-49, p.52-54, p.69-76).  Only when the FDA sent a Dear Doctor letter on August 10, 2017 did ReShape send a letter to Healthcare Providers.  ReShape's Corporate deposition pursuant to FRCP Rule 30(b)(6) stated:

> Q    Okay.  Why did you write this particular letter of August 10, 2017, to ReShape health care providers?  Was this in response to what the FDA Dear Doctor Letter had said?
> A    Yes.  This was to give additional information that related to that communication from the FDA.
> Q    If you look at the second paragraph, it says, "ReShape has received one additional report of death from sepsis, secondary to an esophageal perforation, that was diagnosed 30 days post-insertion."  Is that sentence referring to the death that occurred on March 29, 2016?
> A    I -- I can't say for certain, with  just that general statement.
> Q    Are you familiar with another death that occurred --
> A    No.
> Q    -- from sepsis, secondary to esophageal perforation?

A   I am not, so it is likely that one, but I don't have any way to -- it doesn't call out the exact report, but I am not aware of any other event, so that would imply, it's the same event.

Q   <u>And ReShape was aware, from the date of that death forward, that that was a death from sepsis, secondary to esophageal perforation, was it not?</u>

A   Yes, as was FDA, and reported in the MAUDE MedWatch report.

Q   Only?

A   Excuse me?

Q   That was reported in the MedWatch or the MAUDE database, to the FDA, correct?

A   Correct.

Q   There were no subsequent discussions regarding that particular death, is that true?

A   Correct.

Q   And the treating physicians were not advised of that particular death in the instructions for use prior to July 27, 2017, is that true?

A   Yes, the instructions were not updated, and there is no provision or a requirement to send MAUDE reports to physicians.

(Ex. "E", 74-76), (emphasis added).

Ms. Mooney also testified that the Corrective and Preventive Action (CAPA) Board met on the March 29, 2016 death on November 28, 2017, well <u>after</u> plaintiff's balloon insertion on July 27, 2017 and after Ms. Mooney had left ReShape.  She stated:

Q   Isn't it true that the risk of esophageal perforation, as set forth in the IFU, had occurred in the original clinical trial?

A   The risk of esophageal perforation is identified in the IFU, yes.

Q   And if you look at ReShape 71923, it says, quote, "The product labeling warns of the possible risk of perforation and death."

A   Let me see.  71923?

Q   It's the next page, the previous page from what we were just looking at.

A   Let's see.  The product labeling warns of the possible risk of perforation and death; however, in this case, there is no known -- yes, I see that statement.  I don't know which revision of the IFU this statement is referring to.  Because, again, recognize, this paragraph is from November of 2017.  It should be referring to whatever the current revision of the IFU was at that time.

Q      Do you know whether the IFU, in fact, warned about, quote, "The possible risk of perforation and death," unquote, or does it only warn about the possible risk of perforation?

THE WITNESS:

The Revision G that we reviewed in these documents I've been given identified perforation, but not death.

(Ex. "E", p. 111-112)

## CONTESTED ISSUE OF FACT 4:

Whether Reshape failed to comply with the PMA Order and 21 CFR 814.39 by not

applying for a PMA Supplement or notifying Dr. Lavin by a Letter to Healthcare Providers when

Reshape became aware of two (2) deaths involving its device presents an issue of contested fact.

Regarding the initial MAUDE Report to the FDA reporting the March 29, 2016 death by sepsis

secondary to esophageal perforation,  Ms. Mooney testified:

Q    The last page of that document, it's ReShape Document 048204, under "Additional Manufacturer Narrative," No. 10, it states, quote, "There is no known allegation from a health professional that the patient death was related to the device," unquote.

A    I'm trying to locate that.  Okay. I see the main report.

THE WITNESS:

Oh, I see it, okay.  Yes, I see that.

EXAMINATION BY MR. SHAW:

Q    Do you know who wrote that?

A    That would be whoever completed this form, so, again, that was either myself or my regulatory director.

Q    Did you have any discussions with the treating physician regarding this particular incident?

A    The treating physician would have provided the information we received, in terms of the event and sequela.

Q    Isn't it true that esophageal perforation is a risk of using the ReShape intragastric balloons?

A    Yes.  That's in the device labelings.

29

Q     Was it true that this patient suffered from esophageal perforation, as reported by the treating physician?

A     That's what's in the description above, yes.

Q     So that esophageal perforation was not related to the device use, or was it?

A     Well, the death was sepsis, so the statement from the physician was what the physician provided.  Or lack of a statement from the physician.  That's what this statement actually says.  There wasn't a statement provided that the death was related to the device.

Q     As of the time of this death, in March of 2016, were you aware that sepsis can be secondary to esophageal perforation?

A     I'm not a medical professional.  I have general knowledge of that being a possible sequela of any sort of surgical issue.

(Ex. "E", p. 29-31).

