PAUL VESOULIS on 09/11/2020

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5 PAUL VESOULIS    ) CIVIL ACTION:
  Plaintiff,   ) 19-CV-01795-
6       ) MLCF-DMD
 vs.     ) JUDGE: MARTIN
7      ) L.C. FELDMAN
 RESHAPE LIFESCIENCES, f/k/a  ) MAGISTRATE:
8 ENTEROMEDICS INCORPORATED  ) DANA M. DOUGLAS
  Defendant.    )
9 _____

10   DEPOSITION OF PAUL VESOULIS taken on

11 Friday, September 11, 2020 at or about 8:45 a.m.

12 via videoconference.

13

14

15 REPORTER: KIMBERLY D. EDWARDS, CSR,
   Certified Court Reporter
16

17 APPEARANCES:

18 FOR PLAINTIFF:
   LEGER & SHAW
19   512 East Boston Street
   Covington, Louisiana 70433
20   (985) 809-6625
   Fshaw@legershaw.com
21   BY: FRANKLIN SHAW, ESQUIRE

22

23

24

25



EXHIBIT
C

Page 6

1  Cincinnati from 1978 to 1982. I went to Case
2  Western Reserve dental school from 1982 to 1986.
3      Q.   In your undergraduate career, what was
4  your major?
5      A.   Biology, with a minor in chemistry.
6      Q.   Did that curriculum include any anatomy
7  or physiology classes?
8      A.   Yes.
9      Q.   In your dental school curriculum did
10 you study any anatomy or physiology?
11     A.   Yes.
12     Q.   Do you recall where you graduated in
13 your dental school class?
14     A.   Out of my class we had a couple
15 different rankings. We had both didactic and
16 clinic. So I don't remember exactly, but I assume
17 I was in the middle of the pack academically and
18 then towards the high end clinically.
19     Q.   Do you have any recollection of where
20 you graduated in your undergraduate class?
21     A.   Not a clue. Good enough to get into
22 dental school.
23     Q.   Was that a rigorous process?
24     A.   It was a pretty intense program. Sure.
25 Most professional schools.

Page 7

1      Q.   Did you apply for any dental school
2  other than Case Western?
3      A.   Yes.
4      Q.   Where?
5      A.   At that time it was probably ten, ten
6  different schools. It's normal to apply to
7  multiple schools hoping to get in at a few and then
8  you make your choice on where to go.
9      Q.   Did you gain entrance into any other
10 school besides Case Western?
11     A.   Yes.
12     Q.   Do you recall where?
13     A.   A few of them I recall. West Virginia,
14 Marquette. I was waitlisted at a couple places.
15 And I believe Ohio State.
16     Q.   Where did you grow up, Doctor?
17     A.   Cincinnati, Ohio.
18     Q.   So when you went to the University of
19 Cincinnati, you basically stayed home?
20     A.   Yes. I was a commuter. I lived at
21 home.
22     Q.   Where is Case Western?
23     A.   Cleveland, Ohio.
24     Q.   How far is that from your hometown?
25     A.   About a five hour drive.

Page 8

1      Q.   How far is Case Western from where you
2  currently reside and practice?
3      A.   About two and a half hours.
4      Q.   Was Case Western your first selection
5  on dental schools?
6      A.   Yes.
7      Q.   Why?
8      A.   It had what I thought was a better
9  academic program. Smaller class size. I had
10 family that lived in Cleveland. Those three
11 reasons.
12     Q.   Doctor, we're going to talk a little
13 bit about your care by Tom Lavin. First what I
14 would like to ask you is how you came to know or be
15 in contact with Dr. Lavin?
16     A.   I met -- I was introduced to him from a
17 mutual friend who is from Toledo, Ohio.
18     Q.   Who is that?
19     A.   An individual named John Thomas.
20     Q.   Mr. Thomas was a friend of Dr. Lavin's?
21     A.   Yes.
22     Q.   And he's a friend of yours?
23     A.   Yes, he's a friend of mine.
24     Q.   Did you meet Dr. Lavin socially through
25 Mr. Thomas?

