# Transcript of the Testimony of
# Thomas E. Lavin, M.D., FACS

**Date taken: November 11, 2019**

**Paul Vesoulis v. Reshape Lifesciences, et al**

All electronic deposition & exhibit files
are available at <<<www.psrdocs.com>>>.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone: 504-529-5255
Fax: 504-529-5257
Email: reporters@psrdocs.com
Internet: http://www.psrdocs.com

EXHIBIT D

Thomas E. Lavin, M.D., FACS
Paul Vesoulis v. Reshape Lifesciences, et al

Page 65

1  Q   Would you expect that he would have
2  any continuing symptoms as a result of the fact
3  that he had an esophageal perforation?
4  A   No.
5  Q   Are you aware if he had any?
6  A   I'm not aware.
7  Q   Okay. In other words, none were
8  reported to you?
9  A   None were reported to me.
10 Q   You stated earlier that you no longer
11 use the ReShape balloons, correct?
12 A   Right.
13 Q   And you said that you stopped due to
14 complications with the system and talk that
15 others were having problems; is that right?
16 A   Right. We stopped doing all
17 fluid-filled balloons with the concern that the
18 weight of the fluid was the etiology of the
19 ulcers and possible perforations.
20 Q   Okay. When you say "perforations,"
21 do you mean esophageal perforations?
22 A   Gastric perforations.
23 Q   Okay. Now you use -- I saw an ad for
24 the Orbera out in the lobby; is that right?
25 A   Yes, the air-filled balloons, right.

Page 66

1  Q   Okay. So all of the balloons you use
2  now are air-filled?
3  A   Correct.
4  Q   Do you know whether as we sit here
5  today you could even get a ReShape balloon if
6  you wanted one?
7  A   I don't know.
8  Q   Okay. Let's talk a little bit about
9  your consent process. You have in front of
10 you -- I don't know if you have a copy of your
11 consent forms in this case.
12 A   I don't know.
13 Q   And the numbers that I have don't
14 seem to match up with the sets that you have
15 been given. I might have extra copies here,
16 though.
17     Let me ask you, first, is there a
18 different consent process for the placement of
19 the ReShape balloon versus the removal of the
20 ReShape balloon?
21 A   I don't believe so. I think it's the
22 same process, because the risks are no different
23 for either procedure.
24 Q   Okay. Is it a different form that is
25 ultimately signed by the patient?

Page 67

1  A   I don't know.
2  Q   Okay. I'm going to show you these,
3  and, unfortunately, these might be the only
4  copies that I have, so we will just have to work
5  together here.
6      Okay. Here's one. This, at the
7  bottom it says "VesoulisDrLavin" Bates No. 40,
8  and this is a four-page document. Take a look
9  at that.
10 A   (Reviewing document).
11     Yes.
12 Q   Okay. And the last page of that has
13 the date on it that Dr. Vesoulis signed it?
14 A   Yes, 7-27-17.
15 Q   Okay. So this would have been signed
16 on the day of the actual procedure; is that
17 right?
18 A   Correct.
19 Q   How does this work? At what point
20 does the patient sign this prior to the
21 procedure?
22     MR. SHAW:
23         Can I see it real quick?
24     THE WITNESS:
25         (Handing).

Page 68

1         So, was the procedure on the 27th
2  or the 28th?
3  EXAMINATION BY MS. WEBRE:
4  Q   The 27th.
5  A   So it depends on whether the person
6  is coming from out of town. I do a lot of
7  patients from all over the United States, so
8  they will either do their consent the day before
9  or sometimes, depending on their schedule, the
10 morning of the procedure.
11 Q   Okay.
12 A   So we just do it prior to the
13 procedure, prior to any sedation, of course, or
14 anything like that.
15 Q   Okay. Did you meet Dr. Vesoulis,
16 since he came from out of town, did you meet him
17 before the procedure?
18 A   No -- Well, yes, before the
19 procedure, when we went over the informed
20 consent, of course, yes. Always. I never do a
21 procedure without meeting the patient, going
22 over everything. Even before he came down, I
23 did a phone consult, discussing everything about
24 the procedure. So we talked prior to him coming
25 to town.

Thomas E. Lavin, M.D., FACS
Paul Vesoulis v. Reshape Lifesciences, et al

Page 69

1   Q   He's a doctor, right?
2   A   He's a dentist, correct.
3   Q   Was your procedure any different than
4   it would be with someone who was not a doctor?
5   A   No. We treat everyone the same.
6   Q   The language that you use, the detail
7   that you go into would have been the same with
8   Dr. Vesoulis as it would be with any patient?
9   A   Pretty much, yes. I'm not going to
10  change it for one person. Lot of times I don't
11  even know if it is a healthcare professional.
12  Q   Okay. I had asked you if you met him
13  before the procedure. The morning of the
14  procedure, did you meet him before you took him
15  in?
16  A   For sure.
17  Q   Okay.
18  A   Absolutely. Before he had any
19  sedation, before he went in for the procedure,
20  we met and went over everything.
21  Q   So the form that you're looking at
22  there, the four-page, it says "Endoscopic
23  Balloon Procedure Consent Form," is this
24  something you yourself would have gone over with
25  him or one of your staff?

Page 70

1   A   Probably both. I don't sit and go
2   over the form in detail with everyone. They
3   read it over and sign it, and I go over it and
4   go over the consent again. So there's a
5   combination of me going over it and them reading
6   through things, so they get two chances to see
7   everything.
8   Q   Okay. I want to shift focus a little
9   bit. This is a different form, and it's a
10  two-page document, and it says "Consent for
11  Endoscopic Removal of Intragastric Balloon"; is
12  that correct?
13  A   Right.
14  Q   Can you tell us whether Dr. Vesoulis
15  signed that?
16  A   Yes, right here (indicating).
17  Q   Okay. And what date did he sign it?
18  A   January 11th, 2018.
19  Q   Okay. So would you have also gone
20  over this with him before you took him into this
21  procedure?
22  A   Sure.
23  Q   It would have been similar to the
24  first time, right?
25  A   Right.

Page 71

1   Q   Do you recall whether either in going
2   over this form specifically or just in talking
3   to him about the risks, you would have discussed
4   the risk of esophageal perforation?
5   A   I would have said intra-abdominal GI
6   tract perforation, which I discuss with everyone
7   on any kind of procedure, whether it's a
8   laparoscopic procedure, endoscopic procedure,
9   either way.
10  Q   Okay. And then you would have handed
11  him this form to look at and sign, correct?
12  A   Right.
13  Q   And this form specifically notes, let
14  me quote, "Serious complications include a risk
15  of bleeding or perforation of the esophagus,"
16  et cetera, "occurring in less than one of 10,000
17  cases"; is that correct?
18  A   Right.
19  Q   Okay. And then further down, the
20  next paragraph, there are risks of
21  gastroesophageal reflux, esophagitis, correct?
22  A   Yes.
23  Q   Okay. Is this form that we have
24  talked about, which is number "VesoulisDrLavin"
25  Bates No. 49, is this a form that your office

Page 72

1   would have authored, that you would have
2   authored, or do you know?
3   A   We would have got it from some -- I
4   can get the source, because the girl that runs
5   my clinical side is a nurse practitioner and she
6   was president of the Allied Health side of
7   ASMBS, so she had good access to documents. And
8   so we wouldn't have authored it ourselves. It
9   would have been a collaborative work amongst
10  people doing the procedure.
11  Q   Okay. So you don't know specifically
12  as we sit here right now where it came from?
13  A   I don't, but I can find out.
14  Q   So it's something if I followed up
15  with you, you could let me know?
16  A   For sure.
17  Q   Okay. Other than these two consent
18  forms, would you have given Dr. Vesoulis any
19  other written materials that specifically
20  addressed risks?
21  A   I don't believe so.
22  Q   Okay. Do you share the Instructions
23  for Use with your patients?
24  A   The doctors' Instructions for Use?
25  Q   Correct.

Thomas E. Lavin, M.D., FACS
Paul Vesoulis v. Reshape Lifesciences, et al

Page 73

1  A    No.
2  Q    Okay. Is there another set that you
3  give to the patient?
4  A    If they wanted it, they could get it.
5  Q    The doctors' Instructions for Use?
6  A    No, the doctors' Instructions for
7  Use, I wouldn't think a patient would have any
8  interest in that.
9  Q    Is there a different Instructions for
10 Use that was designed, to your knowledge, to
11 give to the patient?
12 A    No, the Instructions for Use is
13 basically an instruction on how to succeed,
14 because this is all about weight loss and
15 everything is a risk/benefit ratio and we're
16 trying to help them lose weight, you know,
17 correct their medical problems. Basically, it's
18 a six-month step-wise process on how to get the
19 best results from your balloon.
20 Q    Okay. Let me ask a similar, but
21 different question. I asked whether there were
22 other documents that you give to the patient
23 regarding risks, but are there other documents
24 you give to the patient regarding the procedure
25 in general?

Page 74

1  A    I would have to look, but the
2  documents are basically -- Yes, we give them
3  documents, like I said, that is a pathway to
4  help you lose weight, have success with your
5  balloon, since you're, No. 1, investing in the
6  balloon; No. 2, taking the risk of getting a
7  balloon and going through the six-month process.
8  Q    So it's to help the patient have
9  success with the balloon, correct?
10 A    Lose weight and make it a permanent
11 weight loss, right.
12 Q    And are those documents documents
13 that you or someone on your staff would have
14 authored?
15 A    Once again, it's probably a
16 collaborative effort using material, and then,
17 of course, we have our own dieticians on staff
18 that will call the patients and do consults from
19 a distance to make sure the patients are on
20 track and they're losing weight and answering
21 any questions they may have.
22      So it's not only the paperwork. It's
23 also the follow-up of our staff and dieticians
24 and nurses to make sure patients stay on track.
25 Q    Let me ask you this. As we sit here

Page 75

1  today, do you remember going through this
2  particular consent process with Dr. Vesoulis for
3  the removal of the balloon?
4  A    I don't remember with any particular
5  patient. I just know my routine of how I do it
6  with every patient.
7  Q    Sure. Okay. Now, when you initially
8  removed this device, the balloon from
9  Dr. Vesoulis, you didn't experience any
10 complications, correct?
11 A    When I initially removed it, he
12 looked good in the post-op period, but they
13 called back later in the day when he was
14 distended and not feeling good.
15 Q    Okay. So upon removal, did you have
16 any reason to keep the device? Do you know what
17 happened to it?
18 A    No, I don't. I wouldn't have any
19 reason to keep the device.
20 Q    Okay. Would you have just disposed
21 of it?
22 A    I believe so.
23 Q    Okay. Is that what you normally do
24 with a patient with no complications?
25 A    Yes.

Page 76

1  Q    Okay. I understand that Dr. Vesoulis
2  had the complication upon removal of the device,
3  but other than that, was it successful for the
4  purpose for which it was intended?
5  A    He had some weight loss. Not what he
6  wanted, but he had a pretty decent weight loss.
7  In fact, early on he was doing great, and then
8  he got off track at times, and I only know that
9  because of the dieticians following him and our
10 discussion when he came down. But he did have
11 pretty good weight loss and pretty good results.
12 Q    Just to clarify for my own purposes,
13 how was it that the esophageal perforation was
14 discovered? Was it on the exploratory --
15 A    The CT scan on the morning of the
16 13th showed a pneumomediastinum suggestive of a
17 perforated viscus, which the only thing in the
18 mediastinum is the esophagus, so when we took
19 him back, we found it easily. When we opened up
20 the peritoneal reflection, looked at it, you
21 could see a little two-millimeter perforation
22 with a small walled off area of fluid, and we
23 irrigated it out and did a two-layer closure and
24 closed it, drained it, and then, like I said,
25 four days later, after keeping him on

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com