# Transcript of the Testimony of
# Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney

**Date taken: January 27, 2021**

**Paul Vesoulis v. ReShape LifeSciences, et al**

All electronic deposition & exhibit files
are available at <<<www.psrdocs.com>>>.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:504-529-5255
Fax:504-529-5257
Email:reporters@psrdocs.com
Internet: http://www.psrdocs.com



EXHIBIT 6

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 13

1   THE VIDEOGRAPHER:
2       We're off the record.
3       (Whereupon, a discussion was
4   held off the record).
5   THE VIDEOGRAPHER:
6       We're back on record.
7   MR. SHAW:
8       Request No. 2 asks for
9   documents or electronically stored
10  correspondence, emails, tests, reports
11  or data that relate to post-PMA events
12  and incidences involving patients who
13  underwent the ReShape Balloon procedure.
14  And it's pretty much the same objection;
15  would that be a fair statement, Rachel?
16  MS. WEBRE:
17      Yes.
18  MR. SHAW:
19      Okay.  Request No. 3 is
20  documents or electronically stored
21  correspondence, emails, tests, reports
22  or data, MedWatch, FDA, eMDR Generated
23  Form 3500A, MAUDE reports, complaints,
24  complaint forms or complaint summaries,
25  emails, correspondence, news, internet

Page 14

1   or any other reports that relate to the
2   ReShape Integrated Dual Balloon post-PMA
3   approval through present.  And pretty
4   much, that's the same response.
5   EXAMINATION BY MR. SHAW:
6       Q    Ms. Mooney, let me ask you about
7   the FDA's MAUDE database.  From the time of
8   approval until Mr. Vesoulis' balloons were
9   implanted on 7-27-17, who was responsible at
10  ReShape for communicating with the FDA?  And
11  if it's multiple people, if you could name
12  them, I would appreciate it.
13      A    That would -- that would have been
14  primarily Greg Geissinger, who was my
15  Regulatory Affairs Manager/Director until his
16  departure.  I don't recall specifically when
17  he left the company.  His replacement, who was
18  hired, was Lisa Maloney.  She became the new
19  Regulatory Affairs Director, and in that
20  interim gap, I was the primary person
21  completing those reports until I had his
22  position refilled.
23      Q    All right.  Let me back up and then
24  I'll -- to give me some idea.  What is your
25  date of birth, ma'am?

Page 15

1       A    12-8-55.
2       Q    And what's the extent of your
3   educational background, please?
4       A    I have a Bachelor's degree in
5   biology, a Master's in biomedical science.
6       Q    From what institutions were those
7   degrees secured?
8       A    Bachelor's degree was from La Salle
9   University, in Philadelphia, and the Master's
10  degree was from Drexel University, in
11  Philadelphia.
12      Q    I'm sorry, I was shuffling papers
13  during the second answer.  It was Mercer?
14      A    It was La Salle University for my
15  Bachelor's degree, in Philadelphia, and Drexel
16  University for my Master's degree, in
17  Philadelphia.
18      Q    Got it.  And when were you first
19  employed at ReShape?
20      A    I believe it was June of 2011,
21  something like that.
22      Q    When were you last employed by
23  ReShape?
24      A    It was 2017, at the end of
25  September, I believe.

Page 16

1       Q    Did you leave the company?
2       A    I took another position.  Yes, I
3   left the company.
4       Q    Who undertook your job duties?
5       A    The CEO, ultimately, when I first
6   left, and then, I believe, Deborah Schmalz was
7   ultimately hired to replace my position.
8       Q    And what position or positions did
9   you hold during the time that you were
10  employed at ReShape?
11      A    I was the Vice President of
12  Regulatory, Clinical and Quality.
13      Q    And you held that position the
14  entire time during your employment?
15      A    That's correct.
16      Q    Did you have any, you personally,
17  have any communications with anyone at the
18  FDA?
19      A    Yes.
20      Q    And what did that entail?
21      A    In the early part of my time there,
22  that was preparation for the study that was
23  done to support the PMA, and then throughout
24  the PMA process, as the product was under
25  review, then it was ongoing communication with

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 21

1  reports required, under 21 CFR 814.84, at
2  intervals of one year from the date of the
3  original PMA." Those are the annual reports;
4  is that correct?
5      A    That's correct.
6      Q    And you would assemble those and
7  put those together?
8      A    Either myself personally or my
9  director, be it Greg Geissinger or Lisa
10 Maloney, depending upon the time frame.
11     Q    And those particular reports were
12 required to be device-specific? In other
13 words, each device had a designation or a UDI
14 number on it?
15     A    These were specific to the devices
16 covered under the PMA, so the annual report
17 essentially requires manufacturers to update
18 any changes to any of the devices covered
19 under this PMA approval order.
20     Q    And the information included in the
21 annual report would be the total number of
22 devices sold, is that true?
23     A    I'd have to go back and refresh on
24 exactly what the elements are of the annual
25 report. I believe that's one of them.

Page 22

1      Q    Okay. If an adverse event was
2  reported to ReShape, that would go into the
3  data in connection with all of the devices
4  sold; is that correct?
5      A    Well, adverse events are reported
6  through complaint systems or through the MAUDE
7  system.
8      Q    Right.
9      A    That's not, you know, specific to
10 annual reports.
11     Q    But there would be no impediment to
12 determining the occurrence of adverse events
13 of various sorts with regard to the whole
14 population of devices that had been sold by
15 ReShape, would that be true?
16     A    Would you clarify what you mean by
17 "impediment"?
18          MS. WEBRE:
19               Let me just put an objection on
20          the record. Objection to form, okay,
21          because of vagueness, but go ahead.
22          MR. SHAW:
23               Let me see if I could restate
24          that.
25 EXAMINATION BY MR. SHAW:

Page 23

1      Q    It is entirely possible for ReShape
2  to calculate the percentage of adverse events
3  for the entire population of balloons that had
4  sold from the date of the PMA approval
5  forward, is that true?
6      A    Yes. We would have records of
7  number of devices sold, and we would have
8  records of reported complaints, so yes.
9      Q    And the PMA approval included
10 post-approval studies, did it not?
11     A    Yes, it did.
12     Q    What was the purpose of those
13 studies?
14     A    That's a typical requirement
15 following a PMA. It's basically generally
16 designed to continue to collect additional
17 safety data on the product. It's fairly
18 common for any PMA device, or any device
19 approved through a PMA, to have a
20 post-approval study assigned to it, and that
21 is under a specific protocol that's reviewed
22 and approved by the FDA.
23     Q    And what documents would be
24 received by a physician, such as Dr. Lavin, in
25 connection with any labeling or warnings that

Page 24

1  would be issued by ReShape?
2      A    The instructions for use for the
3  product contain that information.
4      Q    I'm looking at the first big batch
5  of documents that I'm going to start going
6  through, which would be a portion of the
7  various documents that were attached to the --
8  and they're not stapled, yet they should be.
9          MS. WEBRE:
10              Are you talking about the
11         Request for Admissions?
12         MR. SHAW:
13              Right. That would be marked as
14         "Exhibit 4."
15 EXAMINATION BY MR. SHAW:
16     Q    It has been admitted in this case
17 by both ReShape and by Dr. Lavin that prior to
18 the implantation of the ReShape intragastric
19 balloons in Mr. Vesoulis, on July 27, 2017,
20 that the MAUDE reports that are attached
21 thereto were not sent to that physician. You
22 can review those if you'd like. Do you agree
23 with that?
24         MS. WEBRE:
25              Hold on, Frank. You're saying

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 29

1  MS. WEBRE:
2  No.
3  THE WITNESS:
4  No. The one I'm looking at has
5  a handwritten "51" in the upper right
6  corner.
7  EXAMINATION BY MR. SHAW:
8  Q  Okay. And in the bottom right
9  corner, it has "ReShape 048202"?
10  A  Yes. Yes, I see that now.
11  MS. WEBRE:
12  Yeah, whenever he refers to
13  Bates, that's what he's talking about.
14  THE WITNESS:
15  Okay. The one at the bottom,
16  okay.
17  EXAMINATION BY MR. SHAW:
18  Q  It's a numbering system we use
19  internally to try to keep track of this stuff.
20  A  Yeah, that's fine.
21  Q  The last page of that document,
22  it's ReShape Document 048204, under
23  "Additional Manufacturer Narrative," No. 10,
24  it states, quote, "There is no known
25  allegation from a health professional that the

Page 30

1  patient death was related to the device,"
2  unquote.
3  A  I'm trying to locate that. Okay.
4  I see the main report.
5  MS. WEBRE:
6  The very end of that report.
7  THE WITNESS:
8  Oh, I see it, okay. Yes, I see
9  that.
10  EXAMINATION BY MR. SHAW:
11  Q  Do you know who wrote that?
12  A  That would be whoever completed
13  this form, so, again, that was either myself
14  or my regulatory director.
15  Q  Did you have any discussions with
16  the treating physician regarding this
17  particular incident?
18  A  The treating physician would have
19  provided the information we received, in terms
20  of the event and sequela.
21  Q  Isn't it true that esophageal
22  perforation is a risk of using the ReShape
23  intragastric balloons?
24  A  Yes. That's in the device
25  labelings.

Page 31

1  Q  Was it true that this patient
2  suffered from esophageal perforation, as
3  reported by the treating physician?
4  A  That's what's in the description
5  above, yes.
6  Q  So that esophageal perforation was
7  not related to the device use, or was it?
8  A  Well, the death was sepsis, so the
9  statement from the physician was what the
10  physician provided. Or lack of a statement
11  from the physician. That's what this
12  statement actually says. There wasn't a
13  statement provided that the death was related
14  to the device.
15  Q  As of the time of this death, in
16  March of 2016, were you aware that sepsis can
17  be secondary to esophageal perforation?
18  A  I'm not a medical professional. I
19  have general knowledge of that being a
20  possible sequela of any sort of surgical
21  issue.
22  Q  Did you consult with any medical
23  professionals after March 29 of 2016, but
24  before Mr. Vesoulis' balloons were implanted
25  in July of 2017, to determine whether or not

Page 32

1  death can result from sepsis?
2  A  I did not consult with any
3  physicians. The purpose of the MAUDE report
4  is to report the findings of the event.
5  Q  From March 29 of 2016 until
6  July 27, 2017, did you have any communications
7  with the FDA regarding death from sepsis
8  secondary to esophageal perforation?
9  A  Any communications would have been
10  MAUDE-reported events. I don't recall offhand
11  whether there were any such events in that
12  time window, but if there were, those would
13  have been reported through the MAUDE database.
14  Q  Was the MAUDE database the
15  exclusive reporting that was done by ReShape
16  to the FDA regarding adverse events?
17  A  Yes, that is our regulatory
18  responsibility, to report all serious adverse
19  events. Any that do not qualify or meet the
20  regulatory criteria of a serious adverse event
21  are captured within the complaint handling
22  system of the company and executed under
23  standard operating procedures.
24  Q  Are you aware of anyone at ReShape
25  communicating with the FDA regarding the

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Case 2:19-cv-01795-MLCF-DMD  Document 101-5  Filed 04/20/21  Page 5 of 13

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 33

1  subject of death either by esophageal
2  perforation or as a result of aspiration, such
3  as the one that occurred on --
4      A    I'm sorry, Frank, you're fading out
5  a little bit. Could you repeat that.
6      Q    I'll try. Are you aware of there
7  being any discussions with the FDA regarding
8  death from sepsis, secondary to esophageal
9  perforation, such as that occurred on
10 March 29, 2016, or death as a result of
11 aspiration, such as that that occurred on
12 May 10, 2017, prior to July 27, 2017?
13     A    The only communications that one or
14 both of those may have been addressed in were
15 some of the letters to health care providers.
16 I don't recall offhand, the dates of those,
17 but those, in addition to any MAUDE data
18 reports, would be the vehicle of any
19 communication of those with FDA, or from FDA,
20 in that case.
21     Q    Were there any letters to health
22 care providers that were issued by ReShape?
23     A    Yes.
24     Q    Were there any letters to health
25 care providers before August 10 of 2017

Page 34

1  regarding either of these two deaths that were
2  issued by ReShape?
3      A    I don't recall what specific dates
4  or communications to health care providers
5  were issued. I think there were some. I
6  don't believe they were for this subject, but
7  I don't have access to those records, so I
8  can't confirm that.
9      Q    To your recollection, was there any
10 communication with Dr. Lavin, Thomas Lavin, or
11 Louisiana Surgical Specialists, regarding
12 these two deaths, prior to August 10 of 2017
13 when the FDA letter came out, Dear Doctor
14 Letter, concerning the number of deaths
15 involving intragastric balloons?
16     A    The regulatory process and our
17 responsibility, as a manufacturer, was to
18 report those through the MAUDE database, and
19 there's no responsibility or regulation that
20 requires us to report it to any health care
21 provider, including Dr. Lavin, so I would not
22 have expected any of that information to be
23 communicated to him.
24     Q    Did you consider that any changes
25 to the instructions for use had to have FDA

Page 35

1  approval before any changes were made?
2      A    Depending upon what the changes
3  are, mostly every change has to be reviewed
4  and approved by FDA. Some inconsequential
5  clarifications or typographical errors, things
6  like that, can be annually reported, but most
7  labeling changes are previewed with FDA.
8      Q    Are you familiar with the
9  requirement of the instructions for use of the
10 intragastric balloons, that the treating
11 physician discuss and advise the patient of
12 all adverse events?
13     A    I'm sorry, can you clarify the
14 question?
15     Q    What is not clear about that
16 question?
17     A    Are you asking me if -- what the
18 content of the IFU is or -- I wasn't clear
19 what the physician connection was, sorry.
20     Q    Okay. Let me get the IFU and then
21 we can look at it.
22     A    Okay.
23         MS. WEBRE:
24             I will note that the IFU
25         appears to be in that same PDF that we

Page 36

1      were just in, on Page 111 of the PDF.
2      That's where it is.
3          THE WITNESS:
4              Okay. That's helpful, Rachel,
5          thank you. Okay, I've got it.
6  EXAMINATION BY MR. SHAW:
7      Q    This particular IFU, if you'll look
8  at the ReShape Document No. 2, is designated
9  as Revision G; is that correct?
10     A    That appears to be correct, yes.
11     Q    So I would assume that there had
12 been some previous revisions to this IFU, is
13 that right?
14     A    Yes.
15     Q    And if you look at Page 5 of the
16 IFU. It's ReShape Document No. 6.
17     A    Yes.
18     Q    The third to the bottom paragraph.
19     A    Yes.
20     Q    It says, quote, "It is important to
21 discuss all possible complications and adverse
22 events with the patient," unquote. Do you see
23 that language?
24     A    I do.
25     Q    Okay. But the MAUDE reports were

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 37

1  not sent to the treating physicians, were
2  they?
3      A    No, they were not. That's not a
4  requirement.
5      Q    And the notice of adverse events or
6  the occurrence of adverse events were also not
7  communicated to the treating physician, were
8  they?
9      A    The notice of adverse events or
10 occurrence? Which document are you referring
11 to?
12     Q    Well, I'm asking, from this
13 requirement in the IFU, that adverse events be
14 discussed with the patient.
15     A    Right. Possible types of adverse
16 events, that's correct.
17     Q    And what do you mean when you say,
18 "Possible types of adverse events"?
19     A    Known potential adverse events,
20 which are listed in the product labeling, in
21 the warning sections, and in the sections that
22 contain data from the original study. I'm
23 looking -- let's see -- for the section I'm
24 thinking of here. You can see that the
25 original clinical study is listed and the

Page 38

1  events that occurred during that study are
2  listed. Bear with me. I'm scrolling through,
3  reviewing this.
4      Q    Let me direct your attention to
5  ReShape Document 8. It's Page 7 of the IFU.
6      A    Okay.
7      Q    And apparently this was an IFU that
8  was sent to Dr. Lavin via email, on May 18,
9  2017; is that right?
10     A    I would have to check the
11 referencing document. I don't recall, off the
12 top of my head. I see Page 7, yes.
13     Q    In the clinical study, it states,
14 quote, "There were no deaths," unquote.
15     A    That's correct.
16     Q    So if a death had occurred after
17 the clinical study, shouldn't the occurrence
18 of that death be communicated to the treating
19 physician, such that he might advise the
20 patient of the occurrence of a type of adverse
21 event?
22          MS. WEBRE:
23              Objection --
24          THE WITNESS:
25              That's not a regulatory

Page 39

1  requirement, to report to a physician,
2  as I mentioned before. That's reported
3  through the MAUDE database.
4  EXAMINATION BY MR. SHAW:
5      Q    Are you familiar with the Code of
6  Federal Regulations that allows communications
7  or warnings to be given to treating physicians
8  that use your products, without FDA approval?
9      A    I'm not familiar with what you're
10 referencing, no.
11     Q    So as far as you're concerned, if
12 the FDA says, "Don't send it," you don't send
13 it?
14     A    If the FDA says, don't send what?
15 The FDA doesn't tell manufacturers what they,
16 you know, can and can't send. The FDA sends
17 communications, and the FDA, on occasion, will
18 require manufacturers to update labeling,
19 based upon additional information.
20     Q    But you would agree with me that
21 the instructions for use that Dr. Lavin had in
22 his possession at the time of the implantation
23 of Mr. Vesoulis' balloons, indicated that
24 there had been no deaths regarding the use of
25 this device, is that true?

Page 40

1      A    There were no deaths in the
2  clinical study. If this is the version he
3  had, then that's the information he had,
4  that's correct.
5      Q    Okay. But we know for a fact,
6  because ReShape provided two MAUDE reports,
7  one from a death that occurred on March 29,
8  2016, and another from a death that occurred
9  in April -- I'm sorry, May of 2017, that there
10 had, in fact, been two deaths as a result of
11 the use of this device, is that true?
12          MS. WEBRE:
13              I'm going to object to the form
14          of the question, especially to your
15          suggestion that these deaths were as a
16          result of the use of the device. That
17          is not the standard that is required in
18          reporting that to the FDA. Simply
19          because it complied with their
20          obligation to report it does not mean
21          there was any specific investigation or
22          conclusion that it was related to the
23          use of the balloon. To the extent you
24          can answer, you can answer.
25          THE WITNESS:

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 41

1    Yeah, as I've restated -- I'll
2    restate, any events that are captured
3    are reported through the MAUDE database.
4    That is the regulatory process that we
5    follow.
6    EXAMINATION BY MR. SHAW:
7    Q    Okay. And so death is an adverse
8    event which gets reported, is that true?
9    A    You -- you basically report the
10   event. So if the FDA -- the FDA typically
11   will capture the event that led to the death,
12   but the description will include the outcome
13   of that event, and if death was the outcome,
14   that would be recorded, and in the MAUDE
15   database, that would be recorded as a death.
16   You can search that database and it will be
17   listed as a death and then it will explain the
18   associated event.
19   Q    And the adverse events of death of
20   patients who received ReShape intragastric
21   balloons are not communicated to the treating
22   physicians --
23   A    All of the --
24   Q    -- after the PMA study, is that
25   true?

Page 42

1    A    All of the adverse events that
2    occur are communicated through the MAUDE
3    database, as required by regulation.
4    Q    Okay. Isn't it true that the CFR
5    also allows ReShape to directly contact
6    treating physicians for any updated labeling
7    that may be necessary?
8    A    That's -- that's an updated IFU
9    issue that would be sent to all prescribers,
10   and IFUs are updated periodically. Yes, I
11   agree with that statement.
12   Q    In fact, this particular IFU was
13   updated to warn of the risk of acute
14   pancreatitis, was it not?
15   A    You mean subsequent to this
16   Revision G?
17   Q    No, in this Revision G.
18   A    In this Revision G? Let me see if
19   I can find it. Do you know which page that's
20   on?
21   Q    I will tell you in just a minute.
22   A    Okay.
23   Q    I didn't get to highlight these.
24   MS. WEBRE:
25        Mary Lou, I'll direct your

Page 43

1    attention to --
2    EXAMINATION BY MR. SHAW:
3    Q    It's Page 3, which would be ReShape
4    Document No. 4, second bullet point.
5    Actually, the third bullet point from the
6    bottom.
7    A    Oh, yes, I see that.
8    MS. WEBRE:
9         Frank, I was also, if it would
10   be helpful, going to direct her to
11   Page 110 of the PDF, which is her email
12   forwarding it, and it discusses that
13   specific issue.
14   EXAMINATION BY MR. SHAW:
15   Q    Do you have that IFU, Ms. Mooney?
16   A    I have Revision G. Yes, I'm
17   looking at that now.
18   Q    The third line from the bottom
19   says, "Acute pancreatitis has been reported as
20   a result of injury to the pancreas by the
21   balloon," unquote. Do you recall the addition
22   of that particular risk being discussed at any
23   time by anybody at ReShape, to be added to the
24   IFU?
25   A    That would have been discussed and

Page 44

1    I believe that was also discussed with the
2    FDA.
3    Q    But the deaths secondary to
4    esophageal perforation and the deaths
5    secondary to aspiration were not discussed
6    with the FDA, is that right?
7    A    You are typically reporting the
8    event risk, such as perforation or aspiration
9    or acute pancreatitis. I mean, any of these
10   in any given patient, depending upon their
11   medical condition, could escalate to death. I
12   mean, people can die from acute pancreatitis.
13   People can die from a lot of different things.
14   So typically you will report the event, the
15   adverse event, such as acute pancreatitis or
16   aspiration or perforation.
17   Q    Had anyone died as a result of
18   acute pancreatitis, as of July 27, 2017?
19   A    Not that I have a recollection of.
20   If they did, it would have been reported as
21   part of the MAUDE report, on the acute
22   pancreatitis.
23   Q    And the IFU, as of July 27, 2017,
24   attaches the clinical study for the initial
25   approval, which indicates that there had been

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

### Page 45

1  no deaths that had occurred as a result of the
2  use of these balloons, is that true?
3      A    Yes. The FDA requires your
4  instructions for use to have a summary of your
5  clinical study results, including the safety
6  results.
7      Q    But why wasn't the IFU updated to
8  also reflect the two deaths to which we have
9  been referring, which occurred after PMA
10 approval, after the clinical study, but before
11 the implantation of Mr. Vesoulis's balloons?
12     A    I just lost volume. I can't --
13 it's frozen to me right now.
14     Q    Did you hear the question?
15     A    No. It froze for a minute there.
16 Now I can hear you. Could you repeat that?
17     Q    Okay. Do you know why the IFU that
18 was in Dr. Lavin's possession at the time that
19 Mr. Vesoulis' balloons were placed, on
20 July 27, 2017, did not reflect or in any way
21 reference the two deaths that occurred, one
22 from aspiration, as of May of 2017, and one
23 from sepsis, secondary to esophageal
24 perforation, as of March 29, 2016?
25     A    There is not a requirement to

### Page 46

1  update the IFU, based upon every single,
2  individual event received. It's reviewed in
3  terms of the types of events that can happen,
4  and when those events start to appear where
5  they were not evident before, or if they
6  appear in a distinctive increase in frequency,
7  those are the things that will typically
8  involve a review and update of an IFU. And
9  FDA also monitors these, through the MAUDE
10 database, and they, at their discretion, can
11 reach out to manufacturers and request some of
12 those updates, as was done with the acute
13 pancreatitis and the aspiration, so there are
14 two vehicles.
15     Q    So you would agree with me that a
16 treating physician cannot warn of any adverse
17 events or discuss any adverse events with his
18 patient unless he is actually notified that
19 there had been an adverse event, isn't that
20 true?
21          MS. WEBRE:
22              Let me just put my objection on
23          the record. First of all, I'm objecting
24          because you cut off her answer. Please
25          don't cut her off. Second of all, I

### Page 47

1  object to the suggestion, the only way
2  he can find out information about
3  adverse events or risks is to get it
4  directly from the company. So if you
5  can answer, you can answer.
6          THE WITNESS:
7              I think a treating physician
8  with specialty in the field can describe
9  for a patient, if he were to have any of
10 the types of events we had been speaking
11 about, that any of those can lead to
12 further sequelae, in any given
13 situation. So our obligation is to
14 report the events that we know have been
15 seen, in the clinical study, or in
16 practice, and then it's up to the
17 physician to describe that and to
18 communicate that to the patients.
19 EXAMINATION BY MR. SHAW:
20     Q    So it's your testimony, sitting
21 here today, that the treating physician should
22 check the MAUDE database for adverse events
23 prior to him placing these balloons?
24     A    No. The point I was trying to make
25 is the physician, because it is a prescription

### Page 48

1  device, uses the information we provide in the
2  IFU to provide informed consent to the patient
3  about the possible adverse events that may
4  occur with the balloons.
5      Q    Okay. And the IFU specifically
6  states, with regard to the clinical study that
7  was used for premarket approval, that no
8  deaths had been experienced as a result of the
9  use of this device, isn't that true?
10     A    That's the data in Revision G.
11 That was the clinical study, correct.
12     Q    But, in fact, ReShape knew that
13 there had been a death, in March of 2016, and
14 a death in May of 2017, and did not advise the
15 treating physician, is that true?
16     A    We reported through the MAUDE
17 database, as required. We did not contact any
18 individual physicians, which is not required.
19     Q    And wouldn't you agree that the IFU
20 does not specifically state that the treating
21 physician should check the MAUDE database for
22 adverse events --
23     A    The IFU --
24     Q    -- prior to speaking with a
25 patient?

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 49

1  A  The IFU does not state that they
2  should check the MAUDE database.
3      MR. SHAW:
4          Being we've been talking about
5      the IFU, I'll go ahead and label that as
6      "Exhibit 5."
7  EXAMINATION BY MR. SHAW:
8  Q  The first annual report you filed
9  is dated July 25, 2016; is that correct?
10 That's ReShape 156189.  And maybe Rachel can
11 tell you where it is on the PDF that she sent
12 you.
13     MS. WEBRE:
14         Can you tell me one more time
15     what that is?
16     MR. SHAW:
17         It's the annual report, dated
18     July 25, 2016.
19     MS. WEBRE:
20         Yeah, I saw that.  That's still
21     in that same PDF, and it starts on
22     Page -- of that PDF, it looks like it
23     starts on Page 20.
24     THE WITNESS:
25         Yes, I see that.  I'm sorry,

Page 50

1      was there a question there, Frank, that
2      I missed?  I'm looking at that report
3      now.
4  EXAMINATION BY MR. SHAW:
5  Q  I'm trying to get a page here,
6  so --
7  A  Oh, okay.
8  Q  Look at Page 31 of that report.
9  A  Okay.
10 Q  And this is a report that you
11 submitted to the FDA, is that correct, as part
12 of the premarket approval order?
13     MS. WEBRE:
14         Give her a second to get there,
15     Frank.
16     THE WITNESS:
17         Okay, I'm at Page 31.  This
18     would have either -- I would have
19     certainly reviewed the report.  Whether
20     I physically authored it or my director
21     did, I don't recall, but I was
22     ultimately responsible for the review of
23     it, yes.
24 EXAMINATION BY MR. SHAW:
25 Q  And at that page, it states, quote,

Page 51

1  "There were no reportable labeling changes
2  during the reporting period."  So that would
3  have been from the date of the PMA approval
4  until the date of the report; is that correct?
5  A  Actually, in the report, on, I
6  think, the first page describes what the
7  reporting window is.  It's a little bit
8  shorter than that, because you allow a couple
9  weeks for data compilation, so I think at the
10 beginning of the report -- let me see if I can
11 find it -- it clearly delineates the reporting
12 period.  Yes, if you look at Page 2 of 36, the
13 asterisk there, it clarifies the reporting
14 period for this report.
15 Q  So during the reporting period,
16 which I have down here as July 1, 2014, to
17 July 4, 2016, there were no labeling changes;
18 is that correct?
19 A  No reportable labeling changes,
20 correct.
21 Q  What do you mean when you say
22 "reportable"?
23 A  I think I might have mentioned
24 earlier in the conversation that if you're
25 making corrections or clarifications --

Page 52

1  there's a whole guidance document that
2  describes reportable labeling changes versus
3  those that can be made for minor corrections
4  and things like that.
5  Q  Certainly, advising a treating
6  physician, such as Dr. Lavin, of a death from
7  sepsis, secondary to esophageal perforation,
8  would be a reportable event, would it not?
9  A  If that was added to the IFU, that
10 would be an IFU change that would require
11 approval and reporting to the FDA.
12 Q  You are not familiar with the
13 sections of the Code of Federal Regulations
14 that allows a manufacturer to advise a
15 treating physician of any aspect that might --
16 of the use of the device, or of the device,
17 that might improve its safety or
18 effectiveness, without FDA approval?
19     MS. WEBRE:
20         Let me just object here
21     because -- I want to put an objection on
22     the record.  You're confusing what's in
23     this report with that CFR, but that's my
24     objection.  If you can answer, go ahead
25     and answer.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Case 2:19-cv-01795-MLCF-DMD Document 101-5 Filed 04/20/21 Page 10 of 13

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 53

1    THE WITNESS:
2        Yeah, I'm not totally sure. I
3    mean, there are, again, labeling
4    communications, there are letters to
5    health care providers. Those are the
6    vehicles that manufacturers have, within
7    the regulations, to report information
8    and updates to physicians. I don't know
9    if that answers your question, but --
10   EXAMINATION BY MR. SHAW:
11   Q    Did ReShape ever send any letters
12   to the health care providers specifically
13   notifying them of the deaths that occurred, in
14   March of 2016 and May of 2017, or was that the
15   FDA?
16   A    I believe we sent one or two
17   letters to physicians that I believe were
18   attached or contemporaneous with some of the
19   FDA communications. I'd have to review those
20   and look at those specifically to comment
21   further.
22   Q    Prior to the letter that you're
23   referring to that was contemporaneous with the
24   FDA Dear Doctor Letter, were there any letters
25   sent, to your knowledge, by ReShape, notifying

Page 54

1    treating physicians, such as Dr. Lavin, of the
2    specific adverse events regarding these two
3    deaths that we've been referring to?
4    A    Not that I recall.
5    MR. SHAW:
6        Okay. I'll mark this annual
7    report, for the sake of completeness, as
8    "Exhibit 6." And I'll mark as
9    "Exhibit 7," the annual report, dated
10   January of 2017. This would be ReShape
11   Document 146413.
12   MS. WEBRE:
13       This is a different annual
14   report?
15   MR. SHAW:
16       Right.
17   MS. WEBRE:
18       Let's see if we can find it.
19   I'm sorry, could you give me the Bates
20   again, Frank?
21   MR. SHAW:
22       146413.
23   MS. WEBRE:
24       Okay.
25   MS. BRIAN:

Page 55

1        It's Page 56.
2    MS. WEBRE:
3        That's the one we were just
4    looking at, wasn't it?
5    MS. BRIAN:
6        I thought the one we were
7    looking at was on 20. Am I wrong?
8    MS. WEBRE:
9        Oh. Oh, yeah. I'm sorry.
10   You're right. Yeah, 146413 is Page 56
11   of 192 of that PDF.
12   MS. BRIAN:
13       Awesome, thank you.
14   THE WITNESS:
15       I just happened to -- I don't
16   know why I was there, but --
17   MR. SHAW:
18       I'm sorry, let's go off the
19   record.
20   THE VIDEOGRAPHER:
21       We're off the record.
22       (Whereupon, a discussion was
23   held off the record).
24   THE VIDEOGRAPHER:
25       We're back on record.

Page 56

1    EXAMINATION BY MR. SHAW:
2    Q    Okay. So I have reoriented myself
3    and marked as "Exhibit 8," the July 27, 2017
4    annual report and the cover letter from
5    yourself to Ms. -- or Dr. Betz; is that
6    correct?
7    A    That's the FDA reviewer? Yes,
8    Dr. Martha Betz.
9    Q    And this would be the annual report
10   submitted on the date that Mr. Vesoulis'
11   balloons were placed, as coincidence would
12   have it, true?
13   A    The one I'm looking at says, "Date
14   of report, July 27, 2017."
15   Q    If you look at Page -- I guess it's
16   Page 23 of that report.
17   A    23? Okay.
18   Q    It indicates that there were no
19   reportable labeling changes during this
20   reporting period, is that true?
21   A    I see that. I see where you're
22   looking, yes.
23   Q    It's Page 23 of the report, ReShape
24   Document No. 146861.
25   A    Okay.

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 73

1    August 10, 2017.
2         MS. WEBRE:
3              And it is a -- I'm having some
4    computer issues. August 10th, 2017, and
5    what is it now?
6         THE WITNESS:
7              FDA letter.
8         MR. SHAW:
9              This is the FDA letter.
10        MS. WEBRE:
11             Okay. August 10, 2017. I'm
12   looking. I think I know what it looks
13   like, so I'm trying to click quick.
14        THE WITNESS:
15             Yeah, I'm scanning through the
16   document, too.
17        MS. WEBRE:
18             Okay, it's No. 167 out of 192.
19        THE WITNESS:
20             Yep, okay, got it.
21   EXAMINATION BY MR. SHAW:
22        Q    Did you see that letter when it
23   came out, on August 10 of 2017?
24        A    Yes.
25        MR. SHAW:

Page 74

1              All right. And I'll mark as
2    "Exhibit 12" a letter signed by you to
3    health care providers, of the same date,
4    August 10, 2017.
5         MS. WEBRE:
6              That's just a couple of pages
7    after. It's Page 169.
8         THE WITNESS:
9              Okay. Yes, I see that.
10   EXAMINATION BY MR. SHAW:
11        Q    Okay. Why did you write this
12   particular letter of August 10, 2017, to
13   ReShape health care providers? Was this in
14   response to what the FDA Dear Doctor Letter
15   had said?
16        A    Yes. This was to give additional
17   information that related to that communication
18   from the FDA.
19        Q    If you look at the second
20   paragraph, it says, "ReShape has received one
21   additional report of death from sepsis,
22   secondary to an esophageal perforation, that
23   was diagnosed 30 days post-insertion." Is
24   that sentence referring to the death that
25   occurred on March 29, 2016?

Page 75

1         A    I -- I can't say for certain, with
2    just that general statement.
3         Q    Are you familiar with another death
4    that occurred --
5         A    No.
6         Q    -- from sepsis, secondary to
7    esophageal perforation?
8         A    I am not, so it is likely that one,
9    but I don't have any way to -- it doesn't call
10   out the exact report, but I am not aware of
11   any other event, so that would imply, it's the
12   same event.
13        Q    And ReShape was aware, from the
14   date of that death forward, that that was a
15   death from sepsis, secondary to esophageal
16   perforation, was it not?
17        A    Yes, as was FDA, and reported in
18   the MAUDE MedWatch report.
19        Q    Only?
20        A    Excuse me?
21        Q    That was reported in the MedWatch
22   or the MAUDE database, to the FDA, correct?
23        A    Correct.
24        Q    There were no subsequent
25   discussions regarding that particular death,

Page 76

1    is that true?
2         A    Correct.
3         Q    And the treating physicians were
4    not advised of that particular death and the
5    instructions for use prior to July 27, 2017,
6    is that true?
7         A    Yes, the instructions were not
8    updated, and there is no provision for a
9    requirement to send MAUDE reports to
10   physicians.
11        MR. SHAW:
12             Let's go off the record real
13   quick, Ms. Mooney, and let me look at
14   the Notice of Deposition of what I
15   wanted to ask you about, and odds are, a
16   lot of it has already been covered.
17        THE WITNESS:
18             Okay.
19        MR. SHAW:
20             And I can fill in any gaps that
21   might exist.
22        THE VIDEOGRAPHER:
23             We're off the record.
24             (Whereupon, a break was taken).
25        THE VIDEOGRAPHER:

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Case 2:19-cv-01795-MLCF-DMD Document 101-5 Filed 04/20/21 Page 12 of 13

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 69

1  through what's called user reporting. They're
2  encouraged to report to the manufacturer so
3  that we can have the most current information,
4  but there is a mechanism where they can report
5  separately to the FDA. If that does occur,
6  the FDA typically forwards copies of those to
7  the manufacturer to close the loop so that the
8  manufacturer is kept informed.
9       MR. SHAW:
10           I'm going to mark as
11  "Exhibit 10" the letter from the FDA to
12  treating physicians, dated February 9,
13  2017.
14      MS. WEBRE:
15          Give us a second to find it,
16  please.
17      MR. SHAW:
18          Yeah, let me see if we can
19  locate it. Do you have it, Ms. Mooney?
20      THE WITNESS:
21          No. Is it in that same PDF,
22  Rachel?
23      MS. WEBRE:
24          Let me see. He's saying
25  February 9th. Okay. So if you look at

Page 70

1  Page 98 of that same PDF.
2       THE WITNESS:
3           Okay. Okay, I see that, dated
4  February 9, 2017, yes.
5  EXAMINATION BY MR. SHAW:
6       Q    Are you familiar with this
7  particular Dear Doctor Letter, issued by the
8  FDA?
9       A    Yes, I have seen this before.
10      Q    And when did you just -- when did
11  you first see this particular document?
12      A    I -- I don't recall specifically.
13  I think the FDA may have given us a day or two
14  heads-up that they were issuing this, but I'm
15  not totally sure on that timing sequence.
16  That's my best recollection.
17      Q    And this document concerns two
18  issues regarding intragastric balloons, one of
19  over-inflation, and the other of instances of
20  acute pancreatitis, is that right?
21      A    Yes, that's what I'm looking at.
22      Q    Did anyone from ReShape have any
23  contact with the FDA regarding either of those
24  two issues at the time this letter was issued
25  on February 9, 2017, until July of 2017?

Page 71

1       A    The only communication would have
2  been if either of these events were reported
3  to us, and they would have been reported
4  through the MAUDE database.
5       Q    If you look at Page 3 of that
6  letter, it says, quote, "The FDA continues to
7  work with ReShape Medical, Inc., and Apollo
8  Endosurgery to better understand these issues
9  of acute pancreatitis and over-inflation in
10  patients with liquid-filled intragastric
11  balloons." Do you see that?
12      A    I do see that, yes.
13      Q    Okay. And that statement
14  specifically includes the two issues of acute
15  pancreatitis and over-inflation in patients
16  with liquid-filled intragastric balloons and
17  does not include death by sepsis, secondary to
18  esophageal perforation, or death from
19  aspiration, isn't that true?
20      A    Yes. This letter does not mention
21  those. This is specific to the two you just
22  highlighted.
23      Q    And ReShape did not have any
24  contact with the FDA prior to August 10 of
25  2017, with regard to either of those two

Page 72

1  deaths, one of which was sepsis, secondary to
2  esophageal perforation, in March of 2016, and
3  the other was an aspiration, in May of 2017,
4  is that true?
5       A    No. The FDA communication would
6  have been MAUDE reports for those events.
7       Q    But other than the MAUDE reports
8  for those events, there were no other
9  communications with the FDA regarding those
10  two tests?
11      A    That's correct, to the best of my
12  recollection. It was just the MAUDE reports.
13      MR. SHAW:
14          And I'll mark as "Exhibit 11"
15  the August 10, 2017, letter from the
16  FDA, entitled "Update and Additional
17  Information Regarding Adverse Event
18  Reports." I don't know where it is on
19  your PDF.
20      THE WITNESS:
21          Do you know where that one is,
22  Rachel?
23      MS. WEBRE:
24          Give me the date again.
25      MR. SHAW:

Case 2:19-cv-01795-MLCF-DMD Document 101-5 Filed 04/20/21 Page 13 of 13

Videotaped Corporate Deposition of ReShape LifeSciences through Mary Lou Mooney
Paul Vesoulis v. ReShape LifeSciences, et al

Page 109

1  Q  And you don't know when that was?
2  A  It would be in the complaint file
3  that -- you know, at the company, but -- FDA
4  will sometimes, with MDRs, write back and ask
5  whether you have any additional information.
6  They can ask a variety of questions. So
7  sometimes you will get a request for
8  additional information, and then you respond,
9  and that's the -- that's the last thing
10  referenced there, response to the request.
11  Q  And if you look at ID No. 5067 --
12  A  Right.
13  Q  It's the ReShape response to the
14  FDA --
15  A  Right.
16  Q  -- request for additional
17  information?
18  A  Yeah. Without looking at those
19  documents, I can't conjecture what they say,
20  but I can say that FDA does review these MDR
21  reports that manufacturers send in, and they
22  will, on occasion, contact the company and ask
23  for additional information or determine
24  whether any additional information they're
25  interested in is available, so that's not --

Page 110

1  that's not uncommon. And then the company
2  needs to respond to FDA's request to either
3  provide that or say that that information
4  isn't available.
5  Q  And what was the ReShape response
6  to the FDA request, if you know?
7  A  I don't know. We'd have to look at
8  this PDF. I don't recall what they asked or
9  what the response was.
10  Q  Was that additional information, in
11  response to the FDA, sent to the health care
12  provider?
13  A  No. This would have been specific
14  to this MDR.
15  Q  So any response would have only
16  been sent to the FDA?
17  A  That's correct. I mean, the
18  request from the FDA could be a myriad of
19  things. They could have wanted to know a
20  patient age or wanted to know -- it could be
21  any number of things. And then the company is
22  obliged to respond to that request by either
23  providing the information or saying they
24  weren't able to obtain whatever information
25  FDA might be asking for.

Page 111

1  Q  Isn't it true that the risk of
2  esophageal perforation, as set forth in the
3  IFU, had occurred in the original clinical
4  trial?
5  A  The risk of esophageal perforation
6  is identified in the IFU, yes.
7  Q  And if you look at ReShape 71923,
8  it says, quote, "The product labeling warns of
9  the possible risk of perforation and death."
10  A  Let me see. 71923?
11  Q  It's the next page, the previous
12  page from what we were just looking at.
13  A  Let's see. The product labeling
14  warns of the possible risk of perforation and
15  death; however, in this case, there is no
16  known -- yes, I see that statement. I don't
17  know which revision of the IFU this statement
18  is referring to. Because, again, recognize,
19  this paragraph is from November of 2017. It
20  should be referring to whatever the current
21  revision of the IFU was at that time.
22  Q  Do you know whether the IFU, in
23  fact, warned about, quote, "The possible risk
24  of perforation and death," unquote, or does it
25  only warn about the possible risk of

Page 112

1  perforation?
2      MS. WEBRE:
3          Object to form.
4      THE WITNESS:
5          The Revision G that we reviewed
6      in these documents I've been given,
7      identified perforation, but not death.
8  EXAMINATION BY MR. SHAW:
9  Q  Did ReShape provide to treating
10  physicians informed consents to be used when
11  the balloons were placed?
12  A  No. No, informed consent, outside
13  of a study controlled by ReShape, is the
14  responsibility of the treating physician, so
15  that treating physician has their own consent,
16  or multiple consents, for the procedure. The
17  company has no involvement in that.
18      MR. SHAW:
19          Okay. Thank you, ma'am. I
20      tender the witness. Kelly, any
21      questions?
22      MS. BRIAN:
23          I don't have any questions.
24      MS. WEBRE:
25          Just a couple, Mary Lou.