UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

PAUL VESOULIS                     CIVIL ACTION NO. 19-CV-01795-MLCF-DMD

                                                 JUDGE MARTIN L.C. FELDMAN

VERSUS

RESHAPE LIFESCIENCES,
f/k/a ENTEROMEDICS            MAGISTRATE JUDGE DANA M. DOUGLAS
INCORPORATED, ET AL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S RESPONSE TO DEFENDANTS, THOMAS LAVIN, M.D. AND SURGICAL SPECIALISTS OF LOUISIANA'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes plaintiff, Paul Vesoulis, who responds to the Statement of Uncontested Facts set forth by defendants, Dr. Thomas Lavin, M.D. ("Dr. Lavin") and Surgical Specialists of Louisiana ("SSL")., and sets forth plaintiff's Statement of Contested Facts which present issues for trial.

**RESPONSE TO STATEMENT OF UNCONTESTED FACTS**

Pursuant to LR 56.2 plaintiff responds to the Statement of Uncontested Facts set forth by defendants, Dr. Thomas Lavin, M.D. and Surgical Specialists of Louisiana, and sets forth a Statement of Contested Facts, which require resolution by the factfinder:

**STATEMENT OF UNCONSTESTED FACT 1:**

1. On July 27, 2017, Dr. Vesoulis underwent a procedure by Dr. Lavin to insert the

ReShape Dual Intragastric Balloon.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 1:**

Uncontested, however, this was a purely elective procedure. The balloons <u>had</u> to be removed in six (6) months such that time for securing informed consent was July 27, 2017. Ex. A to ReShape MSJ. Rec. Doc. 95-1, p.1, ReShape 000002"...it must be removed...".

**STATEMENT OF UNCONSTESTED FACT 2:**

2. Prior to the July 27, 2017 procedure, Dr. Lavin discussed with Dr. Vesoulis the risks and benefits of the procedure. Prior to the July 27, 2017 procedure, Dr. Vesoulis signed informed consent forms. The informed consent form acknowledged and signed by Dr. Vesoulis identified numerous potential known risks of the procedure, including esophageal perforation.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 2:**

Denied. Plaintiff was never advised by Dr. Lavin or SSL that death was even a possibility nor did the consent form include the risk of esophageal perforation. See, Ex. C to defendants' MSJ. This consent included under "nonspecific (general) symptoms" "the upper gastrointestinal tract" but there were no warnings given of "esophageal perforation." In the initial phone consultation, Dr. Lavin certainly did not advise Dr. Vesoulis of the risk of death from this procedure. This is hardly surprising being that Dr. Lavin did not know of the deaths known to ReShape. Dr. Lavin explained the procedure, (apparently equating it with an endoscopy), which Dr. Lavin characterized as "a very easy, noninvasive procedure", i.e. nonsurgical which corresponded with ReShape's declaration that the

2

procedure was "Nonsurgical". (See, Ex. "A", Deposition of Paul Vesoulis, p. 8-14), Ex. B to ReShape MSJ, Doc. 95-2, p.5, ReShape 000136, "Life-changing Weight Loss, No Surgery Required". Dr. Lavin did not warn plaintiff that the risk of esophageal perforation from endoscopic balloon placement was much greater than a simple endoscopy Ex. A to MSJ, Rec. Doc. 95-1 p. 7, ReShape 000008. Dr. Vesoulis' testimony about the initial phone conversation is as follows:

> "Q. In that initial conversation what, as far as you can recall, did you discuss with Dr. Lavin?
> A. Just what the procedure was. That it was nothing like the more invasive gastric procedures, you know, bypass and sleeves and other ones that -- other procedures that were out there that were more surgical. That this was a pretty this was a pretty benign procedure that was very noninvasive and showed really good results.
> Q. When you say what the procedure was, what do you mean?
> A. It was nothing that was irreversible, and that it was not an invasive surgical procedure.
> Q. I guess what I'm trying to get at is you've told me that Dr. Lavin told you what the procedure was. What was that?
> A. That they would insert some balloons into my stomach. They would stay in there for a certain amount of time and then they would pull the balloons out.
> \*\*\*\*\*\*\*\*\*\*
> Q. When you talked to Dr. Lavin the initial time and you discussed the balloon placement procedure, did you discuss any other procedures?
> A. If I did I really don't remember. I just remember that I was particularly interested in this one because it was noninvasive and nonsurgical. And I have known people that have had the gastric bypass and the sleeves and so forth and that was a pretty more involved surgery.
> Q. If I understood you, you don't remember specifically if Dr. Lavin called you initially or you called him initially; is that right?
> A. Right. I don't remember.
> Q. Irrespective --
> A. I know phone numbers were transferred, and I don't know who reached out to who first.

3

> Q. I understand. Irrespective of who first made contact, did the conversation start with you asking Dr. Lavin tell me about the balloon placement?
> A. I had asked him to explain the procedure to me and he explained it to me, that it was basically a very easy, noninvasive procedure that I could fly in and fly out. And that's basically what I did, I flew in and flew out and had it put in.
> Q. I didn't quite understand your answer or hear you completely. Did you say an ED procedure?
> A. An easy.
> A. An easy procedure.
> Q. So when you say -- and you've used the term "noninvasive" a couple of times in your responses. Did you understand that the balloons would be placed inside your stomach through an EGD procedure?
> A. Yes. He told me it was through an upper endoscopy.
> Q. In your mind that's noninvasive?
> A. I was told that upper GIs are very noninvasive and very simple and very, very, very rare side effects to them. Simple. Basically he had said simply sedate you, drop it in, inflate them and you go home.
> Q. But my question is very specifically does an endoscopy procedure, in your mind, equate with noninvasive?
> A. Yes.
> Q. Does Dr. Lavin use the term "noninvasive" when describing the procedure?
> A. I believe so."
> (Ex. "A" Deposition of Paul Vesoulis p. 9-19, 11-13).

A question of fact is presented from the differing versions of that initial consultation.

Dr. Lavin testified:

> Q Let me ask you, first, is there a different consent process for the placement of the ReShape balloon versus the removal of theReShape balloon?
> A I don't believe so. I think it's the same process, because the risks are no different for either procedure.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> Q Okay. Did you meet Dr. Vesoulis, since he came from out of town, did you meet him before the procedure?
> A No -- Well, yes, before the procedure, when we went over the informed consent, of course, yes. Always. I never do a procedure without meeting the patient, going over everything. Even before he came down, I did a phone consult,

4

discussing everything about the procedure. So we talked prior to him coming to town.

*********************

Q   Okay. Here's one. This, at the bottom it says "VesoulisDrLavin" Bates No. 40, and this is a four-page document. Take a look at that.

A   (Reviewing document). Yes.

Q   Okay. And the last page of that has the date on it that Dr. Vesoulis signed it?

A   Yes, 7-27-17.

Q   Okay. So this would have been signed on the day of the actual procedure; is that right?

A   Correct.

Q   How does this work? At what point does the patient sign this prior to the procedure?

A   So it depends on whether the person is coming from out of town. I do a lot of patients from all over the United States, so they will either do their consent the day before or sometimes, depending on their schedule, the morning of the procedure.

Q   Okay.

A   So we just do it prior to the procedure, prior to any sedation, of course, or anything like that.

Q   He's a doctor, right?

A   He's a dentist, correct.

Q   Was your procedure any different than it would be with someone who was not a doctor?

A   No. We treat everyone the same.

Q   The language that you use, the detail that you go into would have been the same with Dr. Vesoulis as it would be with any patient?

A   Pretty much, yes. I'm not going to change it for one person. Lot of times I don't even know if it is a healthcare professional.

Q   Okay. I had asked you if you met him before the procedure. The morning of the procedure, did you meet him before you took him in?

A   For sure.

Q   Okay.

A   Absolutely. Before he had any sedation, before he went in for the procedure, we met and went over everything.

Q   So the form that you're looking at there, the four-page, it says "Endoscopic Balloon Procedure Consent Form," is this something you yourself would have gone over with him or one of your staff?

  A Probably both. I don't sit and go over the form in detail with everyone. They read it over and sign it, and I go over it and go over the consent again. So there's a combination of me going over it and them reading through things, so they get two chances to see everything.
  Q Okay. I want to shift focus a little bit. This is a different form, and it's a two-page document, and it says "Consent for Endoscopic Removal of Intragastric Balloon"; is that correct?
  A Right.
  Q Can you tell us whether Dr. Vesoulis signed that?
  A Yes, right here (indicating).
  Q Okay. And what date did he sign it?
  A January 11th, 2018.
  Q Okay. So would you have also gone over this with him before you took him into this procedure?
  A Sure.
  Q It would have been similar to the first time, right?
  A Right.
  Q Do you recall whether either in going over this form specifically or just in talking to him about the risks, you would have discussed the risk of esophageal perforation?
  A I would have said intra-abdominal GI tract perforation, which I discuss with everyone on any kind of procedure, whether it's a laparoscopic procedure, endoscopic procedure, either way.
  Q Okay. And then you would have handed him this form to look at and sign, correct?
  A Right.
  Q And this form specifically notes, let me quote, "Serious complications include a risk of bleeding or perforation of the esophagus," et cetera, "occurring in less than one of 10,000 cases"; is that correct?
  A Right.
  Q Okay. And then further down, the next paragraph, there are risks of gastroesophageal reflux, esophagitis, correct?
  A Yes.
  Q Okay. Is this form that we have talked about, which is number "Vesoulis Dr. Lavin" Bates No. 49, is this a form that your office would have authored, that you would have authored, or do you know?
  A We would have got it from some – I can get the source, because the girl that runs my clinical side is a nurse practitioner and she was president of the Allied Health side of ASMBS, so she had good access to documents. And so we

6

>wouldn't have authored it ourselves. It would have been a collaborative work amongst people doing the procedure.
>  Q   Okay. So you don't know specifically as we sit here right now where it came from?
>  A   I don't, but I can find out.
>  Q   So it's something if I followed up with you, you could let me know?
>  A   For sure.
>  Q   Okay. Other than these two consent forms, would you have given Dr. Vesoulis any other written materials that specifically addressed risks?
>  A   I don't believe so.
>  Q   Okay. Do you share the Instructions for Use with your patients?
>  A   The doctors' Instructions for Use?
>  Q   Correct.
>  A   No.
>  Q   Let me ask you this. As we sit here today, do you remember going through this particular consent process with Dr. Vesoulis for the removal of the balloon?
>  A   I don't remember with any particular patient. I just know my routine of how I do it with every patient.
>  (Ex. "B", Deposition of Dr. Thomas Lavin p. 66-75).

But there is a difference between an endoscopy and a balloon placement and removal. The risk of esophageal perforation is much higher with a ReShape balloon than 1 in 10,000 which is the risk in a simple endoscopy. That is why ReShape states each risk separately in the IFU. Ex. A to MSJ, Rec. Doc. 95-1, P. 5-6. By all indications, Dr. Lavin was under the impression that the risks were those of a simple endoscopic procedure, which they were not. Further, Dr. Lavin's testimony says nothing of him warning of a risk of death secondary to sepsis from esophageal perforation or that a patient had died on March 29, 2016 from this condition after receiving the ReShape balloons.

7

### STATEMENT OF UNCONTESTED FACT 3:

3. Additionally, the informed consent signed by Dr. Vesoulis noted the following important information: "***You must have the Balloon device removed per protocol***. If the balloon device stays in your stomach for more than recommended time frame there is a much greater risk that the balloon could deflate and cause a blockage in your intestines or develop an ulcer in the stomach." [***Emphasis original.***]

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 3:

Uncontested. The balloons must be removed.

### STATEMENT OF UNCONTESTED FACT 4:

4. On January 11, 2018, Dr. Vesoulis underwent the balloon removal procedure.

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 4:

Uncontested.

### STATEMENT OF UNCONTESTED FACT 5:

5. Prior to the January 11, 2018 procedure, Dr. Lavin and his staff discussed the risk of the procedure and asked offered to ask any questions Dr. Vesoulis might have. Dr. Vesoulis signed informed consent forms. The informed consent form acknowledged and signed by Dr. Vesoulis identified numerous potential known risks of the procedure, including esophageal perforation.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 5:**

Denied. The Informed Consent Form states that "Endoscopy is Safe" and in referring to esophageal perforation that the risk of esophageal perforation occurs in less than 1 of 10,000 cases. The risk of esophageal perforation using ReShape balloons is .04%, <u>40 times greater</u>. (See, ReShape IFU). And for the first time upon balloon removal Dr. Lavin and SSL states that "complications in very rare instances may result in death." Why now and not on July 27, 2017? They are clearly not 1 in 10,000 because ReShape documented that the risk was much greater. This is a failure to obtain valid informed consent from the patient by Dr. Lavin.

**STATEMENT OF UNCONTESTED FACT 6:**

6. Dr. Vesoulis sustained an esophageal perforation, a known risk of the procedures.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 6:**

Denied as written. The actual risk of an esophageal perforation was not known to Dr. Vesoulis. The risk of deaths actually occurring as a result of this purely elective procedure was not known to Dr. Vesoulis.

**STATEMENT OF UNCONTESTED FACT 7:**

7. On or about January 8, 2019, the Plaintiff, Paul Vesoulis, filed a Petition for Medical Malpractice Review with the Division of Administration Commissioner's Office for the Louisiana Patient's Compensation Fund based on the care and

treatment provided by SSL and Dr. Thomas Lavin ("Dr. Lavin") from January 11, 2018 through January 13, 2018.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 7:**

Uncontested.

### STATEMENT OF UNCONSTESTED FACT 8:

8. At all pertinent times, SSL and Dr. Lavin were qualified health care providers and enrolled in the Patient's Compensation Fund under the provisions of Louisiana Revised Statute 40:1231.8.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 8:**

Uncontested.

### STATEMENT OF UNCONSTESTED FACT 9:

9. On May 26, 2020, a Medical Review Panel convened and reviewed the Plaintiff's allegations. After reviewing all the evidence, the Medical Review Panel rendered a unanimous opinion finding that the evidence presented did not support the conclusion that either SSL or Dr. Lavin failed to meet the standard of care as charged in the petition. The panel noted that, as to SSL, it found no deviation from the standard of care for the same reasons addressed in Dr. Lavin's reasons. Specifically, the panel found as follows:

The panel finds no deviation from the standard of care.

10

> Dr. Lavin provided patient with an informed consent what was signed by patient at the time of the placement of the Reshape Duo Gastric Balloon which did reference risks to the "upper gastrointestinal tract or intraabdominal organs including perforation (tearing), …"
>
> Dr. Lavin provided patient with an informed consent for that was signed by patient at the time of the removal of the Reshape Duo Gastric Balloon which did reference "a risk of bleeding or perforation of the esophagus, stomach or duodenum…"
>
> We suspect there was a perforation during the removal of the Balloon but such a perforation is a known complication and risk of this type of surgery. These risks were explained to the patient in the mentioned consent forms.
>
> We find that Dr. Lavin did possess the appropriate degree and skill of a bariatric surgeon. Upon presentation by the patient of a deteriorating condition, Dr. Lavin took him to the operating room, explored the abdominal cavity laparoscopically and upon finding a large distended stomach appropriately performed endoscopy. Forgoing the CT Scan was appropriate due to the urgency of the case.
>
> Dr. Laving's role as a physician is to make patient care decisions based on the patient history and how the patient is presenting clinically. Other patient's results are taken into consideration when providing care but is not required to be shared with subsequent patients specifically.
>
> When the patient appeared to further deteriorate, he was quickly and appropriately taken for a CT Scan which showed a leak. The patient was quickly taken to the operating room where Dr. Lavin repaired the perforation.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 9:**

Plaintiff does not contest that the Panel Rendered an opinion based upon the evidence presented at that time. Plaintiff notes that numerous depositions have been taken, and documents produced since that time.

## STATEMENT OF UNCONTESTED FACT 10:

10. On or about June 9, 2020, Plaintiff filed his Second Amended Complaint joining SSL and Dr. Lavin to the instant litigation. [Doc. 40]

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 10:

Uncontested.

## STATEMENT OF UNCONTESTED FACT 11:

11. Through discovery, the Plaintiff has identified Dr. Eric S. Bour as his expert in the medical malpractice portion of this litigation. On or about June 27, 2020, Dr. Bour provided a written report. And, on August 20, 2020, Dr. Bour was deposed in this matter.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 11:

Uncontested.

## STATEMENT OF UNCONTESTED FACT 12:

12. Dr. Bour has provided no criticism of SSL in either his report or his deposition testimony.

## RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 12:

Denied as written. Dr. Lavin is part owner of Surgical Specialists of Louisiana, LLC. Dr. Bour opined that Lavin breached the standard of care by failing to ensure he secured Informed Consent. (Ex. "C", Deposition of Dr. Eric Bour, p. 44-49). Dr. Lavin testified that "we [SSL] have a research coordinator that watches for FDA alerts" but that he does not remember seeing the

12

FDA Dear Doctor Letters at issue. (Ex. "B", Deposition of Dr. Lavin, p. 26, 38). Jennifer Perrilloux was the clinical research coordinator. She was employed by Surgical Specialists of Louisiana, LLC. (Ex. "D", Deposition of Jennifer Perilloux p. 5-6). Dr. Rachel Moore "missed" the purported 2x.m. perforation during the purported endoscopy procedure during emergent surgery on January 11, 2018. There are no records of this procedure. Dr. Moore was Dr. Lavin's surgical assistant. She testified that she was "employed" by SSL. (Ex. "E", p. 6-7).

### STATEMENT OF UNCONSTESTED FACT 13:

13. With regard to Dr. Lavin, Dr. Bour's single criticism with regard to consent is as follows: "there is no indication that specific mention was made of the then-issued FDA warnings of severe complications and death in several patients who underwent fluid-filled intragastric balloon procedures."

### RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 13:

Denied as written. See Response No. 12 above. Further, Dr. Lavin testified that there were endoscopy risks and device risks and that the two differed greatly.

> Q Well, if your consent said that the instances of esophageal perforation resulting from the placement of ReShape integrated dual balloon systems was one in 10,000, would that be accurate?
> A No, I would say it would be higher than that just with endoscopic, just on plain endoscopy. I would think it would certainly be higher than that.
> Q Regardless whether it was placement of the ReShape balloons or not?
> A Well, any time you instrument the GI tract, particularly removing polyps or anything like that, there's a risk of perforation from esophagus to stomach to colon to anything, and I believe it would be higher than one in 10,000.
> Q So could it be as high as four in 10,000 as reported in the Instructions for Use by ReShape?

        A Sure.

        Q And if that's a risk that is presented to a patient, they should be advised of that before they make a decision of whether or not to proceed with the elective surgery of implanting the ReShape integrated dual balloon systems; would that be correct?

        A Yes, I think people need to know the risks certainly before they proceed with any procedure.

        (Ex. "B", Deposition of Dr. Lavin p. 29-30).

As to the negligence or fault of SSL, there is no necessity to provide expert testimony for acts that are obviously negligent, i.e. failure to present FDA Dear Doctor letters to Dr. Lavin.

## STATEMENT OF UNCONSTESTED FACT 14

14. Dr. Lavin was not informed of the following incidents which Dr. Vesoulis claims should have been a part of his informed consent:

a. March 29, 2016 – patient who received the ReShape Dual Intragastric Balloon died from sepsis secondary to an esophageal perforation (MDR report notes that there was no known allegation that the death was related to the device).

b. February 9, 2017 – FDA issued a "Dear Doctor" letter regarding the chance of "spontaneous hyperinflation of balloon after placement" and "acute pancreatitis" in patients receiving intragastric balloons by various manufacturers, not limited to ReShape.

c. May 10, 2017 - patient who received the ReShape aspirated and died.

d. August 10, 2017 – FDA issued a "Dear Doctor" letter regarding five deaths in

14

patients who received intragastric balloons by various manufacturers; one death occurred in a patient who received the ReShape Dual Intragastric Balloon. This letter was sent approximately two weeks after Dr. Vesoulis' balloon insertion.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 14:**

Uncontested as to (a) and (c).  Denied as written as to (b) and (d).  Dr. Lavin's testimony was "I don't recall".

**STATEMENT OF UNCONSTESTED FACT 15**

15. The remaining incident which Dr. Vesoulis claims should have been part of his informed consent occurred on August 14, 2017, approximately two weeks after Dr. Vesoulis' balloon insertion procedure. A patient of Dr. Lavin, in which a ReShape balloon had been placed, sustained a gastric perforation requiring Surgery.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 15:**

Denied as written.  Plaintiff asserts this should have been part of his Informed Consent on the January 11, 2018 balloon removal.

**STATEMENT OF UNCONSTESTED FACT 16:**

16. Dr. Vesoulis is a dentist who has consistently practiced dentistry for the last ?? years.

**RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 16:**

It is uncontested that plaintiff is a dentist.  The remainder is denied as written.

### **STATEMENT OF UNCONSTESTED FACT 17:**

17. In his practice, Dr. Vesoulis obtains informed consents for his patients on a daily basis.

### **RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 17:**

Denied as written.  Dr. Vesoulis testified the his informed consent form used in his dental practice does <u>not</u> list death as a risk.  (Ex. "A", p.30).

### **STATEMENT OF UNCONSTESTED FACT 18:**

18. Dr. Vesoulis' informed consent was not coerced or induced by fraud.

### **RESPONSE TO STATEMENT OF ALLEGED UNCONTESTED FACT 18:**

Denied.  La. C.C. art. 1953 defines fraud:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction.

In this case there was a misrepresentation of facts:  (1) actual knowledge of a risk of death by ReShape, and (2) the actual risk, of death from sepsis secondary to esophageal perforation by Dr. Lavin and SSL.

### **STATEMENT OF CONTESTED FACTS**

The following facts are contested:

### **CONTESTED ISSUE OF FACT 1:**

Whether Paul Vesoulis D.D.S. (not M.D.) would have undergone this procedure at all had he been properly warned of the risks by Reshape, Dr. Lavin and/or SSL.  Had plaintiff been warned

16

of these deaths and the true risks involving this purely elective procedure he would have withheld his consent and declined the balloon placement on July 27, 2017. See, Deposition of Paul Vesoulis, (Ex. "A"). This presents an issue of fact that can be resolved only by the factfinder. The degree of fault to be allocated among the parties also presents issues enshrouded in fact.

## CONTESTED ISSUE OF FACT 2:

Whether plaintiff gave valid informed consent before the July 27, 2017 balloon implantation procedure and before the January 11, 2018 explantation procedure.

## CONTESTED ISSUE OF FACT 3:

It is admitted by both Reshape, Dr. Lavin and SSL that ReShape did not transmit the MDR reports from the March 29, 2016 of death from sepsis secondary to esophageal perforation and the May 10, 2017 of death from aspiration to Dr. Lavin or SSL. (Ex. "F"). ReShape failed to comply with 21 CFR § 814.39(d)(2) which does not require PMA supplements to be approved by the FDA prior to a labeling change. The parties' degree of fault are contested issues of fact as is culpability which must be weighed by the factfinder in assigning degrees of fault. Compliance with 21 CFR 814.39 is called for in the PMA Order.

## CONTESTED ISSUE OF FACT 4:

Whether ReShape, Dr. Lavin, or both were obliged to warn of "adverse events" as set forth in the Instructions for Use.

1.      On August 14, 2017 a patient of Dr. Lavin with ReShape balloons sustained a gastric perforation and had emergency surgery.  (Ex. "G").  Plaintiff was <u>never</u> advised of this event.

2.      The ReShape PAS Clinical Study Agreement, (Ex. "H"), states in paragraph 2.12 that:

> 2:12    <u>Duty to Inform.</u>  Sponsor [Reshape] and Institution [Dr. Lavin] shall immediately notify each other upon identifying any aspect of the protocol, including information discovered during site monitoring visits, or the study results that may adversely affect the safety, well-being, or medical care of participants, or that may affect the willingness of participants to continue participation in the research, influence the conduct of the study, or that may alter the Institutional Review Board's approval to continue the study.

3.      On August 15, 2017 Diane Begovich for ReShape communicated by email with Dr. Lavin's PAS coordinator, Jennifer Perilloux. (Ex. "I").  This email was produced by Dr. Lavin after he was brought into this case.

Ms. Begovich wrote:  "At his point, ReShape is leaving it to the sites to determine how to share info in the FDA update with current and future ReShape Procedure patients (both study and non-study participants)".

To which Ms. Perilloux replied:  "The statement under new findings states that any new information that is discovered during the study and which may influence your willingness to continue participation in the study will be made available to you.  I don't understand how the recent news would not need to made available to every study patient?"

18

Ms. Begovich makes it plain that prior patient deaths were not communicated to Dr. Lavin or SSL, whether study or non-study.  Ms. Perrilloux makes it equally plain that these prior adverse events of death should have been communicated.  Ms. Begovich testified:

> Q	Okay.  The Instructions For Use should be followed by the physicians that place balloons, both study participants and non-study participants.  Would you agree with that?
> THE WITNESS:
> I agree.
> Q	And you would agree that ReShape LifeSciences should also follow Instructions For Use in connection with physicians being notified of adverse events, study participants or non-study participants.  Would you agree with that?
> THE WITNESS:
> I agree.

Whether Dr. Lavin and SSL should have checked the FDA database for adverse events remains contested.

Respectfully submitted,

/s/*Franklin G. Shaw*
LEGER & SHAW
Franklin G. Shaw, Bar No. 01594
Walter J. Leger, Jr., Bar No. 88278
512 E. Boston St.
Covington, LA 70433
Telephone: 985-809-6625
Facsimile: 985-809-6626

CERTIFICATE OF SERVICE

I hereby certified that a copy of the above and foregoing pleading has been served upon all counsel of record by using the CM/ECF filing system, this 20th day of April 2021.

*/s/Franklin G. Shaw*
Franklin G. Shaw

20