```
1
            UNITED STATES DISTRICT COURT
2
            EASTERN DISTRICT OF LOUISIANA
3

4

5  PAUL VESOULIS            ) CIVIL ACTION:
       Plaintiff,           ) 19-CV-01795-
6                           ) MLCF-DMD
    vs.                     ) JUDGE: MARTIN
7                           ) L.C. FELDMAN
   RESHAPE LIFESCIENCES, f/k/a   ) MAGISTRATE:
8  ENTEROMEDICS INCORPORATED     ) DANA M. DOUGLAS
       Defendant.           )
9  _____

10         DEPOSITION OF PAUL VESOULIS taken on

11 Friday, September 11, 2020 at or about 8:45 a.m.

12 via videoconference.

13

14

15 REPORTER:  KIMBERLY D. EDWARDS, CSR,
           Certified Court Reporter
16

17 APPEARANCES:

18 FOR PLAINTIFF:
        LEGER & SHAW
19        512 East Boston Street
          Covington, Louisiana 70433
20        (985) 809-6625
          Fshaw@legershaw.com
21        BY: FRANKLIN SHAW, ESQUIRE

22

23

24

25
```

EXHIBIT A

Page 6

1  Cincinnati from 1978 to 1982. I went to Case
2  Western Reserve dental school from 1982 to 1986.
3      Q.   In your undergraduate career, what was
4  your major?
5      A.   Biology, with a minor in chemistry.
6      Q.   Did that curriculum include any anatomy
7  or physiology classes?
8      A.   Yes.
9      Q.   In your dental school curriculum did
10 you study any anatomy or physiology?
11     A.   Yes.
12     Q.   Do you recall where you graduated in
13 your dental school class?
14     A.   Out of my class we had a couple
15 different rankings. We had both didactic and
16 clinic. So I don't remember exactly, but I assume
17 I was in the middle of the pack academically and
18 then towards the high end clinically.
19     Q.   Do you have any recollection of where
20 you graduated in your undergraduate class?
21     A.   Not a clue. Good enough to get into
22 dental school.
23     Q.   Was that a rigorous process?
24     A.   It was a pretty intense program. Sure.
25 Most professional schools.

Page 7

1      Q.   Did you apply for any dental school
2  other than Case Western?
3      A.   Yes.
4      Q.   Where?
5      A.   At that time it was probably ten, ten
6  different schools. It's normal to apply to
7  multiple schools hoping to get in at a few and then
8  you make your choice on where to go.
9      Q.   Did you gain entrance into any other
10 school besides Case Western?
11     A.   Yes.
12     Q.   Do you recall where?
13     A.   A few of them I recall. West Virginia,
14 Marquette. I was waitlisted at a couple places.
15 And I believe Ohio State.
16     Q.   Where did you grow up, Doctor?
17     A.   Cincinnati, Ohio.
18     Q.   So when you went to the University of
19 Cincinnati, you basically stayed home?
20     A.   Yes. I was a commuter. I lived at
21 home.
22     Q.   Where is Case Western?
23     A.   Cleveland, Ohio.
24     Q.   How far is that from your hometown?
25     A.   About a five hour drive.

Page 8

1      Q.   How far is Case Western from where you
2  currently reside and practice?
3      A.   About two and a half hours.
4      Q.   Was Case Western your first selection
5  on dental schools?
6      A.   Yes.
7      Q.   Why?
8      A.   It had what I thought was a better
9  academic program. Smaller class size. I had
10 family that lived in Cleveland. Those three
11 reasons.
12     Q.   Doctor, we're going to talk a little
13 bit about your care by Tom Lavin. First what I
14 would like to ask you is how you came to know or be
15 in contact with Dr. Lavin?
16     A.   I met -- I was introduced to him from a
17 mutual friend who is from Toledo, Ohio.
18     Q.   Who is that?
19     A.   An individual named John Thomas.
20     Q.   Mr. Thomas was a friend of Dr. Lavin's?
21     A.   Yes.
22     Q.   And he's a friend of yours?
23     A.   Yes, he's a friend of mine.
24     Q.   Did you meet Dr. Lavin socially through
25 Mr. Thomas?

Page 9

1      A.   No.
2      Q.   So how did that occur?
3      A.   How did?
4      Q.   How did you meet Dr. Lavin through Mr.
5  Thomas?
6      A.   I had run into Mr. Thomas, noticed that
7  he had lost some weight and asked him how he had
8  achieved it. That's when he had told me about Dr.
9  Lavin in Louisiana, and I became interested. And
10 he said that I could make the connection for you to
11 talk with him.
12     Q.   And what happened after that?
13     A.   I can't remember if Dr. Lavin called me
14 or I called him. We discussed what it was and what
15 he did and the results that he could achieve from
16 it. I told him that I was interested in it and he
17 said come on down.
18     Q.   In that initial conversation what, as
19 far as you can recall, did you discuss with Dr.
20 Lavin?
21     A.   Just what the procedure was. That it
22 was nothing like the more invasive gastric
23 procedures, you know, bypass and sleeves and other
24 ones that -- other procedures that were out there
25 that were more surgical. That this was a pretty --

Page 10

1  this was a pretty benign procedure that was very
2  noninvasive and showed really good results.
3      Q.   When you say what the procedure was,
4  what do you mean?
5      A.   It was nothing that was irreversible,
6  and that it was not an invasive surgical procedure.
7      Q.   I guess what I'm trying to get at is
8  you've told me that Dr. Lavin told you what the
9  procedure was. What was that?
10     A.   That they would insert some balloons
11 into my stomach. They would stay in there for a
12 certain amount of time and then they would pull the
13 balloons out.
14     Q.   Was it your understanding that that was
15 the procedure that Mr. Thomas had undergone?
16     A.   Yes.
17     Q.   What did Mr. Thomas tell you about the
18 procedure?
19     A.   Mr. Thomas told me that he had it done
20 and that he had -- it had given him a jump start to
21 lose weight and that it worked for him.
22     Q.   In what profession is Mr. Thomas?
23     A.   Mr. Thomas is a business owner. He
24 basically runs a REIT organization, which I think
25 that's how he knows Dr. Lavin, because he's an

Page 11

1  investor within Dr. Lavin and his facilities in
2  Louisiana. And my understanding was is that's how
3  he had met Dr. Lavin, and that he was an actual
4  participant or a partner in both his private office
5  and a hospital in Louisiana.
6      Q.   Do you do any business with Mr. Thomas?
7      A.   Yes.
8      Q.   As far as you're aware, do you have any
9  ownership interest in any of the REIT's holdings in
10 Louisiana?
11     A.   Actually, I'm an investor in his
12 company, which is DOC REIT, and I am an investor in
13 DOC REIT. So I would be part -- I would have a
14 position in those holdings in those areas as well
15 as other places across the country.
16     Q.   Specifically in which Dr. Lavin also
17 holds an interest?
18     A.   I would assume so.
19     Q.   When you talked to Dr. Lavin the
20 initial time and you discussed the balloon
21 placement procedure, did you discuss any other
22 procedures?
23     A.   If I did I really don't remember. I
24 just remember that I was particularly interested in
25 this one because it was noninvasive and

Page 12

1  nonsurgical. And I have known people that have had
2  the gastric bypass and the sleeves and so forth and
3  that was a pretty more involved surgery.
4      Q.   If I understood you, you don't remember
5  specifically if Dr. Lavin called you initially or
6  you called him initially; is that right?
7      A.   Right. I don't remember.
8      Q.   Irrespective --
9      A.   I know phone numbers were transferred,
10 and I don't know who reached out to who first.
11     Q.   I understand. Irrespective of who
12 first made contact, did the conversation start with
13 you asking Dr. Lavin tell me about the balloon
14 placement?
15     A.   I had asked him to explain the
16 procedure to me and he explained it to me, that it
17 was basically a very easy, noninvasive procedure
18 that I could fly in and fly out. And that's
19 basically what I did, I flew in and flew out and
20 had it put in.
21     Q.   I didn't quite understand your answer
22 or hear you completely. Did you say an ED
23 procedure?
24     A.   An easy.
25     Q.   Easy. See, I didn't understand that.

Page 13

1      A.   An easy procedure.
2      Q.   So when you say -- and you've used the
3  term "noninvasive" a couple of times in your
4  responses. Did you understand that the balloons
5  would be placed inside your stomach through an EGD
6  procedure?
7      A.   Yes. He told me it was through an
8  upper endoscopy.
9      Q.   In your mind that's noninvasive?
10     A.   I was told that upper GIs are very
11 noninvasive and very simple and very, very, very
12 rare side effects to them. Simple. Basically he
13 had said simply sedate you, drop it in, inflate
14 them and you go home.
15     Q.   But my question is very specifically
16 does an endoscopy procedure, in your mind, equate
17 with noninvasive?
18     A.   Yes.
19     Q.   Does Dr. Lavin use the term
20 "noninvasive" when describing the procedure?
21     A.   I believe so.
22     Q.   Did you by chance record any of your
23 telephone conversations with Dr. Lavin?
24     A.   No.
25     Q.   After that initial telephone

Page 14

1  conversation what happened next insofar as your
2  communications with Dr. Lavin?
3      A.   Basically he had told me to call the
4  office and tell them when I was available and make
5  arrangements to fly down there. And that was it.
6      Q.   So when did you do that?
7      A.   I think the next day or two afterwards.
8      Q.   And how soon after that did you
9  actually fly to Louisiana?
10     A.   Probably a couple weeks. Within two or
11 three weeks.
12     Q.   On that first visit to Louisiana, is
13 that when you actually had the balloons placed?
14     A.   Yes.
15     Q.   So we're talking July of 2017?
16     A.   Correct.
17     Q.   The date on which you had the balloons
18 placed, was that the first time you ever met Tom
19 Lavin in person?
20     A.   Yes.
21     Q.   Before you ran into Mr. Thomas and
22 noticed his weight loss, had you done any research
23 on any type of bariatric procedures for weight
24 loss?
25     A.   Research, no. I just knew other people

Page 15

1  that had tried different things. You know,
2  everything from bariatric surgery to the bands to
3  bypass and so forth. And I had never really heard
4  of this procedure until Mr. Thomas had told me
5  about it.
6      Q.   Had you ever inquired with any other
7  healthcare professional before you spoke with Dr.
8  Lavin about potential weight loss procedures of any
9  kind?
10     A.   When I had learned about this
11 procedure, I spoke with my internist and my
12 orthopedic surgeon because I was anticipating a
13 knee surgery later in August and I wanted to make
14 sure it was okay with them that I went ahead and
15 did this.
16     Q.   And I understand your answer. I
17 appreciate it. But I'm not sure it fully answers
18 my question. Before your discussion with Dr. Lavin
19 about any sort of a weight loss procedure, had you
20 actually sought the advice of another healthcare
21 provider to have any sort of weight loss procedure
22 performed on you?
23     A.   No. No. So the answer is no on that.
24     Q.   Had you ever discussed with your
25 internist prior to your first conversation with Dr.

Page 16

1  Lavin any method of weight loss?
2      A.   I had tried different things, of
3  course. Everybody tries different diets whether
4  it's the Miami or Atkins or whatever.
5      Q.   I understand. But no discussions with
6  your internist about potentially seeing a bariatric
7  surgeon?
8      A.   No.
9      Q.   And before you actually arrived in
10 Louisiana did you do any internet research on the
11 procedure that you anticipated having performed?
12     A.   I don't recall looking into it. I
13 basically took it on recommendation and my
14 conversation with Dr. Lavin.
15     Q.   Do you at your office as a general
16 dentist subscribe to any online healthcare research
17 sites?
18     A.   Yes.
19     Q.   Did you research any of those sites
20 regarding the procedure you anticipated having
21 performed?
22     A.   No.
23     Q.   Would you have had access to research
24 on that particular procedure via your sites?
25     A.   That I'm not sure of because the sites

Page 17

1  that I use are mostly for therapeutics and some of
2  the new drugs that are coming out and patients
3  coming in with new drugs. And it's like okay, I
4  don't recognize this as being a typical one. And
5  that's mainly what my extent of what I would be
6  looking for.
7      Q.   What are the names of the subscriptions
8  that you have access to?
9      A.   Like WebMD. And then we have -- and
10 then if that doesn't give me specific enough
11 questions, then I'll call my pharmacist and I'll
12 ask him hey, is it something that's even newer
13 that's not even -- hasn't even hit that site.
14     Q.   What's your internist's name?
15     A.   David Grossman.
16     Q.   Is he a personal friend of yours?
17     A.   I have known him for 30 something
18 years. So yes, I would probably say he's a friend
19 of mine.
20     Q.   Do you socialize with him?
21     A.   Socialize with him, very rarely.
22     Q.   Do you socialize with any physicians?
23     A.   With any physicians, no.
24     Q.   Any other family members who are
25 physicians?

Page 18

1  A.  My older brother.
2  Q.  In what specialty does he practice?
3  A.  He's a pathologist.
4  Q.  Did you have any conversations with
5 your brother regarding the procedure that you
6 anticipated Dr. Lavin performing before you had
7 that procedure?
8  A.  No.
9  Q.  Where does your brother practice?
10  A.  He's retired.
11  Q.  Where did he practice?
12  A.  He practiced in a few different areas.
13 In Hudson, Ohio and then New York and in Illinois.
14  Q.  Doctor, before July of 2017 had you
15 ever had an upper endoscopy performed?
16  A.  Not that I recall. I've had lower.
17 I've had colonoscopies. I don't recall uppers.
18  Q.  And that would have been my next
19 question. So you have had colonoscopies prior to
20 July 2017?
21  A.  That's correct.
22  Q.  On how many occasions?
23  A.  Well, we have a familial history so I
24 was on the 3 to 5-year plan. So since my first one
25 I have -- I probably have had 4 or 5 colonoscopies

Page 19

1 including, I had had a recent one that was -- there
2 was complications from it because of my surgeries.
3  Q.  Other than the colonoscopies, Doctor,
4 have you ever had any other surgical procedures
5 throughout your life?
6  A.  Yes.
7  Q.  Before July of 2017?
8  A.  Yes.
9  Q.  Which procedures?
10  A.  I had my right knee replaced, and that
11 would have been approximately 14 years ago. I had
12 a gallbladder removed I think in 2015. '15 or '16.
13 I don't remember when. Those are the two surgeries
14 I had prior.
15  Q.  Doctor, before each of the
16 colonoscopies, before your right knee replacement
17 and before your cholecystectomy, did you execute a
18 consent to have those procedures done?
19  A.  I would assume so.
20  Q.  And before each of those procedures did
21 you execute a consent to undergo the anesthesia
22 that was necessitated by those procedures?
23  A.  I'm assuming that that's the protocol.
24 I would assume that I did.
25  Q.  And before each of those procedures did

Page 20

1 you discuss with each of your physicians and the
2 respective anesthesia team the risks associated
3 with the procedures and the anesthesia?
4  BY MR. SHAW:
5     Object to the form. It's like
6 compound. Which? The anesthesia?
7  BY MR. POIRIER:
8     If you know of an easier way to do it
9 I'll be happy to try it.
10  BY MR. SHAW:
11     Well, the physician doing the procedure
12 is separate from the anesthesiologist. Just
13 my point.
14  BY MR. POIRIER:
15     Okay. Duly noted.
16 BY MR. POIRIER:
17  Q.  Dr. Vesoulis, we'll drag it out each
18 time. Did you have the opportunity to discuss with
19 your physician performing the colonoscopies on you
20 4 to 5 times, before each procedure, the risks
21 associated with that procedure?
22  A.  The risks, I don't recall discussing
23 the risks. I recall them telling me about the
24 procedure, what they're going to give me, how long
25 I would be out for and that type of stuff. The

Page 21

1 risks always seemed to be in the paperwork that
2 always had the big death word on there, from
3 everything from blowing your nose to doing
4 whatever. So.
5  Q.  So you recall actually seeing those
6 consent forms for your colonoscopies?
7  A.  I remember signing consent forms. I
8 have consent forms in my office.
9  Q.  You mentioned that you never discussed
10 risks with your physician performing the
11 colonoscopies?
12  A.  Never to the extent of it -- a
13 colonoscopy was another pretty benign procedure.
14  Q.  Would you consider a colonoscopy a
15 noninvasive procedure?
16  A.  Yes.
17  Q.  And in fact you went ahead with that
18 procedure 4 to 5 times before July of 2017?
19  A.  Yes, because of family history. And
20 even though I wasn't supposed to, you know, you're
21 not supposed to have them until 55, but I had them
22 before because there was a family history.
23  Q.  You didn't consider any of those 4 to 5
24 colonoscopies that occurred prior to July of 2017
25 emergent, did you?

Page 30

1 tooth. Usually the more invasive ones that there
2 is -- that there would be a potential problem, most
3 of the time I would refer those people out. In
4 fact 99 percent of them I refer out. I would not
5 do them without sending them to an oral surgeon.
6 So the risk in my practice is very, very low.
7      Q.    Does your informed consent form list
8 death as a risk?
9      A.    I don't believe it does.
10     Q.    Is the informed consent form itself,
11 the one you use in your practice today, the same
12 one that you used in 2017?
13     A.    That I couldn't tell you.
14     Q.    Who could?
15     A.    I guess I could go back and look it up
16 and see what protocols have changed in my office on
17 paperwork and so forth.
18     Q.    Doctor, we've talked a little bit
19 generally about the consent forms you have signed
20 with your actual treating physicians. Now I'm
21 going to just go back and ask you globally. Before
22 each of your 4 to 5 colonoscopies, your right knee
23 replacement and your gallbladder removal did you
24 execute an informed consent or a consent form after
25 discussion with the respective anesthesia team?

Page 31

1      A.    I'm assuming --
2      Q.    I know you are a physician.
3      A.    I'm assuming that I signed consent
4 forms. Whether it was before or after a discussion
5 with them, I can't say whether it was before or
6 after.
7      Q.    Did you ever have any questions for any
8 of your anesthesia teams in those procedures?
9      A.    Questions pertaining to the type of
10 anesthesias, yes, but nothing more than how long it
11 was going to take for it and so forth. Nothing
12 more on the risk side. Just more generic
13 questions.
14     Q.    No specific questions regarding gee,
15 Doc, or Mr. or Ms. CRNA, what are the risks of this
16 anesthesia?
17     A.    No. I always assumed that they were
18 using better materials that reduced the risks as
19 much as possible.
20     Q.    Doctor, would you agree with the
21 statement that any medical procedure has a risk of
22 death?
23     A.    No.
24     Q.    Why not?
25     A.    Putting a Band-Aid on somebody is not

Page 32

1 going to -- or putting an ice pack on something,
2 that's a medical procedure. So no. I would say
3 that's too vague of a term. Or an analogy.
4      Q.    I appreciate it. Would you agree with
5 the statement that any invasive medical procedure
6 carries with it a risk of death?
7      A.    I would say yes.
8      Q.    Doctor, I sent -- let me ask you this
9 first. Have you had an opportunity to review any
10 of Dr. Lavin's or Crescent City Surgical Centre's
11 records related to your balloon insertion and your
12 balloon retrieval procedures?
13     A.    I have read over them. I can't -- you
14 know, this has been a couple years. So I might
15 have skimmed over them.
16     Q.    And I appreciate that. What I'm
17 getting at is did you have occasion to review the
18 endoscopic balloon procedure consent form that you
19 executed on July 27, 2017?
20     A.    Yes.
21     Q.    And do you recall that it's a four-page
22 document?
23     A.    I don't know how many pages it was.
24     Q.    Do you have any reason to dispute that
25 it was four pages?

Page 33

1      A.    I have no reason to dispute it, and I'm
2 assuming I signed it.
3      Q.    Now, Doc, this is one of the cumbersome
4 parts of a Zoom deposition. If we were across the
5 table I could hand you a copy and say, Doctor, do
6 you recognize this. Unfortunately I can't do that
7 because I, for one, am not technologically astute
8 enough to be able do it. But I did e-mail it to
9 everybody so that we all know everyone has a copy.
10 Unfortunately I'm assuming you don't have a copy in
11 front of you?
12     A.    I do have a copy.
13     BY MR. SHAW:
14          I sent it to him. He has a copy.
15 BY MR. POIRIER:
16     Q.    You have it in front of you?
17     BY MS. WEBRE:
18          I'm sorry to interrupt you. I can pull
19          it up if you want right here on Share Screen.
20     BY THE WITNESS:
21          I have it.
22     BY MR. POIRIER:
23          I mistakenly assumed he didn't. Thank
24          you, Frank, for sending it.
25     BY THE WITNESS: