```
              UNITED STATES DISTRICT COURT

              EASTERN DISTRICT OF LOUISIANA

*****************************************************

PAUL VESOULIS    CIVIL ACTION NO.19-CV-01795-MLCF-DMD

VERSUS           JUDGE MARTIN L.C. FELDMAN

RESHAPE          MAGISTRATE JUDGE DANA M. DOUGLAS

LIFESCIENCES,

f/k/a ENTEROMEDICS

INCORPORATED

*****************************************************




         The deposition of ERIC S. BOUR, MD,

taken on Tuesday, August 18, 2020, commencing at

9:07 a.m., via Zoom.



                      *  *  *
```



Page 42

1   And I understand the need for urgent or
2 emergent trip to the operating room, but there is
3 a delay in the timing based on the operative --
4 based on the hospital records. At the time of
5 surgery, there is this description of massive
6 gastric dilatation. It was a fairly short
7 laparoscopy, less than 45 minutes. An EGD was
8 done at the time, which did not reveal any
9 significant findings. And this was all felt to be
10 due to the patient having this massive gastric
11 dilatation. He was admitted to the hospital
12 afterwards.
13      I -- I don't -- my -- well, I'll give
14 you the facts. The morning after he had a chest
15 X-ray done, which was -- which clearly showed air
16 in the subcutaneous tissues of the neck. That was
17 at, I believe, it was 8:27 or 7:27 the morning of
18 the 12th. There is no record or indication that
19 Dr. Lavin looked at that X-ray. I believe he said
20 he didn't. He relied on the radiologist's report.
21 Radiologist's report doesn't mention it,
22 unfortunately. And the patient later that
23 afternoon develops additional subcutaneous air now
24 probable in the neck called crepitus. That air
25 was as a -- was worse than it had been in the

Page 43

1 morning based on the nursing notes and the
2 patient's wife's description.
3      The patient was complaining of
4 discomfort. He wasn't able to get comfortable.
5 He was having trouble sleeping. He was seen by
6 Dr. Lavin that afternoon who ordered an ENT
7 consult and an upper G.I. for the following
8 morning. This was around 4:00 in the afternoon,
9 again, as I recall.
10      So this is the 12th. The evening of the
11 12th the patient continues to have oxygen
12 requirements. I mean, this is a healthy guy who
13 is having oxygen requirements in the hospital.
14 He -- his clinical condition gets worse through
15 the evening, through the night. By the morning of
16 the 13th the ENT consult is -- is completed, and
17 the patient has a CT scan, which shows
18 subcutaneous air in the medi -- in the neck, head
19 and neck, mediastinal air and air tracking along
20 the left side of the esophagus at the GE junction,
21 but no extravasation of contrast.
22      And, again, I've looked at all these
23 films myself. And as a result of that the patient
24 is then taken back to the operating room where he
25 is found to have a two-millimeter tear of the

Page 44

1 esophagus above the media -- in the mediastinum
2 above the diaphragm which is repaired. He has a
3 chest tube placed and is -- and recovers from
4 that.
5   Q.  Doctor, you used the term or the phrase
6 "massive gastric dilatation." Is that, in your
7 mind, the same thing as gastric distention?
8   A.  Yeah. Dilation, dilatation, distention.
9   Q.  Are interchangeable?
10  A.  Correct.
11  Q.  Let's break it down -- your opinion
12 down, because you do have them numbered into nine
13 distinct opinions, paragraphs. Your letter to
14 Mr. Shaw is dated June 27th of 2020. Is this
15 the only report that you rendered to Mr. Shaw in
16 this matter?
17  A.  Yes.
18  Q.  So first -- your first finding at
19 page 1, you're critical of Dr. Lavin for not
20 documenting that there was a specific mention made
21 of discussing the -- and I'll quote --
22 "then-issued, all caps, FDA warnings of severe
23 complications and death in several patients who
24 underwent fluid-filled intra-gastric balloon
25 procedures." To which FDA studies are you

Page 45

1 referring?
2   A.  Not studies, but warnings about
3 intra-gastric balloons.
4   Q.  My mistake. Yes, warnings is your word.
5 To which wordings are you referring in that?
6   A.  Yeah. They issued several warnings, and
7 I don't know the dates of all of them. I have --
8 I have looked at those as part of the exhibits
9 that were issued, and they warned about these
10 complications.
11      I mean, it's like any other new
12 procedure. As we get more experience with the
13 procedure, we figure our there's complications or
14 other new things that develop. And so there were
15 warnings issued about the possibility of acute --
16 of balloon hyperinflation and pancreatitis that
17 were issued to -- that were issued by the FDA as
18 warnings for intra-gastric balloons.
19      And there were other patients who had
20 aspiration and other issues and other
21 complications.
22      And I think it's just the nature of the
23 new procedure. As we get more experience with it,
24 we figure out more things that happen.
25  Q.  So is it fair to say that your opinion

Page 46

1 is that a surgeon must expressly warn each patient
2 about any and all FDA warnings of a procedure
3 before the procedure?
4    A.   I think a surgeon should -- should warn
5 any patient about potential complications before a
6 procedure, whether or not they're issued by the
7 FDA.  It has nothing to do with the FDA.  But as
8 the FDA begins to issue warnings saying, "Hey, by
9 the way these balloons can potentially
10 spontaneously hyper-inflate or patients can
11 develop pancreatitis," we added it in to our
12 verbiage with the patients.
13         And I believe it was right around that
14 same time that we thought, you know, the -- and I
15 hate to use the vernacular, but the juice wasn't
16 worth the squeeze for putting these balloons in.
17 I mean, there's too many risks for an elective
18 procedure like this as opposed to patients who
19 undergo a surgical procedure where we would
20 discuss every risk that we could possibly tell
21 for -- I mean, surgical bariatric procedure, like
22 sleeve gastrectomy or gastric bypass, we would
23 discuss the risks.
24         And as things like internal hernias
25 became more common in laparoscopic bariatric

Page 47

1 gastric -- or laparoscopic gastric bypass, we
2 would begin to add that to the discussion with our
3 patients.
4         So I think it's up to the provider to
5 provide -- to secure that information and convey
6 that information to the patients who are
7 undergoing any bariatric procedure, which by its
8 very nature is elective.
9    Q.   Doctor, did any of the warnings from the
10 FDA to which you're referring here in paragraph
11 one address the potential for esophageal
12 perforations?
13    A.   I don't believe that those specifically
14 referred to esophageal perforation.
15    Q.   What harm came to Dr. Vesoulis from your
16 alleged breach that we've discussed in paragraph
17 one of your report?
18    A.   I think it's our duty as physicians to
19 obtain informed consent from our patients.  And so
20 by the nature of the fact that it's informed
21 consent, not uninformed consent, our job is to
22 make sure the patients understand all potential
23 risks of these procedures and then have the
24 ability to make a decision whether or not they
25 want to undergo the procedure based on an informed

Page 48

1 consent.
2         Informed consent is a paper, but it's
3 not the paper, it's the discussion that goes on
4 around the paper that's the key.  The paper is
5 just the documentation that the discussion took
6 place.
7    Q.   Is it your belief, then, that
8 Dr. Vesoulis would not have undergone gastric
9 balloons had he been given the specific FDA
10 warnings?
11    A.   From what I understand, that's correct.
12    Q.   Is that based on any conversation you've
13 had with Dr. Vesoulis?
14    A.   I have not spoken to Dr. Vesoulis.
15    Q.   You certainly have never examined
16 Dr. Vesoulis then?
17    A.   No.  I try to not go to Ohio as much as
18 possible.
19    Q.   Doctor, when you were performing gastric
20 balloons did you ever have patients who opted out
21 of receiving the balloons based on the knowledge
22 of complications?
23    A.   We absolutely did.
24    Q.   Can you recall what specifically they
25 were told that led them to -- no to proceed with

Page 49

1 the procedure?
2    A.   In many cases it was just the sheer
3 minimal amount of weight loss that the procedure
4 was providing for the patients.  They, again, felt
5 that it wasn't worth the investment of time or
6 effort.  As we learn more about the need to really
7 be extremely diligent with these patients with
8 regard to their -- the amount of work that has to
9 go on with these patients after procedures in
10 order to kind of keep them on track, the
11 behavioral changes.  As we became more
12 understanding of that, a lot of them wouldn't
13 commit to, you know, following up with the
14 dietitians and coming in and out of the office.
15         And then the complications and the risk
16 of potentially aspirating or having any, you know,
17 nausea, vomiting.  I mean, it was just the
18 symptomatic issues that the patients could develop
19 were enough for them to say, "No, I'm not
20 interested."
21    Q.   Doctor, moving on to paragraph two of
22 your June 27, 2020, report, you criticize
23 Dr. Lavin for having, "no dictated, handwritten,
24 transcribed operative reports for either the
25 ReShape Duo balloon placement or retrieval