# The *ReShape* Post Approval Study
# CLINICAL STUDY AGREEMENT

This Clinical Study Agreement (the "Agreement") is entered into on September 9, 2016 (the "Effective Date") by and among Thomas E Lavin, MD having a place of business at Surgical Specialists of Louisiana, with an address of 3100 Galleria Dr., Suite 301 Metairie, LA 70001 ("Institution") and ReShape Medical, Inc., a Delaware corporation, with its principal office and place of business at 236 Avenida Fabricante, San Clemente, California 92672 ("Sponsor").

## BACKGROUND

Sponsor and Institution have expressed a mutual interest in the Institution conducting the clinical study as set forth in the *ReShape* Post Approval Study protocol entitled, "A Prospective Multicenter Post Approval Study of the *ReShape®* Integrated Dual Balloon System in Obese Subjects," referenced as Exhibit A (as may be amended in accordance with this Agreement, the "Protocol").

## RECITALS

Whereas, the Sponsor is engaged in the commercialization of the *ReShape®* Integrated Dual Balloon System (*ReShape®* Dual Balloon), with a U.S. Food and Drug Administration ("FDA") approval date of July 28, 2015;

Whereas, Sponsor is the sponsor of a prospective, multicenter, post approval clinical study involving the use of the *ReShape* Dual Balloon (the "Clinical Study");

Whereas, the Institution and Thomas E. Lavin, MD (the "Principal Investigator") are engaged in the treatment of Obesity; and

Whereas, the Institution has the qualified personnel, experience, facilities and resources to undertake and competently conduct a clinical study pursuant to the Protocol at its facilities involving the use of the *ReShape* Dual Balloon for weight loss, and the Institution desires to perform the Clinical Study, subject to the terms and conditions set forth herein.

NOW, THEREFORE, the parties hereto agree as follows:

EXHIBIT H

# 1 PRINCIPAL INVESTIGATOR QUALIFICATIONS

1.1 <u>Principal Investigator</u>. The Clinical Study will be conducted under the supervision of the Principal Investigator, who the Institution shall engage to competently perform the Clinical Study according to the terms and conditions hereinafter set forth, and who shall act as representative for the Institution, with the participation of other clinical and research personnel of the Institution.

1.2 <u>Curriculum Vitae</u>. Within thirty (30) days of the Effective Date, the Principal Investigator shall provide Sponsor and its representatives a current, accurate Curriculum Vitae, to demonstrate Principal Investigator is qualified by training and experience to conduct the Clinical Study (as defined in Section 2.2 below).

1.3 <u>Reports</u>. The Principal Investigator hereby certifies that no clinical study in which the Principal Investigator was involved was terminated for a material noncompliance issue that would materially impact conducting the Study, whether the Principal Investigator has received any Form 483 Observations, Notice of Adverse Findings, or any regulatory letter from the FDA or similar regulatory agency, that either has not been resolved or has not been responded to in an attempt to resolve, or was ever disqualified from receiving investigational drugs or medical devices by the FDA. In the event that any of the foregoing events occur during the course of the Clinical Study, the Principal Investigator agrees to provide to Sponsor and its representatives a full written explanation of the circumstances of such incident(s) within ten (10) days of the occurrence of such event. In the event that Sponsor and its representatives, in their absolute discretion, determine that such information is not acceptable, Sponsor may terminate this Agreement by written notice to the Institution and the Principal Investigator effective immediately upon delivery.

# 2 STUDY

2.1 <u>Institutional Review Board ("IRB") Approval</u>. This study will utilize a Central IRB. In the event that the Institution requires review and oversight by its local IRB, the Principal Investigator shall be responsible for obtaining approval from the Institution's IRB of the Protocol, and the Study Subjects' informed consent form ("Informed Consent"). The Institution will allow Sponsor and its representatives to review, comment on, and approve the Informed Consent prior to its submission to the IRB. The Principal Investigator shall provide Sponsor and its representatives with written confirmation of the IRB's approval prior to the enrollment of any Study Subjects (as defined in Section 2.5 below). If the IRB withdraws approval of the Clinical Study at any time, the Principal Investigator shall immediately notify Sponsor and provide a written explanation of the circumstances leading to such withdrawal. In such event Sponsor may terminate this Agreement by written notice to the Institution and the Principal Investigator effective immediately upon delivery.

2.2 <u>Performance of the Clinical Study</u>. The Institution and Principal Investigator shall perform the research program as set forth in the Protocol in compliance with (i) generally accepted standards of good clinical practice, (ii) the Protocol, (iii) written instructions provided by Sponsor and its representatives, (iv) IRB requirements, and (v) all applicable local, state and federal laws and regulations governing the performance of post approval clinical studies.

2.3  **Informed Consent.** The Principal Investigator shall be responsible for following appropriate informed consent procedures and obtaining a signed Informed Consent for all Study Subjects prior to performing any study-specific procedures.

2.4  **Commencement and Completion.** It is anticipated that the Clinical Study will commence on the Effective Date and that Study Subject enrollment will be completed within eighteen (18) months, unless this Agreement is otherwise terminated pursuant to its terms. The parties anticipate that the Clinical Study will be completed within eighteen (18) months thereafter ("Study Term"). The Principal Investigator agrees to use his or her best efforts to complete the Clinical Study within the specified Study Term. In the event the Clinical Study is not initiated or completed by the foregoing times, Sponsor may terminate this Agreement by written notice to the Institution and the Principal Investigator effective immediately upon receipt of notification.

2.5  **Study Subject Accrual.** The Clinical Study will be conducted at approximately ten to fifteen (1015) commercial sites across the United States. Approximately 250 subjects meeting all Protocol eligibility requirements ("Study Subjects") are planned to be recruited. Enrollment will be on a competitive basis with each site enrolling as many eligible Study Subjects as quickly as possible, up to a maximum of forty-five (45) Study Subjects, unless otherwise approved by the Sponsor. The Sponsor and its representatives will notify the Institution and Principal Investigator when enrollment for the Clinical Study is complete. No other Study Subjects may be enrolled in the Clinical Study after such notification. All Study Subjects shall be enrolled pursuant to Protocol eligibility criteria and within the enrollment period. Sponsor shall not be obligated to pay any sums for additional Study Subjects who are enrolled in the Clinical Study without the Sponsor's prior written approval.

2.6  **Key Personnel.** The parties agree that the active participation of the Principal Investigator is important to the successful performance and completion of the Clinical Study. If the Principal Investigator is unable to complete his or her responsibilities under this Agreement for any reason, or withdraws from participation in the Clinical Study, the Institution shall immediately notify Sponsor, and the Institution and Sponsor shall endeavor to agree upon a successor. In the event that the Principal Investigator becomes unavailable or withdraws from the Clinical Study, and the Institution and Sponsor are unable to jointly agree upon a successor, Sponsor may terminate this Agreement as set forth in Section 11.3 below.

2.7  **Study Monitoring Visits.** Sponsor and its representatives will conduct periodic monitoring visits, at mutually acceptable times during normal business hours, to: (i) inspect and examine the Institution's facilities at which the Clinical Study is being conducted; (ii) monitor and review the progress of the Clinical Study; and (iii) inspect and copy any or all data and work product relating to the Clinical Study. The Institution and Principal Investigator shall cooperate with Sponsor and use reasonable efforts to procure and provide all information and data requested.

2.8  **Changes to the Protocol.** The Institution and/or Principal Investigator may not make modifications to the Protocol. If in the course of performing this Agreement, however, generally accepted standards of clinical study and medical practice relating to the safety of Study Subjects require a deviation from the Protocol, such standards will be followed. In such case, the party aware

of the need for a deviation will immediately inform the other parties of the facts causing such deviation as soon as the facts are known to that party.

2.9  Medical Records; HIPAA Privacy Rule.  In the event the Sponsor and its representatives shall come into contact with a Study Subject's medical records, Sponsor and its representatives shall hold in confidence the identity of the Study Subject and shall comply with all applicable law(s) regarding the confidentiality of such records. In particular, the Sponsor and its representatives shall ensure that the Institution obtains all authorizations required under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and other applicable federal and state laws from subjects participating in the Clinical Study, permitting Institution to disclose such subject's protected health information, as that term is defined under 45 C.F.R. Part 160 and Part 164, Subparts A and E, as amended, to the Sponsor, its representatives and any appropriate regulatory agencies as contemplated under the Clinical Study.

2.10  Compliance with Law – Financial Disclosure.  The Institution and Principal Investigator shall provide the Sponsor with sufficient and accurate financial information to allow the Sponsor to prepare and submit complete and accurate certification or disclosure statements. The Institution and Principal Investigator shall also promptly update this information if any relevant changes occur during the Study Term and for one (1) year following the completion of the Clinical Study. Investigator also agrees to cause any Sub-Investigators to follow these same requirements for financial disclosure.

2.11  Additional Compliance.  The parties will comply with (i) the federal anti-kickback statute (42 U.S.C. 1320a-7(b)) and, to the extent possible, the related safe harbor regulations; (ii) the Limitation on Certain Physician Referrals, also referred to as the "Stark Law" (42 U.S.C. 1395nn); and the Medicare and Medicaid program requirements as applicable. Accordingly, no part of any consideration paid hereunder is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business. Each party agrees to timely notify the other party in the event that it has identified potential violations associated with its performance under this Agreement, and describe the nature of such potential violation. In the event that any part of this Agreement is determined to violate any law or regulation, the parties agree to negotiate in good faith revisions to the provision(s) which are in violation. In the event the parties are unable to agree to new or modified terms as required to bring the entire Agreement into compliance, either party may terminate this Agreement on sixty (60) days written notice.

2.12  Duty to Inform.  Sponsor and Institution shall immediately notify each other upon identifying any aspect of the protocol, including information discovered during site monitoring visits, or the study results that may adversely affect the safety, well-being, or medical care of participants, or that may affect the willingness of participants to continue participation in the research, influence the conduct of the study, or that may alter the Institutional Review Board's approval to continue the study.

## 3 PAYMENT SCHEDULE

The Sponsor will make payments to the Institution in the amounts set forth in and pursuant to the schedule in Exhibit B ("Terms of Payment"). Exhibit B sets out the entire payment obligation hereunder for the Institution's performance under this Agreement, and includes, without limitation, compensation for all of the Institution's direct and indirect costs of materials and labor, and all overhead related thereto, in connection with the Clinical Study. In no event will Sponsor be obligated to pay to the Institution amounts in excess of the amounts set forth in the Terms of Payment without Sponsor's prior written approval.

## 4 STUDY RECORDS, REPORTS AND DATA

4.1 Study Records. The Principal Investigator shall maintain complete, accurate and current Clinical Study records as set forth in the Protocol ("Study Records"). All Study Records, including, without limitation, clinic medical records, source documents, signed Informed Consents, and results of laboratory tests or other procedures, shall be made available to Sponsor and its representatives upon request. All Study Records shall be retained by the Principal Investigator or Institution for a period of two (2) years after the latter of: (1) the date on which the Clinical Study is terminated or completed, or (2) the date that the records are no longer required for purposes of supporting the REDUCE PAS; the Sponsor will inform Investigator of applicable date and circumstance as later determined.

4.2 Subject Management. The Principal Investigator shall be responsible for (i) scheduling appropriate study-related visits for each Study Subject within the timeframes as set forth in the Protocol, and (ii) ensuring the performance of all appropriate procedures at each visit as set forth in the Protocol. The Principal Investigator shall ensure that study procedures are performed and documented with necessary and reasonable care.

4.3 Case Report Forms. The Principal Investigator shall ensure that electronic case report forms ("eCRFs"), as appropriate, are completed and submitted for each Study Subject in accordance with the Protocol. The Principal Investigator shall ensure that each eCRF is completed and submitted to Sponsor and its representatives no more than ten (10) working days after the Study Subject visit from which the data originated.

4.4 Periodic Reports. During the term of this Agreement, periodic progress reports must be prepared and submitted to the governing IRB per the IRB's requirements. Copies of progress reports must be provided to the sponsor.

4.5 Final Report. A final report must be filed with the IRB and a copy thereof provided to the Sponsor within ninety (90) days of completion of the study.

4.6 Data. All data and work product arising out of or relating to the Clinical Study, including without limitation the Study Records, eCRFs, reports and specimens shall be the sole property of the Sponsor pursuant to Article 7. Accordingly, the Sponsor shall have the right to

publish, disclose, disseminate and use, in whole or in part, the same for any and all purposes, including without limitation in submissions to the FDA.

## 5 CONFIDENTIALITY

5.1 <u>Confidential Information</u>. "Confidential Information" shall mean any information, data or material disclosed to or otherwise learned or acquired by Institution or Principal Investigator under this Agreement or otherwise in connection with the Clinical Study or related to the *ReShape* Dual Balloon. The *ReShape* Dual Balloon and all reports, documents, data and other information generated by the Principal Investigator or the Institution in connection with the Clinical Study shall be deemed to be Confidential Information of Sponsor. Notwithstanding the foregoing, Confidential Information shall not include information that: (i) was generally known and available in the public domain at the time it was disclosed, or becomes generally known and available in the public domain through no fault of the Institution or Principal Investigator; (ii) was known prior to disclosure, as evidenced by written records, prior to the Effective Date; or (iii) is received from a third party having no obligation of confidentiality to the Sponsor.

5.2 <u>Nondisclosure/Nonuse</u>. Except as otherwise expressly provided herein, for the term of this Agreement and for a period of five (5) years thereafter, Institution and Principal Investigator shall not disclose to any third party Confidential Information of Sponsor, and shall not use for any purpose other than as expressly provided herein any such Confidential Information, without the express written consent of Sponsor. Without limiting the foregoing, Institution and Principal Investigator shall disclose Confidential Information of Sponsor only to those employees of the Institution who require such Confidential Information for the purposes of this Agreement and who are bound by like obligations of confidentiality. Upon disclosing Confidential Information to any employee, the Institution and Principal Investigator shall advise such employee of the confidential nature of the information, and shall require them to take all necessary and reasonable precautions to prevent the unauthorized disclosure thereof. In the event Institution and Principal Investigator are required to disclose Confidential Information of Sponsor pursuant to the order or requirement of a court, administrative agency, or other governmental body, Institution and Principal Investigator may disclose such Confidential Information provided that the Principal Investigator and/or Institution, as applicable, provide Sponsor with reasonable advance notice thereof to enable Sponsor to seek a protective order or otherwise prevent such disclosure.

5.3 <u>Protection</u>. Institution and Principal Investigator shall maintain reasonable procedures to prevent accidental or other loss of any Confidential Information of Sponsor, and shall use at least the same procedures and degree of care that each uses to protect its own proprietary information, but in no case less than reasonable care. In the event of loss, disclosure or use of any Confidential Information in violation of this Agreement, Institution and Principal Investigator shall immediately notify Sponsor.

5.4 <u>Return of Confidential Information</u>. Except as otherwise provided herein, upon termination, cancellation or expiration of this Agreement for any reason, all documents and other tangible items reflecting Confidential Information of Sponsor, together with all copies thereof shall be promptly returned to Sponsor, provided however, that one (1) copy of Confidential Information may be retained for archival purposes. If Sponsor and its representatives request, Principal

Investigator and Institution shall provide written confirmation that they have returned all such materials to Sponsor and its representatives.

## 6   PUBLICATION

Sponsor recognizes the value of disseminating research results. It is understood that publication of results is expected. After submission of Clinical Study results for publication, notification by the Sponsor that such a submission is no longer planned, or twelve (12) months after the Clinical Study report specified in Section 4.5 is available, whichever occurs first, the Institution and Principal Investigator may publish the results of the Clinical Study, subject to the obligations of Article 5 above, this Article 6, and the approval of Sponsor in writing. The Institution shall furnish Sponsor with a written copy of any proposed publication or disclosure, including without limitation, disclosures at research seminars, lectures and professional meetings and the submission of papers for publication at least sixty (60) days prior to submission for publication or disclosure so that Sponsor may have a reasonable opportunity to protect its proprietary rights to information, inventions, or products developed under the Clinical Study. Upon Sponsor's written request, the Institution and/or the Principal Investigator shall not publish or disclose information related to the Clinical Study. Further, if Sponsor indicates that such publication or disclosure contains Confidential Information, the Institution and Principal Investigator agrees to remove such Confidential Information from the proposed publication or disclosure.

## 7   OWNERSHIP RIGHTS

The Principal Investigator and Institution agree that all right, title and interest in and to any and all discoveries, inventions, ideas, improvements, procedures and other subject matter (whether patentable or not) conceived, reduced to practice or otherwise discovered by Institution personnel (including the Principal Investigator), alone or jointly with others, in connection with performing the Clinical Study or other use of the *ReShape* Dual Balloon and all intellectual property rights therein (collectively, "Inventions") shall be the sole property of the Sponsor. The Principal Investigator and Institution shall promptly disclose any such Inventions in writing to the Sponsor. Accordingly, the Principal Investigator and Institution hereby assign to Sponsor the entire right, title and interest, both in the United States and abroad, in and to the Inventions. Principal Investigator and Institution further agree to execute or have executed any and all papers and documents which are necessary or convenient to perfect the foregoing assignment and fully implement Sponsor's proprietary rights in the Inventions, such as obtaining patents, and to fully cooperate in the prosecution, enforcement and defense of such proprietary rights. The Principal Investigator and Institution hereby designate the Sponsor as its agent for, and grants to the Sponsor a power of attorney, which power of attorney shall be deemed coupled with an interest, solely for the purpose of effecting the foregoing assignment from the Principal Investigator and/or Institution to the Sponsor.

## 8   REPRESENTATIONS AND WARRANTIES

8.1   <u>The Principal Investigator and Institution</u>. The Principal Investigator and Institution each represents and warrants that: (i) each has the legal authority and right to enter into this Agreement; (ii) neither has any obligation to any other party which is in conflict with its obligations under this Agreement; (iii) each will conduct the Clinical Study in accordance with the Protocol and

*ReShape Post Approval Study*
*Principal Investigator: Thomas E. Lavin MD*
*Agreement Date: October 12, 2016*

in full compliance with all applicable local, state and federal laws and regulations for the protection of the rights, safety and welfare of human subjects in clinical studies, and the conditions of the IRB; and (iv) the Clinical Study will not be initiated without the prior approval of the IRB, Sponsor, and the FDA.

8.2 <u>Sponsor.</u> The Sponsor represents and warrants that: (i) it has the legal authority and right to enter into this Agreement; and (ii) it has no obligation to any other party that is in conflict with its obligations under this Agreement.

8.3 <u>No Impairment; No Conflict.</u> During the term of this Agreement, the Institution will not enter into any agreement to provide services that would in any way materially impair its ability to complete the Clinical Study in accordance with the Protocol and the terms of this Agreement.

8.4 <u>No Pending Litigation.</u> The Institution and the Principal Investigator are not currently involved in, and are unaware of, any pending litigation or proceedings relating to the Institution's and/or Principal Investigator's role in the conduct of a human clinical study.

8.5 <u>Full Disclosure.</u> The Principal Investigator and the Institution have provided written notice to the Sponsor of any (i) clinical study or study in which the Principal Investigator was involved that was terminated for any reason prior to completion, (ii) receipt of Form 483 Notices of Observation from the FDA, Notice of Adverse Findings or any regulatory warning letter, and (iii) disqualifications of Principal Investigator from receiving investigational drugs or medical devices by the FDA or any comparable foreign regulatory entity. This written notice shall indicate how any such form, letter or disqualification as outlined above is being addressed by the Principal Investigator and Institution.

8.6 <u>No Debarment.</u> The Institution and the Principal Investigator hereby certify that they have not been debarred under the provisions of 21 U.S.C. §335a(a) or (b), as amended. In the event that the Institution or the Principal Investigator: (i) becomes debarred; or (ii) receives notice of action or threat of action with respect to its debarment, during the term of this Agreement, the Institution and the Principal Investigator agree to notify the Sponsor immediately. In the event that the Institution or the Principal Investigator becomes debarred as set forth in clause (i) above, this Agreement will automatically terminate without any further action or notice by any party hereto. In the event that the Institution or the Principal Investigator receives notice of action or threat of action as set forth in clause (ii) above, the Sponsor will have the right to terminate this Agreement immediately.

8.7 <u>No Services of Debarred Persons.</u> The Institution and the Principal Investigator hereby certify that they have not and will not use in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. §335a(a) or (b), as amended. In the event the Institution or the Principal Investigator becomes aware of the debarment or threatened debarment of any individual, corporation, partnership or association providing services to the Institution or the Principal Investigator which directly or indirectly relate to the Institution's or the Principal Investigator's activities under this Agreement, the Institution and the Principal Investigator will notify the Sponsor immediately. The Sponsor will have the right to terminate this Agreement immediately upon receipt of such notice.

8.8 <u>No Other Warranties</u>. EXCEPT FOR THE LIMITED WARRANTIES GIVEN IN THIS ARTICLE 8, SPONSOR, PRINCIPAL INVESTIGATOR AND INSTITUTION MAKE AND RECEIVE NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO THE SUBJECT MATTER CONTAINED HEREIN, AND EACH EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE.

## 9   INDEMNIFICATION AND INSURANCE

9.1 <u>Sponsor Indemnification</u>. Sponsor shall hold harmless and indemnify the Institution, its trustees, officers, medical and professional staff (including the Principal Investigator), employees, agents, successors or assigns ("Institutional Indemnitee") from and against amounts paid to third parties as a result of third party claims by reason of personal injury to any person or damage to property arising out of or in connection with the performance of any activities performed solely and uniquely for the purposes of the Clinical Study hereunder (including additional blood draws to assess diabetes and hyperlipidemia and additional follow-up diagnostic endoscopies); provided that the Institution (i) promptly notifies Sponsor in writing of obtaining knowledge of such claims; (ii) gives Sponsor sole control over the defense and/or settlement thereof; and (iii) at Sponsor's request and expense, provides full information and reasonable assistance to Sponsor with respect to such claims. Notwithstanding the foregoing, Sponsor will have no liability arising out of or relating to claims resulting from performance of standard medical procedures required during normal use of the *ReShape* Dual Balloon, or as covered under Section 9.2 below.

9.2 <u>Institution Indemnification</u>. Institution shall hold harmless and indemnify the Sponsor, their directors, officers, employees, agents, successors or assigns from and against all costs resulting from third party claims by reason of the negligence, recklessness or willful misconduct of the Principal Investigator or Institution, breach of this Agreement by the Principal Investigator or Institution, or failure of the Principal Investigator or the Institution to adhere to the Protocol, Sponsor's written instructions with respect to the Clinical Study, or applicable FDA or other governmental requirements; provided that the Sponsor (i) promptly notifies Institution in writing of such claims; (ii) gives Institution sole control over the defense and/or settlement thereof; and (iii) upon Institution's request and expense, provides full information and reasonable assistance to Institution with respect to such claims.

9.3 <u>Right to Participate</u>. With respect to claims brought under Sections 9.1 or 9.2 above, the indemnified party, at its own expense, shall have the right to participate with counsel of its own choosing in the defense and/or settlement of any such third party claim.

9.4 <u>Insurance</u>. The Sponsor and Institution each shall, at its own expense, maintain a policy or program of insurance or self-insurance at levels reasonable and customary in the medical device industry and sufficient to support the indemnification obligations assumed herein. During the term of this Agreement and upon one party's request, the other party shall provide such party with a certificate of insurance and shall provide to such party thirty (30) days' prior written notice of cancellation of such insurance.

## 10    STUDY SUBJECT INJURY

Without limiting Section 9.1 above, the Sponsor shall reimburse the Institution for reasonable and necessary medical expenses incurred by Institution for treatment of a Study Subject as a direct result of activities performed solely and uniquely for the purpose of this study in accordance with the protocol (including additional blood draws to assess diabetes and hyperlipidemia and additional follow-up diagnostic endoscopies), provided such expenses are not covered by the Study Subject's medical or hospital insurance coverage or governmental programs, provided, however, that Sponsor's obligations under this Section 10 shall not apply to the extent that any such costs or such illness or injury is attributable to:

i. The failure of any Institution Indemnitee or any other Institution personnel involved in the Clinical Study to adhere to the terms of the Protocol or any written instructions provided to Institution by Sponsor (including, without limitation, package inserts, where appropriate) relative to the use of any product(s) used in the performance of the Clinical Study, or comply with applicable FDA or other government requirements;
ii. Any negligent or wrongful act or omission, or willful malfeasance, of any Institution Indemnitee;
iii. The Study Subject's primary disease or any concurrent disease is not directly and solely caused by the performance of the Clinical Study in accordance with the Protocol; or
iv. Performance of standard medical procedures required during normal use of the *ReShape* Dual Balloon.

Medical expenses necessary to treat an injury related to the *ReShape* Procedure and all other procedures performed as part of the normal treatment for obesity will not be reimbursed by the Sponsor.

## 11    TERM AND TERMINATION

11.1    Term. This Agreement shall begin on the Effective Date and remain in full force and effect until the completion of the Clinical Study and submission of the final report pursuant to Section 4.5 above, unless earlier terminated in accordance with this Article 11.

11.2    Termination at Will. The Sponsor may terminate this Agreement upon thirty (30) days' prior written notice to the other parties hereto.

11.3    Termination by Sponsor. In the event that the Principal Investigator becomes unavailable or withdraws from the Clinical Study, and the Institution and Sponsor are unable to jointly agree upon a successor within fifteen (15) days after Sponsor is so notified, Sponsor may terminate this Agreement by written notice to the Institution effective immediately upon delivery.

11.4    Termination by the Institution and/or Principal Investigator. The Institution and/or Principal Investigator may terminate this Agreement upon thirty (30) days' prior written notice to the other parties of such parties' material breach of this Agreement if such breach is not cured within such thirty (30) day period.

11.5 **Effect of Termination.** In the event of termination of this Agreement, for any reason, the Principal Investigator shall: (i) notify the IRB that the Clinical Study at the Institution has been terminated; (ii) cease enrolling Study Subjects in the Clinical Study; (iii) cease treating Study Subjects according to the Protocol as directed by Sponsor to the extent medically permissible and appropriate; and (iv) terminate as soon as practicable, but in no event more than thirty (30) days after the effective date of termination, all other Clinical Study activities; provided however, that upon Sponsor's request, the Institution and Principal Investigator shall continue to collect data and prepare and complete CRFs for Study Subjects treated in the Clinical Study prior to termination. Within ninety (90) days from the effective date of any termination, the Principal Investigator and Institution shall provide to Sponsor and its representatives all data collected in connection with the Clinical Study including without limitation Annual Reports and the final written report described in Section 4.5 above, and except as otherwise provided herein, shall return to Sponsor any materials and Confidential Information provided by Sponsor for the conduct of the Clinical Study in accordance with Section 5.4 above, provided, however that one (1) copy of Confidential Information may be retained for archival purposes. Sponsor shall provide payments due for CRFs submitted prior to the effective date of termination or within ninety (90) days thereafter, in compliance with the terms of this Agreement.

In addition, Sponsor agrees to reimburse Institution for reasonable non-cancelable obligations properly incurred for the Clinical Study by the Institution prior to the effective date of termination.

11.6 **Survival.** Termination of this Agreement by any party shall not affect the rights and obligations of the parties accrued prior to the effective date of such termination. The rights and duties under Articles 5, 6, 7, 8, and 10, Sections 1.3, 4.5, 9.1, 9.2, 9.3, 11.5, 11.6, 12.1, 12.2, and 12.6, and the last sentence of Section 4.1 shall survive the expiration or termination of this Agreement for any reason and such Sections shall continue in effect.

## 12   MISCELLANEOUS

12.1 **Use of Names.** No party to this Agreement shall use the name or other identifying marks of any other party in any advertising, promotional or sales literature or in any publicity without the prior written consent of the party whose name or mark is to be used. Notwithstanding the foregoing, no party shall unreasonably withhold its consent to any use of its name, which accurately and appropriately describes the scope and nature of the parties' participation in the Clinical Study, and which does not imply directly or indirectly any endorsement of the other party or its products by the party whose name is to be used.

12.2 **Publicity.** Each of the parties hereto agrees not to disclose to any third party the terms of this Agreement without the prior written consent of the other parties hereto, except to advisors and existing or prospective investors on a need-to-know basis under circumstances that reasonably ensure the confidentiality thereof, or to the extent required by law.

12.3 **Assignment.** The parties agree that their rights and obligations under this Agreement may not be delegated, transferred or assigned to a third party without prior written consent of the other parties hereto. Notwithstanding the foregoing, Sponsor may transfer or assign its rights and obligations under this Agreement to a successor to all or substantially all of its business or assets

pertaining to the subject matter of this Agreement whether by sale, merger, operation of law or otherwise.

12.4 Force Majeure. No party hereto will be held liable or responsible to the other parties, nor be deemed to have defaulted under or breached this Agreement, for failure or delay in fulfilling or performing any term of this Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party, including, without limitation, fire, floods, earthquakes, natural disasters, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God, or acts, omissions or delays in acting by any governmental authority or other party hereto.

12.5 Notices. Any notice required or permitted hereunder shall be in writing and shall be deemed to have been delivered (i) when delivered by hand; or (ii) when shipped by private express carrier (such as FedEx), shipping charges prepaid, to the party to whom delivery shall be made at the respective addresses as set forth below, or such other address as the party may substitute by written notice; or (iii) when faxed to the number set forth below with confirming letter mailed thereafter under the conditions described in (ii).

If to Sponsor:    ReShape Medical, Inc.
                  100 Calle Iglesia
                  San Clemente, California 92672
                  Attn.: Mary Lou Mooney
                  Fax: (949) 429-6684

If to Institution:   Surgical Specialists of Louisiana
                     3100 Galleria Dr., Suite 301
                     Metairie, LA 70001
                     Attn: Jennifer Perilloux

If to Principal     Surgical Specialists of Louisiana
Investigator:       3100 Galleria Dr., Suite 3014720
                    Metairie, LA 70001

12.6 Governing Law. This Agreement shall be governed and construed by the laws of California, without reference to its conflict of laws principles. Any dispute or claim arising out of or in connection with this Agreement or the performance, breach or termination thereof shall be subject to the exclusive jurisdiction of the state and Federal courts located in California. The parties hereby agree to the venue and exclusive jurisdiction of such courts.

12.7 Limitation of Liability. IN NO EVENT SHALL SPONSOR BE LIABLE TO THE INSTITUTION OR THE PRINCIPAL INVESTIGATOR FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE SUBJECT MATTER HEREOF, HOWEVER CAUSED AND WHETHER SUCH CLAIM IS BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EVEN IF

AN AUTHORIZED REPRESENTATIVE OF SPONSOR IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL BE RESTRICTED TO THIS CLINICAL STUDY ONLY AND SHALL NOT EXTEND TO ANY OTHER CURRENT OR FUTURE STUDY CONTRACT AGREEMENTS BETWEEN SPONSOR AND PRINCIPAL INVESTIGATOR.

12.8 Modification; Waiver. This Agreement may not be altered, amended or modified in any way except in writing signed by the parties. The failure of a party to enforce any provision of this Agreement shall not be construed to be a waiver of the right of such party to thereafter enforce that provision or any other provision or right.

12.9 Severability. In the event that any provision of this Agreement is determined to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect without said provision. The parties shall negotiate in good faith a substitute clause for any provision declared illegal, invalid or unenforceable, which shall most nearly approximate the original intent of the parties in entering this Agreement.

12.10 Independent Contractors. The parties agree that the relationship between the Sponsor, the Institution and Principal Investigator created by this Agreement is that of independent contractors and that neither the Principal Investigator nor the Institution may create or assume any obligations on behalf of the Sponsor.

12.11 Entire Agreement. This Agreement, the Investigator Agreement and the Exhibits attached hereto represent the entire understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior discussions, agreements and writings in respect to such subject matter. In the event of any inconsistency between this Agreement and the Exhibits, the terms of this Agreement shall govern.

12.12 Counterparts. This Agreement may be executed in counterparts and delivered by fax, each of which shall be deemed an original, and all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Agreement.

**INSTITUTION**

SURGICAL SPECIALISTS OF LOUISIANA, LLC

By: _____
Name, Title

**SPONSOR**

RESHAPE MEDICAL, INC.

By: _____
Mary Lou Mooney
Vice President of Regulatory, Clinical, and Quality

The undersigned Principal Investigator hereby agrees to accept responsibility for the conduct of the Clinical Study in accordance with this Agreement, including the confidentiality obligations set forth herein, the Protocol, and for providing such reports, records, approvals and notices as required herein.

PRINCIPAL INVESTIGATOR

THOMAS E. LAVIN, MD

Signature: _____

## EXHIBIT A

## STUDY PROTOCOL

The protocol referenced in this agreement is the December 21, 2015 version of the protocol for the ReShape Post Approval Study entitled, "A Prospective Multicenter Post Approval Study of the *ReShape*™ Integrated Dual Balloon System in Obese Subjects."

## EXHIBIT B

## TERMS OF PAYMENT

As consideration for performance under the terms of this Agreement, the Sponsor shall provide financial remuneration for the Clinical Study as follows:

**To the Institution:**
- Payments are limited to those described per the attached study budget.
- Payments will be made on a quarterly basis commencing after the first monitoring visit, based on completed, monitored case report forms. No invoices need to be submitted for routine costs; payments will be automatically generated and sent with detailed accounting.
- Institution will need to submit invoices for PPI medication (limited to subjects with ulcers that meet the protocol-specified ulcer follow up requirement). Invoices will be paid within 45 days of receipt.

| | |
|---|---|
| Checks will be made payable to: | Surgical Specialists of Louisiana |
| Checks will be sent to: | Surgical Specialists of Louisiana |
| Payment address: | 3100 Galleria Dr., Suite 301<br>Metairie, LA 70001 |
| Attention: | Jennifer Perilloux, Study Coordinator |
| Institution Tax I.D. No.: | 72-1482691 |

# Study Budget

A. Site Fees (for completed visits)

| Visit | Fee |
|---|---|
| Screening | $400 |
| Day 0 | $250 |
| Week 1 | $200 |
| Week 4 | $200 |
| Week 8 | $100 |
| Week 12 | $200 |
| Week 16 | $100 |
| Week 20 | $100 |
| Week 24 | $350 |
| Week 28 | $100 |
| Week 32 | $100 |
| Week 36 | $100 |
| Week 40 | $100 |
| Week 44 | $100 |
| Week 48 | $300 |

B. Subject Stipends

| Visit | Stipend ($25 Stipends will be increased to $37.50 and $50 stipends will be increased to $75 if subject completes the visit within the specified protocol visit window) |
|---|---|
| Day 0, Week 24, Week 48 | $50 per visit |
| Screening, Week 1, Week 4, Week 8, Week 12, Week 16, Week 20, Week 28, Week 32, Week 36, Week 40, Week 44 | $25 per visit |

C. Invoiceable Items (limited to specified tests and study time points)

| Laboratory Test | Fee |
|---|---|
| Pregnancy Test (serum) @ screening | $15.38 |
| Pregnancy Test (urine) @ Day 0 | No charge (SOC) |
| Hemoglobin & Hematocrit @ screening, Week 24 and Week 48 | $8.22 (SOC at screening only) |
| H. Pylori @ screening | $65.00 |
| Fasting lipids (cholesterol, LDL, HDL, triglycerides) @ screening, Week 24 and Week 48 | $7.88 |
| HbA1C @ screening, Week 24 and Week 48 | $8.48 |
| Fasting glucose @ screening, Week 24 and Week 48 | $3.16 |

| Ulcer Follow-up (Per protocol) | Fee |
|---|---|
| Endoscopic examination of stomach (inclusive of facility fees and supplies, anesthesia professional fees, MD and tech professional fees) | $1800 |
| PPI Medication (8-week course) | TBD (requires invoice) |
| Associated data collection and entry | $150 |

# ReShape Medical

## Signature Authorization and Delegation of Authority

**Principal Investigator:** Thomas Lavin, MD  
**Protocol No:** The RESHAPE PAS Study  
**Site #:** 02  
**Page** 1 **of** 1

| Printed Name | Signature | Initials | Title | Dates Involved on Study | | Study Responsibilities [Enter codes from list below or specify if not listed] |
|---|---|---|---|---|---|---|
| | | | | Start Date | End Date | |
| Jennifer Penillouy | [signature] | JP | Study Coordinator | 10/3/16 | | 1,2,3,8,9,11 |
| Laura Boyer | [signature] | LB | RN | 10/3/16 | | 1,2,3,6,7,8,10,11 |
| Vesna Batchelder | [signature] | VB | RD | 10/3/16 | | 7 |
| Ramsey Schmitz | [signature] | RS | RN | 10/3/16 | | 1,2,3,5,6,7,8,10,11 |
| Thomas E. Lavin, MD | [signature] | TL | PI | 10/3/16 | | 1,2,3,4,5,10,11,12,13,14 |

**Task Codes:**
1) Screening
2) ICF Administration
3) Medical History
4) Physical Exam
5) Labs review/signoff

6) Vitals
7) Diet & Exercise Counseling
8) Source Document Completion
9) CRF Completion/Corrections
10) AE Review & Assessment

11) Medication Assessment
12) Endoscopy
13) Dual Balloon Insertion
14) Dual Balloon Retrieval

By signing below the Principal Investigator delegates the noted tasks to the personnel listed above.

Principal Investigator Signature: [signature]  Date: 10/18/16

v.05AUG16

ReShape Medical

# Signature Authorization and Delegation of Authority

| Principal Investigator: | Thomas Lavin, MD | Site #: 02 |
|---|---|---|
| Protocol No: | The RESHAPE PAS Study | Page 1 of __ |

| Printed Name | Signature | Initials | Title | Dates Involved on Study | | Study Responsibilities [Enter codes from list below or specify if not listed] |
|---|---|---|---|---|---|---|
| | | | | Start Date | End Date | |
| Jennifer Penilloux | [signature] | JP | Study Coordinator | 10/3/16 | | 1,2,3,8,9,11 |
| Laura Boyer | Laura Boyer | LB | RN | 10/3/16 | | 1,2,3,6,7,8,10,11 |
| VESTA BATCHELDER | [signature] | VB | RD | 10/3/16 | | 7 |
| Ramsey Schmitz | [signature] | RS | RN | 10/3/16 | | 1,2,3,5,6,7,8,10,11 |
| Thomas E. Lavin, MD | [signature] | TL | PI | 10/3/16 | | 1,2,3,4,5,10,11,10,13,14 |

### Task Codes:
1) Screening
2) ICF Administration
3) Medical History
4) Physical Exam
5) Labs review/report
6) Vitals
7) Diet & Exercise Counseling
8) Source Document Completion
9) CRF Completion/Corrections
10) AE Review & Assessment
11) Medication Assessment
12) Endoscopy
13) Dual Balloon Insertion
14) Dual Balloon Retrieval

By signing below the Principal Investigator delegates the noted tasks to the personnel listed above.

Principal Investigator Signature: [signature]  Date: 10/18/16

v.05AUG16