```
1
              UNITED STATES DISTRICT COURT
2
              EASTERN DISTRICT OF LOUISIANA
3

4

5  PAUL VESOULIS            ) CIVIL ACTION:
      Plaintiff,            ) 19-CV-01795-
6                           ) MLCF-DMD
   vs.                      ) JUDGE: MARTIN
7                           ) L.C. FELDMAN
   RESHAPE LIFESCIENCES, f/k/a ) MAGISTRATE:
8  ENTEROMEDICS INCORPORATED    ) DANA M. DOUGLAS
      Defendant.            )
9  _____

10         DEPOSITION OF PAUL VESOULIS taken on

11 Friday, September 11, 2020 at or about 8:45 a.m.

12 via videoconference.

13

14

15 REPORTER:   KIMBERLY D. EDWARDS, CSR,
             Certified Court Reporter
16

17 APPEARANCES:

18 FOR PLAINTIFF:
       LEGER & SHAW
19       512 East Boston Street
         Covington, Louisiana 70433
20       (985) 809-6625
         Fshaw@legershaw.com
21       BY: FRANKLIN SHAW, ESQUIRE

22

23

24                                                 EXHIBIT

25                                                    D
```

**EXHIBIT D**

Page 26

1   A.   23 years.
2   Q.   Congratulations. That's a feat in
3 these days.
4        Doctor, tell me about your first
5 conversation with Dr. Lavin?
6   A.   Hi, how do you do, are you ready to do
7 this, let's do it. It was real quick.
8   Q.   How long was the conversation?
9   A.   Not very long.
10  Q.   Did Dr. Lavin discuss with you again
11 the process to be undergone in the procedure?
12  A.   Real quickly, yes. Going to sedate
13 you, NG tube, put the balloons in, inflate them,
14 and then you go on from there and then we take them
15 out in six months.
16  Q.   Did you execute an informed consent
17 form in front Dr. Lavin?
18  A.   Yes.
19  Q.   Did you discuss the form with him?
20  A.   Discuss it, probably not. I skimmed
21 over it.
22  Q.   Did you have any questions for Dr.
23 Lavin regarding any of the risks of the procedure?
24  A.   Yes.
25  Q.   What was it?

Page 27

1   A.   I specifically asked him, I said this
2 is a pretty benign, safe procedure. Yes. It's a
3 simple scope, insert the balloons, inflate them and
4 pull the tube out and you're good to go.
5   Q.   And in fact was your experience just
6 that?
7   A.   The night after the balloons were put
8 in I did have some issues with some vomiting and so
9 forth where I had to -- I ended up staying. I
10 ended up not going back to Toledo. I ended up
11 staying. And I had to go in and he sent his nurse
12 in to give me some I.V. fluids because they were
13 afraid I was becoming too dehydrated.
14  Q.   Were you aware before you had the
15 procedure that postplacement vomiting was a known
16 complication or risk?
17  A.   I wasn't aware of it, but when I went
18 back and read the consent form I saw that it was on
19 there. It was nothing that -- it was pretty
20 simple. It gave you a sense of fullness. He
21 explained to me that it made me feel full so you
22 don't want to eat. That's the whole premise behind
23 it.
24  Q.   Did you read the consent form before
25 you executed it?

Page 28

1   A.   I skimmed it. I can honestly say I
2 probably didn't read it word for word.
3   Q.   You use consent forms in your practice
4 I think you mentioned, Doctor?
5   A.   Yes.
6   Q.   How long are they?
7   A.   Probably a page, page and a half.
8   Q.   Do you review those with your patients
9 each time that they are signed?
10  A.   I can't say that I do the whole time.
11 Whether I do or whether my staff does. You know,
12 basically it's signed, and I'm not so sure if it's
13 more of clerical thing versus discussing it. It
14 also depends on the procedure.
15  Q.   Well, that was going to be my next
16 question. For what procedures do you actually need
17 your patients to sign an informed consent?
18  A.   Well, as a general rule my consent form
19 is pretty broad that they are consenting to dental
20 treatment. If I'm doing a surgical procedure where
21 I'm actually removing wisdom teeth, then it's a
22 little bit more involved.
23  Q.   The consent form is more involved?
24  A.   It's a little bit more involved. Yes.
25 And my discussion with them about complications

Page 29

1 that can occur.
2   Q.   Let me break that into two different
3 things. I want to make sure I understand. In a
4 surgical procedure such as removal of wisdom teeth,
5 which begs the question, is removal of wisdom teeth
6 the only surgical procedure you perform?
7   A.   Well, extractions would be the only
8 thing that's considered a surgical procedure.
9   Q.   So whether it be wisdom teeth or any
10 other tooth?
11  A.   That's correct.
12  Q.   So when you have a patient that needs
13 an extraction is there a different informed consent
14 form that you use with that patient versus just a
15 more simple procedure?
16  A.   No. It's the same generalized consent
17 form but I just reinforce it a little bit more.
18  Q.   So no matter what the procedure, the
19 form is the same. When you have an extraction
20 patient you spend a little more time discussing the
21 risks and/or complications?
22  A.   Yes. Depending on the extraction.
23  Q.   What would change your discussion based
24 on the type of extraction?
25  A.   Well, it depends on the location of the

Page 38

1  A.  Yes.
2  Q.  Okay. Doctor, were you also provided
3  an additional anesthesia consent form that, like
4  the first one we discussed, is four pages in
5  length?
6  A.  Yes. It looks to be exactly the same
7  thing because I'm assuming it was the same
8  anesthesia group.
9  Q.  So on the first page of that four-page
10 anesthesia consent form, this second set of forms
11 is also marked general anesthesia?
12 A.  Yes.
13 Q.  And on each of those four pages at the
14 lower right corner your name and date of birth are
15 written by hand?
16 A.  Yes.
17 Q.  Is that your handwriting this time?
18 A.  No, it's not.
19 Q.  Okay. Doctor, on the fourth page of
20 the consent form, is that your signature?
21 A.  Are you talking about the anesthesia
22 one?
23 Q.  Yes.
24 A.  Yes, that's -- yes.
25 Q.  The fourth page of the four-page

Page 39

1  anesthesia consent form which is dated January 11,
2  2018?
3  A.  That's correct.
4  Q.  Okay. That is your signature?
5  A.  Yes.
6  Q.  Did you discuss with Dr. Lavin before
7  the removal of the intragastric balloon the risks
8  of that procedure?
9  A.  I think it was vague, like before. We
10 put you under. We put the endoscopy back down
11 there. We drain the balloons and we extract them,
12 and you go home and have a nice day.
13 Q.  Did you read the two-page consent form
14 that Dr. Lavin or his office provided to you before
15 the intragastric balloon removal?
16 A.  I have read it subsequently at greater
17 length, but I'm sure that I skimmed through it that
18 time just like I did the first time.
19 Q.  So the answer to my question is no, you
20 did not read it completely before the intragastric
21 balloon removal?
22     BY MR. SHAW:
23         Object to the form. He answered it.
24 BY MR. POIRIER:
25 Q.  You can answer, Doctor.

Page 40

1  A.  If you mean read it word for word, line
2  by line, I skimmed it. So I'm assuming that I had
3  to look at it to sign it. So at what great length,
4  I can't tell you that.
5  Q.  After skimming the two-page removal
6  consent form did you have any questions for Dr.
7  Lavin regarding any risks?
8  A.  I remember kind of saying to him, hey,
9  this is a piece of cake, right? He said yep, just
10 like putting them in.
11 Q.  Doctor, before or after executing the
12 four-page general anesthesia consent form on
13 January 11, 2018, did you discuss with the
14 anesthesiologist any of the risks of that
15 anesthesia?
16 A.  No. The conversation was this is the
17 same as what we did before. And I said okay.
18 Q.  Doctor, before you had the placement of
19 the intragastric balloons you were familiar with
20 the esophagus, weren't you?
21 A.  Before -- I'm not sure I understand
22 what you're --
23 Q.  Well, I mean from your training as a
24 dentist in your undergraduate biology coursework
25 and anatomy classes, you know what the parts of the

Page 41

1  body are, don't you?
2  A.  Yes. But particularly I had -- our
3  anatomy consisted of very, very little. 90 percent
4  of our anatomy knowledge in dental school was head.
5  Q.  Yeah. That's why I just asked you the
6  question generally. You knew what the esophagus
7  was before July of 2017?
8  A.  Of course.
9  Q.  And you know what a perforation is,
10 don't you, Doctor?
11 A.  Yes.
12 Q.  Doctor, have you ever met Dr. Eric
13 Bour?
14 A.  I don't recall the name.
15 Q.  Have you ever spoken with him?
16 A.  I would have to know who he is first to
17 know if I could have possibly spoken to him.
18 Q.  He's a general surgeon contracted on
19 behalf of you by Mr. Shaw to serve as the expert.
20 He's testifying against Dr. Lavin in this matter.
21 Have you not ever spoken to him or met him?
22 A.  No, I have not.
23 Q.  Have you ever seen his written report
24 or deposition testimony?
25 A.  I have read through this. Yes.

Page 42

1  Q.  Doctor, do you recall executing an
2  affidavit in April of this year?
3  A.  Yes.
4  Q.  With five discreet points on it?
5  A.  Yes.
6  Q.  The first of which reads, and I'll
7  quote, Subsequent to the January 11, 2018
8  laparoscopy, Dr. Lavin stated that he did not
9  discover the esophageal tear because he did not
10 look high enough, end quote.
11      What do you mean by that?
12 A.  After the esophageal perforation repair
13 on Saturday, I recall him telling me if I would
14 have looked up high enough, I would have seen it.
15 I did not look up high enough.  These are instances
16 that make one think about retiring.  And I should
17 have looked higher than I did and I didn't.
18 Q.  What did that mean to you?
19 A.  It means to me that when he did the
20 emergency lap on that Thursday night, that he
21 didn't look high enough to see if there was a
22 possible perforation of my esophagus.
23 Q.  Did you understand there was any
24 additional risk to you or procedure to be
25 undertaken for him to be able to see higher than he

Page 43

1  looked laparoscopically?
2  A.  No.  I'm not that familiar with the
3  anatomy to know.  But my feeling was if he's a
4  general surgeon he should have access to that.  And
5  if it was a genuine risk of an esophageal
6  perforation, then he probably should have looked to
7  see.
8  Q.  Do you know what the mediastinum is?
9  A.  Mediastinum is your midline, yes.
10 Q.  Do you know if the mediastinum, above
11 the mediastinum is an area that is visible via
12 laparoscopy?
13 A.  I don't have a clue.
14 Q.  Doctor, the second point of your
15 affidavit reads, and I'll quote, Dr. Lavin never
16 advised Paul Vesoulis of the gastric rupture which
17 occurred on August 14, 2017, end quote.
18      What gastric rupture of August 14, 2017
19 are you referring to?
20 A.  I'm referring to the one that was told
21 to me by my attorney that did the research and
22 advised me of that.  And no, I was never told that.
23 Q.  You didn't have a gastric rupture?
24 A.  I don't know what -- in what scenario
25 they are using the gastric rupture versus

Page 44

1  perforation.  Gastric rupture I'm assuming means
2  that the stomach ruptured, not the esophagus.  I
3  don't know what that means.  But he never advised
4  me of any adverse occurrence.
5  Q.  Did you have a gastric rupture on
6  August 14, 2017?
7  A.  Did I have a gastric rupture, no.
8  Q.  So point 2 is not something you're
9  talking about occurred to you?
10 A.  No.
11 Q.  Why would it matter to you if Dr. Lavin
12 had a patient that suffered a gastric rupture three
13 weeks after you had your balloons inserted?
14 A.  I don't know, except that it was an
15 adverse occurrence.
16 Q.  Have you ever had a patient who had an
17 adverse occurrence?
18 A.  Have I ever had a patient, sure.
19 Q.  When that occurs do you tell every
20 subsequent patient about the adverse occurrence?
21 A.  No.  I use it as a learning tool for
22 myself on why it happened and how it could be
23 prevented.
24 Q.  Doctor, the third point of your
25 affidavit states, and I quote, Dr. Lavin never

Page 45

1  advised Paul Vesoulis of the deaths, or death, by
2  esophageal tear as reported by the FDA, end quote.
3      Do you know anybody that died from this
4  procedure?
5  A.  Do I know anybody that died, no.  But I
6  have found out subsequently that there were deaths
7  associated with it.
8  Q.  Do you know when those deaths occurred?
9  A.  I'm sure that I read it, but I couldn't
10 tell you when.  But I was never advised that there
11 were any deaths that had occurred.
12 Q.  When you say you were never advised
13 that any deaths had occurred, when do you mean?
14 A.  When?  In the conversation before we
15 put the balloons in.  Have there been any adverse
16 occurrences, is this something safe, are you sure.
17 Piece of cake.  Never a problem.  If there is a
18 problem, we take the balloons out.  Death was never
19 even mentioned that it was a possibility.
20 Q.  But it was mentioned in your consent
21 forms in 2017, wasn't it?
22     BY MR. SHAW:
23        Object to form.
24     BY THE WITNESS:
25        Yeah.  But it is when you get on an