But Ms. Mooney later testified confirmed that she <u>knew</u> this death was from sepsis secondary to esophageal perforation on March 29, 2016 and never communicated this to treating physicians such as Dr. Lavin.  (Ex. "E", p. 74-76).  And Dr. Lavin's expert witness, Dr. George Woodman, who conducted the ReShape Pivotal Trial contained in the IFU confirmed that esophageal perforation "...could lead to sepsis." (Ex. "E", p.40-41).

**CONTESTED ISSUE OF FACT 5:**

Whether ReShape, Dr. Lavin, <u>or both</u> were under a duty to warn of risks as set forth in the Instructions for Use.

**CONTESTED ISSUE OF FACT 6:**

Whether ReShape violated 21 CFR 814.84 as set forth in the PMA Order by failing to supply information required in Annual Reports.

30

## CONTESTED ISSUE OF FACT 7:

Whether the labeling was "false or misleading" under 21 U.S.C. § 352(A)(1), causation and degree of causation.

## CONTESTED ISSUE OF FACT 8:

Whether ReShape violated 21CFR 814.39 by failing to provide post-PMA "newly acquired information" to Dr. Lavin and other healthcare providers.

Plaintiff submits that the following facts are established and demonstrate issues of fact.

1.      On March 29, 2016 a patient receiving Reshape Dual Intragastric balloons died from sepsis secondary to esophageal perforation.  (Ex. "G", Reshape 048202-048204).  Reshape was notified on March 21, 2016.  (Ex. "G", Reshape 048203). An MDR report was filed by Reshape but not sent to the treating physician.

2.      On July 25, 2016, ReShape filed with the FDA an Annual Report as required by 21 CFR 84 and the PMA.  (Ex. "H").  ReShape made no labeling changes.  (Ex. "H", p. 31, Reshape 146219).  The Instructions for Use continued to show zero (0) deaths.

3.      21 CFR 814.39(d)(1) and (d)(2), provide that the filing of a Post PMA Supplement and FDA approval thereof is <u>not</u> required before a labeling change is made for safety reasons.

> (d)(1) After FDA approves a PMA, any change described in paragraph (d)(2) of this section to reflect <u>newly acquired information</u> that enhances the safety of the device or the safety in the use of the device may be placed into effect by the applicant prior to the receipt under §814.17 of a written FDA order approving the PMA Supplement.....

(2)     The following changes are permitted by paragraph (d)(1) of this section:

(i)     Labeling changes that add or strengthen a contraindication, <u>warning</u>, precaution, or <u>information about an adverse reaction</u> for which there is reasonable evidence of a casual association.

(ii)     Labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device.

(iii)     Labeling changes that delete misleading, <u>false</u>, or unsupported indications.  (emphasis added).

ReShape continued reporting that there had been <u>no</u> deaths of patients receiving the ReShape balloons to the patient and the treating physician.

4.     In January 2017, ReShape provided to the FDA an Amendment to PMA Annual Report P140012, (Ex. "I", Reshape 146413-146454), stating again that there were <u>no</u> labeling changes, (Ex. "I", p. 33, Reshape 146445) and adding two (2) research articles.

5.     On February 9, 2017, the FDA issued a "Dear Doctor Letter" warning of spontaneous hyperinflation of balloons after placement in patients and acute pancreatitis. (Ex. "J").

6.     In the February 2017 issue, the Journal of Anesthesia and Analgesia published a letter authored by Mark A. Burbridge, M.D. and Clarity Coffman, M.D., Depart of Anesthesiology, Perioperative and Pain Medicine, Stanford University School of Medicine, entitled **"High Risk of Aspiration in Patients with ReShape Intragastric Balloon Weight Loss System".**  Feb. 2017, Vol 124, Issue 2, p. 703.  (Ex. "K").

7.      On April 20, 2017, the FDA approved changes to the Instructions for Use and Patient Information Guide for the ReShape balloons, Exhibit A to the reurged MSJ of ReShape, Rec. Docs. 95-4, 95-5, to warn of acute pancreatitis.  There was no warning of death from esophageal perforation or aspiration.

8.      On May 10, 2017, a patient receiving ReShape balloons aspirated and died. (Ex. "M", Reshape 270206-270208).  Reshape was notified on May 11, 2017 and filed an MDR.

9.      On May 18, 2017, ReShape emailed to Dr. Lavin revised Instructions for Use, which specifically provided at p. 5 that "It is important to discuss <u>all</u> possible complications <u>and adverse events</u> with the patient".  (emphasis added).  (Ex. "N", p. 5, Reshape 000006) and Ex. A to Reshape's MSJ (without Dr. Lavin email), (Rec. Doc. 95-1).  No mention is made of the possibility of "death", in general, from esophageal perforation, aspiration, or otherwise in the Patient Information Guide. Exhibit B to MSJ, (Rec. Doc. 95-2).  The word "death", in general, from esophageal perforation or aspiration, similarly does not appear in the Instructions for Use, except and only in the event the device deflates, migrates and causes a bowel obstruction.  Ex. A to Reshape's MSJ, p. 6, ReShape-00007.  ("Death due to intestinal obstruction is possible and has been reported with other intragastric balloons").   The only substantive change to the Instruction for Use was the addition of the risk of acute pancreatitis.

10. It is admitted that MDR reports of the death from esophageal perforation on March 29, 2016 and from aspiration of May 10, 2017 were not provided by ReShape to Dr. Lavin or LSS. (Ex. "L").

11.     Plaintiff's balloons were inserted on July 27, 2017.

12.     21 CFR 814.84(b)(ii) provides that Annual Reports include:

"<u>Reports</u> in the scientific literature concerning the device and known to or that <u>reasonably should be known</u> to the applicant". (emphasis added)

13.     On July 27, 2017, ReShape filed an Annual Report with the FDA.  (Ex. "O", Reshape 146833-146864).  Signed by Mary Lou Mooney, ReShape states that "There were no reportable label changes during the reporting period" which is noted to be July 5, 2016 to July 5, 2017.  (Ex. "O", p. 23, ReShape 146841).  Further, ReShape does not list or alert the FDA to the reporting by Drs. Burbridge and Coffman via a letter to the editor in the Journal of Anesthesia and Analgesia, "High Risk of Aspiration in Patients with ReShape Intragastric Balloon Weight Loss System" in violation of the PMA and 21 CFR 814.84(b)(ii).  (Ex. "O" p. 25, Reshape 146863).

14.     On August 10, 2017, (fourteen days after plaintiff was implanted) the FDA issued another "Dear Doctor Letter". (Ex. "P").  The FDA warned of five patient deaths.  Of note is that there was one death reported with "esophageal perforation with the ReShape Integrated Dual Balloon System".

15.     Also, on August 10, 2017 Ms. Mary Lou Mooney, ReShape Vice President, Regulatory, Clinical & Quality wrote to ReShape Health Care Providers.  (Ex. "Q").  The letter contains this sentence:  "ReShape has received one additional report of death from sepsis secondary to esophageal perforation..."  This death had occurred in March of 2016.  The letter says nothing about the May 2017 death from aspiration.

16.     On August 14, 2017 a patient of Dr. Lavin with ReShape balloons sustained a gastric perforation and had emergency surgery.  (Ex. "R").  Plaintiff was <u>never</u> advised of this event.

17.     The ReShape PAS Clinical Study Agreement, (Ex. "S"), states in paragraph 2.12 that:

> 2:12     <u>Duty to Inform.</u>  Sponsor [Reshape] and Institution [Dr. Lavin] shall immediately notify each other upon identifying any aspect of the protocol, including information discovered during site monitoring visits, or the study results that may adversely affect the safety, well-being, or medical care of participants, or that may affect the willingness of participants to continue participation in the research, influence the conduct of the study, or that may alter the Institutional Review Board's approval to continue the study.

18.     On August 15, 2017 Diane Begovich for ReShape communicated by email with Dr. Lavin's PAS coordinator, Jennifer Perilloux. (Ex. "T").  This email was produced by Dr. Lavin after he was brought into this case.

Ms. Begovich wrote:  "At his point, ReShape is leaving it to the sites to determine how to share info in the FDA update with current and future ReShape Procedure patients (both study and non-study participants)".

To which Ms. Perilloux replied:  "The statement under new findings states that any new information that is discovered during the study and which may influence your willingness to continue participation in the study will be made available to you.  I don't understand how the recent news would not need to made available to every study patient?"

Ms. Begovich makes it plain that prior patient deaths were not communicated to Dr. Lavin or SSL, whether study or non-study.  Ms. Perrilloux makes it equally plain that these prior adverse events of death should have been communicated.  Ms. Begovich testified (Ex. "T):

> Q      Okay.  The Instructions For Use should be followed by the physicians that place balloons, both study participants and non-study participants.  Would you agree with that?
> THE WITNESS:
> I agree.
> Q      And you would agree that ReShape LifeSciences should also follow Instructions For Use in connection with physicians being notified of adverse events, study participants or non-study participants.  Would you agree with that?
> THE WITNESS:
> I agree.

Respectfully submitted,


/s/*Franklin G. Shaw*
LEGER & SHAW
Franklin G. Shaw, Bar No. 01594
Walter J. Leger, Jr., Bar No. 88278
512 E. Boston St.
Covington, LA 70433
Telephone: 985-809-6625
 Facsimile: 985-809-6626

## CERTIFICATE OF SERVICE

I hereby certified that a copy of the above and foregoing pleading has been served upon all counsel of record by using the CM/ECF filing system, this 20th day of April 2021.


/s/*Franklin G. Shaw*
Franklin G. Shaw

36