Page 9

1      A.   No.
2      Q.   So how did that occur?
3      A.   How did?
4      Q.   How did you meet Dr. Lavin through Mr.
5  Thomas?
6      A.   I had run into Mr. Thomas, noticed that
7  he had lost some weight and asked him how he had
8  achieved it. That's when he had told me about Dr.
9  Lavin in Louisiana, and I became interested. And
10 he said that I could make the connection for you to
11 talk with him.
12     Q.   And what happened after that?
13     A.   I can't remember if Dr. Lavin called me
14 or I called him. We discussed what it was and what
15 he did and the results that he could achieve from
16 it. I told him that I was interested in it and he
17 said come on down.
18     Q.   In that initial conversation what, as
19 far as you can recall, did you discuss with Dr.
20 Lavin?
21     A.   Just what the procedure was. That it
22 was nothing like the more invasive gastric
23 procedures, you know, bypass and sleeves and other
24 ones that -- other procedures that were out there
25 that were more surgical. That this was a pretty --

Page 10

1 this was a pretty benign procedure that was very
2 noninvasive and showed really good results.
3     Q.   When you say what the procedure was,
4 what do you mean?
5     A.   It was nothing that was irreversible,
6 and that it was not an invasive surgical procedure.
7     Q.   I guess what I'm trying to get at is
8 you've told me that Dr. Lavin told you what the
9 procedure was.  What was that?
10     A.   That they would insert some balloons
11 into my stomach.  They would stay in there for a
12 certain amount of time and then they would pull the
13 balloons out.
14     Q.   Was it your understanding that that was
15 the procedure that Mr. Thomas had undergone?
16     A.   Yes.
17     Q.   What did Mr. Thomas tell you about the
18 procedure?
19     A.   Mr. Thomas told me that he had it done
20 and that he had -- it had given him a jump start to
21 lose weight and that it worked for him.
22     Q.   In what profession is Mr. Thomas?
23     A.   Mr. Thomas is a business owner.  He
24 basically runs a REIT organization, which I think
25 that's how he knows Dr. Lavin, because he's an

Page 11

1 investor within Dr. Lavin and his facilities in
2 Louisiana.  And my understanding was is that's how
3 he had met Dr. Lavin, and that he was an actual
4 participant or a partner in both his private office
5 and a hospital in Louisiana.
6     Q.   Do you do any business with Mr. Thomas?
7     A.   Yes.
8     Q.   As far as you're aware, do you have any
9 ownership interest in any of the REIT's holdings in
10 Louisiana?
11     A.   Actually, I'm an investor in his
12 company, which is DOC REIT, and I am an investor in
13 DOC REIT.  So I would be part -- I would have a
14 position in those holdings in those areas as well
15 as other places across the country.
16     Q.   Specifically in which Dr. Lavin also
17 holds an interest?
18     A.   I would assume so.
19     Q.   When you talked to Dr. Lavin the
20 initial time and you discussed the balloon
21 placement procedure, did you discuss any other
22 procedures?
23     A.   If I did I really don't remember.  I
24 just remember that I was particularly interested in
25 this one because it was noninvasive and

Page 12

1 nonsurgical.  And I have known people that have had
2 the gastric bypass and the sleeves and so forth and
3 that was a pretty more involved surgery.
4     Q.   If I understood you, you don't remember
5 specifically if Dr. Lavin called you initially or
6 you called him initially; is that right?
7     A.   Right.  I don't remember.
8     Q.   Irrespective --
9     A.   I know phone numbers were transferred,
10 and I don't know who reached out to who first.
11     Q.   I understand.  Irrespective of who
12 first made contact, did the conversation start with
13 you asking Dr. Lavin tell me about the balloon
14 placement?
15     A.   I had asked him to explain the
16 procedure to me and he explained it to me, that it
17 was basically a very easy, noninvasive procedure
18 that I could fly in and fly out.  And that's
19 basically what I did, I flew in and flew out and
20 had it put in.
21     Q.   I didn't quite understand your answer
22 or hear you completely.  Did you say an ED
23 procedure?
24     A.   An easy.
25     Q.   Easy.  See, I didn't understand that.

Page 13

1     A.   An easy procedure.
2     Q.   So when you say -- and you've used the
3 term "noninvasive" a couple of times in your
4 responses.  Did you understand that the balloons
5 would be placed inside your stomach through an EGD
6 procedure?
7     A.   Yes.  He told me it was through an
8 upper endoscopy.
9     Q.   In your mind that's noninvasive?
10     A.   I was told that upper GIs are very
11 noninvasive and very simple and very, very, very
12 rare side effects to them.  Simple.  Basically he
13 had said simply sedate you, drop it in, inflate
14 them and you go home.
15     Q.   But my question is very specifically
16 does an endoscopy procedure, in your mind, equate
17 with noninvasive?
18     A.   Yes.
19     Q.   Does Dr. Lavin use the term
20 "noninvasive" when describing the procedure?
21     A.   I believe so.
22     Q.   Did you by chance record any of your
23 telephone conversations with Dr. Lavin?
24     A.   No.
25     Q.   After that initial telephone

PAUL VESOULIS on 09/11/2020

Page 14

1 conversation what happened next insofar as your
2 communications with Dr. Lavin?
3      A.   Basically he had told me to call the
4 office and tell them when I was available and make
5 arrangements to fly down there.  And that was it.
6      Q.   So when did you do that?
7      A.   I think the next day or two afterwards.
8      Q.   And how soon after that did you
9 actually fly to Louisiana?
10      A.   Probably a couple weeks.  Within two or
11 three weeks.
12      Q.   On that first visit to Louisiana, is
13 that when you actually had the balloons placed?
14      A.   Yes.
15      Q.   So we're talking July of 2017?
16      A.   Correct.
17      Q.   The date on which you had the balloons
18 placed, was that the first time you ever met Tom
19 Lavin in person?
20      A.   Yes.
21      Q.   Before you ran into Mr. Thomas and
22 noticed his weight loss, had you done any research
23 on any type of bariatric procedures for weight
24 loss?
25      A.   Research, no.  I just knew other people

Page 15

1 that had tried different things.  You know,
2 everything from bariatric surgery to the bands to
3 bypass and so forth.  And I had never really heard
4 of this procedure until Mr. Thomas had told me
5 about it.
6      Q.   Had you ever inquired with any other
7 healthcare professional before you spoke with Dr.
8 Lavin about potential weight loss procedures of any
9 kind?
10      A.   When I had learned about this
11 procedure, I spoke with my internist and my
12 orthopedic surgeon because I was anticipating a
13 knee surgery later in August and I wanted to make
14 sure it was okay with them that I went ahead and
15 did this.
16      Q.   And I understand your answer.  I
17 appreciate it.  But I'm not sure it fully answers
18 my question.  Before your discussion with Dr. Lavin
19 about any sort of a weight loss procedure, had you
20 actually sought the advice of another healthcare
21 provider to have any sort of weight loss procedure
22 performed on you?
23      A.   No.  No.  So the answer is no on that.
24      Q.   Had you ever discussed with your
25 internist prior to your first conversation with Dr.

Page 16

1 Lavin any method of weight loss?
2      A.   I had tried different things, of
3 course.  Everybody tries different diets whether
4 it's the Miami or Atkins or whatever.
5      Q.   I understand.  But no discussions with
6 your internist about potentially seeing a bariatric
7 surgeon?
8      A.   No.
9      Q.   And before you actually arrived in
10 Louisiana did you do any internet research on the
11 procedure that you anticipated having performed?
12      A.   I don't recall looking into it.  I
13 basically took it on recommendation and my
14 conversation with Dr. Lavin.
15      Q.   Do you at your office as a general
16 dentist subscribe to any online healthcare research
17 sites?
18      A.   Yes.
19      Q.   Did you research any of those sites
20 regarding the procedure you anticipated having
21 performed?
22      A.   No.
23      Q.   Would you have had access to research
24 on that particular procedure via your sites?
25      A.   That I'm not sure of because the sites

Page 17

1 that I use are mostly for therapeutics and some of
2 the new drugs that are coming out and patients
3 coming in with new drugs.  And it's like okay, I
4 don't recognize this as being a typical one.  And
5 that's mainly what my extent of what I would be
6 looking for.
7      Q.   What are the names of the subscriptions
8 that you have access to?
9      A.   Like WebMD.  And then we have -- and
10 then if that doesn't give me specific enough
11 questions, then I'll call my pharmacist and I'll
12 ask him hey, is it something that's even newer
13 that's not even -- hasn't even hit that site.
14      Q.   What's your internist's name?
15      A.   David Grossman.
16      Q.   Is he a personal friend of yours?
17      A.   I have known him for 30 something
18 years.  So yes, I would probably say he's a friend
19 of mine.
20      Q.   Do you socialize with him?
21      A.   Socialize with him, very rarely.
22      Q.   Do you socialize with any physicians?
23      A.   With any physicians, no.
24      Q.   Any other family members who are
25 physicians?

PAUL VESOULIS on 09/11/2020

18..21

Page 18

1    A.   My older brother.
2    Q.   In what specialty does he practice?
3    A.   He's a pathologist.
4    Q.   Did you have any conversations with
5  your brother regarding the procedure that you
6  anticipated Dr. Lavin performing before you had
7  that procedure?
8    A.   No.
9    Q.   Where does your brother practice?
10   A.   He's retired.
11   Q.   Where did he practice?
12   A.   He practiced in a few different areas.
13  In Hudson, Ohio and then New York and in Illinois.
14   Q.   Doctor, before July of 2017 had you
15  ever had an upper endoscopy performed?
16   A.   Not that I recall. I've had lower.
17  I've had colonoscopies. I don't recall uppers.
18   Q.   And that would have been my next
19  question. So you have had colonoscopies prior to
20  July 2017?
21   A.   That's correct.
22   Q.   On how many occasions?
23   A.   Well, we have a familial history so I
24  was on the 3 to 5-year plan. So since my first one
25  I have -- I probably have had 4 or 5 colonoscopies

Page 19

1  including, I had had a recent one that was -- there
2  was complications from it because of my surgeries.
3    Q.   Other than the colonoscopies, Doctor,
4  have you ever had any other surgical procedures
5  throughout your life?
6    A.   Yes.
7    Q.   Before July of 2017?
8    A.   Yes.
9    Q.   Which procedures?
10   A.   I had my right knee replaced, and that
11  would have been approximately 14 years ago. I had
12  a gallbladder removed I think in 2015. '15 or '16.
13  I don't remember when. Those are the two surgeries
14  I had prior.
15   Q.   Doctor, before each of the
16  colonoscopies, before your right knee replacement
17  and before your cholecystectomy, did you execute a
18  consent to have those procedures done?
19   A.   I would assume so.
20   Q.   And before each of those procedures did
21  you execute a consent to undergo the anesthesia
22  that was necessitated by those procedures?
23   A.   I'm assuming that's the protocol.
24  I would assume that I did.
25   Q.   And before each of those procedures did

Page 20

1  you discuss with each of your physicians and the
2  respective anesthesia team the risks associated
3  with the procedures and the anesthesia?
4    BY MR. SHAW:
5        Object to the form. It's like
6    compound. Which? The anesthesia?
7    BY MR. POIRIER:
8        If you know of an easier way to do it
9    I'll be happy to try it.
10   BY MR. SHAW:
11       Well, the physician doing the procedure
12   is separate from the anesthesiologist. Just
13   my point.
14   BY MR. POIRIER:
15       Okay. Duly noted.
16  BY MR. POIRIER:
17   Q.   Dr. Vesoulis, we'll drag it out each
18  time. Did you have the opportunity to discuss with
19  your physician performing the colonoscopies on you
20  4 to 5 times, before each procedure, the risks
21  associated with that procedure?
22   A.   The risks, I don't recall discussing
23  the risks. I recall them telling me about the
24  procedure, what they're going to give me, how long
25  I would be out for and that type of stuff. The

Page 21

1  risks always seemed to be in the paperwork that
2  always had the big death word on there, from
3  everything from blowing your nose to doing
4  whatever. So.
5    Q.   So you recall actually seeing those
6  consent forms for your colonoscopies?
7    A.   I remember signing consent forms. I
8  have consent forms in my office.
9    Q.   You mentioned that you never discussed
10  risks with your physician performing the
11  colonoscopies?
12   A.   Never to the extent of it -- a
13  colonoscopy was another pretty benign procedure.
14   Q.   Would you consider a colonoscopy a
15  noninvasive procedure?
16   A.   Yes.
17   Q.   And in fact you went ahead with that
18  procedure 4 to 5 times before July of 2017?
19   A.   Yes, because of family history. And
20  even though I wasn't supposed to, you know, you're
21  not supposed to have them until 55, but I had them
22  before because there was a family history.
23   Q.   You didn't consider any of those 4 to 5
24  colonoscopies that occurred prior to July of 2017
25  emergent, did you?

Page 70

1 were deaths?
2     A.    I saw it on the internet.  I saw that
3 there was reported cases on the internet, that
4 there was adverse occurrences with this product.
5     Q.    Where did you look?
6     A.    I don't remember the website.
7     Q.    You don't know.  Okay.
8     A.    Google it and things pop up.
9     Q.    Okay.
10     A.    And so I don't know the exact site.
11     Q.    Would you have looked like on the MAUDE
12 database?  Do you know what that is?
13     A.    No.
14     Q.    Okay.  Do you know if you would have
15 looked on an FDA website?
16     A.    To be honest with you, I really, really
17 don't know.
18     Q.    Okay.  So where did you get the
19 information that whatever it was, the deaths that
20 you saw, are associated with the balloon?
21     A.    When I was on the internet and I looked
22 they said that there was deaths associated with the
23 ReShape product.
24     Q.    How many?
25     A.    There were a few.

Page 71

1     Q.    More than five?
2     A.    I don't recall the exact number.  But I
3 was alarmed.  That was alarming that there were any
4 deaths with it.  And if there were, then I probably
5 would not have had the procedure done because I was
6 told that it was not a -- it was such a lame
7 procedure that I probably would not have done if I
8 had known that there was a death associated with
9 it.
10     Q.    Who told you that it was, what did you
11 say, a lame procedure?
12     A.    I was told by Dr. Lavin that it was
13 such an easy procedure that it's like weight loss
14 101 for dummies and that it's so noninvasive and so
15 nonriskful that nothing bad happens.
16     Q.    Before your procedure, before you had
17 it, did you reach out in any way to ReShape?
18     A.    No.
19     Q.    Okay.  You said before you don't think
20 you looked at their website; is that right?
21     A.    I don't recall.
22     Q.    Before your procedure do you remember
23 receiving any marketing materials about the
24 balloon?
25     A.    You mean just like inadvertently?  No.

Page 72

1 Nothing.
2     Q.    Or even anything from Dr. Lavin?
3 Anything at all?
4     A.    No.
5     Q.    I mean like a brochure, an e-mail?
6     A.    No.
7     Q.    Okay.  We talked a little bit about
8 your dental practice and the fact that you use
9 consent forms in your practice, right?
10     A.    Yes.
11     Q.    Okay.  And you said your consent
12 form -- well, first of all, what are the things
13 that are on the consent form?  The risks that are
14 identified?
15     A.    The risk that there could be abnormal
16 bleeding, paraesthesia, allergic reaction.
17     Q.    Infection?
18     A.    Well, I treat infections.  I don't
19 cause infections.  But there's a chance of getting
20 an infection, yes.
21     Q.    Do you know if your consent form
22 includes that?
23     A.    Not offhand.  I'm assuming it does.
24 It's a standard American Dental Association consent
25 form.

Page 73

1     Q.    Okay.  And we will get a copy of that
2 so we will be able to look at it.  And you said to
3 your recollection it doesn't include the risk of
4 death; is that correct?
5     A.    Not that I recall.
6     Q.    Now, it's true that loss of blood can
7 lead to death, correct?
8     A.    I assume if you lose enough blood, yes.
9     Q.    It's true that an infection can lead to
10 death?
11     A.    I would assume if it was a nasty enough
12 infection, yes.
13     Q.    It's true that an allergic reaction to
14 anesthesia could lead to death?
15     A.    I would assume that to be correct.
16     Q.    Okay.  And certainly in your training,
17 in your experience, in your knowledge of dental
18 procedures historically, unfortunate incidents have
19 led to death resulting from extraction of teeth; is
20 that correct?
21 BY MR. SHAW:
22         Object to the form.
23         You can answer.
24 BY THE WITNESS:
25         I'm assuming that there have been.  I

Page 74

1    don't know of anybody that's happened to, but
2    I'm assuming it's in the literature. Yes.
3 BY MS. WEBRE:
4    Q.   Certainly we can all agree it's not
5 very likely that every dental extraction procedure
6 in the history of dental extraction procedures has
7 avoided someone dying? Do we agree on that?
8    BY MR. SHAW:
9        Object to the form.
10    BY THE WITNESS:
11       I would say every extraction does not
12    precipitate a death.
13 BY MS. WEBRE:
14    Q.   Certainly every extraction does not
15 precipitate a death, thank goodness, because no one
16 would get their teeth pulled.
17    A.   That's right.
18    Q.   But it's a risk nonetheless, correct?
19    BY MR. SHAW:
20       Object to the form.
21    BY THE WITNESS:
22       I would assume that it would be a risk,
23    okay, if they had underlying conditions, you
24    know, bleeding disorders or whatever. But it
25    would -- you know, of course it is. So.

Page 75

1 BY MS. WEBRE:
2    Q.   Do you talk to your patients about
3 that?
4    BY MR. SHAW:
5        Object to the form.
6 BY MS. WEBRE:
7    Q.   I'm sorry. I couldn't hear you,
8 Doctor.
9    BY MR. SHAW:
10       Same objection. Talk to him about
11    what? That.
12    BY MS. WEBRE:
13       Thank you, Frank.
14 BY MS. WEBRE:
15    Q.   Dr. Vesoulis, do you talk to your
16 patients about the risk of death?
17    A.   Usually not. No. Actually no.
18    Q.   And that's because the potential
19 adverse event would be the infection or the
20 bleeding as we talked about and you do talk about
21 those risks, right?
22    BY MR. SHAW:
23       Object to the form.
24       You can answer.
25    BY THE WITNESS:

Page 76

1       Yes. And what to look for and follow
2    up. That's correct.
3 BY MS. WEBRE:
4    Q.   Okay. You were asked some questions
5 earlier about whether you would agree that any
6 invasive procedure -- there's a risk of death with
7 any invasive procedure and you agreed to that. Is
8 that correct? I don't want to misstate what you
9 said.
10    A.   I think they were referring to -- they
11 were referring to when I had my gallbladder taken
12 out versus having my balloons put in. And I said
13 that there was a correlation between, you know,
14 there is a laparoscopic procedure and there is
15 actually penetration, you know. So that would be,
16 in my mind that would be a greater risk than an
17 endoscopy where they're just dropping something in
18 and they're not supposedly damaging anything.
19    Q.   Okay. Doctor, I appreciate that. I am
20 not talking about greater or lesser risk. I mean
21 existence of a risk, okay?
22    A.   I'm referring back to what you said I
23 said before.
24    Q.   Sure.
25    A.   That was the context that I said it in.

Page 77

1    Q.   Sure. And so let's go back a little
2 bit. It's a little bit different than I remember
3 so I will just ask the questions again. Not a
4 problem.
5       Would you agree generally, I'm not
6 speaking about any specific procedure, generally
7 any invasive procedure there is an associated risk
8 of death?
9    A.   I would say some more than others.
10    Q.   Certainly.
11    A.   As a general generic rule, probably
12 yes.
13    Q.   Would you agree that with any procedure
14 requiring anesthesia that there is a risk of death?
15    BY MR. SHAW:
16       Object to the form. Calls for an
17    expert opinion.
18       Go ahead.
19    BY MS. WEBRE:
20       Frank, I will ask you again to state
21    your objections just to form.
22    BY MR. SHAW:
23       I'm not in Texas, Ms. Webre. So if you
24    don't want to hear the ground for the
25    objection so you can cure it, then we can do

Page 78

1  that and I will state it in writing if
2  necessary.
3  BY MS. WEBRE:
4      You said something about Texas.  This
5  is a Louisiana case taking place in
6  Louisiana.  We're all sitting in Louisiana
7  except for Dr. Vesoulis, who is not sitting
8  in Texas.  So I'm not really sure what Texas
9  has to do with anything.
10  BY MR. SHAW:
11      Well, with the Texas ruling all you can
12  say is object to the form.  If you don't want
13  to hear the ground of the objection so that
14  you can cure it, then go ahead.  And I won't
15  state it.  I will just reserve it and make
16  the objection and then you can guess.
17  BY MS. WEBRE:
18      Good.  Because that's how it works in
19  Louisiana.  Thank you, Frank.
20  BY MR. SHAW:
21      That is not how it works for Louisiana.
22  But go ahead.
23  BY MS. WEBRE:
24      Q.   Dr. Vesoulis, would you agree that any
25  procedure requiring anesthesia, that there's a risk

Page 79

1  of death?
2      A.   It depends on the type of anesthesia.
3  That's too vague of a statement.
4      Q.   Okay.  Is there anesthesia that is free
5  from the -- completely free from the risk of death?
6  Any type?
7  BY MR. SHAW:
8      Object to the form.
9  BY THE WITNESS:
10      I don't know that answer.
11  BY MS. WEBRE:
12      Q.   Okay.  You use anesthesia in your
13  practice, correct?
14      A.   Yes.
15      Q.   Okay.  And --
16  BY MS. WEBRE:
17      There's some kind of feedback.
18  BY THE WITNESS:
19      It said please charge battery.  So I
20  don't know.
21  BY MS. WEBRE:
22      Q.   Okay.  I asked you a moment ago if you
23  would agree that any procedure requiring anesthesia
24  includes a risk of death.  Do you remember that
25  question?

Page 80

1      A.   Yes.
2      Q.   You said you couldn't answer it because
3  some do and some don't, right?
4      A.   It was too general of a question.
5      Q.   Okay.  So I would like to know you, who
6  are a doctor who uses anesthesia, what are the
7  types of anesthesia that do not include a risk of
8  death?
9      A.   I don't know for a fact because I'm not
10  a medical doctor, but I'm sure there's -- I've
11  never heard of somebody using a topical lidocaine
12  on a hand wound causing somebody to die.  I'm just
13  being honest with you.  I don't even know if that's
14  in the literature.  So that's why I'm not
15  knowledgeable to answer that for you.
16      Q.   I understand that you're not a medical
17  doctor, and I'm not asking you for your medical
18  expertise in this.  That's not what I'm asking.
19  But you understand that a patient could be allergic
20  to lidocaine, correct?
21      A.   That's correct.
22      Q.   And an allergic reaction can result in
23  death; is that correct?
24      A.   That's correct.
25      Q.   Okay.

Page 81

1      A.   But it also dependent upon
2  concentration and amount and so forth.  So that's
3  why my comment about a topical, I don't know if
4  that's on there.  That would be on their list of
5  precautions.  It's an interesting point.  I might
6  look it up when we're done.
7      Q.   Sure.  And I understand that
8  circumstances vary with regard to every procedure
9  and every patient and every situation.  The
10  question I was asking simply was whether there was
11  a risk, any risk of death with any anesthesia?
12  BY MR. SHAW:
13      Are you equating risk with possibility?
14  BY MS. WEBRE:
15      I'm going to go ahead and take this
16  deposition again.
17  BY MR. SHAW:
18      Object to the form.
19  BY MS. WEBRE:
20      That's good enough for me.  Thank you.
21  Now you've already coached him, but thank
22  you.
23  BY MS. WEBRE:
24      Q.   Let me move on, Dr. Vesoulis.  Your
25  testimony is that you did not know that there was a

Page 94

1 procedure, this was elective. So me taking a risk
2 of death and having that number of people that are
3 going to die, I would not have done it.
4    Q.   Again, Doctor, I have to ask you, you
5 said knowing the number of people who died. Do you
6 know the number of people who died?
7    A.   I know there has been a few. I don't
8 know the exact number. I don't know if the exact
9 number exists. You guys know that information.
10   Q.   Okay. Did anyone from ReShape tell you
11 that there were no deaths because of this
12 procedure?
13   A.   Nobody from ReShape told me there were
14 any deaths from this procedure.
15   Q.   Did you reach out to ReShape before you
16 had the procedure?
17   A.   No. Nobody -- there was no reason to.
18 You know, you trust your doctor, okay, that he does
19 the research. He's using products that he trusts.
20 And I wouldn't use something -- I wouldn't use
21 something that I knew had a high risk, a higher
22 risk of death, or I just wouldn't do the procedure.
23 I would refer it out. I wouldn't take that on
24 myself.
25   Q.   Okay. I have a few questions for you

Page 95

1 about this, Doctor. First of all, let's be clear.
2 You didn't die, right?
3    A.   I came pretty close to it.
4    Q.   Not my question. You didn't die, did
5 you?
6    A.   I'm alive, but I still want to be very,
7 very clear that I almost didn't. If I would have
8 got on that plane, if I would have got on the plane
9 and I would have come home with that perforation
10 there, I could have very well died.
11   Q.   The perforation -- no. I'm going to
12 hold that question for a second.
13        You said that you didn't know the
14 number. You said it could be, I wrote it down, 2,
15 5 or 10, right?
16   A.   I have no idea what the exact number
17 is.
18   Q.   The consent form that you signed, not
19 the anesthesia consent form, the balloon consent
20 form, said, "Death, very rare," correct?
21   BY MR. SHAW:
22       Objection. Asked and answered.
23   BY MS. WEBRE:
24       Well...
25 BY MS. WEBRE:

Page 96

1    Q.   Doctor?
2    A.   It said very rare. So.
3    Q.   Okay.
4    A.   That's what it says.
5    Q.   Is two very rare? Is five?
6    A.   I don't know.
7    Q.   How many procedures overall? How many
8 balloons have been implanted?
9    A.   I don't have that answer either.
10   Q.   What's the percentage of death versus
11 patients who didn't die from the procedure?
12   BY MR. SHAW:
13       Object to the form.
14 BY MS. WEBRE:
15   Q.   I'm sorry, Doctor. You were both
16 speaking at the same time.
17   A.   No, I wasn't. I was trying to
18 understand what you were asking. And I'm not
19 understanding what you're asking.
20   Q.   Okay. I'll rephrase it. What are the
21 incidents, the percentage incidents of death
22 resulting from a ReShape epigastric dual balloon?
23   BY MR. SHAW:
24       Object to the form.
25   BY THE WITNESS:

Page 97

1       I thought the one consent form said 1
2 in 10,000, if I'm referring to the right part
3 of it. But that was on the retrievable part,
4 not on the front end part of it.
5 BY MS. WEBRE:
6    Q.   Okay. Is it more than 1 in 10,000?
7    A.   I think it is.
8    Q.   Okay. What is it?
9    BY MR. SHAW:
10       Object to the form.
11   BY THE WITNESS:
12       I don't know what it is, but I think it
13   is more.
14 BY MS. WEBRE:
15   Q.   You testified earlier that if you had
16 known there had been deaths associated with the
17 product, that you wouldn't have had the procedure,
18 correct?
19   A.   That's correct.
20   Q.   But the consent form you signed, four
21 consent forms in fact, list death as a risk. Is
22 that correct?
23   BY MR. SHAW:
24       Object to the form.
25 BY MS. WEBRE: